UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GE DANDONG; LOH TUCK WOH PETER;
SINGAPORE GOVERNMENT STAFF CREDIT
COOPERATIVE SOCIETY, LTD; NI YAN AMY;
ANG SOO CHENG; CHOH GEK HONG JOHNSON;
NG SHOOK PHIN SUSAN; and ZHAO YUZHENG,

              Plaintiffs,

        -vs.-

PINNACLE PERFORMANCE LIMITED; MORGAN
STANLEY ASIA (SINGAPORE) PTE; MORGAN
STANLEY & CO. INTERNATIONAL PLC;
MORGAN STANLEY CAPITAL SERVICES INC.;
MORGAN STANLEY & CO. INC.; and MORGAN
STANLEY,

           Defendants.

Case No.: 10 Civ. 8086
(JMF)(GWG)

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING PERSONAL
JURISDICTION OVER PINNACLE**

**KIRBY McINERNEY LLP**
Daniel Hume
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: 212-371-6600
Facsimile: 212-751-2540

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page No.**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.   Background and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.   Overview of the Pinnacle Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.   Overview of Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.   Plaintiffs' Application for an Anti-Suit Injunction and the Second
        Circuit's Limited Remand Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.   The Pinnacle Transactions, Defendants' Control of Pinnacle, and Pinnacle's
    Contacts with New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.   The Pinnacle SPV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.   Defendants, Not Pinnacle, Proposed All of the Pinnacle Notes
        Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    3.   Defendants Bore Pinnacle's Costs and Expenses . . . . . . . . . . . . . . . . . 8

    4.   Pinnacle Contracted Its Business Activities and Obligations to
        Its Co-Defendants and Their Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        i.   Defendants Retained Maples to Provide Pinnacle
            With Administrative Services . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        ii.   MS Singapore Provided the Logistical Support Necessary
            to Issue the Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        iii.   MS International Selected the Underlying Assets . . . . . . . . . . . 10

        iv.   Pinnacle Designated Defendants' Employees as Agents . . . . . . . 11

    5.   Pinnacle's Two-Man Board of Directors Did Not Exercise
        Independent Judgment and Instead Rubber-Stamped Defendants'
        Business Proposals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    6.   Pinnacle's and Its Agents'/Co-Conspirators' Contacts with
        New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.     Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         A.     Jurisdictional Showing Necessary to Support Preliminary Relief . . . . . . 14

         B.     Jurisdiction Under New York's Long-Arm Statute . . . . . . . . . . . . . . . . 15

    II.    The Record Developed to Date Establishes at Least a Reasonable Probability
        of Ultimate Success on the Issue of the Court's In Personam Jurisdiction
        Over Pinnacle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         A.     Pinnacle Transacted Business in New York . . . . . . . . . . . . . . . . . . . . . 16

         B.     Jurisdiction Over Pinnacle Is Appropriate Based on Its
             Co-Conspirators' Acts in New York . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES:**

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
    782 F. Supp. 215 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bensusan Rest. Corp. v. King*,
    126 F.3d 25 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chase Manhattan Bank v. Banque Generale du Commerce*,
    No. 96 Civ. 5184, 1997 WL 266968 (S.D.N.Y. May 20, 1997) . . . . . . . . . . . . . . . . . . . 17

*Chrysler Capital Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*,
    120 F. Supp. 2d 401 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 20

*Cutco Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Dale v. Banque SCS Alliance S.A.*,
    No. 02 Civ. 3592, 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) . . . . . . . . . . . . . . . . . . 16

*Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086, 2011 WL 6156743 (S.D.N.Y. Dec. 12, 2011) . . . . . . . . . . . . . . . . . . 6

*Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086, 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) . . . . . . . . . . 2, 3, 4, 5,6

*Dixon v. Mack*,
    507 F. Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Gulf Coast Dev. Grp., LLC v. Lebror*,
 No. 02 Civ. 6949, 2003 WL 22871914 (S.D.N.Y. Dec. 4, 2003) . . . . . . . . . . . 16, 17, 19

*HSH Nordbank AG New York Branch v. Street*,
 No. 11 Civ. 9405, 2012 WL 2921875 (S.D.N.Y. July 18, 2012) . . . . . . . . . . . . 16, 18, 20

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Jain v. T & C Holding Inc.*,
 No. 10 Civ. 1006, 2011 WL 814659 (S.D.N.Y.  Mar. 3, 2011) . . . . . . . . . . 16, 17, 18, 19

*Kronisch v. U.S.*,
 150 F.3d 112 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Lancaster v. Zufle*,
 165 F.R.D. 38 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Leng v. Pinnacle Performance Ltd.*,
 Fed. App'x 810, 2012 WL 1175475 (2d Cir. 2012)  . . . . . . . . . . . . . . . . . . . . . . 1, 6, 14

*Licci v. Lebanese Canadian Bank, SAL*,
 __ N.E.2d __, 2012 WL 5844997,
 2012 N.Y. Slip Op. 07854 (Nov. 20, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Licci v. Lebanese Canadian Bank, SAL*,
 673 F.3d 50 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Madanes v. Madanes*,
 981 F. Supp. 241 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Nova Int'l, Inc. v. American Express Bank, Ltd.*,
 No. 94 Civ. 8536, 1996 WL 39317 (S.D.N.Y. Jan. 31, 1996) . . . . . . . . . . . . . . . . 15, 17

*Sierra Rutile Ltd. v. Katz*,
 No. 90 Civ. 4913, 1992 WL 236208 (S.D.N.Y. Sept. 8, 1992) . . . . . . . . . . . . . . . . . . 24

*Simon v. Philip Morris, Inc.*,
 86 F. Supp. 2d 95 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sunward Elecs., Inc. v. McDonald*,
 362 F.3d 17 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iv

*Visual Scis., Inc. v. Integrated Commc'ns Inc.*,
    660 F. F.2d 56 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Weitzman v. Stein*,
    897 F.2d 653 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Rules:**

Fed. R. Civ. P. 4(k)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.Y. C.P.L.R. § 302(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Authorities:**

Frank J. Fabozzi, Henry A. Davis, & Moorad Choudhry,
    *Credit-Linked Notes: A Product Primer*,
    The Journal of Structured Finance (Winter 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Frank J. Fabozzi,
    *The Handbook of Fixed Income Securities* (8th ed. 2012) . . . . . . . . . . . . . . . . . . . . . . . 4

Janet M. Tavakoli,
    *Structured Credit Finance & Collateralized Debt Obligations* (2d ed. 2008) . . . . . . . . 4

**Preliminary Statement**

In an Order dated April 10, 2012, the Second Circuit affirmed the Court's issuance of an anti-suit injunction against the Defendants. *See Leng v. Pinnacle Performance Ltd.*, Fed. App'x 810, 2012 WL 1175475 (2d Cir. 2012). However, because Defendant Pinnacle Performance Ltd. ("Pinnacle"), a Cayman Islands Special Purpose Vehicle ("SPV"), had challenged personal jurisdiction, and because the Court had not addressed the jurisdictional issue prior to enjoining Pinnacle, the Second Circuit directed the Court to determine on remand whether Plaintiffs have "established at least *a reasonable probability* of ultimate success on the question of the court's in personam jurisdiction." *Id.* at 813 (internal quotation marks omitted and emphasis added).[1] As discussed below, Plaintiffs have met this showing based on either (i) Pinnacle's transaction of business in New York, or (ii) its co-conspirators' New York-based conduct.

