UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GE DANDONG; LOH TUCK WOH PETER; SINGAPORE GOVERNMENT STAFF CREDIT COOPERATIVE SOCIETY, LTD; NI YAN AMY; ANG SOO CHENG; CHOH GEK HONG JOHNSON; NG SHOOK PHIN SUSAN; and ZHAO YUZHENG,<br><br>              Plaintiffs,<br><br>        -vs.-<br><br>PINNACLE PERFORMANCE LIMITED; MORGAN STANLEY ASIA (SINGAPORE) PTE; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY CAPITAL SERVICES INC.; MORGAN STANLEY & CO. INC.; and MORGAN STANLEY,<br><br>            Defendants. | Case No.: 10 Civ. 8086 (JMF)(GWG) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

**KIRBY McINERNEY LLP**
Daniel Hume
Andrew M. McNeela
Christopher S. Studebaker
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: 212-371-6600
Facsimile: 212-751-2540

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Pinnacle Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.    Overview of the Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            2.    Customary CLN Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            3.    The Pinnacle Offering Materials and Sale . . . . . . . . . . . . . . . . . . . 5

      B.    Both The Pinnacle Notes and Their Underlying Assets Deviated From
           Customary Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Defendants' Fraudulent Conduct and the Offering Documents'
           Uniform Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    Defendants' Fraudulent Scheme Worked, Resulting in
           Windfall Gains and Massive Investor Losses . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.     Standard Governing Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.    The Proposed Class Satisfies Rule 23(a)'s Requirements . . . . . . . . . . . . . . . . . 18

      A.    The Proposed Class Meets the Numerosity Requirement . . . . . . . . . . . . . . 18

      B.    There Are Questions of Law and Fact Common to the Entire Class . . . . . . . . 18

      C.    Plaintiffs' Claims Are Typical of the Other Class Members . . . . . . . . . . . . . . 20

      D.    Plaintiffs Will Fairly and Adequately Represent the Class . . . . . . . . . . . . . . . 21

III.   The Proposed Class Satisfies Rule 23(b)(3)'s Requirements . . . . . . . . . . . . . . . . 22

      A.    Common Questions of Law and Fact Predominate . . . . . . . . . . . . . . . . . . . 22

            1.    Plaintiffs' GFFD Claims Can Be Established
                 Through Common Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.    Plaintiffs' Fraud Claims Can Be Established
Through Common Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.    Individualized Damages Issues do not Defeat Predominance . . . . . . . . 33

B.    The Superiority Requirement Is Satisfied Here . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.    Lead Counsel Satisfy Rule 23(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

**CASES:**                                                                    **Page No.**

*Ackerman v. Price Waterhouse*,
   252 A.D.2d 179 (N.Y. App. Div. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Alcantara v. CNA Mgmt., Inc.*,
   264 F.R.D. 61 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Amchem Prods. Inc., v. Windsor*,
   521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 34

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Bridge v. Phx. Bond Indem. Co.*,
   553 U.S. 639 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bussie v. Allmerica Fin. Corp.*,
   50 F. Supp. 2d 59 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.*,
   No. 650957/2010 (N.Y. Sup. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chislom v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

*Cross v. 21st Century Holding Co.*,
   No. 00 Civ. 4333, 2004 WL 307306 (S.D.N.Y. Feb. 18, 2004) . . . . . . . . . . . . . . . . . . . 18

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dandong v. Pinnacle Performance Ltd.*,
   No. 10 Civ. 8086, 2011 WL 5170293 (S.D.N.Y Oct. 31, 2011) . . . . . 3, 4, 7, 8, 10, 19, 31

*DeMarco v. Nat'l Collector's Mint, Inc.*,
   229 F.R.D. 73 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Epstein v. MCA, Inc.*,
   50 F.3d 644 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ersler v. Toshiba Am., Inc.*,
    No. 07 Civ. 2304, 2009 WL 454354 (E.D.N.Y. Feb. 24, 2009) . . . . . . . . . . . . . . . . 26, 31

*Fiala v. Metro Life Ins. Co.*,
    No. 0601181/2000, 2006 WL 4682149 (N.Y. Sup. Ct. May 2, 2006),
    *aff'd as modified*, 52 A.D.3d 251 (N.Y. App. Div. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Fogarazzo v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Friar v. Vanguard Holding Corp.*,
    78 A.D.2d 83 (N.Y. App. Div. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32

*Green v. Wolf Corp*,
    406 F.2d 291 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Chase Bank USA, N.A. Check Loan Contract Litig.*,
    274 F.R.D. 286 (N.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Checking Account Overdraft Litig.*,
    281 F.R.D. 667 (S.D. Fla. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Coordinated Title Ins. Cases*,
    2 Misc. 3d 1007(A), 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004) . . . . . . . . . 27, 30, 32

*In re Drexel Burnham Lambert Grp.*,
    960 F.2d 285 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re U.S. Foodservice Inc. Pricing Litig.*,
    No. 07 MD 1894, 2011 WL 6013551 (D. Conn. Nov. 29, 2011) . . . . . . . . . . . . . . . . . 26

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007),
    *vacated in part on other grounds*, 574 F.3d 29 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 18, 34

*In re Woodward & Lothrop Holdings, Inc.*,
    205 B.R. 365 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson v. Geico Cas. Co.*,
    673 F. Supp. 2d 255 (D. Del. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kenavan v. Empire Blue Cross & Blue Shield*,
    No. 91 Civ. 2393, 1993 WL 128012 (S.D.N.Y. Apr. 19, 1993) . . . . . . . . . . . . . . . . . . . 27

*Kennedy v. Jackson Nat'l Life Ins. Co.*,
    No. 07 Civ. 0371, 2010 WL 2524360 (N.D. Cal. June 23, 2010) . . . . . . . . . . . 27, 31, 32

*King v. Club Med*,
    76 A.D.2d 123 (N.Y. App. Div. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Koppel v. 4987 Corp.*,
    191 F.R.D. 360 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
    516 U.S. 367 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 32

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 33

*Nat'l Seating & Mobility, Inc. v. Parry*,
    No. 10 Civ. 2782, 2012 WL 2911923 (N.D. Cal. July 16, 2012) . . . . . . . . . . . 23, 24, 33

*Negrete v. Allianz Life Ins. Co. N. Am.*,
    238 F.R.D. 482 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31-33

*Norflet v. John Hancock Life Ins. Co.*,
    No. 04 Civ. 1099, 2007 WL 2668936 (D. Conn. Sept. 6, 2007) . . . . . . . . . . . . . . . . . . 26

*Peterson v. H & R Block Tax Servs., Inc.*,
    174 F.R.D. 78 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Robidoux v. Celani*,
    987 F. 2d 931 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Seekamp v. It's Huge, Inc.*,
    No. 09 Civ. 0018, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) . . . . . . . . . . . . . . . . . . 26

*Spark v. MBNA Corp.*,
    178 F.R.D. 431(D. Del. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
    256 F.R.D. 284 (D. Conn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 30, 31

*Stanich v. Travelers Indemnity Co.*,
    249 F.R.D. 506 (N.D. Ohio 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Taylor v. Am. Bankers Ins. Grp., Inc.*,
    267 A.D.2d 178 (N.Y. App. Div. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Williams v. Wells Fargo Bank, N.A.*,
    280 F.R.D. 665 (S.D. Fla. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Yue v. Conseco Life Ins. Co.*,
    282 F.R.D. 469 (C.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Rules:**

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Authorities:**

Antulio N. Bomfim,
    *Understanding Credit Derivatives and Related Instruments* (2005) . . . . . . . . . . . . . . . . 7

Arvind Rajan, Glenn McDermott & Ratul Roy,
    *The Structured Credit Handbook* (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

Barclays,
    *The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations*
    (Mar. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Frank J. Fabozzi, Henry A. Davis, & Moorad Choudhry,
    *Credit-Linked Notes: A Product Primer*,
    The Journal of Structured Finance (Winter 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Frank J. Fabozzi,
    *The Handbook of Fixed Income Securities* (8th ed. 2012) . . . . . . . . . . . . . . . . . . . . 4, 6, 7

Jessie Eisinger,
    *Financial Crisis Suit Suggests Bad Behavior at Morgan Stanley*,
    N.Y. Times, Jan. 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Morgan Stanley Fixed Income Research,
    *CDO Market Insights – Manager Matters* (Jan. 12, 2007) . . . . . . . . . . . . . . . . . . . . 12, 31

Morgan Stanley,
    *Structured Credit Insights* (Apr. 27, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

# PRELIMINARY STATEMENT

*"[R]etail is a bit stupid . . . at least they don't have size and they don't act together."*[1]

Plaintiffs are retail investors who purchased an investment known as the Pinnacle Notes, which Defendants[2] structured and issued in seven Series during 2006 and 2007. In its October 31, 2011 decision, the Court held that Plaintiffs pleaded claims for fraud, fraudulent inducement, and breach of the covenant of good faith and fair dealing ("GFFD"). Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs respectfully request certification of the following class (the "Class"):

> All persons who purchased Pinnacle Notes Series 1, 2, 3, 6, 7, 9, and 10 or their successors in interest and thereby suffered damages, excluding: the Defendants named herein; any of Defendants' Officers or Directors or their immediate family members; or any firm trust, partnership, corporation, or entity in which a Defendant or its Officers or Directors or their immediate family members, has a controlling interest.

The Plaintiffs also seek their appointment as Class Representatives, and the appointment of Kirby McInerney LLP ("KM") as Lead Class Counsel.

