# EXHIBIT 9

FABOZZI

# The Handbook of Fixed Income Securities

EIGHTH EDITION



McGraw Hill

# THE HANDBOOK OF FIXED INCOME SECURITIES

**Eighth Edition**

**FRANK J. FABOZZI, Ph.D., CFA, CPA**

*Editor*

*With the assistance of*
**STEVEN V. MANN, Ph.D.**



New York   Chicago   San Francisco   Lisbon   London   Madrid
Mexico City   Milan   New Delhi   San Juan   Seoul
Singapore   Sydney   Toronto

The McGraw·Hill Companies

Copyright © 2012, 2005, 2001, 1997, 1995, 1991, 1987, 1983 by The McGraw-Hill Companies, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

1 2 3 4 5 6 7 8 9 10   DOC/DOC   1 9 8 7 6 5 4 3 2 1

ISBN 978-0-07-176846-7
MHID     0-07-176846-7

e-ISBN 978-0-07-176847-4
e-MHID     0-07-176847-5

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that neither the author nor the publisher is engaged in rendering legal, accounting, securities trading, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.
                    —From a Declaration of Principles Jointly Adopted by a Committee
                       of the American Bar Association and a Committee of Publishers

McGraw-Hill books are available at special quantity discounts to use as premiums and sales promotions or for use in corporate training programs. To contact a representative, please e-mail us at bulksales@mcgraw-hill.com.

This book is printed on acid-free paper.

C

Preface     xxiii
Acknowledgments     xxvi
Contributors     xxvii

PART ONE

BACKGROUND

Chapter 1

Overview of the Types and F
Frank J. Fabozzi, Michael G. Feri

Bonds     3
Preferred Stock     15
Residential Mortgage-Backed Sec
Commercial Mortgage-Backed Se
Asset-Backed Securities     17
Covered Bonds     18
Key Points     18

Chapter 2

Risks Associated with Investi
Ravi F. Dattatreya, Frank J. Faboz.

Interest-Rate Risk     22
Reinvestment Risk     23
Call/Prepayment Risk     24
Credit Risk     25
Inflation, or Purchasing-Power, Ris
Liquidity Risk     27
Exchange-Rate, or Currency, Risk
Volatility Risk     29
Political or Legal Risk     29

(also known as the *underlying securities*). The SPV uses the proceeds from issuing the CLNs to purchase the pre-agreed collateral securities. They are normally risk-free securities, such as Treasury bills. The SPV grants a security interest in the collateral to secure the SPV's future performance under the CLN contract. The cash flow from these high-quality securities is used to pay the interest and principal on the CLNs as long as no credit event occurs. In this structure, the SPV buys credit protection on a single reference asset or entity by entering into a CLN and paying the ongoing premium, which is included in the CLN interest rate. The CLN investors sell the credit protection and receive the premium; they have the credit risk exposure to the reference asset or entity.

At the same time, the SPV simultaneously enters into a CDS agreement with a highly rated swap counterparty. In this swap agreement, the SPV sells credit protection on the same reference asset or entity underlying the CLNs and, in return, receives the CDS premium. Through the combined CLN and CDS structure, the SPV has a neutral credit risk position with respect to the reference asset or entity.

The coupon rate on the CLN is a spread over LIBOR and is funded by the collateral securities and the fee generated by selling protection in the CDS transaction. The SPV's payment on the CLN is linked to the performance of the reference asset or entity. If a specified credit event[1] involving the reference asset or entity occurs, there are three options to settle the CLN and the CDS. First, under the recovery-linked option, a third party sells the reference assets into the market, and the SPV distributes the realized proceeds to the CLN investors to settle the CLN. At the same time, the third party sells the underlying collateral securities and distributes the proceeds to the swap counterparty to settle the CDS. Second, under the physical delivery option, the CDS swap counterparty delivers the reference assets to the SPV and the SPV delivers them to the CLN investors, and the SPV also delivers the underlying collateral securities to the CDS swap counterparty. Third, under the binary option, a specified cash payment is negotiated among the SPV, the CDS counterparty, and the CLN investors at the outset of the transactions. The SPV makes that cash payment to the CDS counterparty if a credit event occurs. It then deducts it from the principal amount owed to the CLN investors and repays the net amount to the CLN investors.

