# EXHIBIT 10

# Credit-Linked Notes:
# A Product Primer

FRANK J. FABOZZI, HENRY A. DAVIS, AND MOORAD CHOUDHRY

FRANK J. FABOZZI
is an adjunct professor of
finance and Becton Fellow
at Yale School of Manage-
ment in New Haven, CT.
frank.fabozzi@yale.edu

HENRY A. DAVIS
is editor of *The Journal of
Structured Finance* and the
editor of *The Journal of
Investment Compliance.*
hdresearch@aol.com

MOORAD CHOUDHRY
is a visiting professor at
London Metropolitan
University, U.K.

Credit derivatives are grouped into *funded* and *unfunded* variants. In an unfunded credit derivative, typified by a credit default swap, the protection seller does not make an upfront payment to the protection buyer. In a funded credit derivative, typified by a credit-linked note (CLN), the investor in the note is the credit-protection seller and is making an upfront payment to the protection buyer when buying the note. Thus, the protection buyer is the issuer of the note. If no credit event occurs during the life of the note, the redemption value of the note is paid to the investor on maturity. If a credit event does occur, then on maturity a value less than par will be paid out to the investor. This value will be reduced by the nominal value of the reference asset to which the CLN is linked. In this article, we explain how CLNs work and discuss some recent applications.

## DESCRIPTION OF *CLN*s

Credit-linked notes exist in a number of forms, but all of them contain a link between the return they pay and the credit-related performance of the underlying asset or pool of assets. A standard CLN is a security, usually issued by an investment-grade entity, which has an interest payment and fixed maturity structure similar to a conventional bond. The performance of the CLN, however, including the maturity value, is linked to the performance of a specified underlying asset or assets, as well as that of the issuing entity. CLNs are usually issued at par. They are often used as a financing vehicle by borrowers in order to hedge against credit risk; CLNs are purchased by investors to enhance the yield received on their holdings. Hence, the issuer of the CLN is the protection buyer and the buyer of the note is the protection seller.

Essentially CLNs are hybrid instruments that combine a pure credit risk exposure with a conventional bond. The CLN pays regular coupons; however, the credit derivative element is usually set to allow the issuer to decrease the principal amount, and/or the coupon interest, if a specified credit event occurs.

## ILLUSTRATION OF A *CLN*

To illustrate a CLN, consider a bank issuer of credit cards that wants to fund its credit card loan portfolio via an issue of debt. The bank is rated AA–. In order to reduce the credit risk of the loans, it issues a two-year CLN. The principal amount of the bond is 100 (par), and it pays a coupon of 7.50%, which is 200 bps above the two-year benchmark.

Suppose that the equivalent spread for a vanilla bond issued by a bank of this rating would be on the order of 120 bps. With the

CLN though, if the incidence of bad debt among credit card holders exceeds 10% then the terms state that note-holders will only receive 85 per 100 par. The credit card issuer has, in effect, purchased a credit option that lowers its liability in the event that it suffers from a specified credit event, which in this case is an above-expected inci-dence of bad debts. The cost of this credit option to the credit protection buyer is paid in the form of a higher coupon payment on the CLN. The bank has issued the CLN, in the form of this particular type of credit insur-ance, to reduce its credit exposure. If the incidence of bad debts is low, the CLN is redeemed at par. However, if there is a high incidence of such debt, the bank will only have to repay part of its loan liability.

## INVESTOR MOTIVATION

Investors may wish to purchase the CLN because its coupon will be above what the bank would pay on a con-ventional bond, and higher than other comparable invest-ments in the market. In addition, such notes are usually priced below par when they are issued. Assuming no credit event occurs, the notes are eventually redeemed at par and investors will also realize a capital gain.

## SETTLEMENT

As with a credit default swap (CDS), a CLN may be cash settled or physically settled. However, there are differences associated with the funded nature of CLNs and also with the specific type of CLN that is being con-sidered.

