# EXHIBIT 18

Case 1:10-cv-08086-JMF-GWG    Document 143-18    Filed 03/22/13    Page 2 of 6

WILEY FINANCE

# THE STRUCTURED CREDIT HANDBOOK

Arvind Rajan

Glen McDermott

citigroup

Case 1:10-cv-08086-JMF-GWG    Document 143-18    Filed 03/22/13    Page 2 of 6

Copyright © 2007 by Arvind Rajan, Glen McDermott, and Ratul Roy. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

Wiley Bicentennial Logo: Richard J. Pacifico.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at http://www.wiley.com/go/permission.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books. For more information about Wiley products, visit our Web site at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*

Rajan, Arvind.
    The structured credit handbook / Arvind Rajan, Glen McDermott, Ratul Roy.
        p. cm.—(Wiley finance series)
    Includes bibliographical references and indexes.
    ISBN 978-0-471-74749-9 (cloth)
    1. Credit derivatives.   2. Credit—Management.   3. Default (Finance).
    I. McDermott, Glen, 1968–   II. Roy, Ratul, 1964–   III. Title.
        HG6024.A3R35 2007
        332.7—dc22                                                  2006019227

Printed in the United States of America.

10   9   8   7   6   5   4   3   2

To *the memory*

This bool

M

To *my*

# CHAPTER 1

# A Primer on Credit Default Swaps

## Arvind Rajan

A credit default swap (CDS) is a contract in which the buyer of default protection pays a fee, typically quarterly or semiannually, to the seller of default protection on a reference entity, in exchange for a payment in case of a defined credit event[1] such as default (see Figure 1.1). Default swaps allow credit risk to be isolated and traded between investors. In a sense, they are synthetic bond equivalents, where the buyer of default protection has a position equivalent to shorting a bond, and the seller is in effect being long the bond. However, default swaps introduce counterparty risk. In particular, the buyer of protection is exposed to the seller contingent on the credit event. The intent of this chapter is to provide a basic understanding of the single-name CDS product and its practical implementation in the credit derivatives marketplace.

## THE MARKET FOR CREDIT DEFAULT SWAPS

The market for CDSs originated with banks looking to hedge credit risk in their loan portfolios. This market has grown exponentially since 1997, exceeding the expectations of market participants, and the pace of its growth shows little sign of abating (see Figure 1.2). The set of participants has expanded as well, as more players are seeking credit hedges or yield (a pickup over conventional cash instruments). Banks, insurance companies, corporations, and hedge funds actively trade in the default swap market, which is expected to grow substantially in coming years.

17

*A Primer on Credit Default Swaps*                                                                    **21**





**FIGURE 1.4**  Credit Derivatives Market—Buyers and Sellers Breakdown (Year 2003)
*Source:* BBA Survey 2004.

Second, the protection seller may want to have different parts of the investment exposed to different risk profiles. For example, the investor might want the final payoff of the investment principal to be linked to a single highly rated credit and the coupon payments to the junior STCDO tranche. Such variations, made possible by STCDO technology, are similar in principle to a principal-protected structure, which allows risk-averse investors to enjoy the upside in a risky investment.

Third, the flexibility of STCDOs allows investors to better manage their investments or exposures in conjunction with other business objectives. For example, a life insurance company might prefer to receive a decreasing premium payment scheme to increase its near-term earnings profile and better match its long-term asset/liability mix.

**Ramp-Up Period for Single-Tranche CDOs** The STCDO structure resolves another structural conflict inherent in traditional CDO investments. Traditional cash CDOs or balance-sheet synthetic CDOs are basically supply-driven products because brokers and dealers drive the reference portfolio selection and the ramp-up process. Unless they wish to carry a substantial amount of risk, the originators of a synthetic CDO are forced to sell the entire capital structure to investors. This process can be time-consuming and costly, often implicitly resulting in a conflict of interest between senior and junior investors. With only two parties to a STCDO, the buyer of a tranche (seller of protection) takes on the tranche credit risk and the protection buyer hedges mark-to-market risk in the liquid CDS market. This dramatically reduces the transaction period. Supply and demand for different parts of the capital structure are resolved through differences in the levels of implied correlation.

## Main Decision Steps for Investors

In a typical STCDO transaction, there are three main decision steps for potential investors:

1. Select a portfolio of credits to which they want exposure.
2. Choose a subordination level (attachment point) and a tranche size corresponding to their risk/return preference or yield target.
3. Dynamically manage their position and substitute credits in the collateral portfolio throughout the life of a STCDO.

**Selection of Single-Tranche CDO Reference Portfolio** The first step in structuring a STCDO transaction is the investors' selection of the credits in the underlying reference portfolio according to their preferences. For example,