UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GE DANDONG; LOH TUCK WOH PETER; SINGAPORE GOVERNMENT STAFF CREDIT COOPERATIVE SOCIETY, LTD; NI YAN AMY; ANG SOO CHENG; CHOH GEK HONG JOHNSON; NG SHOOK PHIN SUSAN; and ZHAO YUZHENG, <br><br> Plaintiffs, <br><br> -vs.- <br><br> PINNACLE PERFORMANCE LIMITED; MORGAN STANLEY ASIA (SINGAPORE) PTE; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY CAPITAL SERVICES INC.; MORGAN STANLEY & CO. INC.; and MORGAN STANLEY, <br><br> Defendants. | Civil Action No. 10 CIV 8086 |

**Expert Declaration of Craig A. Wolson**

1. INTRODUCTION AND QUALIFICATIONS

1.01 I have been retained by Ge Dandong, Loh Tuck Woh Peter, Singapore Government Staff Credit Cooperative Society, LTD, Ni Yan Amy, Ang Soo Cheng, Choh Gek Hong Johnson, Ng Shook Phin Susan, and Zhao Yuzheng, Plaintiffs in this case, as an expert to support Plaintiffs' motion for class certification. In particular, I have been asked to: (i) examine the transactions that are the subject of this suit--that is, the sale by Pinnacle Performance Limited ("Pinnacle") of the notes (the "Pinnacle Notes") purchased by the plaintiffs in this case; (ii) determine if those transactions deviated in any way from industry custom and practice relating to credit-linked note ("CLN") and collateralized debt obligation ("CDO") structure, and (iii) determine whether the offering materials for these transactions (the "Offering Materials") omitted information so fundamental to the structuring of the Pinnacle Notes that any reasonable investor would have considered such information material to his

1

or her investment decision. As discussed herein, I conclude that the Pinnacle Notes transaction deviated significantly from standard CLN and CDO structures, that a description of these deviations was omitted from the Offering Materials, and that the omitted information concerned fundamental risk considerations that would have significantly influenced any reasonable investor's decision to purchase the Pinnacle Notes.

1.02  I am Of Counsel to the Law Offices of John F. Lang in New York City. In addition, I am on the roster of arbitrators of the American Arbitration Association; I was chosen for this role in particular because of my expertise in structured finance and derivatives.

1.03  A copy of my Curriculum Vitae is attached hereto as Appendix A. As noted in my Curriculum Vitae, I attended the University of Michigan Law School, where I was an Articles Editor of the *Michigan Law Review*. I was admitted to the Bar of the State of New York in 1975. I began my legal career with the New York law firm of Shearman & Sterling, which at the time was the largest law firm in New York. Thereafter, I was employed by Thomson McKinnon Securities Inc. as Vice President and Assistant General Counsel, by J.D.Mattus Company, Inc. as Vice President, Secretary and General Counsel and by Chemical Bank as Vice President and Assistant General Counsel.

1.04  From 1988 until the present I have worked on hundreds of derivatives transactions. From 1988-92, I served as the main derivatives lawyer for Chemical Bank (now part of JPMorgan Chase), which at the time was the leading interest-rate swaps dealer in the world. During that time, I also served as Chemical's legal representative to The International Swaps Dealers Association (now called The International Swaps and Derivatives Association, but shortened to "ISDA" in all cases), the main trade association for dealers throughout the world involved in derivatives. I was heavily involved in the promulgation of ISDA's Master Agreement forms of 1992, which are still used throughout the industry and which were used by the defendants in this case. Starting in 1994 and continuing until the present, I have also focused on structured finance transactions, including dozens of CDOs (including all the variations thereof--"cash", "synthetic", and "hybrid").

1.05  Beginning in 1995, I worked at several law firms, including Mayer Brown & Platt, Schulte Roth & Zabel, and Cadwalader Wickersham & Taft, LLP, where my practice focused on structured finance and derivatives transactions. I have been a member of The New York City Bar Association's Structured Finance Committee since 2004 and served as the Chairman of the Committee from 2004-2008; the Committee consists, on a revolving basis, of 35 of the leading structured finance attorneys in the United States. Since 2009 I have also been an active member of the American Bar Association's Structured Finance and Securitization Committee and the New York State Bar Association's Derivatives and Structured Products Committee. I have co-authored and/or edited numerous articles on securitization financing, and I have spoken at or moderated several seminar panels relating to structured finance. Appendix B lists such articles and seminars. As part of my transaction practice, as a member (and, in the case of the New York City Bar, Chairman) of these Committees and as part of my continuing legal education requirements, I have attended dozens (possibly hundreds) of meetings and seminars where CLNs and CDOs were discussed.