By way of background, Pinnacle is, in essence, a Board of Directors without a company. Although Defendants[2] established Pinnacle as the nominal issuer of the Pinnacle Notes, it had no offices, employees, or even day-to-day management. Instead, Pinnacle had a two man board of directors that contracted all of Pinnacle's primary business functions to the Defendants and certain other agents (such as a business affiliate of the law firm Defendants retained to create Pinnacle).

Pinnacle did, however, need to establish bank accounts to deposit the money it raised from

---

[1] In order to defeat dismissal on jurisdictional grounds, Plaintiffs face a less onerous burden than that necessary to support injunctive relief. *See Madanes v. Madanes*, 981 F. Supp. 241, 260 (S.D.N.Y. 1997) (where court has ordered limited jurisdictional discovery but has not held an evidentiary hearing, plaintiff need only "make a *prima facie* showing supported by an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over" defendant).

[2] As used in this brief, "Defendants" refers to Pinnacle's co-defendants: Morgan Stanley; Morgan Stanley Capital Services Inc. ("MS Capital"); Morgan Stanley & Co., Inc. ("MS & Co."); Morgan Stanley & Co. International plc ("MS International"); and Morgan Stanley Asia (Singapore) Pte ("MS Singapore").

investors and to facilitate its purchase of subsidiary investments, known as underlying assets ("Underlying Assets").  And for each Series of Notes, Pinnacle:  (i) established bank accounts in New York with MS Capital to deposit the investors' funds; (ii) submitted IRS tax documentation to the Defendants in New York (to file on its behalf) to ensure that the accounts complied with applicable regulations; and (iii) used the funds in those accounts to purchase the Underlying Assets that Defendants, primarily MS Capital, created and rigged.  Numerous courts, including, most recently, the New York Court of Appeals in response to questions certified by the Second Circuit, have held that a foreign defendant's  purposeful use of a bank account in New York to facilitate its misconduct is sufficient, in and of itself, to confer personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1).

Additionally, jurisdiction over Pinnacle is proper based on the in-forum conduct of its co-conspirators.  Three of Pinnacle's co-conspirators are located in New York, including Morgan Stanley and MS Capital.  Among other New York-based conduct, Morgan Stanley guaranteed MS Capital's counter-party obligations to Pinnacle, MS Capital provided banking services to Pinnacle in connection with the funds raised by the Pinnacle Notes, and MS Capital structured and was the counter-party to the Underlying Assets that Pinnacle purchased.  Pinnacle ratified all of these actions, which benefitted Pinnacle and furthered the co-conspirators' common scheme.

## Statement of Facts

### A.    Background and Procedural History

#### 1.    Overview of the Pinnacle Notes

The Pinnacle Notes are a type of credit derivative known as a credit-linked note ("CLN"). *See Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *1 (S.D.N.Y.

Oct. 31, 2011).  CLNs shift the credit risk associated with certain Reference Entities ("REs") from a protection buyer, *i.e.*, typically the bank arranging the CLNs, to a protection seller, *i.e.*, the CLN investors.  *See id.*  CLNs are typically created as follows:

> *First*, the bank arranging the CLNs creates a Special Purpose Vehicle ("SPV") to issue the CLNs.  The SPV is generally . . . an orphan company owned by a trustee that will not appear on the balance sheet of any party to the transaction.  The bank then buys protection from the SPV in the amount of the CLNs that will be issued to investors insuring it against the possibility that the REs would experience a credit event, such as a default.  The name given to this particular transaction is a credit default swap, and this is, in effect, a derivative contract that functions like a form of insurance.  *Second*, the SPV sells the CLNs to investors and uses the principle it receives therefrom to purchase highly-rated securities, or underlying assets, which serve as collateral in the event the REs default . . . .  *Third*, in return for assuming the risk, investors receive interest in the form of (i) credit protection payments from the sponsoring bank and (ii) any interest generated by the underlying assets.  Assuming that no credit event occurs, investors will receive the redemption value of the Note.

*Id.* (internal quotation marks and citations omitted).

Here, MS Singapore was the Pinnacle Notes "Arranger," *see* Deposition Transcript of Richard Gordon ("Tr.") at 64:5-10,[3]  MS Capital was the protection buying counter-party under the credit default swap ("CDS"), *see id.* at 86:22-88:15; Dkt. No. 124, Defendants' Answer to Amended Complaint ("Am. Answer") ¶ 71, Morgan Stanley was the guarantor of MS Capital's counter-party obligations,[4] *see* McNeela Decl. Ex. 2; Am. Answer ¶¶ 85, 134, Pinnacle was the SPV and protection selling counter-party under the CDS, *see* McNeela Decl. Ex 3 at SING 610, 650-51; Am. Answer ¶¶ 36, 100, and MS International was the entity charged with selecting the Underlying Assets, *see*

---

[3] Mr. Gordon is one of Pinnacle's current directors, and served as Pinnacle's Rule 30(b)(6) witness for deposition.  Excerpts of Mr. Gordon's deposition transcript are annexed as Exhibit 1 to the January 4, 2012 Declaration of Andrew M. McNeela ("McNeela Decl.).

[4] Both Morgan Stanley and MS Capital are New York entities that share offices at 1585 Broadway, New York, New York.  *See* Am. Answer ¶¶ 70, 74, 82.

Tr. at 122:6-14; McNeela Dec. Ex. 3 at SING 621.

The REs for each Series of Notes consisted of approximately seven secure sovereign nations and corporations, such as the Korean Development Bank, the Commonwealth of Australia, the Republic of Singapore, and the Hong Kong Special Administrative Region of the Peoples' Republic of China. *See* Am. Answer ¶¶ 15, 128, 132. For this reason, Defendants marketed the Pinnacle Notes as safe, conservative investments that provided an attractive alternative to bonds.[5] *See* McNeela Decl. Ex. 4 at SING 162963, Ex. 5 at ii, Ex. 6 at ii, Ex. 7 at ii, Ex. 8 at ii, Ex. 9 at ii.

Although it was standard practice for a CLN Issuer to select low risk Underlying Assets, such as Treasury bills,[6] Pinnacle used the investors' principal to purchase bespoke, single tranche Synthetic Collateralized Debt Obligations ("CDOs") that MS International selected. *See* Tr. at 118:21-20:2, 122:6-14; Am. Answer ¶¶ 4, 104. Those CDOs were issued by Morgan Stanley ACES SPC (the "MS ACES CDOs"), another Cayman Islands SPV, and MS Capital was the "short" counter-party to each of those CDOs. *See* Tr. at 115:20-116:20, 119:17-120:2; Am. Answer ¶¶ 4,

---

[5] In fact, numerous treatises note that a standard CLN is functionally akin to a bond. *See* Frank J. Fabozzi, Henry A. Davis, & Moorad Choudhry, *Credit-Linked Notes: A Product Primer*, The Journal of Structured Finance, at 67 (Winter 2007) (McNeela Decl. Ex. 10) ("A standard CLN is a security . . . which has an interest payment and fixed maturity structure similar to a conventional bond."); Janet M. Tavakoli, *Structured Credit Finance & Collateralized Debt Obligations*, at 47-48 (2d ed. 2008) (McNeela Decl. Ex. 11) ("The buyer of a credit default swap is the credit protection buyer, the premium payer, and is short credit risk. Put another way, the protection buyer is the seller of default risk similar to the seller of a bond . . . . The protection seller is long credit risk similar to the buyer of a bond.") (emphasis omitted).