The crux of the action is that Defendants engaged in a uniform scheme to defraud the Pinnacle Notes investors – and to deprive them in bad faith of the benefits of their investment – by reinvesting their principle into certain subsidiary investments, known as "Underlying Assets," which Defendants created, made highly susceptible to loss, and bet against. When the Underlying Assets

---

[1] Excerpt from correspondence among Defendants' personnel commenting that the Pinnacle investors were too "stupid," small, and disorganized to take collective action in the event they learned that the mark-to-market price Defendants quoted for the Pinnacle Notes post-issuance was "fake" and substantially inflated. *See* Declaration of Andrew M. McNeela ("McNeela Decl.") Ex. 1 at SING 245875.

[2] Defendants are Pinnacle Performance Limited ("Pinnacle"), Morgan Stanley Asia (Singapore) Pte ("MS Singapore"), Morgan Stanley & Co. International plc ("MS International"), Morgan Stanley Capital Services Inc. ("MS Capital"), Morgan Stanley & Co. Inc. ("MS & Co."), and Morgan Stanley.

suffered losses, as intended, the investors' funds were "swapped" to Defendants. Defendants perpetrated their scheme through uniform omissions contained in uniform Offering Materials that they created, and which were the only sources of information regarding the Pinnacle Notes' terms available to investors. The Offering Materials failed to disclose: (i) basic information regarding the structure of the Underlying Assets, including that they would be financial instruments that Defendants created; (ii) that Defendants stood to gain and the investors stood lose if those Underlying Assets performed poorly; (iii) that Defendants therefore had a manifest conflict of interest; and (iv) that Defendants succumbed to this conflict of interest and utilized their unilateral control over the Underlying Assets to intensify the risk of loss in order to benefit at the Pinnacle investors' expense.

This case thus presents the prototypical example of an action where class treatment is appropriate. The Pinnacle investors, including the named Plaintiffs here, are numerous, all engaged in similar transactions based on uniform Offering Materials, and all suffered losses due to Defendants' uniform misconduct. As a consequence, Plaintiffs' GFFD and fraud-based claims can be established at trial through evidence common to the class as a whole, and common issues of law and fact predominate.

Accordingly, Plaintiffs respectfully request that the Court issue an Order: (i) certifying the Class; (ii) appointing Plaintiffs as Class Representatives; and (iii) appointing KM as Lead Class Counsel.

**STATEMENT OF FACTS**

**A.     The Pinnacle Notes**

**1.     Overview of the Notes**

The Pinnacle Notes are a type of credit derivative known as a credit-linked note ("CLN"), which Defendants issued through Pinnacle Performance Limited, a Cayman Islands Special Purpose Vehicle ("SPV") that they created. *See* McNeela Decl. Ex. 2. As relevant to this action, Defendants offered seven Series of Notes between August 2006 and December 2007, to hundreds if not thousands of retail investors in Singapore. Each Series was available to the retail public during a brief offering period that lasted about a month on average. *See* McNeela Decl. Ex. 3 at ii; *id*. Ex. 4 at ii; *id*. Ex. 5 at ii; *id*. Ex. 6 at ii; *id*. Ex. 7 at ii.

**2.     Customary CLN Structure**

CLNs are akin to a form of insurance that shifts the credit risk associated with certain Reference Entities ("REs") from a protection buyer (the bank) to a protection seller (the investor). *See Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *1 (S.D.N.Y Oct. 31, 2011); *see also* Expert Declaration of Craig Wolson ("Wolson Decl.") at ¶¶ 2.01-03. The agreement transferring the credit risk is known as a Credit Default Swap ("CDS"). *See Dandong*, 2011 WL 5170293, at *1; *see also* Wolson Decl. at ¶ 2.03. Under the CDS, the protection seller's investment in the CLN is used to indemnify the protection buyer if the REs experience a "credit event." In exchange for assuming that risk, the protection seller receives: (i) periodic credit protection payments from the protection buyer; and (ii) the return of its principal when the CLN matures less any payments made to the protection buyer. *See Dandong*, 2011 WL 5170293, at *1; *see also* Wolson Decl. at ¶¶ 2.03-04.

3

During a CLN's term, the money raised by the sale of the Notes – *i.e.*, the investors' principal – is reinvested in subsidiary investments known as "Underlying Assets." *See Dandong*, 2011 WL 5170293, at *1; *see also* Wolson Decl. at ¶ 2.06. Depending on whether a credit event occurs, the Underlying Assets are either used to pay the protection buyer or are returned to the protection seller. *See Dandong*, 2011 WL 5170293, at *1; *see also* Wolson Decl. at ¶ 2.06; Expert Report of Ilya Eric Kolchinsky ("Kolchinsky Decl.") at ¶ 25. Accordingly, it is normally in both the protection seller's and the protection buyer's interests to ensure that the Underlying Assets are preserved during the term of the CLN. (¶ 9) (unless otherwise noted, citations to "¶__" refer to the Amended Complaint); *see also* Wolson Decl. at ¶ 2.07.

For this reason, the Underlying Assets typically consist of safe, conservative investments, such as Treasury Bills.[3] *See Dandong*, 2011 WL 5170293, at *1; *see also* Wolson Decl. at ¶ 2.07. Thus, "from the perspective of the investor, the single most important risk exposure in a CLN is . . . the credit risk associated with the reference entit[ies]," and not the Underlying Assets. *Dandong*, 2011 WL 5170293, at *2 (internal quotation marks omitted); *see also* Wolson Decl. at ¶ 2.05 ("The size of the credit protection payment depends on the creditworthiness . . . of the CLN Reference Entities."); *id.* at ¶ 2.07.

---

[3] *See* Morgan Stanley, *Structured Credit Insights*, at 29 & n.1 (Apr. 27, 2007) (noting that both CLNs and CDOs typically hold Underlying Assets in "low-risk 'eligible collateral'" that included "investments in cash or government bonds or guaranteed investment contracts (GICs) issued by highly rated insurance companies") (McNeela Decl. Ex. 8); Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, at 332 (8th ed. 2012) ("The SPV uses the proceeds from issuing the CLNs to purchase the pre-agreed collateral securities. They are normally risk free securities, such as Treasury bills.") (McNeela Decl. Ex. 9); Frank J. Fabozzi, Henry A. Davis, & Moorad Choudhry, *Credit-Linked Notes: A Product Primer*, The Journal of Structured Finance, at 71 (Winter 2007) ("The proceeds of the CLN are invested in risk-free collateral such as Treasury bills.") (McNeela Decl. Ex. 10).

### 3. The Pinnacle Offering Materials and Sale

The Offering Materials for each Series of Pinnacle Notes consisted of a Base Prospectus, common to all Series of Notes, and Series specific Pricing Statements. *See* McNeela Decl. Ex. 12 at iv (definition of Offering Materials in Base Prospectus). The Pricing Statements were materially indistinguishable from one another with respect to the Notes' description of the Underlying Assets (referred to as the "collateral/security" in the "Term Sheets"). *See id*. Ex. 3 at 12-13; *id*. Ex. 4 at 13-14; *id*. Ex. 5 at 13-14; *id*. Ex. 6 at 31-32; *id*. Ex. 7 at 30-31. Each Pricing Statement also contained a two page term sheet ("Brochure"), *see id*. Ex. 3 at ii-iii; *id*. Ex. 4 at ii-iii; *id*. Ex. 5 at ii-iii; *id*. Ex.6 at ii-iii; *id*. Ex. 7 at ii-iii, which provided an executive summary of the transactions' key terms and doubled as the Pinnacle Notes advertisements, (¶¶ 127(a), 245, 254); *see also* McNeela Decl. Ex. 11 at SING 216755 ("Advertising is an extract of the Pricing Statement."). Defendants offered the Notes "to the retail public in the Republic of Singapore solely on the basis of the information contained and the representations made in the Base Prospectus . . . and the Applicable Pricing Statement." *Id.* Ex. 12 at i.

Prospective investors were required to complete an Application Form that: (i) Defendants created; (ii) incorporated the terms and conditions of the Offering Materials; and (iii) committed investors to purchase the amount of Notes for which they subscribed in the event their applications were accepted. *See id*. Ex. 13 at ¶¶ 1-3. MS Singapore was responsible for weighing and approving/accepting the investor applications on Pinnacle's behalf. *See id*. Ex. 12 at 1 (noting that the Arranger "MS Singapore" was "involved in the offer acceptance process"); *id*. Ex. 3 at 15 ¶ 14 (Pricing Statement noting that Pinnacle applications were accepted "in consultation with" MS Singapore).

If approved, the investors did not purchase the Pinnacle Notes from the Defendants directly. Instead, "[t]he retail Notes [were] distributed exclusively by locally-licensed banks or securities companies selected by Morgan Stanley (the "Distributors"), and appointed pursuant to a standard master distributor appointment agreement." McNeela Decl. Ex. 14 at SING 215674 (emphasis added). The Master Distributor Appointment Agreement explicitly barred the Distributors from providing any information not contained in the Offering Materials or from utilizing their own marketing materials. *See id.* Ex. 15 at §§ 5.4, 7.10; *see also id.* Ex. 11 at SING 216755 ("All advertising produced by [MS Singapore]. *Distributors not permitted to produce their own marketing materials*.") (emphasis added). Not only were Defendants the sole authors of any materials conveyed to investors, but they meticulously tracked the Offering Materials and advertisements that they provided to each Distributor. *See, e.g.*, *id*. Ex. 16.[4]

## B. Both The Pinnacle Notes and Their Underlying Assets Deviated From Customary Practice

Although the CDS market consisted primarily of institutional investors, the Defendants sold the Pinnacle Notes to *retail investors* in Singapore. *See* Wolson Decl. at ¶ 2.02.[5] Those retail investors stood as the protection sellers, while MS Capital – Morgan Stanley's alter-ego with respect

---

[4] Defendants also extensively trained the Distributors' representatives: "In Singapore, on the pinnacle notes, because there is no middleman, we visit every single branch to promote the note every single time. Training is also done by MS so we directly influence what the distributors say to their clients." McNeela Decl. Ex. 17 at SING 224194.