### Reference Obligation Is Emerging Market Sovereign Debt

In the case of CLNs, in which the reference obligation is an emerging market debt obligation, the SPV also may need to enter into an interest-rate swap or a currency swap to reduce interest-rate risk and to tailor the required cash flows of the CLN to the cash flows of the collateral. The resulting package is a CLN that performs similarly to a sovereign bond. Such CLNs are bought by investors who seek an increase in yield as compared with what a comparable sovereign bond would offer and who do not need liquidity during the life of the CLN.

---

1. Credit events typically include bankruptcy, payment default, repudiation, and restructuring.

onto CCPs was well underway, especially for CDS indices, with over fifteen trillion dollars of index trades already cleared by ICE in North America and Europe by early 2011. The first CDS to be cleared via a CCP and in compliance with the new Dodd-Frank regulations was traded in February 2011. Although most CCPs are based at exchanges, trading in the CDS market trades continue to be executed in the OTC market. The CCP then steps into the trade, placing itself between the two initial parties.

As of 2011, the size of the CDS market and CDS index markets is roughly half what it was at the market peak in 2007. A significant part of this decline can be attributed to the numerous compression cycles (discussed below) that have been carried out in the last two years. Some of it may also be due to the decrease in CDS-based and CDS index–based hedging activities of more exotic credit derivatives, in particular synthetic CDOs. Indeed a snapshot of the credit derivatives market in early 2011 shows that CDS made up 57% of the gross notional of credit derivatives, whereas CDS indices made up 34%, leaving just 9% to other transaction types.[6]

## Market Participants

Since its inception, the credit derivatives market has been dominated by commercial and investment banks. Commercial banks have used CDS to hedge the credit risk of their loan book. The advantage of CDS is that they permit the bank to hedge the risk of a specific loan privately and bilaterally. This is often preferred to selling the loan because the sale of a loan by a bank usually requires the bank to notify the borrower and such a sale may be considered to be a negative signal by the borrower and as such may be damaging to the bank–borrower relationship. Surveys of the credit derivatives market have generally found that commercial banks buy more protection than they sell as their loan book hedging requires them to be net protection buyers. Their reason for selling protection is to earn income and diversify their portfolio credit exposure.

Investment banks and the dealer arms of commercial banks play an important role in the credit derivatives markets where they act as dealers. Overall they tend to run balanced books with equal amounts of protection bought and sold.

Insurance companies are also an important user of credit derivatives, primarily as a form of investment on the asset side of their business where they tend to be net sellers of protection. Hedge funds are an important market participant as they are able to play the credit markets from a long or short position and they also tend to buy roughly as much protection as they sell. They are particularly attracted by the ability to go short and the ability to leverage as the upfront payment needed to enter a CDS contract is typically much smaller than the contract notional.

Other users of the market with a lower market share include pension funds, mutual funds and companies. Funds may be more interested in CDS indices in

---

6. These numbers are based on a snapshot of market positions on February 11, 2011 taken from the DTCC Trade Information Warehouse Reports.

out the credit risk of convertible bonds in an attempt to isolate the economics of the embedded equity option.

- *Speculation:* CDS enable market participants to express a positive or negative view on an underlying credit while a CDS index makes it possible to go long or short macro-level credit.
- *Structured credit investments:* CDS can be used as the building blocks for more exotic structured credit investments that are created to provide a more tailored risk-return profile to specific types of investor.
- *Manage regulatory capital:* Banks can use CDS to hedge credits that have a high regulatory capital charge, provided such a hedge is recognized as being economically effective by regulators.

## THE CREDIT DEFAULT SWAP

The simplest way to think of the CDS is as an insurance contract in which one party, the "protection buyer," pays a premium to be protected against a credit loss on a specific face amount of bonds or loans issued by a specified corporate or sovereign reference entity. The other party, known as the "seller of protection," receives the premium and takes on the credit risk. Since there is a buyer and a seller of the credit risk, a CDS contract does not create credit risk, it simple transfers it from the protection buyer to the protection seller as shown in Exhibit 66–1. However, unlike an insurance contract, a CDS is a traded contract that can be valued at any time. The protection seller is any investor who takes a view that the premium is attractive given his or her view of the risk of default of the reference entity.

Care needs to be taken when trading CDS to be clear about to which side of the contract we are referring. In the market, "buying" a CDS contract is usually associated with buying protection. However, buying protection is economically equivalent to shorting credit risk or selling a corporate bond issued by the reference entity. Equally, "selling" a CDS contract is economically equivalent to assuming credit risk and so is akin to buying a corporate bond issued by the

**EXHIBIT  66–1**

A CDS is a Bilateral Contract between a Protection Buyer and a Protection Seller