The true credit derivative CLN is a note issued by one party that references another party as the credit ref-erence name. However, certain bonds have been labeled CLNs despite being issued by the same company that is the credit reference. For these bonds the occurrence of a credit event signifies immediate termination of the bond, but no settlement process exists, as such, because the pro-tection seller is already holding the bond. In this respect, such CLNs are more akin to conventional cash bonds of the same issuer.[1]

For true CLNs, the settlement process is similar to that for CDS contracts. Consider a CLN issued by ABC Securities that references XYZ Automotive Corporation:

- Under cash settlement, upon occurrence of a credit event, the note is terminated. The protection buyer will pay the default value, or recovery value (RR), of the reference name to the protection seller. This is equivalent to the $[100 - RR]$ payout under a CDS contract.
- Under physical settlement, upon occurrence of a credit event, the note is terminated. The protection buyer will deliver an XYZ Automotive bond, out of a deliverable basket of XYZ bonds, to the pro-tection seller. The protection seller of course retains the original CLN bond issued by ABC Securities. Note that the protection buyer may well be ABC Securities, but does not have to be.

The value of the reference asset at the time of the credit event determines the pay-out under the terms of the CLN. This is known as the recovery value. In prac-tice, a process of administration must be undertaken, in some cases lasting years, before the ultimate recovery value for the various classes of debtors can be realized. To assist payout under a credit derivative contract, a third-party calculation agent may be appointed at the inception of the contract. The role of the calculation agent is to deter-mine the market value of the defaulted reference asset at, or immediately after occurrence of a credit event, so that the CLN may be matured and the redemption proceeds calculated. This would apply under cash or physical set-tlement.

Exhibit 1 illustrates a cash-settled CLN.

## FORMS OF CREDIT-LINKING

CLNs may be issued directly by a financial or cor-porate entity or via a special purpose vehicle (SPV).[2] They have been issued with several different forms of credit-linking. For instance, a CLN may have its return perfor-mance linked to the issuer's or a specified reference entity's credit rating, risk exposure, financial performance, or cir-cumstance of default. Exhibit 2 shows a page from the Bloomberg screen "CLN" with a list of the various types of CLN issues that have been created. Exhibit 3 shows another page accessed from the Bloomberg screen CLN with a list of CLNs whose coupons have been affected by a change in the reference entity's credit rating.

Many CLNs are issued directly by banks and cor-porate borrowers in the same way as conventional bonds. An example of such a bond is shown in Exhibit 4. This shows Bloomberg screen "DES" for a CLN issued by British Telecom plc, specifically, the 8.125% note due

## EXHIBIT 1
### Credit-Linked Note



**Credit-linked note on issue**

Issuer ← Issue proceeds (principal payment) → Investor
Note coupons

Reference asset or entity

**No credit event**

Issuer → Par value on maturity (100%) → Investor

Reference Asset

**Credit event**

Issuer → 100% minus value of reference obligation → Investor

Reference Asset

December 2010. The terms of this note state that the coupon will increase by 25 bps for each one–notch rating downgrade below A–/A3 suffered by the issuer during the life of the note. The coupon will decrease by 25 bps for each rating upgrade, with a minimum coupon set at 8.125%. In other words, this note allows investors to take on a credit play based on the fortunes of the issuer.

Exhibit 5 shows Bloomberg screen "YA" for this note on May 29, 2003. A rating downgrade has changed the coupon on the note to 8.375%.

Exhibit 6 is the Bloomberg DES page for a U.S. dollar–denominated CLN issued directly by Household Finance Corporation (HFC).[3] Like the British Telecom bond, the return of this CLN is linked to the credit risk of the issuer, but in a different way. The coupon of the HFC bond was issued as floating U.S. dollar–LIBOR, but if the bond was not called by November 2001, the coupon

would be the issuer's two–year credit spread over a fixed rate of 5.9%.[4] In fact, the issuer called the bond at the coupon change date. Exhibit 7 shows the Bloomberg screen YA for the bond and how its coupon remained as at first issue until the call date.

Another type of credit–linking is evidenced from Exhibit 8, the Ford CLN Bloomberg DES page. This is a Japanese yen–denominated bond issued by Alpha-Spires, which is a medium–term note program vehicle (a SPV) set up by Merrill Lynch. The note itself is linked to the credit quality of Ford Motor Credit Company. In the event of a default of the reference name, the note will be called immediately. Exhibit 9 shows the rate fixing for this note as of the last coupon date. The screen snapshot was taken on June 6, 2003.