2

1.06  I have acted as an expert witness and/or consultant in numerous cases involving (a) CDOs and other types of securitization financing structures and (b) credit default swaps, interest rate swaps and other types of derivatives. Appendix C lists the cases in which I have been deposed or testified. In 2006 I was chosen by *Law and Politics Magazine,* based on a survey of my peers, as a New York Super Lawyer. I have been included in *Who's Who in the World* since 1993, *Who's Who in America* since 1992, *Who's Who in Finance and Business* since 1993 *and Who's Who in American Law* since 1986.

1.07  In preparing this Declaration, I have relied on my general knowledge, training, experience, and expertise. In addition, I have reviewed in whole or in part the materials listed on Appendix D hereto. Both my analysis and the factual observations I make in this Declaration are, subject to Section 1.08 below, based solely on the foregoing.

1.08  My work on this matter is ongoing. I may review additional materials or conduct further analysis. I reserve the right to update, refine, or revise my opinion as appropriate.

1.09  I am being compensated for my time in this matter at my normal billing rate, currently $575 per hour ($675 per hour for depositions and trial testimony). This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.


2. CREDIT- LINKED NOTES

2.01  A CLN is a form of credit derivative. A standard CLN is a security. Like any ordinary bond or note, it has an interest payment and a fixed maturity structure. The performance of the CLN, however, is linked to the performance of a specific asset or specific assets (usually notes or bonds) issued by one or more specific entities (each, a "CLN Reference Entity"). *See, e.g.,* Frank J. Fabozzi, Henry A. Davis and Moorad Choudhry, "Credit-Linked Notes: A Product Primer," *The Journal of Structured Finance* 67, 67 & 71 (Winter 2007) (hereinafter, "Fabozzi, Davis & Choudhry"); *The Handbook of Fixed Income Securities 434* (8th ed. 2012, Frank J. Fabozzi, ed.)(hereinafter, "Fabozzi").

2.02  The issuer (the "Issuer") of a CLN is typically a large financial institution or a bankruptcy-remote special purpose vehicle (an "SPV"). *See, e.g.,* Fabozzi at 330-31. The SPV typically is controlled indirectly by the sponsoring commercial bank or investment bank; the sole purpose of such vehicle is to issue CLNs to investors. A CLN investor typically is a financial institution or other institutional investor; in my experience, with one exception of which I am aware, CLNs have not been sold to retail investors.

2.03  The primary agreement underlying a CLN is known as a credit default swap (a "CDS"). The CDS functions as a form of insurance that transfers the credit risk of the CLN Reference Entities from a protection buyer to a protection seller. In other words, the protection buyer pays the protection seller to bear the loss should a CLN Reference Entity suffer one or more defined "Credit Events" (such as default or bankruptcy). Conversely, the protection seller stands ready to compensate the protection buyer with respect to a decline in

value of the relevant security of the CLN Reference Entity should a Credit Event occur (*e.g.*, a decline in value of $100 million of Microsoft bonds). *See, e.g.*, Fabozzi at 1546-51.

2.04   Traditionally, the sponsor of the SPV that issues the CLNs is the buyer of credit protection, while the SPV is the seller of credit protection. In order to effect this transaction, the sponsoring bank and the SPV enter into the CDS as counterparties. In exchange for assuming the credit risk associated with the CLN Reference Entities, the SPV receives periodic credit protection payments from the sponsoring bank. Because the SPV is an empty shell created by the sponsoring bank, the SPV funds its credit protection obligations by selling CLNs to investors and passing along the sponsoring bank's periodic credit protection payments.   In this manner, it is the CLN investors who ultimately assume the credit risk associated with the CLN Reference Entities.

2.05   The credit protection payments are expressed as a fraction of the notional amount of the credit protection the sponsoring bank purchased (*e.g.*, quarterly payments of 0.5% of the notional amount). The size of the credit protection payment depends on the creditworthiness (*i.e.*, the riskiness) of the CLN Reference Entities. The riskier the CLN Reference Entities, the greater the chance a Credit Event will occur and that the SPV will have to make payments to the sponsoring bank under the CDS and, therefore, the greater the periodic credit protection payments the sponsoring bank will have to make in order to entice investors to fund the SPV's contingent payment obligations through the purchase of CLNs.

2.06   Customarily, the Issuer will reinvest the proceeds from the sale of the CLNs (*i.e.*, the investors' principal) into interest-generating assets commonly referred to as "Underlying Assets." The Underlying Assets serve as collateral for the SPV's payment obligations to the sponsoring bank.   If the CLN Reference Entities suffer a Credit Event, the Underlying Assets are liquidated to fund the SPV's payments to the sponsoring bank under the CDS. If the CLN Reference Entities do not experience a Credit Event, the Underlying Assets are liquidated upon the maturity of the CLNs and the investors' principal is returned to them. The interest generated from the Underlying Assets during the life of the CLNs is paid to the investors along with the protection buyer's periodic credit protection payments.