[6] *See Dandong*, 2011 WL 5170293, at *1 ("In Morgan Stanley's own words, the proceeds of the funded note issuance are invested in low risk eligible collateral" which "mainly consists of investments in cash or government bonds or guaranteed investment contracts (GICs) issued by highly rated insurance companies") (internal marks omitted); Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, at 332 (8th ed. 2012) (McNeela Decl. Ex. 12) ("The SPV uses the proceeds from issuing the CLNs to purchase the pre-agreed collateral securities. They are normally risk free securities, such as Treasury bills.").

18; McNeela Decl. Ex. 13 at 27, Ex. 14 at 27, Ex. 15 at 27, Ex. 16 at 23, Ex. 17 at 21.

A Synthetic CDO is also based on a CDS ("CDO CDS") and is linked to the performance of a portfolio of specified REs ("CDO REs"). *See Dandong*, 2011 WL 5170293, at *2; Am. Answer ¶¶ 100, 112. Each of the MS ACES CDOs had a portfolio of approximately 100 CDO REs. *See*, *e.g.*, Ex. 13 at A1-A5. Pursuant to the MS ACES transactional documents, MS Capital unilaterally selected the CDO REs comprising those portfolios. *See* McNeela Decl. Ex. 13 at 1, Ex. 14 at 1, Ex. 15 at 1, Ex. 16 at 1, Ex. 17 at 1 (in section entitled "Swap Counterparty Not Advisor or Fiduciary," explaining that MS Capital, as the counter-party, was charged with "selecting the Reference Entities"). This was significant because under the CDO CDS, if the risk associated with the CDO REs materialized, the investors' principal would be transferred, *i.e.* swapped, to MS Capital as the "short" counter-party. *See* Am. Answer ¶¶ 112, 114, 125.

## 2. Overview of Plaintiffs' Claims

The crux of Plaintiffs' claims is that Defendants did not inform investors that, after Pinnacle received their money, Defendants: (i) would select Underlying Assets that they created just for the Pinnacle Transactions, *i.e.* the MS ACES CDOs; (ii) had an inherent conflict of interest because they "shorted" the MS ACES CDOs; and (iii) utilized their unilateral control over the structuring of the MS ACES CDOs to stack the deck, by choosing a disproportionate number of CDO REs that were highly susceptible to a downturn in the housing and financial markets, at a time when the financial crisis was well underway. *See Dandong*, 2011 WL 5170293, at *2. Thus, even though none of the Pinnacle Notes REs experienced a credit event, virtually all of Plaintiffs' principal was nonetheless transferred to Defendants because each of the MS ACES CDOs suffered losses sufficient to trigger a "Mandatory Redemption Event." *See* Am. Answer ¶¶ 128-32.

3.    **Plaintiffs' Application for an Anti-Suit Injunction and the Second Circuit's Limited Remand Order**

Based on the strength of Plaintiffs' well-pleaded allegations, the Court largely denied Defendants' motion to dismiss. *See Dandong*, 2011 WL 5170293, at *1. Less than a month later, Defendants "took the extraordinary measure of seeking an 'expedited' anti-suit injunction from the High Court" of Singapore to bar Plaintiffs from litigating before this Court, based on arguments "substantially similar" to those the Court had just rejected. *See Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 6156743, at *1, *4  (S.D.N.Y. Dec. 12, 2011).  By Order dated December 12, 2011, the Court granted Plaintiffs' motion for a counter-injunction, and enjoined Defendants from further prosecuting their injunction application in Singapore. *See id.* at *1, *8.

Defendants appealed the Court's injunction order, which the Second Circuit affirmed in a Summary Order dated April 10, 2012. *See Leng*, 474 Fed. App'x at 814.  With respect to Pinnacle, however, the Second Circuit found that the "district court erred in enjoining Pinnacle without first making any findings as to its jurisdiction over that party." *Id.* at 813.  The Second Circuit observed that:

> Where a challenge to jurisdiction is interposed on an application for preliminary injunction, the district court must determine that the party moving for the injunction has established 'at least a reasonable probability of ultimate success on the issue of the court's in personam jurisdiction' over the non-moving party.

*Id.* (quoting *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990)).  Accordingly, " in the absence of any jurisdictional determination as to Pinnacle," the Second Circuit remanded to the "district court to make factual findings adequate enough to permit intelligent appellate review." *Id.* at 814 (internal marks omitted).

6

On remand, Pinnacle has produced approximately 1400 pages of jurisdictional discovery – comprised  primarily of Board minutes –  and produced one Rule 30(b)(6) witness for deposition.[7]

**B.      The Pinnacle Transactions, Defendants' Control of Pinnacle, and Pinnacle's Contacts with New York**

**1.      The Pinnacle SPV**

 In late 2005, Defendants retained the law firm of Maples and Calder ("Maples") to, *inter alia*, incorporate Pinnacle in the Cayman Islands.  *See* McNeela Decl. Ex. 18, Ex. 19.  On November 30, 2005, Maples incorporated Pinnacle through its affiliate, Mapcal Ltd., *see* Tr. at 36:5-7. Thereafter, Mapcal Ltd.: (i) selected employees of Maples' business affiliate, Maples Finance Jersey Limited ("Maples Jersey"), to serve as Pinnacle's initial directors,[8] *see id.* at 40:21-43:12; and (ii) transferred Pinnacle's shares to Maples Finance Limited ("Maples Finance"), an affiliate of Maples and Maples Jersey, to hold in a charitable trust, *see id.* at 48:7-49:15; *see also* McNeela Decl. Ex. 3 at SING 618.

Although Pinnacle's "sole business [was] the raising of money by issuing Series of Notes . . . for the purposes of purchasing assets and entering into related derivatives and other contracts," it had no offices, employees, or even day-to-day management.  *See* McNeela Decl. Ex. 3 at SING

---

[7] Notably, Pinnacle's designated Rule 30(b)(6) representative: (i) was not associated with Pinnacle at the time of the transactions upon which this action is based, and was first appointed as a director of Pinnacle in January 2012, Tr. at 21:16-18, 23:6-17; (ii) currently serves as director for approximately 300 other entities, *see id.* at 16:19-17:3; (iii) did not speak to any of Pinnacle's former directors who held their positions at times relevant to the complaint, *see id.* at 12:12-15; and (iv) did not review Pinnacle's correspondence files in advance of his deposition, and instead reviewed only those documents selected by Pinnacle's attorneys, *see id.* at 9:22-11:15, 55:22-56:8.

[8] Pinnacle changed directors frequently during the course of its business activities.  *See* McNeela Decl. Ex. 20.  Like its initial directors, all of Pinnacle's subsequent directors were employees of Maples Jersey.  *See* McNeela Decl. Ex. 21 at § 2.4.