[5] Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, at 1544 (8th ed. 2012) (CLN purchasers typically include "commercial and investment banks," "[i]nsurance companies," "hedge funds," "pension funds, mutual funds and companies") (McNeela Decl. Ex. 9); Arvind Rajan, Glenn McDermott & Ratul Roy, *The Structured Credit Handbook*, at 17 (2007) ("*Handbook*") (stating "[b]anks, insurance companies, corporations, and hedge funds actively trade in the default swap market") (McNeela Decl. Ex. 18); *Handbook*, at 21 (chart identifying categories of purchasers and sellers of CDS and showing that retail investors did not participate in CDS market).

to over-the-counter derivatives transactions – was the protection buyer and counter-party to the Notes. (¶¶ 134-35, 146-48).

The REs for each Series of Pinnacle Notes (the "CLN REs") consisted of approximately five to seven secure sovereign nations and corporations that Defendants touted prominently in the Offering Materials. *See Dandong*, 2011 WL 5170293, at *11 ("Plaintiffs were enticed by relatively safe CLNs, secured by sovereign nations and highly-rated corporations."); *see also* Kolchinsky Decl. at ¶¶ 19, 22 (Table). Because, as noted above, the primary driver of CLN risk is typically the CLN REs' creditworthiness,[6] Defendants pitched the Notes as safe, conservative investments that presented an attractive alternative to bonds. *See* McNeela Decl. Ex. 20 at SING 162963. Relatedly, since "payment on the CLN is linked to the performance of the reference asset or entity,"[7] the Pinnacle Notes offered only *slightly* higher yields than contemporaneous fixed deposits.[8]

Because Pinnacle was a shell entity that lacked any offices, assets, employees, or day-to-day management, *see id*. Ex. 12 at 9, it appointed MS International as its "Determination Agent," responsible for selecting the Underlying Assets, *id*. Ex. 12 at 2, 12-13. In this connection, MS

---

[6] *See* Wolson Decl. at ¶ 2.07; *see also* Antulio N. Bomfim, *Understanding Credit Derivatives and Related Instruments*, at 126 (2005) (McNeela Decl. Ex. 19); Frank J. Fabozzi, Henry A. Davis, & Moorad Choudhry, *Credit-Linked Notes: A Product Primer*, The Journal of Structured Finance, at 71 (Winter 2007) ("Investors in the CLN will have exposure to the reference asset or entity, and the repayment of the CLN is linked to performance of the reference entity.") (McNeela Decl. Ex. 10).

[7] Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, at 332 (8th ed. 2012) (McNeela Decl. Ex. 9); *see also id*. at 1546 ("The [CDS] protection seller is any investor who takes a view that the premium is attractive given his or her view of the risk of default of the reference entity."); Wolson Decl. at ¶ 2.05.

[8] For example, the annual return for Series 1 was 6.4% while the average annualized return for 6 month U.S. Treasury Bills during the Pinnacle Notes offering period – August 7, 2006 to September 15, 2006 – was 5.13%. *See* McNeela Decl. Ex. 21 (charts providing the annual return on the Pinnacle Notes and the return for 30, 60, and 90 day U.S. Treasury Bills).

International was vested with "sole and absolute discretion," McNeela Decl. Ex. 12 at 12, provided

the Underlying Assets were rated AA as of the date of issuance, and were acceptable to MS Capital,

*see id*. Ex. 3 at 12.  This arrangement proved convenient:  for each Series of Notes, MS International

selected single-tranche Synthetic CDOs (the "MS ACES CDOs") that MS Capital created:

> [The MS ACES CDOs were] yet another example of a credit default swap.  In this case, [t]he the SPV sells protection on [a] collateral pool of assets to the sponsoring financial institution . . . and receives a premium for the risk being assumed.  The protection-selling SPV takes  a long position on the risk, while the protection buying counterparty takes a short position on the risk.  When a credit event occurs with respect to any asset in the collateral pool, the SPV pays the protection buyer an amount linked to loss incurred on the asset.  Usually the CDOs are divided into tranches, with riskier tranches yielding greater returns.  Some banks, however, offer single-tranche CDOs that allow purchasers to bet on a particular band of risk in the overall portfolio.  From the perspective of the investor, CDOs – much like CLNs – are bets on the creditworthiness of the collateral pool of assets in any given tranche.

*Dandong*, 2011 WL 5170293, at *2 (internal quotation marks and citations omitted); *see also*

Kolchinsky Decl. at ¶ 27 (Table); McNeela Decl. Ex. 61 at 1 (noting that MS Capital, as counter-

party, was charged with "selecting the Reference Entities"); *id*. Ex. 62 at 1 (same); *id*. Ex. 63 at 1

(same); *id*. Ex. 64 at 1 (same); *id*. Ex. 65 at 1 (same); *see also* (¶¶ 16-17, 142, 145, 152-60).

MS Capital was also the short counter-party to the MS ACES CDOs – *i.e.*, the party that

stood to gain if the CDOs suffered credit losses – while the investors were assigned the "long"

position when Pinnacle purchased the MS ACES CDOs with their principal.  *See Dandong*, 2011

WL 5170293, at *2; *see also* McNeela Decl. Ex. 61 at 27 (noting that MS Capital was "swap"

counter-party); *id*. Ex. 62 at 27 (same); *id*. Ex. 63 at 27 (same); *id*. Ex. 64 at 23 (same); *id*. Ex. 65

at 21 (same).

"In a typical [CDO] transaction, there are three main decision steps for potential investors:"

(1) "[s]elect a portfolio of credit events to which they want exposure," (2) "[c]hoose a subordination

level (attachment point) and a tranche size," (3) "[d]ynamically manage their position and substitute credits in the collateral portfolio throughout the life of a [CDO]." *Handbook*, at 153 (McNeela Decl. Ex. 18); *see also* Wolson Decl. at ¶ 3.08. Here, however, the MS ACES CDOs deviated from industry custom on all three points: (i) the portfolio of CDO REs were not negotiated at arms-length, but were unilaterally selected by MS Capital, the party that stood to gain if those REs experienced credit events; (ii) the tranche structure was also not negotiated, but unilaterally determined by Defendants; and (iii) Defendants did not appoint an independent collateral manager to select and manage the portfolios.[9] *See* Wolson Decl. at ¶ 4.05; Kolchinsky Decl. at ¶¶ 27, 29; *see also* McNeela Decl. Ex. 22 ("[T]he Synthetic CDOs that we select are not managed.").

## C.    Defendants' Fraudulent Conduct and the Offering Documents' Uniform Omissions

Because Defendants did not provide Plaintiffs with specific information regarding the structure of the Underlying Assets – including that they would be selecting CDOs that MS Capital created and shorted – *until after* Plaintiffs had purchased the Pinnacle Notes, Defendants were able to utilize their unilateral control over the MS ACES CDOs to surreptitiously concentrate risk. (¶¶ 153, 162-69, 212). Defendants did so by: (i) selecting a highly disproportionate number of CDO REs at elevated risk of default in the event of a downturn in the housing and financial markets, (¶¶ 167-210);[10] and (ii) manipulating the MS ACES CDOs' tranche characteristics, particularly the

---

[9] Independent collateral managers play a key role in CDO transactions because they traditionally select the REs and manage that portfolio during the CDO's term. *See* Barclays, *The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations*, at 22 (Mar. 2002) ("The asset manager is by far the most important participant in any CDO transaction . . . .") (McNeela Decl. Ex. 66).

[10] A recent *New York Times* Article that examined documents disclosed in another action brought against Morgan Stanley – *China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.*, No. 650957/2010 (N.Y. Sup. Ct.) – buttresses Plaintiffs' allegations that Defendants in 2006 and 2007

attachment points, so that the CDO would suffer sudden, swift, and total impairment upon even modest RE defaults, as compared to standard, contemporaneous CDOs, (¶¶ 154, 167-244).

The Offering Materials did not disclose Defendants' actual conflict of interest, or their self-dealing in structuring and selecting the Underlying Assets in order to benefit at Plaintiffs' expense. (¶¶ 259-81); *see also* Wolson Decl. at ¶¶ 5.01-02. As the Court observed: "even a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that Morgan Stanley would select inherently risky underlying assets and short them." *Dandong*, 2011 WL 5170293, at *14.