Structured products such as synthetic collateralized debt obligations (CDOs) may combine both CLNs and

## EXHIBIT 2
**Bloomberg Screen CLN**



*Source: © Bloomberg L.P. Used with permission.*

credit default swaps to meet issuer and investor requirements. For instance, Exhibit 10 shows a credit structure designed to provide a higher return for an investor on comparable risk in the cash market. An issuing entity is set up in the form of a SPV that issues CLNs to the market. The structure is engineered so that the SPV has a neutral position on a reference asset. It has bought protection on a single reference name by issuing a funded credit derivative,

## EXHIBIT 3
**Bloomberg Screen Showing a Sample of CLNs Impacted by Change in Reference Entity Credit Rating, October 2002**



*Source: © Bloomberg L.P. Used with permission.*

## EXHIBIT 4

**Bloomberg Screen DES for British Telecom plc 8.125% 2010 Credit-Linked Note Issued on December 5, 2000**



*Source: © Bloomberg L.P. Used with permission.*

the CLN, and simultaneously sold protection on this name by selling a credit default swap. The proceeds of the CLN are invested in risk-free collateral such as Treasury bills. The coupon on the CLN will be a spread over LIBOR. It is backed by the collateral account and the fee gener-ated by the SPV in selling protection with the credit default swap. Investors in the CLN will have exposure to the reference asset or entity, and the repayment of the CLN is linked to the performance of the reference entity. If a credit event occurs, the maturity date of the CLN is

## EXHIBIT 5

**Bloomberg Screen YA for British Telecom CLN, May 29, 2003**



*Source: © Bloomberg L.P. Used with permission.*

## EXHIBIT 6

**Bloomberg DES Screen for Household Finance Corporation CLN**



Source: © Bloomberg L.P. Used with permission.

brought forward and the note is settled as par minus the value of the reference asset or entity.

## THE FIRST-TO-DEFAULT CREDIT-LINKED NOTE

A standard CLN is issued in reference to one specific bond or loan. An investor purchasing such a note is writing credit protection on a specific reference credit. A CLN that is linked to more than one reference credit is known as a *basket credit-linked note*. A variant of the basket CLN is the *first-to-default CLN* (FtD), which is a CLN that is linked to a basket of reference assets. The investor in the CLN is selling protection on the first credit to default.[5]

Exhibit 11 shows a progression in the development of CLNs as structured products, with the *fully-funded synthetic CDO* being the vehicle that uses CLNs tied to a large basket of reference assets.

An FtD CLN is a funded credit derivative in which the investor sells protection on one reference in a basket of assets, whichever is the first to default. The return on the CLN is a multiple of the average spread of the basket. The CLN will mature early upon occurrence of a credit event relating to any of the reference assets. Settlement on the CLN can be either of the following:

- Physical settlement, with the defaulted asset(s) being delivered to the noteholder.
- Cash settlement, in which the CLN issuer pays redemption proceeds to the the noteholder calculated as the difference between the Principal Amount and the Reference-asset Recovery Value.

In practice, it is not the recovery value that is used but the market value of the reference asset at the time the credit event is verified. Recovery of a defaulted asset follows a legal process of administration and/or liquidation that can take some years, and so the final recovery value may not be known with certainty for some time. Because the computation of recovery value is so difficult, holders of a CLN may prefer physical settlement where they take delivery of the defaulted asset.

Exhibit 12 shows a generic FtD credit-linked note.

To illustrate, consider an FtD CLN that is issued at par, with a term-to-maturity of five years, linked to a basket of five reference assets with a face value (issued nominal amount) of $10 million. An investor purchasing this note will pay $10 million to the issuer. If no credit event occurs during the life of the note, the investor will receive the face value of the note on maturity. If a credit event occurs on any of the assets in the basket, the note will redeem early and the issuer will deliver a deliverable

## Exhibit 7

Bloomberg YA Screen for Household Finance Corporation CLN, June 6, 2003



Source: © Bloomberg L.P. Used with permission.

obligation of the reference entity, or a portfolio of such obligations, for a $10 million nominal amount. An FtD CLN carries a similar amount of risk exposure on default to a standard CLN, namely the recovery rate of the defaulted credit. However, its risk exposure prior to default is theoretically lower than a standard CLN, as it can reduce default probability through diversification. The investor can obtain exposure to a basket of refer-

## Exhibit 8

Bloomberg DES Screen for Ford CLN



Source: © Bloomberg L.P. Used with permission.

## EXHIBIT 9
Bloomberg YA Screen for Ford CLN, June 6, 2003



*Source:* © *Bloomberg L.P. Used with permission.*

ence entities that differ by industrial sector and by credit rating.

The matrix shown in Exhibit 13 illustrates how an investor can select a credit mix in the basket that diversifies risk exposure across a wide range; we show a hypothetical mix of reference assets to which an issued FtD could be linked. The precise selection of names will reflect an investor's own risk/return profile requirements.