2.07   As a result, under standard CLN structure both the protection-buying sponsoring bank and the protection-selling SPV (and implicitly the investors in the SPV) have a significant interest in safeguarding the investors' principal during the life of the CLN. The Underlying Assets are the source of any funds paid to the sponsoring bank for a Credit Event and are returned to the CLN investors if no such event occurs. For this reason, it is customary for the Underlying Assets to consist of a conservative investment that is both safe and liquid, such as Treasury bills. *See, e.g.*, Fabozzi at 330-32; Fabozzi, Davis & Choudry at 71; Arvind Rajan, Glen McDermott and Ratul Roy, *The Structured Credit Handbook* 152 (2007) (hereinafter "Rajan, McDermott & Roy"); Antulo N. Bomfim, *Understanding Credit Derivatives and Related Instruments* 126 (2005): "As [a] general rule, the single most important risk exposure in a CLN is, naturally, the credit risk associated with the reference entit[ies]."

2.08  Against this backdrop, it is not surprising that, to my knowledge, based on my experience and activities as described in Sections 1.04 and 1.05 above, CLN investors are primarily concerned with the riskiness of the CLN Reference Entities and not the Underlying Assets. This is not only because the Underlying Assets are traditionally safe, conservative investments but also because the return on the CLN is driven primarily by the credit risk associated with the CLN Reference Entities and not the Underlying Assets.

2.09  Accordingly, a CLN that reinvested its investors' principal into Underlying Assets that were less secure than the CLN Reference Entities themselves would deviate significantly from customary CLN structure.


3.  SYNTHETIC CDOs

3.01 A collateralized debt obligation ("CDO") is an arrangement under which a portfolio of debt or debt-linked assets owned by an SPV can serve as the collateral for one or more classes of notes to be issued by the SPV.   (In actuality, these notes are the "collateralized debt obligations". However, throughout the industry the issuer of these notes and/or the arrangement under which the issuer issues such notes are often referred to as the "CDO".   I will use this term in this Declaration to refer to the transaction and not the issuer (which, for tax and certain historical reasons not relevant to this discussion, is usually a Cayman Islands company with limited liability), which I will refer to as the "CDO Issuer", or the notes, which I will refer to as the "CDO Notes".)   The portfolio may consist of actual assets that the CDO Issuer purchases and holds (a "cash CDO") or a collection of CDS that merely reference assets synthetically (a "Synthetic CDO").

3.02 For example, a $200 million cash CDO could be based on 20 bonds of $10 million each issued by 20 different investment- grade corporations. To purchase these assets, the CDO Issuer issues CDO Notes backed by those assets to investors. The end result is that the purchasers of the CDO Notes gain "exposure" to the CDO Issuer's asset portfolio. In this manner, while the income generated by those assets is passed through the CDO structure to CDO noteholders, any impairment of those assets will create corresponding impairment to the CDO Notes and result in losses to the noteholders.

3.03 Under a synthetic CDO, exposure to a portfolio of corporate or other debt is achieved "synthetically" via CDS rather than by cash purchase of the actual assets. For example, whereas a $200 million cash CDO can raise $200 million from investors to purchase 20 bonds of $10 million each, a $200 million synthetic CDO can achieve exposure to the same portfolio by entering into CDS referencing a $200 million notional amount of the same 20 bonds.

3.04 Synthetic CDOs thus offer almost unlimited flexibility in the portfolio of credit risk on which they are based. The synthetic CDO can easily enter into CDS referencing any notional amount (*e.g.,* $100 million, $200 million*, etc.*) of any credits (one Microsoft bond, the bonds issued by several emerging market countries, the bonds issued by every company in France, *etc.*), whether or not any such bonds are available for purchase.

3.05 Because synthetic CDOs are based on CDS, the synthetic CDOs feature counterparties that take opposing "long" and "short" positions on the CDO's risks. In each case, the synthetic CDO Issuer is "long" the risk; it contracts with one or more counterparties through one or more CDS to provide credit protection with respect to the CDO's referenced portfolio. In exchange for credit protection payments provided to the CDO Issuer by its counterparty, the CDO Issuer (and implicitly its investors) agrees to "assume" the credit risks referenced by the CDS and compensate the counterparty to the extent that such risk materializes.

3.06 The CDO Issuer "funds" its potential counterparty obligations by raising principal through the sale of notes to investors. By this means, the CDO Issuer essentially transfers its "long" risk position to the investors that purchase the notes issued by the CDO Issuer. The principal paid by investors to purchase the CDO Notes is at risk of impairment should the reference entities ("CDO Reference Entities") included in the CDO Issuer's portfolio default, triggering the CDO Issuer's obligations to pay its CDS counterparty with the investors' principal.

3.07 Customarily, CDOs (particularly synthetic, which are in essence a form of credit derivative, transforming the CDO investors into sellers of CDS/credit protection) were not sold to retail investors. On the contrary, CDOs customarily were sold to financial institutions or institutional investors. *See, e.g.*, Fabozzi at 1544; Rajan, McDermott & Roy at 20-21.