618; Am. Answer ¶ 37.  Instead Pinnacle's "registered office" was a non-exclusive Cayman Island's P.O. box that was (i) assigned to Maples Finance, and (ii) shared by several other SPVs.  *See* Tr. at 34:21-35:15; McNeela Decl. Ex. 3 at SING 618.

### 2.     Defendants, Not Pinnacle, Proposed All of the Pinnacle Notes Transactions

Pinnacle's directors *were not* empowered to provide commercial advice to Pinnacle, *see* McNeela Decl. Ex. 21 at § 5; Tr. at 79:25-82:3, and Pinnacle's issuance of Notes was expressly subject to MS Singapore's prior approval, *see* McNeela Decl. Ex. 22 at § 5.7; Tr. at 75:5-76:14.  In fact, Defendants proposed all of Pinnacle's business transactions through MS Singapore, pursuant to a "Proposals and Advice Agreement."  McNeela Decl. Ex. 23 at § 2; Tr. at 64:5-10, 94:14-95:18, 98:21-99:25.  These business proposals – which took the form of a letter summarizing the terms of the deal and enclosing transactional documents – included Pinnacle's establishment of the overarching "Notes Programme" as well as its issuance of each Series of Notes.  *See* Tr. at 89:20-23, 91:12-92:8, 94:14-95:18, 98:21-99:25; McNeela Decl. Ex. 24.  Notably, MS Singapore was also authorized to provide Pinnacle with "advice on financial matters," including *its own* proposals.  McNeela Decl. Ex. 23 at §§ 2-3.

### 3.     Defendants Bore Pinnacle's Costs and Expenses

Defendants not only paid for Pinnacle's incorporation, but also agreed to pay all of Pinnacle's business, legal, and administrative costs pursuant to an Expenses Agreement between Pinnacle and MS Singapore.  *See* McNeela Decl. Ex. 25 at § 3, Ex. 22 at §§ 7.1, 7.2.  Although MS Singapore was the entity contractually obligated to reimburse Pinnacle, at Defendants' request all invoices were made "[p]ayable by" MS International.  *See* McNeela Decl Ex. 26; Tr. at 51:6-15, 136:23-136:14.  Those invoices directed MS International to make payment on Pinnacle's behalf either by wire

transfer through Barclays Bank in New York, or by a US dollar draft drawn on a United States bank. *See* McNeela Decl. Ex. 26.[9]

### 4. Pinnacle Contracted Its Business Activities and Obligations to Its Co-Defendants and Their Agents

As discussed below, because Pinnacle was a mere shell, it contracted all of its business activities – from the mundane (such as answering correspondence) to the complex (such as the reinvestment of the proceeds of the Pinnacle Notes in Underlying Assets) – to the Defendants and their agents. *See* Tr. at 76:15-77:7.

### i. Defendants Retained Maples to Provide Pinnacle With Administrative Services

One of the many services Defendants retained Maples to provide was administrative support to Pinnacle through its affiliate Maples Jersey. *See* McNeela Decl. Ex. 19 at PINNACLE 1330 § 1.2., Ex. 21; Tr. at 78:20-79:2. Among other services, Maples Jersey agreed to: (i) maintain Pinnacle's books and records; (ii) answer correspondence and provide secretarial services; and (iii) "provide the services of two or more directors" as well as "non-exclusive telephone, facsimile, and postal address or post office box facilities." McNeela Decl. Ex. 21 at § 2.7. For the majority of its operation, Pinnacle's Board consisted of only two directors, that met at Maples Jersey's office in the Channel Islands. *See* Tr. at 57:24-59:24.

### ii. MS Singapore Provided the Logistical Support Necessary to Issue the Notes

Pinnacle did not solicit investors or vet their applications. Rather, these activities were overseen by MS Singapore, whom Pinnacle appointed as its "Arranger in respect of the Programme

---

[9] MS Singapore also agreed to indemnify Pinnacle's directors in connection with certain aspects of the Pinnacle transactions. *See* McNeela Decl. Ex. 27.

and each Series of Notes." *See* McNeela Decl. Ex. 3 at SING 610 (describing the Arranger's duties), Ex. 22 at § 10.3. Among other actions, MS Singapore retained multiple independent distributors for each Series of Notes. *See* McNeela Decl. Ex. 3 at 610, 636-37, Ex. 28 (example of distribution agreement). Those Distributors were responsible for providing informational materials and accepting investor applications, *see* McNeela Decl. Ex. 28 at §§ 3.1-3.3, 7.5, and selling the Notes to those investors whom MS Singapore had approved, *id.* Ex. 5 at 15-16 ¶ 14. MS Singapore also managed the media campaign in support of the Pinnacle Notes, which Morgan Stanley in New York reviewed and authorized. *See* McNeela Decl. Ex. 29 at SING 20015 (email explaining that "the advertising needs to be finalised . . . and our NY colleagues in charge of branding will need to see a first draft no later than the 2nd week of July").

### iii.    MS International Selected the Underlying Assets

Pinnacle did not directly select the Underlying Assets that it purchased with the investors' principal, but instead delegated this duty to MS International as its appointed "Determination Agent." *See* McNeela Decl. Ex. 30 at § 2.3; Tr. at 122:6-14. In this connection, MS International was granted "sole and absolute discretion" to select the Underlying Assets, *see* McNeela Decl. Ex. 3 at SING 621, subject to MS Capital's approval, *see e.g., id.* Ex. 5 at 12. MS International used this authority to select Underlying Assets consisting solely of synthetic CDOs structured by MS Capital and issued through another SPV, Morgan Stanley ACES SPC ("MS ACES"). *See* Tr. at 115:20-116:20, 119:10-120:2; McNeela Decl. Ex. 31. Like Pinnacle, MS ACES was administered by, and its directors were employees of, Maples Finance. *See* Tr. at 118:14-20.[10]

---

[10] Based on MS International's recommendation, Pinnacle entered into subscription agreements to purchase the MS ACES CDOs as the Underlying Assets for each Series of Pinnacle Notes. *See* Tr. at 119:15-120:2, 122:15-23. Notably, in those subscription agreements, Pinnacle

### iv.   Pinnacle Designated Defendants' Employees as Agents

For each Series of Notes, Pinnacle also granted broad powers of attorney to several of Defendants' employees.  *See, e.g.,* Tr. at 105:18-24, 106:12-108:4; McNeela Decl. Ex. 32 (appointment memorialized in resolution 9 in each set of minutes).  Those powers included the right to "do, execute, or perform all or any of the acts . . . that any director" had been authorized to do "at the meetings of the board of directors,"  including, "for the avoidance of doubt, all acts to negotiate, approve, give, make, sign, agree [and] execute," relevant transactional documents relating to the Pinnacle Notes.  *See, e.g.*,  McNeela Decl. Ex. 32 at PINNACLE 1027.  Defendants' Rule 26(a) disclosures identify at least one of Pinnacle's agents, Mr. Brian Neer, as being located in New York, *see id.* Ex. 33 at Ex. A thereto, and contemporaneous documents also indicate that he was a New York-based employee at the time of the Pinnacle transactions, *see id.* Ex. 44 (discussing Mr. Neer's return to New York).