Indeed, at even the most basic level, the Offering Materials deceived, claiming that "information about which particular Eligible Investment(s) comprise the Underlying Assets will not be available at the time the investors decide to purchase the Notes of such Series." *See, e.g.*, McNeela Decl. Ex. 12 at 13; *see also id*. Ex. 3 at 12. As Judge Sand observed, however, the fact that each Series of Notes followed the exact same blueprint for over a year-and-a-half period – *i.e.*, MS International's selection of bespoke Synthetic CDOs that Defendants created and shorted, (¶¶ 1, 16-17, 142, 145-48, 152-60) – "raise[s] the suspicion that MS International had no intention of selecting anything apart from the synthetic CDOs created by MS Capital." *Dandong*, 2011 WL 5170293, at

---

were aware of and positioned themselves to gain from the impending financial crisis. *See* Jessie Eisinger, *Financial Crisis Suit Suggests Bad Behavior at Morgan Stanley*, N.Y. Times, Jan. 23, 2013 (McNeela Decl. Ex. 23); *see also Dandong*, 2011 WL 5170293, at *11 (noting Morgan Stanley's chief economist had predicted housing crisis in 2006). According to the article, Defendants' internal documents indicate that: (i) in 2006 "people across the bank understood the American housing market was in trouble" and "took advantage of that knowledge *to create and then bet against securities and then also to unload garbage investments on unsuspecting buyers*"; and (ii) that by early 2007 "the bank appeared to realize the subprime market was faring even worse than it expected . . . so Morgan Stanley bankers set to scouring the world to peddle as safe and sound investments what its own employees were internally deriding." *See* McNeela Decl. Ex. 23 (emphasis added).

\*13.  This suspicion is confirmed by Defendants' internal documents.[11]

Notably, months before the issuance of the first Series of Notes, Defendants provided Distributors with details regarding the Underlying Assets' structure, including the number of REs in the CDO portfolio, the approximate tranche dimensions, and the number of REs that would need to suffer a credit event for the tranche to suffer principal impairment.  *See*, *e.g.,* McNeela Decl. Ex. 20 at SING 162967-68 (specifying that there would be 100 REs in the CDO portfolio and that if less than 10% of those REs experienced a credit event, the tranche would lose value).  None of that information, however, was included in the Offering Materials.[12]

Nor, as discussed below, did the Offering Materials disclose that Defendants would:  (i) play ratings arbitrage between Fitch, Moody's, and S&P in order to create the riskiest CDOs that could still garner an AA rating; (ii) routinely lower their internal credit standards in order to approve riskier CDO portfolios for the Underlying Assets; and (iii) not appoint independent collateral managers for any of the CDOs, despite Morgan Stanley's admission that "managers matter," are "a major determinant of [CDO] performance," and  "*manager choice is perhaps the most important decision*

---

[11] *See, e.g.*, McNeela Decl. Ex. 24 at SING 170243 ("Please keep this in context – there is no real underwriting going on *as this is a package arrangement* where the ACES notes are exact collateral for the Pinnacle notes.") (emphasis added).

[12] Not only did the Master Distributor Appointment Agreement that Defendants made the Distributors sign bar them from disclosing aspects of the Pinnacle transactions that were not described in the Offering Materials, Defendants also confiscated the presentation materials when their meetings with the Distributors concluded.  *See* McNeela Decl. Ex. 25 ("As previously discussed, the Distributors will not be allowed to take away this training material."); *id*. Ex. 26 (noting that "[t]he training material has been sanitized to ensure that it does not contain any information that is not in the Prospectus," and excising those portions regarding the structure of the Underlying Assets); *id*. Ex. 27 at SING 34480 (discussing need "to control the training material[]" provided to Distributor and to make sure Distributor understands it is "NOT an offer document and for internal use only").

*that investors need to make*." Morgan Stanley Fixed Income Research, *CDO Market Insights – Manager Matters*, at 464 (Jan. 12, 2007) (emphasis added) (McNeela Decl. Ex. 28)

Indeed, from the very outset of the Pinnacle Notes Programme, Defendants' goal was to "re-optimize" the MS ACES CDO portfolio in order to "make it riskier," while still coaxing an AA rating at the time of closing. *Id*. Ex. 29. One of the ways Defendants accomplished this goal was to select Fitch over other ratings agencies for the specific reason that Fitch was the most aggressive, and therefore would bestow an AA rating upon a CDO that would not pass muster with the other agencies. *See, e.g.*, *id*. Ex. 30 ("Here are the rating result[s] for Pinnacle 3 collateral. Surely this is a rating arbitrage. For Fitch rating, the attachment point could be 3.6% with a 40bps buffer. However, on the S&P rating, the attachment point need[s] to be 6.18% of higher. *A huge discrepancy*!") (emphasis added); *id*. Ex. 31 ("'Fitch rating is more aggressive than S&P now. For example, the new portfolio for Pinnacle . . . that I am working on right now is AAA rated by Fitch if we attach at 4.66%, but the same tranche will only [be] rated BBB+ if we use S&P").[13]

Not only did Defendants' selection of Fitch permit them to create lower, thinner tranches than they could have with Moody's or S&P, but it also enabled them to include numerous REs that had been placed on negative ratings watch by those agencies, but not the more aggressive Fitch. Thus, for example, of the 100 REs Defendants selected for the MS ACES CDO underlying the first Series of Pinnacle Notes, 11 were placed on negative ratings watch by either Moody's or S&P, while six

---

[13] Defendants played games with the Distributors as well when it came to ratings. For example, Defendants told Distributors that the actual rating was akin to AA+, when in fact Defendants knew that, as a result of their ratings arbitrage, even the AA ratings technically achieved were not true reflections of the heightened risk that those tranches would fail. *See, e.g.*, McNeela Decl. Ex. 32 ("As for CDO, we are both having AA rated tranche. However, I must stress that we have to go through internal investment committee and I would say it is indeed AA+ tranche.").

of the 11 were placed on negative ratings watch by both of those agencies.  *See* McNeela Decl. Ex. 33.[14]    Remarkably, Defendants' selection of risky CDO REs was so aggressive that even they worried that some of the REs might be downgraded before the deal closed and the MS ACES CDOs were issued.  *See, e.g.*, *id*. Ex. 29.  The balancing act, therefore, was to select risky REs that would maintain their ratings through closing.  Thus, when Fitch notified Defendants that a number of the CDO REs they selected were "subject to LBO risk" and "could be severely downgraded in a short period of time . . . affect[ing] the rating of [the CDO] *shortly after closing*," *id*. Ex. 35  (emphasis added), Defendants nonetheless retained those REs, requiring Fitch to provide a disclaimer with its ratings issuance, *see id*. Ex. 36 at SING 107070 ("The portfolio contains five reference entities currently on Ratings Watch Negative due to potential leveraged buyout (LBO) activity.  Should their respective LBOs proceed, it is likely that these entities will be downgraded by several notches.").

This was the true reason that Defendants could not reveal the CDO REs prior to closing: they needed the flexibility in order to substitute REs up until the last minute in case their initial selections  were downgraded too early.  Thus, in response to a potential Distributor's inquiry as to why, if a given CDO portfolio was to consist of 125 REs, Defendants could not disclose to investors a list of 150 RE candidates prior to closing and simply choose from that pool, Defendants responded that this was not possible because there was a significant possibility that *more than* 25 of the REs they were considering would suffer a downgrade during the brief offer period.  *See id*. Ex. 37.

Defendants also surreptitiously lowered their internal lending standards in order to approve

---

[14] Similarly, out of the 125 REs  in the portfolio for the MS ACES CDO issued in connection with Pinnacle Notes Series 6, 17 of the REs were on negative ratings watch with either Moody's or S&P, and seven of the 17 had been placed on negative ratings watch by both agencies.  *See* McNeela Decl. Ex. 34.

increasingly risky Underlying Assets for the Pinnacle Notes. Specifically, although it was Defendants' internal policy that CDO portfolios needed to withstand "2 times the highest historical S&P default rate for [an] equivalent portfolio type," McNeela Decl. Ex. 38 at SING 163251,[15] the Defendants lowered that multiple to 1.5 in order to approve the MS ACES CDOs, *see, e.g.*, *id*. Ex. 40 at SING 16681 ("AA CDO . . . please note that this portfolio will not pass the 2x historical default analysis"); *id*. Ex. 41 ("It looks like using our original collateral criteria of 2x historical defaults makes the trade not work. At 1.5x historical worst the trade works."). Thus, for example, when Defendants determined that the standard 2x historical default analysis would require an attachment point of 5.79% for one of the MS ACES CDO tranches, they decided to lower the criteria to 1.5x in order to approve a much riskier attachment point of 4.58%. *See id*. Ex.38.

Even *after* each Series of Pinnacle Notes closed, Defendants sought to keep information on the MS ACES CDOs as difficult as possible to obtain. Defendants did not provide copies of the ACES offering materials to investors but required them to travel to Defendants' offices in order to physically inspect the documents. *See*, *e.g.*, *id*. Ex 3 at 21. When one of the Distributors requested such information, Defendants responded: "We also strongly encourage you NOT TO mass mail this . . . . We are legally NOT obligated to release this information at mass to the note holders. This is thus, purely for your private info only." *Id*. Ex. 42 (emphasis in original). Similarly, when Distributors notified the Defendants of mounting investor "doubts" regarding the "Pinnacle Series CDOs" and requested a "presentation," Defendants did not want to provide information to the investors: "I am able to give a quick talk to your [representatives] . . . . We try not to open up to

---

[15] *See also* McNeela Decl. Ex. 39 at SING 221934 (Collateral "[n]eeds to pass pre-agreed objective tests: . . . . Historical Buffer: Attachment must be > 2 x Historical S&P").

clients for now."  McNeela Decl. Ex. 43.