The FtD CLN creates a synthetic credit entity that features a note return with enhanced spread. Investors receive a spread over LIBOR that is the average return of all the reference assets in the basket. This structure serves to diversify credit risk exposure while benefiting from a higher average return. If the pool of reference assets is sufficiently large, the structure becomes similar to a single-tranche CDO.

## RECENT APPLICATIONS AND ISSUES

We conclude this article with some recent applications and issues. In recent years, CLNs have been frequently used by banks to manage their regulatory capital requirements. However, their use has been subject to some controversy in connection with the Enron and Parmalat bankruptcies. Moreover, they have been used by Russian corporations to gain initial access to international capital markets, and they have achieved some popularity among high-net-worth personal investors.

## EXHIBIT 10
CLN and Credit Default Swap Structure on Single Reference Name



## EXHIBIT 11
**Progression of CLN Development**



A bank can use CLNs both alone and as part of synthetic collateralized loan obligations (CLOs) to diversify its credit exposures and manage its regulatory capital requirements. Assume, for example, that a bank has a $100 loan to XYZ Automotive Corporation which has a 100% risk weighting and is subject to an 8% capital requirement. (To keep it simple, we'll leave aside additional complexities related to Basel II capital requirements.) The bank wants to offload that credit exposure. However, either for relationship reasons or because that particular loan asset would be difficult to sell, the bank prefers to keep the loan on its balance sheet. The bank issues a $100 CLN with XYZ as the reference entity. The bank retains the $100 note proceeds as collateral, either keeping it as cash on its balance sheet or investing it in U.S. Treasury securities. As long as the defined credit events are sufficiently robust that regulators view the CLN as providing true protection against XYZ's credit deterioration, the bank can apply a 0% risk weighting to the $100 collateral. Therefore, rather than setting aside 8% capital, or

$8, for the $100 loan to XYZ, the bank has no capital requirement at all. The bank could also invest the collateral in other securities with a higher-risk weighting and set aside the required capital accordingly. The investor receives a coupon above the normal market rate as compensation for bearing the XYZ credit risk. If there is no defined credit event such as bankruptcy, restructuring, or failure to pay, the investor receives par value for the bond at maturity. If there is a credit event, then in the case of cash settlement the investor receives the default value, or recovery value, of XYZ, the reference credit (as explained earlier in the article) or, in the case of physical settlement, receives an XYZ bond which, of course, will have declined in value.

Nolan [2006] explains how CLNs are also an integral part of CLOs, another instrument used by banks to manage their capital requirements. Let's assume a bank is seeking regulatory capital relief for a portfolio of loans and, here again, it wants to keep those loans on its balance sheet. Acting as the sponsoring bank and the credit

## EXHIBIT 12
**First-to-Default CLN Structure**



## Exhibit 13
**Diversified Credit Exposure to Basket of Reference Assets: Hypothetical Reference Asset Mix**



| | Automobiles | Banks | Electronics | Insurance | Media | Telecoms | Utilities |
|---|---|---|---|---|---|---|---|
| AAA | | | | | | | |
| Aa1 | | | | | | | |
| Aa2 | | | | SunAlliance | | | |
| Aa3 | | RBoS | | | | | |
| A1 | | | | | | | |
| A2 | | | | | | | Powergen |
| A3 | Ford | | | | | British Telecom | |
| Baa1 | | | Philips | | News Intl | | |
| Baa2 | | | | | | | |
| Baa3 | | | | | | | |

protection purchaser, the bank sets up a CLO with an SPV. The bank transfers the entire credit risk on the loan portfolio to the SPV either through a CDS or CLN the bank issues to the SPV.

- If the CDS is used, the SPV (the credit protection seller) assumes the entire credit risk in exchange for periodic credit-spread-premium payments from the bank, the credit protection purchaser. The SPV issues CLNs to investors and uses the proceeds to collateralize its obligations to the bank and grants the bank a perfected security interest in that collateral. The bank's capital requirements are based on the risk weighting of the collateral, which may be as low as 0% in the case of U.S. Treasury securities.
- If CLNs rather than a CDS are used to transfer risk from the credit protection purchaser to the SPV, then the SPV uses the proceeds from CLNs it issues to investors to purchase CLNs from the bank (the credit protection purchaser). Once again, the bank's capital requirements are based on how it invests the collateral.