3.08 There are three primary risk factors that CDO investors consider in determining whether to invest in and/or how to structure CDO Notes: (i) the tranche characteristics; (ii) the composition of the portfolio of CDO Reference Entities (the "CDO Reference Entity Portfolio"); and (iii) the management and substitution of CDO Reference Entities during the life of the CDO. Typically, these terms are heavily negotiated and have a direct impact on the riskiness of the CDO.

*Tranche Characteristics.* CDOs issue multiple levels ("tranches") of unequal notes representing senior, intermediate, and subordinate interests and payment priorities. The most junior of the tranches (often called an "equity" or "first loss" tranche) stands first in line for any and all collateral portfolio losses. Senior tranches in turn are protected from collateral portfolio losses by the sum total of the more junior tranches below them. To compensate the investors in junior tranches for assuming greater risk, such investors receive higher yields than investors in more senior tranches.

The risk embodied in each CDO tranche is defined by three structural factors: (i) the tranche's "Attachment Point," which is the level of aggregate portfolio losses at which the tranche in question begins to suffer principal impairment (*e.g.*, 5%); (ii) the tranche's "Detachment Point," which is the level of aggregate portfolio losses at which the tranche in question suffers total principal impairment (*e.g.*, 7%); and (iii) the tranche's "Thickness," which is the difference between the tranche's Detachment Point and Attachment Point (*e.g.*, 7% minus 5%, or 2%).

*Composition.* The composition of the CDO Reference Entity Portfolio also directly impacts the risk to the investor. The riskier the CDO Reference Entities, the greater the likelihood

that: (i) a Credit Event will occur and (ii) losses will surpass the tranche's Attachment Point, resulting in the diminution of the investor's principal. In addition, if default risk for the various CDO Reference Entities is closely correlated--that is, if a Credit Event occurred with respect to a company in a specific sector, other companies in that sector are also likely to suffer credit events--the risk of principal impairment is generally greater than if the credit risk for the various Reference Entities were not closely correlated.

*CDO Management.* How the CDO is managed also impacts investor risk. In order to avoid conflicts of interest between the arranging bank and the investors in the CDO Notes, by 2006-07 it was industry custom for the sponsor to retain an independent collateral manager to select the CDO Reference Entities and, depending on the collateral manager's mandate, to make permitted substitutions during a specified period of time in the life of the CDO in order to meet an investor's expected rate of return. Accordingly, a CDO arrangement under which the sponsor--*i.e.*, the party taking the "short" position with respect to the CDO Reference Entity risk--selected the CDO Reference Entities would deviate from customary practice, would foster conflicts of interest, and would be a significant consideration for any reasonable investor in CDO Notes.

## 4. THE PINNACLE TRANSACTIONS DEVIATED SIGNIFICANTLY FROM INDUSTRY CUSTOM AND PRACTICE

4.01  As discussed below, the Pinnacle Notes deviated from standard CLN and CDO transactions in several significant ways.

4.02  First, the Pinnacle Notes transactions deviated from customary industry practice by reinvesting the proceeds of the CLNs into atypical Underlying Assets--*i.e.*, the single-tranche, "bespoke" notes (the"ACES CDO Notes") issued by Morgan Stanley ACES SPC ("ACES"), the synthetic CDO Issuer that Defendants created specifically for the Pinnacle Notes transactions--as opposed to Treasury bills or other similarly secure investments.

4.03  Second, CDOs customarily are sold to institutional investors, such as financial institutions, hedge funds, insurance companies, *etc.* In fact, despite having worked on numerous CDO transactions and having discussed innumerable additional transactions with colleagues, I am aware of only one other transaction in which retail investors invested (indirectly) in CDOs, and that transaction is the subject of litigation. Here, contrary to industry custom and practice, the Pinnacle Notes investors essentially invested in the ACES CDO Notes because the money such investors invested in the Pinnacle Notes was, in turn, reinvested by Pinnacle into ACES CDO Notes.

4.04  Third, under standard CLN structure both counterparties have an interest in ensuring that the money raised by the issuance of the CLNs remains safe and available during the life of the CLN. This is because such money serves as the source of payments to the protection-buying sponsoring bank if the CLN Reference Entities experience a Credit Event and, if not, is returned to the CLN investors when the CLNs have matured. The Pinnacle Notes deviated materially from this customary arrangement because the protection buyer, Morgan Stanley

Capital Services Inc. ("MS Capital"), still stood to gain if the Underlying Assets became valueless inasmuch as it was the "short" counterparty (and creator) of the ACES CDO Notes selected for the Underlying Assets.