### 5.   Pinnacle's Two-Man Board of Directors Did Not Exercise Independent Judgment and Instead Rubber-Stamped Defendants' Business Proposals

All material actions Pinnacle's board took in connection with the Pinnacle Notes transactions were recorded in the minutes of Pinnacle's board meetings.  *See* Tr. at  61:10-18, 96:5-9.  Those actions consisted of universally approving Defendants' business proposals, *see id.* at 94:14-95:18, 124:9-25.

Such approval was a *fait accompli* and, in fact, one of the services for which Defendants retained Maples.  As Maples explained in response to Defendants' solicitation to establish Pinnacle, its fee included Board minutes "*to approve* the relevant corporate housekeeping matters and

───────────────

submitted to jurisdiction in New York with respect to any actions "relating to" those agreements. *See* McNeela Decl. Ex. 31 at § 6.

programme," "*to approve* the [initial] Transaction documentation," and "*to approve* additional Transactional documentation," McNeela Decl. Ex. 19 at 1323, 1330 (emphasis added); *see also id.* at 1330 (requesting from Defendants "a list of the documents which *will be entered into* by the note issuer") (emphasis added).

In this connection, Defendants unilaterally set the terms of the Pinnacle transactions. *See, e.g.,* Tr. at 94:14-95:18. For example, the terms of the CDS between Pinnacle and MS Capital – the central agreement underlying all Series of Pinnacle Notes – were determined solely by Defendants, and Pinnacle entered into the agreement pursuant to MS Singapore's advice. *See* Tr. 86:22-91:17; McNeela Decl. Ex. 34 at 775-85 (schedule of CDS terms specific to Pinnacle transactions).

Similarly, the Pinnacle directors' ostensible due diligence in approving the Pinnacle transactions was limited to reading the documentation Defendants provided and receiving "comfort letters" from: (i) its legal advisor, Maples, whom Defendants retained and paid for that very service, *see e.g.*, McNeela Decl. Ex. 19 at PINNACLE 1323-24; and (ii) MS Singapore's legal counsel. But even this modest review was perfunctory. For example, Pinnacle's directors approved the Series 2 Pricing Statement the same day it was received from MS Singapore, *see* Tr. at 104:23-105:17; McNeela Decl. Ex. 23 at SING 101778-79, Ex. 35 at PINNACLE 179 (resolutions 2 & 3), and approved the establishment of the over-arching Pinnacle Notes Programme in advance of actually receiving counsels' comfort letters, *see* McNeela Decl. Ex. 36 at PINNACLE 205, 207 (noting that Pinnacle "will receive" comfort letters "on or about the date of the lodging of the Preliminary Base Prospectus," but still approving the Notes Program).

Likewise, in acceding to MS International's proposal that Pinnacle enter into subscription agreements investing the proceeds from each Series of Notes into the MS ACES CDOs, *see, e.g.,*

12

Tr. at 119:17-120:2, 122:6-23; McNeela Decl. Ex. 20 at 162, Pinnacle's Directors literally did nothing more than "consider[]" the proposal before executing the subscription agreements, Tr. at 124:9-25; *see, e.g.,* McNeela Decl. Ex. 47 (board minutes approving purchase of MS ACES CDOs).

### 6.    Pinnacle's and Its Agents'/Co-Conspirators' Contacts with New York

Defendant MS Capital is Pinnacle's counter-party to the CDS and a New York entity located at 1585 Broadway, New York, New York.  *See* McNeela Decl. Ex. 34 at SING 779 (providing New York address for MS Capital); Am. Answer ¶ 70.  Under the CDS, MS Capital made periodic credit protection payments to Pinnacle.  *See* Am. Answer ¶ 134.  Morgan Stanley, operating out of the same address in New York, guaranteed MS Capital's payment obligations to Pinnacle under the CDS.  *See* McNeela Decl. Ex. 2; *see also* Am. Answer ¶¶ 70, 82 (identifying common offices).

MS Capital was also the counter-party to and creator of the MS ACES CDOs that MS International, as Pinnacle's agent, selected as the Underlying Assets.  *See* McNeela Decl. Ex. 13 at 1, Ex. 14 at 1, Ex. 15 at 1, Ex. 16 at 1, Ex. 17 at 1 (regarding MS Capital's control of the CDO RE portfolio).   Moreover, under the CDO transactional documents, when the MS ACES CDOs  failed Pinnacle made payments (using the investors' principal) to MS Capital's bank accounts in New York.  *See id.* Ex. 37 ("Notice and Account Details" section of Swap Confirmations identifying MS Capital's New York bank account as recipient of transfer payments).

Pinnacle also established several bank accounts with MS Capital in New York specifically in connection with the funds raised by each Series of Pinnacle Notes.  *See, e.g.,* McNeela Decl. Ex. 38 (Series 2), Ex. 39 (Series 3), Ex. 40 (Series 9) Ex. 41 (Series 10), Ex. 42 (account opening letters

13

for Series 9 and 10).[11]  And Pinnacle submitted W8-BEN tax forms relating to those accounts to Morgan Stanley in New York to file on its behalf with the IRS.  Tr. at 130:2-12;  McNeela Decl. Ex. 44.

Finally, one of Defendants' employees, Mr. Brian Neer, whom Pinnacle appointed as its agent, was located in New York at the time of the Pinnacle transactions.  *See* McNeela Decl. Ex. 32 at PINNACLE 996 (resolution 9), Ex. 33 at Ex. A thereto, Ex. 44.

## ARGUMENT

## I.     Applicable Legal Standards

### A.     Jurisdictional Showing Necessary to Support Preliminary Relief

When "a challenge to [personal] jurisdiction is interposed on an application for a preliminary injunction," a plaintiff need not definitively establish jurisdiction to support the imposition of an injunction, but only *"a reasonable probability of ultimate success on the question of jurisdiction when the action is tried on the merits*."  *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 59 (2d Cir. 1981) (internal marks omitted) (emphasis added); *see also Leng*, 474 Fed. App'x at 813.

Similarly, in determining whether a defendant's jurisdictional challenge requires its dismissal from suit, where, as here, the Court has ordered limited discovery on the jurisdictional issue but has not held an evidentiary hearing, a plaintiff need not establish jurisdiction by a preponderance of the evidence.  *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Rather, a plaintiff need only "make a *prima facie* showing supported by an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant[]."  *Madanes*, 981

---

[11] The account statements that Defendants have produced to date are incomplete.  *See, e.g.*, McNeela Decl. Ex. 38 (December 2007 statement referring to a  "last statement date" of "November 30, 2007," but production has not yet included a statement for the November 2007 period).

14

F. Supp. at 260 (citing *Ball*, *S.A.*, 902 F.2d at 197).

**B.      Jurisdiction Under New York's Long-Arm Statute**

In a diversity suit, personal jurisdiction is determined in accordance with the forum state's laws. *See Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *see also* Fed. R. Civ. P. 4(k)(1)(A). As relevant here, New York's long-arm statute confers personal jurisdiction over a foreign defendant "who in person or through an agent": (i) "transacts any business in the state"; or (ii) "commits a tortious act within the state." N.Y. C.P.L.R. §§ 302(a)(1), (2).