Defendants, however, were well aware that information regarding the Underlying Assets was material, and that their terse disclosures were exceedingly opaque.  As early as the first Series of Notes, Defendants internally noted that in order to increase sales, they needed to "allay all those concerns over the CDO collateral."  *Id.* Ex.  44.[16]  That did not mean, however, actually disclosing the CDOs' true risks at the expense of generating sales.  *See id.* Ex. 47 (MS Singapore sales force discussing colleague's inability to do sales in connection with Pinnacle Notes and noting "u must create the need rather than highlight the risk and dare the investor to put money with u").

Defendants later conceded the materiality of the information they had failed to disclose, when they discussed the "re-vamp[ing] of" the "Asia retail" marketing materials "to make sure people understand what they are buying," while hoping that "the business does not *drop dead* when we impose new [disclosure] standards."  *Id.* Ex. 48 (emphasis added).[17]

---

[16] *See also* McNeela Decl. Ex. 45 (prospective distributor for later Series noting that in deciding whether to sell the Pinnacle Notes or a competitor's product, "the preference is toward the other since [the] transparency regarding the underlying CDO is higher"); *id.* Ex. 46 at SING 218318 (in response to an inquiry from "UBS Wealth Management" seeking additional information regrading the composition of the MS ACES CDOs and their relationship to the Pinnacle Notes, Defendant's employee commented internally "I can write an entire essay on this which will take the entire day"); *id.* Ex. 37 at SING 245177 (distributor commenting that "one feedback that I feel is worthwhile . . . is to incorporate a provision of full disclosure on the underlying CDO basket of names that are slated for these CLNs . . . in the interest of better transparency for clients").

[17] *See also* McNeela Decl. Ex. 49 (in light of increasing public skepticism of CDOs, Defendants discussed the need for "[i]ncreased disclosure in the marketing materials . . . to further highlight the CDO collateral as key aspect of the trade."); *id.* Ex. 50 (amid increased complaints, discussing the need to "re-vamp marketing materials and documentation to highlight CDOs (synthetic CDO needs to be highlighted along with its details as prominently as the other features of the transaction).  *We need to get comfortable that investors will know that they are buying a synthetic CDO . . . .*" and not just a CLN) (emphasis added).

## D. Defendants' Fraudulent Scheme Worked, Resulting in Windfall Gains and Massive Investor Losses

Although each Series of Pinnacle Notes suffered total or near total losses, it was not because any of the surface level CLN REs experienced a credit event. Rather, the five to seven secure CLN REs that Defendants selected and touted for each Series of Notes, and that attracted investors, performed perfectly. (¶¶ 24, 128(b), 129(b), 130(b), 131(b), 132(b)). Rather, all of the investors' losses were due to the failure of the normally secure Underlying Assets that Defendants unilaterally created and selected. *See* Kolchinsky at ¶¶ 35-39, 44; *see also* Answer to Am. Compl. ¶¶ 128-132 (admitting that each of the MS ACES CDOs suffered losses sufficient to cause a mandatory redemption event)). Because MS Capital positioned itself as the short counter-party to the MS ACES CDOs, when those investments failed, all of the Pinnacle investors' principal was transferred to MS Capital under the CDO CDS. (¶¶ 15-21, 24).

## ARGUMENT

## I. Standard Governing Class Certification

Rule 23 of the Federal Rules of Civil Procedure governs the determination of class certification. The party moving for class certification must first show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition, the movant must also satisfy one of the categories set forth in Rule 23(b). Here, certification is sought pursuant to Rule 23(b)(3), which requires that:

> the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). The factors pertinent to this determination include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (internal quotation marks omitted). As such, "Rule 23 grants courts no license engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194-95.[18]

A plaintiff seeking certification may rely on documentary evidence, affidavits, and the complaint's well-pleaded allegations to satisfy its showing. *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y. 2005).

---

[18] Because the court can alter or amend a class certification order at any time before final judgment, *see* Fed. R. Civ. P. 23(c)(1)(C), "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999).

## II. The Proposed Class Satisfies Rule 23(a)'s Requirements

### A. The Proposed Class Meets the Numerosity Requirement

Rule 23(a) requires that the members of the Class be so numerous that joinder of all members is impracticable. "[I]mpracticable" does not mean impossible, however, and "[p]laintiffs are not obligated to prove the exact class size to satisfy numerosity." *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333, 2004 WL 307306, at *1 (S.D.N.Y. Feb. 18, 2004); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) (plaintiff "may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class")

Here, Counsel has been retained by more than 200 Pinnacle Notes investors in the relevant Series, *see* McNeela Decl. ¶ 2, which represents just a subset of the total number of investors, and is sufficient to satisfy the numerosity requirement. *See Alcantara v. CNA Mgmt., Inc.*, 264 F.R.D. 61, 64–65 (S.D.N.Y. 2009) (numerosity presumed where it's reasonably inferred that class contains 40 members or more).[19]

### B. There Are Questions of Law and Fact Common to the Entire Class

"The commonality requirement [of Rule 23(a)(2)] is met if plaintiffs' grievances share a common question of law or of fact." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). This requires plaintiffs simply to "identify some unifying thread among the members' claims that warrants class treatment." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007) (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007), *vacated in part on other*

---

[19] Defendants have informed Plaintiffs that they do not intend to challenge the numerosity requirement.

*grounds*, 574 F.3d 29 (2d Cir. 2009)). "[I]t is sufficient if a single common issue is shared by the class." *DeMarco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D. 73, 80 (S.D.N.Y. 2005).

Here, the crux of the action is that Defendants engaged in a uniform scheme in connection with each Series of Notes, pursuant to which they surreptitiously created and shorted inherently risky Underlying Assets in order to enrich themselves at Plaintiffs' expense. *See Dandong*, 2011 WL 5170293, at *2. The misconduct alleged is uniform for each of the seven Series of Notes, (¶¶ 127-32), and includes uniform omissions contained in a Base Prospectus common to all Series, and Pricing Statements that are materially indistinguishable overall, and identical with respect to those sections giving rise to the omissions (*i.e.*, the Underlying Assets section). *See* McNeela Decl. Ex. 3 at 12-13; *id*. Ex. 4 at 13-14; *id*. Ex. 5 at 13-14; *id*. Ex. 6 at 31-32; *id*. Ex. 7 at 30-31. Moreover, the Brochures, which are part of the Pricing Statements, uniformly address, but omit the same key information concerning the Underlying Assets. *See id*. Ex. 3 at ii-iii (referred to as "collateral/security"); *id*. Ex. 4 at iii (same); *id*. Ex. 5 at iii (same); *id*. Ex. 6 at iii (same); *id*. Ex. 7 iii (same); s*ee Amgen*, 133 S. Ct. at 1196, 1208 ("[T]his Court has held that loss causation and the falsity or misleading nature of defendants' alleged statements or omissions are common questions" and that "materiality is a common question for purposes of Rule 23(b)(3).") (internal quotation marks and alterations omitted).

Thus, there are numerous issues common to the Class, including, but not limited to:

• Whether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets, including conflicts of interest, from the investors (*See* Statement of Facts ("SOF") at Point C, *supra*);

• Whether the omitted information was material and whether Defendants acted with *scienter* when they omitted material facts (*See id*. Point C, *supra*);

- Whether Defendants utilized their unilateral authority over the Underlying Assets to select CDOs that they created and shorted, thereby creating an express conflict of interest *vis á vis* the Pinnacle Investors, and, if so, whether they acted in bad faith (*See id*. at Points B & C, *supra*);

- Whether Defendants utilized their unilateral control over the Underlying Assets to select REs highly susceptible to a downturn in the housing and financial markets, and, if so, whether they acted in bad faith (*See id*. at Points B & C, *supra*);

- Whether Defendants played ratings arbitrage and selected Fitch in order to create the riskiest possible Underlying Collateral still capable of garnering an AA rating, and, if so, whether they acted in bad faith (*See id*. at Points B & C, *supra*);

- Whether Defendants lowered their internal underwriting criteria in order to approve riskier Underlying Assets, and, if so, whether they acted in bad faith (*See id*. at Point C, *supra*);

- Whether Defendants' misconduct injured Plaintiffs (*See id*. at Point D, *supra*).

## C. Plaintiffs' Claims Are Typical of the Other Class Members

Rule 23(a)(3)'s typicality requirement is satisfied when the plaintiff shows that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A*., 126 F.3d at 376. However, typicality does not require "that the situations of the named representatives and the class members be identical." *In re Veeco Instruments, Inc. Sec. Litig*., 235 F.R.D. 220, 238 (S.D.N.Y. 2006) (citation omitted). Rather, so long as "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class," *In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. 267, 280 (S.D.N.Y. 2003), the "typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993).

Here, Plaintiffs' claims are identical to those of the other members of the proposed Class.

Plaintiffs, like all Class members, purchased the Notes pursuant to a uniform application procedure and allege that they were defrauded and suffered damages due to Defendants' undisclosed self-dealing in connection with the Underlying Assets. Therefore, Plaintiffs' claims are typical of the proposed Class.

### D. Plaintiffs Will Fairly and Adequately Represent the Class

Rule 23(a)(4)'s adequacy requirement entails two showings: (i) class counsel must be qualified, experienced, and generally able to conduct the litigation; and (ii) the representative plaintiffs' interests must not be antagonistic to those of the remainder of the class. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

First, KM is amply qualified, experienced, and able to conduct this litigation vigorously and effectively. The Court may take judicial notice of this fact based upon the litigation history of this case to date. KM, on behalf of Plaintiffs, has *inter alia*: prepared and filed the Complaint and Amended Complaint; opposed and defeated Defendants' motion to dismiss; successfully obtained an anti-anti-suit injunction against Defendants and defended that order on appeal; successfully obtained a protective order barring disclosure of certain confidential mediation communications; and conducted significant discovery to date. KM's firm resume is annexed as Ex. 51 to the McNeela Decl.