During the 1990s, CLNs were used by some lenders that wanted to securitize part of their credit exposures to Enron and other large energy companies. Assuming there was no credit event, an investor in such a CLN would receive an above-market return and par value at maturity. But when Enron declared bankruptcy, the lenders were able to swap near-worthless Enron bonds for low-risk securities held in trust by the SPV as collateral, and investors received the Enron bonds. Investors sued the lenders, claiming that those lenders had inside knowledge of Enron's true financial condition when they issued the CLNs and participated with Enron in all the accounting gimmicks it used to disguise that financial condition. To make matters worse, Enron in its bankruptcy proceedings said claims from those bond investors should rank lower than other claims because the underwriting banks were involved in the deception that triggered Enron's collapse.

In another high-profile bankruptcy, Parmalat, an Italian dairy products company, was found to have invested in self-referenced CLNs—CLNs in which Parmalat itself was the reference entity. Farrell [2003] notes that a company may want to buy a CLN on itself because it receives an enhanced yield on a credit risk it is always willing to accept, or at least is in the best position to assess. Furthermore, the company may consider that the redemption of the CLN at a lower price following a credit event would be of no real consequence because the company may no longer be a going concern at the time. If all had gone well, Parmalat would have had just a relatively high-yielding bond asset on its balance sheet. But the identity of that asset was not disclosed, so most lenders and investors had no way of knowing that the value of that investment became impaired as Parmalat's own financial condition deteriorated. Parmalat's motivation to invest in self-referenced CLNs was allegedly to boost the price of its own debt and to influence the price of its credit default swaps.

Over the past five years, CLNs have been a popular instrument for Russian corporations that are just a tier below the largest and best known names, and just beginning to tap international capital markets. Examples of recent issuers include Avtovaz, a leading Russian auto manufacturer; Novatek, Russia's second largest gas producer; and Irkut, one of Russia's largest aircraft builders. By issuing CLNs, a Russian company can make a name for itself and pave the way to issue straight Eurobonds in the future. Current coupons for Russian corporate CLNs

with one-year maturities are about 9.5–10% compared to 8% for Eurobonds issued by better known Russian names, according to Corrado Taveggia, Director and Head of Fixed Income International Sales, at MDM Financial Group in Moscow. MDM and Trust Investment Bank are two of the leading Moscow-based CLN underwriters for Russian companies. Mr. Taveggia observes that investor demand outside Russia is about 50% retail and 50% institutional, with relatively more retail demand in continental Europe and relatively more institutional demand in London. There is also growing demand for CLNs in Singpore, Hong Kong, Japan, China, and Australia as private investors in search of higher yields become more familiar with structured securities.

Recently some investment banking firms have been enhancing their CLN products by investing collateral in higher-risk, higher-yield securities and thereby offering higher coupons to investors. Lehman Brothers, for example, has a CLN product called RACERS for Restructured Asset Certificates with Enhanced ReturnS.

## ENDNOTES

Parts of this article are drawn from Frank J. Fabozzi, Henry A. Davis, and Moorad Choudhry, *Introduction to Structured Finance*, Hoboken, NJ: John Wiley & Sons, 2006.

[1]The reason such bonds are termed CLNs is because their pay-off is linked to a credit-related performance of the issuer; for example, a change in the credit rating.

[2]There are opinions in the marketplace that a CLN is a CLN only if it has been issued by an SPV or if the issuing entity and the reference entity are not the same. The authors' opinion is that any bond whose payoff is partially or wholly linked to the credit performance of a defined entity is a CLN.

[3]HFC was subsequently acquired by HSBC.

[4]Exactly how to calculate the credit spread would be specified in the CLN's offering circular. For example, it could be the difference between current LIBOR and the current yield on one of HFC's other bond issues or the average of current yields on several of its other issues.

[5]Here, "default" means a credit event as defined in the International Swap and Derivatives Association (ISDA) definitions.

## REFERENCES

Farrell, S. "Defending the Value of Self-Referenced Credit-Linked Notes." *International Financial Law Review* (October 2003), pp. 31–33.

Nolan, A.R.G. "Sweet Basel II: The Regulatory Capital Treatment of Securitization and Credit Derivatives Activities of Banking Institutions." Goodwin Procter LLP, January 2006. www.goodwinprocter.com. See Publications, Attorney Articles.

*To order reprints of this article, please contact Dewey Palmieri at dpalmieri@iijournals.com or 212-224-3675*