4.05  Fourth, a CDO's terms are typically heavily negotiated by the opposing counterparties, and an independent collateral manager is customarily employed to select the CDO Reference Entities comprising the CDO portfolio and to make permitted substitutions during the CDO's term. Here, in contrast, the ACES CDO Notes were not the product of arms-length negotiations. Instead, such Notes were created by interested parties--ACES is a special purpose entity affiliated with Defendants, MS Capital, one of Pinnacle's counterparties, selected the CDO Reference Portfolio, and Morgan Stanley & Co. International plc ("MS International"), a corporate entity related to MS Capital, selected the ACES CDO Notes on Pinnacle's behalf--and did not utilize a disinterested third-party collateral manager.

## 5. THE OFFERING MATERIALS OMITTED INFORMATION THAT WOULD HAVE BEEN MATERIAL TO ANY REASONABLE INVESTOR

5.01  The Offering Materials omitted crucial information regarding these deviations (i) which relate to the three primary risk considerations outlined in paragraph 3.08 and (ii) which any reasonable investor would have factored into his or her investment decision:

- The Offering Materials did not provide even basic information regarding the structure of the Synthetic CDOs that Defendants would be selecting to serve as the Underlying Assets, despite the fact that Defendants provided such information to Distributors as early as May 2006 (approximately three months before the first series of Pinnacle Notes was offered). For example, although the Offering Materials generally noted that investors would be assuming the credit risk of the Underlying Assets, they failed to specifically inform investors that this included assuming the credit risk of approximately 100 to 125 CDO Reference Entities (depending on the series of ACES CDO at issue) *in addition* to the 5 to 7 CLN Reference Entities that were widely publicized in the Offering Materials. Defendants also failed to disclose in the Offering Materials that the CDO tranches at issue would begin to suffer principal impairment upon even modest defaults in the overall CDO Reference Entity Portfolio.

- The Offering Materials also did not inform investors that: (i) the same entity that stood as the "short" counterparty to the Pinnacle Notes--MS Capital--would also be the "short" counterparty to the Underlying Assets for the Pinnacle Notes and (ii) because of this arrangement, MS Capital stood to gain if the Underlying Assets decreased in value. As noted, this scenario was the opposite of the typical CLN structure under which both counterparties customarily stand to lose if the Underlying Assets lose their value.

- The Offering Materials also did not inform investors of MS Capital's role in structuring ACES and the ACES CDO Notes and that there would be no independent collateral

8

manager. This information related directly to obvious conflicts of interest because the ACES CDO Notes were structured by related, interested entities--most notably, MS Capital--and were selected by another related entity, MS International.

5.02  Finally, if, in fact, the Defendants selected CDO Reference Entities in order to intensify the risk of loss – and thereby increase the odds that the Defendants would benefit at the investors' expense – as alleged in the Complaint, any reasonable investor would have found that information material to such investor's investment decision.

5.  SUMMARY

I have been a securities and finance attorney for close to 40 years. I have specialized in derivatives transactions for close to 25 years and structured finance/securitization transactions for over 15 years. During the course of this time I have come to know what the standards and practices of disclosure in these industries are. Based on these years of experience, it is my conclusion that some very significant information that would have been material to any investor in the CLNs that are the subject of this litigation was omitted.

February 4, 2013

Craig A. Wolson

9

APPENDIX A

CRAIG A. WOLSON
29 Punch Bowl Drive
Westport, CT 06880
203-858-4804
cwolson@structuredfinanceexpert.com

## EDUCATION AND ACADEMIC HONORS

### UNIVERSITY OF MICHIGAN, Ann Arbor, MI

- *Juris Doctor*, *cum laude*, 1974
  Honors: Articles Editor of *Michigan Law Review*
  Best brief in moot court section
  Case Club judge

- *Bachelor of Arts, summa cum laude*, 1971
  Honors: Phi Beta Kappa, Phi Eta Sigma, Pi Sigma Alpha (honorary fraternities)
  James B. Angell Scholar

## PROFESSIONAL EXPERIENCE

### *Consultant and Expert Witness*

Have acted as expert witness and/or consultant in numerous cases involving collateralized debt obligations (CDOs), mortgage-backed securities (MBS) and other types of securities, and credit default swaps (CDS), interest rate swaps and currency swaps, including acting on behalf of plaintiff hedge fund in two cases brought against two major commercial/investment banks in federal court, acting on behalf of two major pension funds in case brought against major bank in federal court, acting on behalf of major investment bank defendant in arbitration brought by another major investment bank, and acting on behalf of plaintiffs in class action brought in federal court against two major investment banks.

### *Securitizations*

Negotiated and documented cash, synthetic and hybrid collateralized debt obligations (CDOs), asset-backed commercial paper programs, structured investment vehicles (SIVs), collateralized loan obligations, collateralized bond obligations, structured derivatives, securitized credit-linked notes, securitized equipment leases, securitized railroad license agreements, securitized auto loans, securitized project finance loans and obligations of certified capital companies. Primary assets of many CDOs, ABCP programs and SIVs were mortgages, commercial mortgage-backed securities (CMBS) and/or residential mortgage-backed securities (RMBS).