Under Section 302(a)(1), a court must examine "the totality of circumstances" to determine whether a defendant or its agent has "transacted business" in New York. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999). Importantly, a plaintiff need not "show regular or continuous business activity in the state; *even a single action within New York is sufficient to confer jurisdiction* under § 302(a)." *Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*, 120 F. Supp. 2d 401, 404 (S.D.N.Y. 2000) (emphasis added) (citing *Bank Brussels Lambert*, 171 F.3d at 786); *Nova Int'l, Inc. v. American Express Bank, Ltd.*, No. 94 Civ. 8536, 1996 WL 39317, at *7 (S.D.N.Y. Jan. 31, 1996) ("[P]ersonal jurisdiction under CPLR § 302(a)(1) may be founded upon a single transaction of business, *even if the defendant never enters New York . . . .*") (emphasis added).[12]

Section 302(a)(1) also requires that there be an "'articulable nexus' or a 'substantial relationship' between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (quoting *Kronisch v. U.S.*, 150

---

[12] "[T]he overriding criterion necessary to establish the transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012).

F.3d 112, 130 (2d Cir. 1998)).  The New York Court of Appeals has "consistently held that causation is not required, and that the inquiry under the statute is relatively permissive."  *Licci v. Lebanese Canadian Bank, SAL*, __ N.E.2d __, 2012 WL 5844997, 2012 N.Y. Slip Op. 07854, at 15 (Nov. 20, 2012) (annexed as Exhibit 48 to the McNeela Decl.).  What Section 301(a)(1) requires "at a minimum [is] a relatedness between the transaction and the legal claim such that the latter is *not completely unmoored* from the former, regardless of the ultimate merits of the claim." *Id.* (emphasis added).

Although Section 302(a)(2) does not require a specific level of contacts with New York, there are two prerequisites for its application: (i) the tortious act must be committed by a defendant or an agent when he or she "was physically present in New York"; and (ii) the plaintiff's claims must arise from the tortious act. *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997).

## II.   The Record Developed to Date Establishes at Least a Reasonable Probability of Ultimate Success on the Issue of the Court's In Personam Jurisdiction Over Pinnacle

### A.   Pinnacle Transacted Business in New York

Numerous courts in this district have held that Section 302(a)(1) confers jurisdiction over a foreign defendant based solely on its use of a New York bank account, where the account directly relates to the plaintiff's claims.  *See HSH Nordbank AG New York Branch v. Street*, No. 11 Civ. 9405, 2012 WL 2921875, at *4-5 (S.D.N.Y. July 18, 2012); *Jain v. T & C Holding Inc.*, No. 10 Civ. 1006, 2011 WL 814659, at *5 (S.D.N.Y.  Mar. 3, 2011); *Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *3 (S.D.N.Y. Sept. 22, 2005) (citing *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002)); *Gulf Coast Dev. Grp., LLC v. Lebror*, No. 02 Civ. 6949, 2003 WL 22871914, at *3-4 (S.D.N.Y. Dec. 4, 2003); *Correspondent*

16

*Servs. Corp*, 120 F. Supp. 2d at 404-05; *Chase Manhattan Bank v. Banque Generale du Commerce*, No. 96 Civ. 5184, 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997); *Nova Int'l*, 1996 WL 39317, at *7.

In keeping with this precedent, the New York Court of Appeals recently reiterated that Section 302(a)(1) encompasses a foreign defendant's "use of a correspondent bank account in New York, *even if no other contacts between the defendant and New York can be established*, if the defendant's use of that account was purposeful" and plaintiffs' claims are "in some way arguably connected to the transaction."  *Licci*, 2012 WL 5844997, Slip Op. at 13, 16 (internal marks omitted and emphasis added) (McNeela Decl. Ex. 48).[13]

This includes situations where the foreign defendant: (i) transferred the funds that are the subject of the lawsuit to the New York bank account;[14] or (ii) used the New York bank account to facilitate the wrongful actions underlying the plaintiffs' claims.[15]  Both scenarios are present here

---

[13] The nexus the New York Court of Appeals found sufficient to confer jurisdiction in *Licci* is significantly more attenuated than Pinnacle's contacts here.  Specifically, there, the plaintiffs sued the Lebanese Canadian Bank, SAL, on the ground that it utilized a correspondent bank account in New York to facilitate the transfer of several million dollars to the Shahid Foundation, the "financial arm" of Hizballah, which, in turn, "caused, enabled and facilitated" rocket attacks in Israel resulting in the plaintiffs' injuries.  *Licci*, 2012 WL 5844997, Slip Op. at 2, 4.

[14] *Jain*, 2011 WL 814659, at *5 (jurisdiction proper where defendant maintained a New York bank account and "significant portion" of the payment for the shares 'which are the basis of this lawsuit were transferred to that account'") (quoting *Gulf Coast Dev. Grp.*, 2003 WL 22871914, at *3); *Nova Int'l, Inc.*, 1996 WL 39317, at *7 (jurisdiction proper over foreign corporation that used New York bank account to accept funds provided as security from plaintiffs and to arrange for letters of credit).

[15] *Correspondent Servs.*, 120 F. Supp. 2d at 404-05 (jurisdiction proper where defendant used New York bank account to facilitate unauthorized purchase of securities with plaintiff's money); *Dale*, 2005 WL 2347853, at *1, *3 (jurisdiction proper over foreign bank that used New York bank account to launder money a third-party stole from plaintiffs); *Chase Manhattan Bank*, 1997 WL 266968, at *2 ("[A] cause of action arising out of a transaction involving the *use* of a correspondent

17

and confer jurisdiction over Pinnacle.

Pinnacle opened numerous bank accounts with MS Capital in New York specifically to deposit the funds it raised through the issuance of the Series of Notes, *i.e.*, the investors' principal and the money directly at issue in this litigation. *See, e.g.,* McNeela Decl. Exs. 38-41 (relating to Series 2, 3, 9, and 10). Series 9 and 10 provide a clear example. Pinnacle opened accounts specific to those Series on the exact date those Notes were issued, *see id.* Ex. 42 (account opening letters dated December 14, 2007); Am. Answer ¶ 132 (Series 9 and 10 "issued on or about December 14, 2007"). And the funds Pinnacle deposited matched the funds raised by those Series. *See* Amended Complaint ("AC") ¶ 132(a) ($17.9 million combined issuance for Series 9 & 10); McNeela Decl. Ex. 40 at PINNACLE 1215, Ex. 41 at PINNACLE 1221 (initial deposits into Series 9 and 10 accounts $10.1 million and $7.8 million, respectively, for a total of $17.9 million). Pinnacle also submitted tax forms in connection with its New York bank accounts to Morgan Stanley in New York to file on its behalf, *see id.* Ex. 43, in order to ensure that those accounts complied with applicable IRS rules, *see id.* Ex. 42 (Series 9 and 10 account opening letters explaining that Pinnacle would need to comply with IRS filing requirements).