Second, there are no potential intra-class conflicts here. Indeed, there is not a hint of conflict or antagonism between the claims of the proposed class representatives and those of the other members of the proposed Class.

Third, the Plaintiffs' testimony and the record in this action establish several indicia of their

adequacy: (i) Plaintiffs understand the nature of their claims;[20] (ii) they are aware of the action's procedural posture;[21] (iii) they are familiar with their duties as class representatives;[22] and (iv) they are actively involved litigants as demonstrated through frequent contact with counsel and their review of court documents.[23]

Given that no conflicts, including unique defenses, exist between Plaintiffs' interests and those of other proposed Class members, and that KM is comprised of able and competent lawyers in this area of practice, the adequacy of representation requirement is met.

## III. The Proposed Class Satisfies Rule 23(b)(3)'s Requirements

### A. Common Questions of Law and Fact Predominate

Rule 23(b)(3) sets forth two requirements, the first being that the questions of law or fact common to the members of the class must "predominate" over any questions affecting only

---

[20] *See* McNeela Decl. Ex. 52 at 188:25, 189:2-6, 215:6-24, 216:16-25, 217:2-12, 219:17-23; *id*. Ex. 53 at 169:14-24, 172 8-22, 175 20-25, 176:2-5, 179:11-20, 180:14-25, 181:2; *id*. Ex. 54 at 199:6-14, 205:5-13; *id*. Ex. 55 at 127:13-22, 150:5-10; *id*. Ex. 56 at 206:10-16; *id*. Ex. 57 at ¶¶ 2-4.

[21] *See* McNeela Decl. Ex. 52 at 171:4-21, 228:10-13; *id*. Ex. 53 at 122:12-13, 23-25, 123:2-6, 10-11, 125:16-20; *id*. Ex. 56 at 195:3-12; *id*. Ex. 58 at 164:3-16; *id*. Ex. 59 at 173:16-18.

[22] *See* McNeela Decl. Ex. 52 at 210:11-20, 212: 9-14, 213:18-25, 214:2-4, 16-25, 215:6-24, 238:18-24, 239:25, 240:2-22; *id*. Ex.53 at 117:11-25, 118:23-25, 119:24, 129:14-18, 222:7-12; *id*. Ex. 54 at 177:15-20, 185:10-15, 205:5-13, 219:20-25, 220:2-18; 221:5-23, 251:12-25, 252:3-8, 21-25, 253:2-4; *id*. Ex. 55 at 99:16-25, 100:2-19, 159:25, 160:2-7, 161:11-20; *id*. Ex. 56 at 197:13-18, 201:21-25, 202:2-8, 203:2-10, 15-23, 210:7-15; *id*. Ex. 58 at 155:21-24, 156:17-25, 157:2, 13-21, 158:2-5, 163:3-16, 177:22-25, 178:2-25, 179:2-21; *id*. Ex. 59 at 168:9-25, 169:2-23, 170:7-10, 193:23-25, 194:2-11; *id*. Ex. 60 at 77:24-25, 78:1-18, 87:19-25, 88:1-3, 93:17-21.

[23] *See* McNeela Decl. Ex. 52 at 206:24-25, 207:2-8, 23-25, 208:2-11, 14-17, 25;209: 2-6, 209:18-23, 212:9-14, 219:3-5; *id*. Ex. 53 at 123:17-24, 125:13-20, 126:7-9, 17-25, 127:11-16; *id*. Ex. 54 at 176:10-19, 178:11-20, 252:9-20; *id*. Ex. 55 at 13:22-25, 14: 2-7, 153:19-25, 154:2-4, 154:8-22, 157:6-12; *id*. Ex. 56 at 15:18-25, 16:2, 190:11-24; 191:4-11, 19-24, 192:11-23; *id*. Ex. 58 at 151:23-25, 152:2-24, 153:25, 154:2-7, 167:3-7, 179:22-25, 180:2-19; *id*. Ex. 59 at 158:7-14, 163:17-25, 164:2-7, 172:9-13; *id*. Ex. 60 at 76:8-12, 81:22-24.

individual members. Fed. R. Civ. P. 23(b)(3). The Second Circuit has stated that "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). As discussed below, because Plaintiffs' GFFD and fraud claims can be established through common proof, common questions of fact and law predominate over any individualized inquiries.

### 1. Plaintiffs' GFFD Claims Can Be Established Through Common Evidence

Numerous courts have certified GFFD claims, where, as here, the plaintiffs allege that defendants engaged in uniform misconduct in connection with uniform agreements or corporate policies. *See, e.g., In re Checking Account Overdraft Litig.*, 281 F.R.D. 667 (S.D. Fla. 2012) (certifying GFFD claim where defendants allegedly charged excessive overdraft fees due to bank's practice of sequencing debit card transactions from highest to lowest, because claim could be established through class-wide evidence of defendant's subjective bad faith or objectively unreasonable conduct).[24]

---

[24] *See also Nat'l Seating & Mobility, Inc. v. Parry*, No. 10 Civ. 2782, 2012 WL 2911923, at *1, 10 (N.D. Cal. July 16, 2012) (certifying GFFD claim based on improper calculation of commissions under employment agreements); *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 476, 480 (C.D. Cal. 2012) (certifying GFFD claim in connection with uniform insurance policies); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 671, 675 (S.D. Fla. 2012) (certifying GFFD claim alleging that defendants artificially inflated force-placed insurance premiums where scheme was common to all policies an uniformly implemented); *In re Chase Bank USA, N.A. Check Loan Contract Litig.*, 274 F.R.D. 286, 290, 293 (N.D. Cal. 2011) (certifying GFFD claim in connection with credit card agreement, where bank raised monthly payment, after cardholders had taken out loan, and therefore all class members were subject to the same discretionary policy); *Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 255, 275-76 (D. Del. 2009) (certifying GFFD claims where defendants allegedly had a uniform policy of bad faith denials of benefits under insurance contracts); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 65, 78 (D. Mass. 1999) (certifying GFFD claim

So too here, because all potential Class members applied for and purchased the Pinnacle Notes in accordance with the terms and conditions set forth in a common Base Prospectus and materially indistinguishable Pricing Statements,[25] the issue of whether and how Defendants breached the covenant of GFFD in connection with their selection and structuring of the Underlying Assets would be resolved through common evidence applicable to the class as a whole. *See, e.g., Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("Where the contract contemplates the exercise of discretion," the focus of the GFFD claim is whether Defendants "act[ed] arbitrarily or irrationally in exercising that discretion.").

Indeed, the only potential individualized issue is each investor's damages, which, as noted in Point III.A.3, *infra*, is wholly insufficient to preclude class certification. *See Nat'l Seating & Mobility, Inc.*, 2012 WL 2911923, at *8 (individual damages issues do not preclude certification of GFFD claim).

## 2. Plaintiffs' Fraud Claims Can Be Established Through Common Evidence

As with Plaintiffs' GFFD claims, common issues of fact and law predominate over Plaintiffs' fraud claims. Specifically, because Plaintiffs' fraud claims are based on a uniform scheme perpetrated through uniform omissions in uniform Offering Materials, *see* Point II.B, *supra*, they can be established through proof common to the class as a whole, and are therefore particularly conducive to class treatment. Indeed, as the Second Circuit has observed: "fraud claims based on

---

involving uniform life insurance sales materials); *Spark v. MBNA Corp.*, 178 F.R.D. 431, 433-34, 437 (D. Del. 1998) (certifying GFFD claim where bank misleadingly applied lower APR to certain credit card debts, but not others, in order to maximize payments owed).

[25] Slight deviations in the relevant documents are irrelevant where the terms giving rise to the claims are uniform. *See, e.g.*, *Nat'l Seating & Mobility, Inc.*, 2012 WL 2911923, at *6 (certifying GFFD claim and noting that deviations in agreements were irrelevant).

uniform misrepresentations *. . . are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.*" *Moore*, 306 F.3d at 1253 (emphasis added). Similarly, the Commentary to Rule 23 itself advises that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." Fed. R. Civ. P. 23, Advisory Committee Notes to 1966 Amendment, sub. (b)(3); *see generally Amchem Prods. Inc., v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud.").

This is especially true of frauds arising from uniform financial transactions, as opposed to those based on the purchase of consumer goods, because, depending on the circumstances of the case, reliance can be inferred on a class-wide basis through "circumstantial evidence." *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008), *abrogated by Bridge v. Phx. Bond Indem. Co.*, 553 U.S. 639, 649 (2008);[26] *see also Spencer*, 256 F.R.D. at 302 ("*McLaughlin*

---

[26] In *McLaughlin*, the Second Circuit reversed the district court's certification of a class in a fraud-based civil RICO action consisting of all smokers of "Light" cigarettes from 1971 until the time of trial, which sought $800 billion in damages. *See* 522 F.3d at 215. The plaintiffs asserted that the defendant tobacco manufacturers' various advertisements and statements over the preceding 25 years had created the "implicit representation" that "Light" cigarettes were healthier than regular cigarettes. *Id.* at 220. In holding that individualized issues of reliance would predominate, the Second Circuit observed: "[i]ndividualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative – for example, if a Lights smoker . . . preferred the taste of Lights, or chose lights as an expression of personal style." 522 F.3d at 223; *see also id.* at 225 ("[E]ach plaintiff in this case could have elected to purchase light cigarettes *for any number of reasons*, including a preference for the taste and a feeling that smoking Lights was 'cool.'") (emphasis added). The Second Circuit, however, expressly distinguished fraud claims based on a "financial" transaction from those based on the purchase of a consumer good, because the former do "*not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase*," and class certification may therefore be appropriate. *Id.* at 225 n. 7 (emphasis added); *see also Spencer v. Hartford Fin. Servs. Grp. Inc.*, 256 F.R.D. 284, 302 (D. Conn. 2009) (relying on *McLaughlin*'s distinction between financial transactions versus the purchase of consumer products to certify fraud claim).

explicitly declined to adopt the rule . . . that a requirement to prove individual reliance necessarily defeats certification in a proposed fraud class action" and "made clear that proof of reliance by circumstantial evidence may be sufficient . . . .") (internal marks omitted).