*Derivatives*
Structured, negotiated and/or documented secured and unsecured credit default, interest rate, currency, commodity, equity, market value and cost of funds derivatives, using ISDA agreements and unique forms, and repurchase ("repo") and reverse repurchase ("reverse repo") agreements.

*Loans and Credit Facilities*
Structured, negotiated and/or documented syndicated and single-lender asset-based and other secured loans (including loans secured by inventory, accounts receivable, vehicles, equipment, trademarks, securities, and life insurance); project, lease and other limited recourse financings (of oil and gas refineries and pipelines, 747 aircraft, marine vessels, manufacturing plants, and foundries); acquisition financings; letter of credit transactions supporting rated commercial paper and tax-exempt bonds; workouts; intercreditor agreements; subordination agreements; and synthetic loans.

## PROFESSIONAL AFFILIATIONS

**LAW OFFICES OF JOHN F. LANG,** New York, NY, Of Counsel, 2011- Present**; TULLY RINCKEY PLLC,** New York, NY, *Of Counsel*, 2009-12**; EXPERT WITNESS AND CONSULTANT,** 2008-Present**; SALON MARROW DYCKMAN NEWMAN & BROUDY LLP,** New York, NY, *Of Counsel,* 2008-08**; CADWALADER, WICKERSHAM & TAFT LLP,** New York, NY, *Special Counsel (CWT equivalent of Income Partner),* 2006-08; **DUANE MORRIS LLP,** New York, NY, *Partner,* 2003-06**; SCHULTE ROTH & ZABEL LLP,** New York, NY, *Special Counsel,* 2001-03*;* **MAYER, BROWN & PLATT,** New York, NY, *Counsel,* 1999-2001*;* **BROWN & WOOD LLP,** New York, NY, *Counsel,* 1997-98*;* **WILLIAMS & HARRIS LLP,** New York, NY, *Partner,* 1995-97*;* **CHEMICAL BANK,** New York, NY, *Vice President and Assistant General Counsel,* 1988-95*;* **J.D. MATTUS COMPANY, INC**., Greenwich, CT, *Vice President, Secretary, General Counsel and Director,* 1985-88*;* **THOMSON MCKINNON SECURITIES INC.,** New York, NY, *Vice President and Assistant General Counsel,* 1981-85*;* **SHEARMAN & STERLING,** New York, NY, *Associate,* 1974-81.

## PROFESSIONAL HONORS

*Chairman and/or Member (appointed),* **NY City Bar Association Structured Finance Committee,** 2004-Present
*Member (appointed),* **NY City Bar Association Corporation Law Committee,** 1997-2000 & 2003-06
*Member (appointed),* **NY City Bar Association Project Finance Committee,** 2000-03
*Member (appointed),* **NY City Bar Association Securities Regulation Committee,** 1994-97

**New York Super Lawyer**, *Law & Politics Magazine* (national professional magazine; selected by peers), 2006

**Arbitrator** (specializing in structured finance and derivatives matters), **American Arbitration Association**, 2010 - present

**Who's Who in the World** (1989-1990 & 1993-present); **Who's Who in America** (1992-present); **Who's Who in American Law** (1986-present); **Who's Who in Finance and Business** (1989-present); **Who's Who in the East** (1989-present); **Who's Who of Emerging Leaders** (1987)

## PUBLICATIONS

Author:

"The Real Estate Investment Trust: State Tax, Tort and Contract Liabilities of the Trust, Trustee and Shareholder," March 1973 *Michigan Law Review* (reprinted in *The Real Estate Investment Trust--Problems and Opportunities* (L. Oliensis ed. 1974))

Co-Author:

Supplemental Comment Letter to SEC dated  August 10,  2012 relating to the SEC's proposed rules pertaining to risk retention in transactions involving asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  February 13, 2012 relating to the SEC's proposed rule pertaining to the prohibition against conflicts of interest in certain securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 16, 2011 relating to the SEC's re-proposal of the shelf eligibility conditions for asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 15, 2011 relating to the SEC's proposed changes to Rule 3a-7 under the Investment Company Act of 1940 (in particular, to delete the investment-grade ratings requirement of the Rule), submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 14, 2011 relating to the SEC's Concept Release relating to interpretive issues under the Investment Company Act of 1940 pertaining to the status under the Act of companies that are engaged in the business of acquiring mortgages and mortgage-related instruments, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  August 19, 2011 relating to the SEC's proposed  rules pertaining to credit rating agencies, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  July 20, 2011 relating to the SEC's proposed  rules pertaining to risk retention in transactions involving asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 30, 2010 relating to the Commission's proposed  rule pertaining to  certain requirements to be imposed on rating agencies in connection with reports accompanying credit ratings of ABS and requirements to be imposed on ABS issuers to disclose demands for repurchase of assets and whether such assets were repurchased, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 17, 2010 relating to the Commission's proposed rules relating to risk-retention with respect to securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated November 17, 2010 relating to the Commission's proposed requirement that an ABS issuer perform a review of the assets underlying certain ABS offerings, submitted by American Bar Association Business Law Section