Judge Berman recently found virtually identical facts sufficient to support jurisdiction over a foreign defendant. *See Jain*, 2011 WL 814659, at *1, *5. In *Jain*, the plaintiffs alleged that the defendants had fraudulently induced them to purchase shares in a company by concealing the fact that the shares would be unsaleable, even after the company went public. *See id.* at *1. The court held that jurisdiction was proper over a foreign defendant even though her only contact with New

---

account may confer jurisdiction over [the] defendant in New York.") (emphasis in original); *HSH Nordbank*, 2012 WL 2921875, at *4-5 (court had jurisdiction over foreign defendant who used a New York bank account to facilitate fraudulent conveyance).

York was a bank account, because "'significant portions of the payment for the shares 'which are the basis of this lawsuit were transferred to that account.'" *Id.* at *5 (quoting *Gulf Coast Dev. Grp.*, 2003 WL 22871914, at *3); s*ee also Indosuez Int'l Fin. B.V.*, 98 N.Y.2d at 246-47 (long arm jurisdiction proper over Russian bank based on its maintenance of New York bank accounts for receipt of payments under currency exchange options that were the subject of the action).

Additionally, Pinnacle *used* its New York accounts to purchase the MS ACES CDOs that MS Capital structured as the Underlying Assets. Again using Series 9 and 10 as examples, at the same time Pinnacle raised $17.9 million from its issuance of Notes to investors, it entered into a subscription agreement to purchase $17.9 million of MS ACES CDOs. *See* McNeela Decl. Ex. 31 at SING 49318. Because Pinnacle did not engage in any business other than the raising of money through the issuance of Notes, *see id.* Ex. 3 at SING 618, the combined $17.9 million in Pinnacle's Series 9 and 10 New York bank accounts, by definition, represents either: (i) the funds Pinnacle used to purchase the MS ACES CDOs; or (ii) the dollar value of the MS ACES CDOs that Pinnacle purchased. Moreover, Pinnacle consented to New York jurisdiction in those subscription agreements, further demonstrating that Pinnacle sought the protection of New York's laws. *See* McNeela Decl. Ex. 31 at § 6.

Thus, these transactions not only facilitated Defendants' fraudulent scheme but lie at its core: it was Defendants' *sub rosa* creation, rigging, and shorting of the Underlying Assets and Pinnacle's purchase of those assets that resulted in Plaintiffs' injury. These contacts are sufficient to confer jurisdiction over Pinnacle. *See Gulf Coast Dev. Corp.*, 2003 WL 22871914, at *3 ("A single act of transferring funds to a New York bank account has been held to constitute the 'transaction of business from which [the] cause of action directly arises and thus has been held sufficient for the

19

exercise of long-arm jurisdiction' under section 302(a)(1).") (quoting *Correspondent Servs. Corp.*, 120 F. Supp. at 404-05 (internal citations omitted)).[16]

Lastly, the record developed to date establishes a reasonable probability that Plaintiffs will be able to establish that Pinnacle also transacted business in New York through its agents, which included certain of its co-Defendants.  It is undisputed that: (i) MS International, in its capacity as Pinnacle's "Determination Agent," selected the MS ACES CDOs as the Underlying Assets, *see* Tr. at 115:20-116:20, 119:10-120:2, 122:6-14, and that MS Capital in New York was the counter-party to those CDOs, *see* McNeela Decl. Ex. 13 at 27, Ex. 14 at 27, Ex. 15 at 27, Ex. 16 at 23, Ex. 17. at 21; (ii) Pinnacle granted several of Defendants' employees powers of attorney, including at least one employee who resides in New York (Mr. Brian Neer), in order to carry out various aspects of the Pinnacle Notes transactions, *see id.* Dec. Ex. 33, Ex. 44; and (iii) Maples Finance instructed MS International to pay for Pinnacle's expenses via, *inter alia*, wire transfers to Maple Finance's New York bank account, *see id.* Ex. 26 (invoices providing wire instructions); *see also Madanes*, 981 F. Supp. at 261 (citing *Lancaster v. Zufle*, 165 F.R.D. 38, 41 (S.D.N.Y. 1996) (holding that written power of attorney creates agency relationship and finding personal jurisdiction where, among other things, defendant's attorney engaged in New York banking transactions on defendant's behalf).

Although discovery from Pinnacle's co-Defendants is far from complete, it is highly likely

---

[16] Pinnacle has not previously argued that the exercise of personal jurisdiction would not comport with Due Process.  *See* Dkt. No. 19, Defendants' Memorandum of Law in Support of Motion to Dismiss, at 46-51; Dkt. No. 28, Defendants' Reply Memorandum of Law in Support of Motion to Dismiss, at 22-24.  In any event, Pinnacle's purposeful use of bank accounts in New York to facilitate the fraud and to receive the very funds at issue in this litigation provides sufficient minimum contacts.  *See generally HSH Nordbank*, 2012 WL 2921875, at *4 n.3 ("[T]he personal jurisdiction analysis under § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous . . . ."); *see also Licci*, 673 F.3d at 61 n.11 ("Th[e] similarity of state-law and constitutional standards appears particularly evident with respect to [§ 302(a)(1)].").

that additional employees of Pinnacle's agents were employed in New York or transacted business

on Pinnacle's behalf in New York,[17] considering, *inter alia*, Defendants frequently sent Pinnacle

transactional documents to Defendants' New York-based email accounts including

"nycln@morganstanley.com," and "nytaxdocs@morganstanley.com." *See, e.g.,* McNeela Decl. Ex.

45, Ex. 46.

### B.   Jurisdiction Over Pinnacle Is Appropriate Based on Its Co-Conspirators' Acts in New York

This Court also has long-arm jurisdiction over Pinnacle based on its co-conspirators' conduct

in New York in furtherance of Defendants' fraudulent scheme. *See* AC ¶¶ 3, 5, 12, 20, 34, 83, 104,

227, 280 (asserting conspiracy among the Defendants). Under Sections 302(a)(1) and (2), a plaintiff

is not required to establish a formal agency relationship, but can rely instead on the acts of a

defendant's co-conspirators to establish jurisdiction.[18] To do so, a plaintiff must adduce facts: (i)

establishing a *prima facie* showing of conspiracy;[19] (ii) warranting the inference that the defendant

was a member of the conspiracy; and (iii) showing that the defendants' co-conspirator transacted

business or committed a tortious act within the meaning of Section 302(a)(1) or (a)(2). *See First*

*Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 394 (S.D.N.Y. 2002) (citing

---

[17] Mr. Gordon was unable to identify the particular Morgan Stanley entities that employed the individuals to whom Pinnacle granted powers of attorney. *See* Tr. at 107:5-108:4.

[18] *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) ("Many courts in this circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory.") (collecting cases); *see also Mandanes*, 68 F. Supp. 2d at 261 (jurisdiction proper over foreign corporation used by New York co-conspirators to fraudulently conceal funds).

[19] Under New York law, a conspiracy requires: (i) a corrupt agreement between two or more persons, (ii) an overt act in furtherance of the agreement; (iii) the party's intentional participation in furtherance of the plan or purpose, and (iv) resulting damage or injury. *See Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

*Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 119-20 (E.D.N.Y. 2000)).