Thus, numerous federal courts within the Second Circuit, as well as New York state courts, have certified reliance-based claims where: (i) the claims were based on uniform misrepresentations; and (ii) there was circumstantial evidence of class-wide reliance. Thus, for example, in *Seekamp v. It's Huge, Inc.,* No. 09 Civ. 0018, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012), the court certified plaintiffs' common law fraud claim, noting that:

> [W]here misrepresentations are materially uniform, an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine. The [Agreement] was a uniform contract entered into by Plaintiff and the proposed class members. Though it is true, as Defendants point out, that each proposed class member may have opted to purchase the [policy] for different reasons, *it is equally clear that every plaintiff would have relied on the implicit representation of the [policy's] legality and beneficialness in deciding whether to purchase it.*

*Id.* at *10 (emphasis added and internal citations omitted).[27]

---

[27] For additional federal cases within the Second Circuit: *see, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, No. 07 MD 1894, 2011 WL 6013551, at *2-3, 10-11 (D. Conn. Nov. 29, 2011) (certifying fraud-based civil RICO claim and finding plaintiffs' payment of invoices provided circumstantial evidence of reliance on defendants' representations that the cost of goods was "based on transactions with '[third-party] suppliers'"); *Ersler v. Toshiba Am., Inc.,* No. 07 Civ. 2304, 2009 WL 454354, at *5 (E.D.N.Y. Feb. 24, 2009) (certifying nation-wide class despite the fact that reliance was an element under certain states consumer protection laws because "it is reasonable to assume" that purchasers of high-end televisions relied on defendants' representations that a component "essential to the useful operation of the television" would function properly); *Spencer*, 256 F.R.D. at 302-03 (certification proper where fraud claim was based on uniform, written misstatements, and reliance could be inferred from nature of misrepresentations); *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 374 (S.D.N.Y. 1997) (for "fraud claims based on uniform written misrepresentations or omissions . . . the court may often infer reliance"); *accord Norflet v. John Hancock Life Ins. Co.*, No. 04 Civ. 1099, 2007 WL 2668936, at *9 & n.6 (D. Conn. Sept. 6, 2007) (certification proper where fraud claim is based on "company-wide policy enforced through its commission system" and not "varied contractual agreements demanding individual factual inquiries") (internal quotation marks omitted); *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365-66

26

Similarly, in *In re Coordinated Title Ins. Cases*, 2 Misc. 3d 1007(A), 2004 WL 690380, *5 (N.Y. Sup. Ct. Jan. 8, 2004), the court certified plaintiffs' fraud claim and rejected defendants' argument that "individual issues of reliance predominate" based on "[t]he basic notion that people don't agree to overpay" and that "'[i]t is almost impossible to envisage circumstances in which a seller would willingly confer a financial gratuity upon the buyer's lender.'" (quoting *Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83, 98 (N.Y. App. Div. 1980)).[28]

Several other jurisdictions have similarly held that reliance can be inferred based on circumstantial evidence applicable to the class as a whole. *See, e.g.*, *Kennedy v. Jackson Nat'l Life Ins. Co.*, No. 07 Civ. 0371, 2010 WL 2524360, at *8 (N.D. Cal. June 23, 2010) ("If plaintiff proves

---

(S.D.N.Y. 2000) (rejecting defendants' argument that "individualized questions of reliance, materiality and causation" precluded certification of, *inter alia*, plaintiffs' "state law fraud" claims in omissions case involving uniform written solicitation); *Kenavan v. Empire Blue Cross & Blue Shield*, No. 91 Civ. 2393, 1993 WL 128012, at *3-4 (S.D.N.Y. Apr. 19, 1993) (rejecting defendants' argument that individual issues of reliance precluded class certification where defendants' "representations regarding policy coverage were contained in standardized promotional brochures").

[28] For additional New York State cases: *see e.g., Fiala v. Metro Life Ins. Co.*, No. 0601181/2000, 2006 WL 4682149 (N.Y. Sup. Ct. May 2, 2006), *aff'd as modified*, 52 A.D.3d 251 (N.Y. App. Div. 2008) ("Courts have held that reliance issues will not bar class certification where identical representations are made in writing to a large group, especially where it is difficult to conceive of a situation where the plaintiff would not have relied on the omission or representation at issue. Once it has been determined that the representations alleged are material and actionable . . . the issue of reliance may be presumed . . . .") (internal quotation marks, citations and alterations omitted); *King v. Club Med*, 76 A.D.2d 123, 127 (N.Y. App. Div. 1980) ("[I]t is not plausible that persons confronted with the very distinct choice in the character of facilities presented in defendants' brochures would have opted to spend a July vacation on a tropical island in a 'luxury' hotel with air conditioning, private bathroom and electricity, without having 'relied' on those representations."); *accord Taylor v. Am. Bankers Ins. Grp., Inc.*, 267 A.D.2d 178 (N.Y. App. Div. 1999) ("Accordingly, given the nature and uniformity of defendants' offers of coverage, any matters relating to individual reliance and causation are relatively insignificant, if not irrelevant, and, as such, do not preclude class certification."); *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 198, 201 (N.Y. App. Div. 1998) (reversing denial of class certification and holding that reliance could be inferred class-wide based on "identical written misrepresentations and omitted warnings")

27

that the annuities do not offer a benefit *in relation to their cost*, a reasonable inference could be drawn that class members would not have purchased them had they been fully informed of material facts.") (emphasis added).[29]

Although there is no bright-line test, the kinds of circumstantial evidence that the cases cited above have found sufficient to support class certification include, but are not limited to: (i) plaintiffs' implicit acceptance of certain key terms (such as in the case of a contract or the payment of an invoice); (ii) circumstances where the omissions were so central to the transaction at issue that any reasonable person would have relied thereon; or (iii) where the plaintiffs' involvement in the transaction would be economically irrational absent reliance.

In keeping with these authorities, Plaintiffs here assert the prototypical fraud where there is circumstantial evidence of class-wide reliance. Unlike a consumer fraud that involves varied motivations and "personal idiosyncratic choice," there is only one reason an investor purchases a financial product such as the Pinnacle Notes: to receive a return on their investment. In this connection, reliance on the Offering Materials' omissions can be inferred for all proposed class

---

[29] For additional federal cases from other jurisdictions: *see, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (holding in fraud case based on uniform contracts, "while each plaintiff must prove his own reliance . . . we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance *is common to the whole class*") (emphasis added); *Stanich v. Travelers Indemnity Co.*, 249 F.R.D. 506, 519 (N. D. Ohio 2008) ("[C]ircumstantial evidence leading to legitimate inferences 'could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations.'"); *Negrete v. Allianz Life Ins. Co. N. Am.*, 238 F.R.D. 482, 491-92 (C.D. Cal. 2006) (holding reliance on misrepresentations was a "'common sense' or 'logical explanation' for the behavior of plaintiffs and the members of the class" and that a jury could infer that "no rational class member would purchase the annuities in question upon adequate disclosure of the facts, regardless of their individual circumstances . . . ."); *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 85 (N.D. Ill. 1997) (in case involving uniform written misrepresentations, reliance could be inferred because it was the only logical explanation for the plaintiffs behavior).

members based on: (i) the fact that Defendants made the sale of, and Plaintiffs agreed to purchase, the Pinnacle Notes subject to the terms and conditions described in the Offering Materials; (ii) expert testimony and learned treatises establishing that Defendants omitted information about the Pinnacle Notes structure that are standard considerations of any reasonable investor; (iii) the economic irrationality of Plaintiffs' investment absent reliance on the omitted information; and (iv) Defendants' admissions.

First, all investors were required to complete and submit standard form applications, pursuant to a uniform application process, that: (i) Defendants created; (ii) specifically incorporated the Offering Materials' terms and conditions; (iii) made clear that the sale of the Notes was subject to those terms and conditions; and (iv) committed Plaintiffs to purchase the Notes if Defendants accepted their application.[30] *See* McNeela Decl. Ex. 13; *id*. Ex. 12 at vi ("The offer of Notes . . . is made solely on the basis of the information" in the Offering Materials). As such, "[i]t does not strain credulity to conclude that each plaintiff," in applying for and obligating themselves to purchase the Notes, "relied upon the defendants' representations." *Klay*, 382 F.3d at 1259.[31]

Second, Plaintiffs' expert testimony and learned treatises also provide circumstantial

---

[30] And all proposed class representatives specifically testified that they reviewed and relied upon the term sheets/Brochures that were included in the Pricing Statements, and which provided an executive summary of the Notes' key terms, including a description of the Underlying Assets. *See* McNeela Decl. Ex. 52 at 83:8-13, 19-23; *id*. Ex. 53 at 35:5-7, 69:12-14; *id*. Ex. 54 at 62:24-25, 63:2-3; *id*. Ex. 55 at 41:10-13, 16-18, 21-24; *id*. Ex. 56 at 28:22-24, 97:13-19; *id*. Ex. 58 at 43:2-3, 43:17-22; *id*. Ex. 59 at 38:3-5, 42:20-25; *id*. Ex. 60 at 44:15-17, 22.