Comment Letter to Financial Stability Oversight Council dated  November 8, 2010 relating to the Council's Study Regarding the Implementation of the Prohibitions on Proprietary Trading Imposed  by the Dodd-Frank Act, submitted  by American Bar Association Business Law Section

"Structuring Commercial Mortgage Securitization Special Purpose Entities After General Growth Properties," published  in November 2010 *Bloomberg Law Reports*

Comment Letter to SEC dated October 29, 2010 relating to the Commission's proposed  rule concerning conflicts of interest pertaining to certain securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC  dated August 17,  2010 relating to the Commission's proposed amendments to Regulation AB, submitted by American Bar Association Business Law Section

"Securitization in the Post-Crisis Economy: An ABA Business Law Section White Paper" (paper completed on November 20, 2009 by American Business Law Section, presented to Congress on January 22, 2010 and sent to the FDIC on March 5, 2010)

"Reviving Securitization--A Response to Critics," published in  June 8, 2009 *Law 360*

"Special Report on the Preparation of Substantive Consolidation Opinions," published in February 2009 *Business Lawyer*

New York City Bar Association Statement to Obama Transition Team Regarding Regulation of Financial Services, December  2008

Comment letter re American Securitization Forum proposal (Project RESTART RMBS Disclosure Package), August 20, 2008

Comment letter to Financial Accounting Standards Board re Revised Exposure Draft of Proposed Amendments to FASB Statement No. 140 Relating to Transfer of Financial Assets, October 28, 2005

## SPEAKING ENGAGEMENTS

Moderator:

Seminar: "The Upheaval in the Subprime Market: The Direct and Indirect Effects of Same on the Structured Finance Market," New York City Bar Association, January 2008

Seminar: "What Every Finance Lawyer Needs to Know About Securitization," New York City Bar Association, May 2007

Speaker:

Seminar on Securitization of Project Finance Loans, New York City Bar Association, April 2003

**APPENDIX B**

**PUBLICATIONS**

Author:

"The Real Estate Investment Trust: State Tax, Tort and Contract Liabilities of the Trust, Trustee and Shareholder," March 1973 *Michigan Law Review* (reprinted in *The Real Estate Investment Trust--Problems and Opportunities* (L. Oliensis ed. 1974))

Co-Author:

Supplemental Comment Letter to SEC dated  August 10,  2012 relating to the SEC's proposed rules pertaining to risk retention in transactions involving asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  February 13, 2012 relating to the SEC's proposed rule relating to the prohibition against conflicts of interest in certain securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 16, 2011 relating to the SEC's re-proposal of the shelf eligibility conditions for asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 15, 2011 relating to the SEC's proposed changes to Rule 3a-7 under the Investment Company Act of 1940 (in particular, to delete the investment-grade ratings requirement of the Rule), submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 14, 2011 relating to the SEC's Concept Release relating to interpretive issues under the Investment Company Act of 1940 pertaining to the status under the Act of companies that are engaged in the business of acquiring mortgages and mortgage-related instruments, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  August 19, 2011 relating to the SEC's proposed  rules pertaining to credit rating agencies, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  July 20, 2011 relating to the SEC's proposed  rules pertaining to risk retention in transactions involving asset-backed securities, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 30, 2010 relating to the Commission's proposed  rule pertaining to  certain requirements to be imposed on rating agencies in connection with reports accompanying credit ratings of ABS and requirements to be imposed on ABS issuers to disclose demands for repurchase of assets and whether such assets were repurchased, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated  November 17, 2010 relating to the Commission's proposed rules relating to risk-retention with respect to securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC dated November 17, 2010 relating to the Commission's proposed requirement that an ABS issuer perform a review of the assets underlying certain ABS offerings, submitted by American Bar Association Business Law Section

Comment Letter to Financial Stability Oversight Council dated  November 8, 2010 relating to the Council's Study Regarding the Implementation of the Prohibitions on Proprietary Trading Imposed  by the Dodd-Frank Act, submitted  by American Bar Association Business Law Section

"Structuring Commercial Mortgage Securitization Special Purpose Entities After General Growth Properties," published  in November 2010 *Bloomberg Law Reports*

Comment Letter to SEC dated October 29, 2010 relating to the Commission's proposed  rule concerning conflicts of interest pertaining to certain securitizations, submitted by American Bar Association Business Law Section

Comment Letter to SEC  dated August 17, 2010 relating to the Commission's proposed amendments to Regulation AB, submitted by American Bar Association Business Law Section