Additionally, to establish the requisite agency relationship under a co-conspirator theory, a plaintiff must demonstrate that: (i) the defendant had an awareness of the effect in New York of its co-conspirator's activities; (ii) the co-conspirators conduct was to the benefit of the defendant; and (iii) the co-conspirator acted at the direction, control, or behest of the defendant, or on the defendant's behalf or with its knowledge and consent. *First Capital Asset Mgmt., Inc.*, 218 F. Supp. 2d at 394; *see also Dixon v. Mack*, 507 F. Supp. 345, 351-52 (S.D.N.Y. 1980) (defendant's knowing ratification of co-conspirator's activity suffices to establish agency relationship). All requirements are met here.

With respect to the elements of a conspiracy and Pinnacle's membership therein: *First*, the corrupt nature of the agreement is manifest from the transactional and offering documents themselves, which: (i) delineate each Defendant's precise role in the scheme; and (ii) demonstrate that Defendants agreed, but did not inform investors until after they had purchased the Notes, that Pinnacle would use the investors' principal to purchase CDOs which MS Capital structured and shorted. *Compare* Am. Answer ¶¶ 128-32 (admitting that for each and every Series of Notes issued over a year-and-a-half period Defendants selected only MS ACES CDOs as the Underlying Assets), *with* McNeela Decl. Ex. 3 at 621-22 (claiming in Base Prospectus that "information about which particular Eligible Investment(s) comprise the Underlying Assets would not be available at the time of the investors decide to purchase the Notes").

*Second*, because there is no dispute that the sale of each Series of Notes was consummated,

the requirement of an overt act of the agreement is easily satisfied.[20]

*Third*, Pinnacle's intentional participation and membership in the conspiracy is established by the fact that Pinnacle: (i) was created by the Defendants solely for the purpose of issuing the Pinnacle Notes, *see* McNeela Decl. Ex. 3 at 618, Ex. 18, Ex. 19; (ii) was completely funded by the Defendants, *see id.* Ex. 25 at § 3, Ex. 22 at §§ 7.1, 7.2; (iii) was ostensibly helmed by employees of an affiliate of the law firm that Defendants retained to create Pinnacle, *see* Tr. at  20:10-19, 40:21-43:12, 63:13-17; (iv) did not engage in any business other than that which Defendants proposed, *see id.* at 64:5-10, 81:24-82:3, 90:2-23, 91:12-17, 94:14-95:22; and (iv) approved the issuance of each Series of Pinnacle Notes as well as the purchase of the Underlying Assets, *see id.* at 94:14-95:22, 115:20-116:19, 119:15-120:2, 122:15-23; *see also Madanes*, 981 F. Supp. at 261 (defendants' creation of foreign corporation to facilitate the "fraudulent[] hiding" of funds demonstrated that foreign corporation "was aware of its part in an elaborate scheme" and was sufficient to confer jurisdiction under a co-conspirator theory).

*Fourth*, Plaintiffs were injured, since Defendants have admitted that the MS ACES CDOs, *i.e.*, the Underlying Assets they created and selected for each Series of Notes, lost their value resulting in a "Mandatory Redemption Event" and the transfer of Plaintiffs' funds to Defendants. *See* Am. Answer ¶¶ 128-32.

With respect to the conspiracy's New York nexus:  Pinnacle's co-conspirators transacted business and committed tortious acts in New York in furtherance of their fraudulent scheme.  MS Capital, in New York:  (i) was the counter-party to the Pinnacle Notes CDS, *see* McNeela Decl. Ex.

---

[20]   In any event, other overt acts include: MS International's selection and Pinnacle's purchase of the Underlying Assets; MS Capital's structuring of the Underlying Assets; Morgan Stanley's Guaranty of MS Capital's swap obligations; and MS Singapore's arranging of the deal.

34; (ii) structured the rigged MS ACES CDOs, *see id.* Ex. 13 at 1, Ex. 14 at 1, Ex. 15 at 1, Ex. 16 at 1, Ex. 17 at 1; (iii) served as the counter-party to those investments, *see id.* Ex. 13 at 27, Ex. 14 at 27, Ex. 15 at 27, Ex. 16 at 23, Ex. 17 at 21; and (iv) established bank accounts for Pinnacle relating to those investments, *see id.* at Exs. 38-41.  Relatedly, Plaintiffs' funds were transferred to MS Capital's bank accounts in New York when the MS ACES CDOs failed.  *See* McNeela Decl. Ex. 37 ("Notice and Account Details" section of Swap Confirmations identifying MS Capital's New York bank account as recipient of transfer payments); s*ee also Sierra Rutile Ltd. v. Katz*, No. 90 Civ. 4913, 1992 WL 236208, at *10 (S.D.N.Y. Sept. 8, 1992) (finding personal jurisdiction over out-of-state defendant where acts of co-conspirators included use of New York City banks in furtherance of scheme).  Additionally, the record reflects that Morgan Stanley, in New York, guaranteed MS Capital's payment obligations to Pinnacle, and that Morgan Stanley in New York reviewed and approved Defendants' Pinnacle Notes marketing efforts.  *See* McNeela Decl. Ex. 2, Ex. 29.

With respect to the requisite agency relationship: *First*, Pinnacle was plainly aware of the effects of its co-conspirators activities in New York.  MS Capital, in New York, was the counter-party to the Synthetic CDOs that MS International selected as Pinnacle's agent, and that Pinnacle purchased using funds it maintained in a New York bank account with MS Capital.  Moreover, the MS ACES CDO transactional documents make clear that New York was the location of the transfer payments to MS Capital under the CDS. *See* McNeela Decl. Ex. 37 ("Notice and Account Details" section).

*Second,* the co-conspirator's New York conduct benefitted Pinnacle.  Morgan Stanley guaranteed MS Capital's payment obligations to Pinnacle, *see* McNeela Decl. Ex. 2, MS Capital established bank accounts with Pinnacle in New York, *see id.* Exs. 38-41, which facilitated

Pinnacle's purchase of the Underlying Assets and its fulfillment of its swap obligations, and Morgan Stanley filed tax documents on Pinnacle's behalf related to those accounts, *see id.* Ex. 43; *see also Madanes*, 981 F. Supp. at 261 (foreign corporation created by co-conspirators solely to further fraudulent scheme benefitted via its receipt of the fraudulently obtained funds).

*Lastly*, the record demonstrates that those actions were performed on Pinnacle's behalf and with its knowledge and consent. *See* McNeela Decl. Ex. 2. (guaranty letter from Morgan Stanley addressed to Pinnacle), Ex. 31 (Subscription Agreements for MS ACES CDOs signed by Pinnacle), Ex. 43 (Pinnacle's email communications providing tax documents in connection with its New York bank accounts to Morgan Stanley in New York to file on its behalf).

Accordingly, Plaintiffs have sufficiently established jurisdiction over Pinnacle based on the in-forum actions of its co-conspirators.

## CONCLUSION

For the foregoing reasons, the Court should find that Plaintiffs have made a sufficient showing of jurisdiction in accordance with the Second Circuit's limited remand order and should maintain Pinnacle as a party to the action subject to the Court's anti-suit injunction.

Dated: January 4, 2013

Respectfully submitted,

**KIRBY McINERNEY LLP**

By:   /s/ Daniel Hume
Daniel Hume
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: 212-371-6600
Fax: 212-751-2540
*Counsel for Plaintiffs*

25