[31] *See also Chislom v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) ("[B]y definition, parties to a contract are aware of and rely on the representations or omissions in the contract.") (cited with approval by *McLaughlin*, 522 F.3d at 225 n.7); *see also McLaughlin*, 522 F.3d at 225 n.7 ("[P]ayment may constitute circumstantial proof of reliance upon a financial representation.").

evidence of class-wide reliance on Defendants' omissions. As those sources make clear, the primary driver of CLN risk, and therefore a primary consideration for investors, is the creditworthiness of the REs. *See* Wolson Decl. at ¶ 2.07. That risk is a direct determinant of the return on investment, which is a CLN investor's other primary consideration. *See id.* at ¶ 2.05 (the riskier the REs the higher the return). In contrast, the Underlying Assets are typically conservative investments that are less risky than the CLN REs; a feature that runs to the benefit of both the CLN investors and the bank purchasing the credit-protection. *See id.* at ¶ 2.07. In the event this structure is reversed, such that the bank purchasing the credit-protection structured the deal in order to make the Underlying Assets the primary risk, an investor's focus would, by definition, shift to the riskiness of the Underlying Assets in order to assess the adequacy of the return.

Here, as alleged by Plaintiffs and evidenced by the record, Defendants reversed the customary allocation of CLN risk by intensifying the Underlying Assets' risk of loss while fraudulently concealing that fact from investors. *See* SOF at Points B & C, *supra*; *see generally In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *6 (certifying fraud and inferring reliance on "[t]he basic notion that people generally don't agree to overpay"); *Spencer*, 256 F.R.D. at 301-03 (inferring reliance and certifying fraud claim where "all plaintiffs released their claims in exchange for an agreed-upon amount, from which 15% was then surreptitiously deducted").

Additionally, CDO investors have three fundamental considerations that are traditionally negotiated at arms-length: (i) the composition of the CDO RE Portfolio; (ii) the attachment point; and (iii) the CDO's management. *See* SOF at Point C, *supra*. Thus, in the event one party exercised unilateral control over these inputs, the resulting structure would deviate materially from customary practice. *See* Kolchinsky Decl. at ¶ 29. Here, the record demonstrates that the MS ACES CDOs

deviated from customary practice in this *exact manner*, and that Defendants fraudulently concealed from investors that they alone would control the CDOs' structure and that there would be no independent collateral manager. *See* SOF at Points B & C, *supra*; *see also Dandong*, 2011 WL 5170293, at *12 (Plaintiffs "have pled what amounts to self-dealing by Morgan Stanley" based on "Morgan Stanley's positions on both sides of the deal"); Morgan Stanley Fixed Income Research, *CDO Market Insights – Manager Matters*, at 464 (Jan. 12, 2007) (presence and selection of collateral manager of utmost importance to CDO investors).

Third, reliance can be inferred from the fact that no economically rational investor would purchase the Pinnacle Notes but for Defendants' omission of the fact that: (i) they had a manifest conflict of interest because they both created and shorted the Underlying Assets, thereby assuming an adversarial position *vis á vis* the investors; and (ii) they utilized their unilateral control over the Underlying Assets to intensify the risk of loss in order to benefit at Plaintiffs' expense. *See* SOF at Points C & C, *supra*; *see also Pinnacle*, 2011 WL 5170293, at *14 ("Even a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that Morgan Stanley would select inherently risky underlying assets and short them."); *Kennedy*, 2010 WL 2524360, at *8 (certifying common law fraud claim and observing that "[n]o reasonable person would have purchased an unsatisfactory investment product had Defendant disclosed the facts Plaintiff alleges it either misrepresented or failed to disclose"); *Negrete*, 238 F.R.D. at 491 (certifying fraud claim on ground that "no rational class member would purchase the annuities in question upon adequate disclosure of the facts, regardless of their individual circumstances . . . .").[32]

---

[32] *See also Spencer*, 256 F.R.D. at 301-03 (certifying fraud claim because plaintiffs who settled claims for sum certain would have invariably relied on omission that defendant surreptitiously deducted 15% therefrom); *Ersler*, 2009 WL 454354, at *5 (inferring reliance on representations

In light of the specific circumstances of the Pinnacle transactions, the inference of class-wide reliance is so manifest that a contrary conclusion would require the Court to presume that the Pinnacle investors were so irrational that, even if they were armed with the information Defendants omitted, they nonetheless would have gifted their money to Morgan Stanley. *See In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *6 (certifying fraud claim on the ground that a party to a transaction does not "'willingly confer a financial gratuity'" upon the other) (quoting *Friar*, 78 A.D.2d at 98) (emphasis added); *Chislom*, 194 F.R.D. at 561 (inferring reliance where "[t]o conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational choice, and leave the Court with an absurd conclusion") (cited with approval by *McLaughlin*, 522 F.3d at 225 n.7); *Kennedy*, 2010 WL 2524360, at *8-9 (certifying fraud claim where defendants failed to disclose material information regarding "annuities that are high cost, illiquid, and poorly performing") (internal quotation marks omitted); *Negrete*, 238 F.R.D. at 492 (same).

Fourth, and finally, Defendants' own conduct and admissions provide further circumstantial evidence of class-wide reliance. That Defendants labored to not only conceal information regarding the Underlying Assets before the issuance of each Series of Notes but also to keep such information as obscure as possible post issuance, provides powerful evidence that they believed the omitted information would have been highly material to the investors' decisions. After all, when the pressure for increased disclosures reached a crescendo after the issuance of the last Series of Pinnacle Notes relevant to this action, it was Defendants themselves who feared that their Asia retail business would "drop dead" once they changed their protocol.

---

regarding televisions' picture bulb since that component is fundamental to televisions' utility).

"Because plaintiffs' evidence may enable them to establish reliance" on a class-wide basis, "the Court [should] find[] that common issues regarding [Defendants'] alleged overarching fraudulent scheme predominate over questions affecting only individual members of the . . . class." *Negrete*, 238 F.R.D. at 492.

### 3.     Individualized Damages Issues do not Defeat Predominance

The only question of law or fact here that is not subject to "generalized proof," *Moore*, 306 F.3d at 1252, is the amount of each class member's damages.  Individual questions of damages, however, are no bar to class certification.[33]

### B.     The Superiority Requirement Is Satisfied Here

A class action must be superior to other available methods for the fair and efficient adjudication of the controversy.  *See* Fed. R. Civ. P. 23(b)(3) (listing factors to consider when determining whether a class action is superior: a) the interest of class members in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; c) whether it is desirable to concentrate litigation of claims in this forum; and d) the manageability of a class action). Each factor strongly favors certification of the Class.

This is the only action asserting claims by investors in the Pinnacle Notes against Defendants.

---

[33] *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *Nat'l Seating & Mobility, Inc.*, 2012 WL 2911923, at *8 (individualized issues of damages did not preclude class certification of good faith and fair dealing claim); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) ("While damages may vary among class members, all share common questions of liability. Damage amounts can be calculated for each individual class member after a determination of liability.").

Concentrating class members' claims in this district, where several of the Defendants are headquartered, where several of the witnesses are located, and where one of the Distributors of the Pinnacle Notes has brought suit against Morgan Stanley, ensures an efficient expenditure of judicial and private resources.

There are no management or administration issues that would cause difficulties going forward or at trial. Indeed, "it is difficult to imagine a case where class certification would be more appropriate. Without it, thousands of identical complaints by [investors] would have to be filed - the very result the class action mechanism was designed to avoid." *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996).

Absent a class action, most class members would be discouraged from even seeking relief because their potential individual recovery would be outweighed by the massive costs of pursuing litigation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *cf. In re Vivendi*, 242 F.R.D. at 91 ("[A] class action in a federal securities action may well be the appropriate means for expeditious litigation of issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.") (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir. 1968)). Accordingly, the superiority requirement is met.[34]

---

[34] Additionally, Singapore recognizes representative actions, and a class action judgment obtained here would likely be enforceable in a Singapore court. *See* Declaration of Professor Michael Furmston at ¶¶ 11-12.

34

**IV.    Lead Counsel Satisfy Rule 23(g)**

Plaintiffs respectfully request that KM be appointed Lead Class Counsel.  KM is experienced in litigating class actions and the type of claims asserted in this action.  KM will fairly and adequately represent the Class because, among other things, it has to date already performed substantial work in, and committed significant resources to, investigating and prosecuting the claims asserted.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for class certification in its entirety.

Dated: March 22, 2013
      New York, New York

                          Respectfully submitted,

                          **KIRBY McINERNEY LLP**

                    By:    /s/ Andrew M. McNeela
                          Daniel Hume
                          Andrew M. McNeela
                          Christopher S. Studebaker
                          825 Third Avenue, 16th Floor
                          New York, NY 10022
                          Tel:  212-371-6600
                          Fax:  212-751-2540

                          *Counsel for Plaintiffs*