"Securitization in the Post-Crisis Economy: An ABA Business Law Section White Paper" (paper completed on November 20, 2009 by American Business Law Section, presented to Congress on January 22, 2010 and sent to the FDIC on March 5, 2010)

"Reviving Securitization--A Response to Critics," published in  June 8, 2009 *Law 360*

"Special Report on the Preparation of Substantive Consolidation Opinions," published in February 2009 *Business Lawyer*

New York City Bar Association Statement to Obama Transition Team Regarding Regulation of Financial Services, December  2008

Comment letter re American Securitization Forum proposal (Project RESTART RMBS Disclosure Package), August 20, 2008

Comment letter to Financial Accounting Standards Board re Revised Exposure Draft of Proposed Amendments to FASB Statement No. 140 Relating to Transfer of Financial Assets, October 28, 2005


**SPEAKING ENGAGEMENTS**

Moderator:

Seminar: "The Upheaval in the Subprime Market: The Direct and Indirect Effects of Same on the Structured Finance Market," New York City Bar Association,  January 2008

Seminar: "What Every Finance Lawyer Needs to Know About Securitization," New York City Bar Association, May 2007

Speaker:

Seminar on Securitization of Project Finance Loans, New York City Bar Association, April 2003

**APPENDIX C**

Deposed in December 2011 for *In re Doctors Hospital of Hyde Park, Inc.,* Chapter 11 Case No. 00 B 11520, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division

APPENDIX D

1. Pinnacle Notes Base Prospectus (dated August 7, 2006)

2. Pinnacle Notes Supplementary Base Prospectus (dated April 24, 2007)

3. Pinnacle Notes Supplementary Base Prospectus (dated August 13, 2007)

4. Pinnacle Notes Pricing Statements Relating to

    a. Pinnacle Notes Series 1 (dated August 7, 2006)

    b. Pinnacle Notes Series 2 (dated October 6, 2006)

    c. Pinnacle Notes Series 3 (dated January 9, 2007)

    d. Pinnacle Notes Series 6 & 7 (dated May 16, 2007)

    e. Pinnacle Notes Series 9 & 10 (dated October 25, 2007)

5. ISDA Master Agreement dated August 7, 2006 between Pinnacle and MS Capital ("Pinnacle-MS Capital Master Agreement")

6. CDS Confirmations Entered Into Under Pinnacle-MS Capital Master Agreement Relating to

    a.    Pinnacle Notes Series 1 (Tranches A & B)

    b.    Pinnacle Notes Series 2 (Tranches A & B)

    c.    Pinnacle Notes Series 3 (Tranches A & B)

    d.    Pinnacle Notes Series 6 (Tranches A & B)

    e.    Pinnacle Notes Series 7 (Tranches A & B)

    f.    Pinnacle Notes Series 9

    g.    Pinnacle Notes Series 10

7. Cross Currency and Rate Swap Confirmation Entered Into Under Pinnacle-MS Capital Master Agreement Relating to Pinnacle Notes Series 10

8. May 2006 Product Summary Regarding Pinnacle Notes Series 1

9. ACES Private Placement Memorandum (dated September 7, 2004)

10. ACES Private Placement Memorandum (dated April 26, 2007)

11. ACES Private Placement Memorandum Supplements Relating to

    a.    ACES Series 2006-28 (dated September 25, 2006)

    b.    ACES Series 2006-32 (dated November 20, 2006)

    c.    ACES Series 2007-5 (dated February 15, 2007)

      d.     ACES Series 2007-26 (dated July 5, 2007)

      e.     ACES Series 2007-41 (dated December 13, 2007)

12. CDS Confirmations Entered Into Under ACES-MS Capital Master Agreement

      a.     ACES Series 2006-28

      b.     ACES Series 2006-32

      c.     ACES Series 2007-5

      d.     ACES Series 2007-26

      e.     ACES Series 2007-41

13. Morgan Stanley, *Structured Credit Insights* (3d ed. 2007)

14. Morgan Stanley, *Credit Derivatives Insights* (3d ed. 2007)

15. Janet M. Tavokoli, *Structured Finance & Collateralized Debt Obligations* (2d ed. 2008)

16. *The Handbook of Fixed Income Securities* (8th ed. 2012, Frank J. Fabozzi ed.)

17. Arvind Rajan, Glen McDermott, and Ratul Roy, *The Structured Credit Handbook* (2007)

18. Frank J. Fabozzi, Henry A. Davis and Moorad Choudhry, "Credit-Linked Notes: A Product Primer," *The Journal of Structured Finance 67* (Winter 2007)

19. Antulo N. Bomfim, *Understanding Credit Derivatives and Related Instruments* (2005)

20. The Complaint and Amended Complaint for *Dandong et al. v. Pinnacle Performance Limited et al.*