# Exhibit 3



PF2 Securities Evaluations, Inc.
11 Hanover Square, Floor 6
New York, NY  10005
T  212 797 0215   F  212 797 0213

www.pf2se.com


February 5, 2013


**EXPERT REPORT OF ILYA ERIC KOLCHINSKY**


    Re:    *Dandong et al v. Pinnacle Performance Limited et al., New York Southern District Court,* Case Number: 1:2010cv08086


## I.   BACKGROUND

1. My name is Ilya Eric Kolchinsky.  I have industry-related experience in analyzing securities that are similar to the Pinnacle Performance Limited Series 1, 2, 3, 6, 7, 9 and 10 notes (the "Pinnacle Notes") which are at the center of this dispute.

2. Specifically, I have over 15 years of experience working in the structured finance business.  Since early 1997, my work has focused on all forms of derivatives, particularly structured finance derivatives.

3. I am currently a consultant with PF2 Securities Evaluations, Inc. ("PF2"), which provides consulting services relating to various types of securities, often collateralized debt obligation securities ("CDOs").  Concurrent with my consulting duties at PF2, I fulfill two consulting roles, one for the National Association of Insurance Commissioners ("NAIC") and for the State of Wisconsin's Office of the Commissioner of Insurance ("OCI").

4. The NAIC is the U.S. regulatory support organization created and governed by the chief insurance regulators from the 50 states and six U.S. territories.  In 2009, the NAIC determined to cease the use of ratings for setting capital on RMBS owned by insurance companies.  In the place of ratings, the insurance regulators set out to hire a third party valuation vendor, and I was retained by the NAIC to provide oversight of this process.  I participated in the selection of valuation vendors, set the appropriate valuation methodology and lead the quality assurance of the results.  Currently, the vendors are PIMCO Advisory for RMBS and Blackrock Solutions for CMBS.

5. I advise the OCI regarding the rehabilitation of the Segregated Account of Ambac Assurance Corp., which includes developing and overseeing de-risking strategies for the RMBS portfolio, including large-scale commutations and open-market synthetic commutations, servicer intervention strategies and transfers.  I created and implemented portfolio risk measures and, as with the NAIC, managed the selection of a valuation vendor for Ambac's RMBS portfolio.  I also advise the rehabilitator regarding certain legal issues related to Ambac's structured finance portfolio.

6. Prior to assuming these roles, I was a Managing Director at Moody's, first on the ratings side at Moody's Investors Service and then at Moody's Analytics.  I previously worked at Goldman Sachs, Merrill Lynch, MBIA Insurance Corporation and Lehman Brothers.

7. During my tenure at Moody's Analytics, I served as the Head of Methodology for Structured Finance valuations. On the rating side, I managed the US ABS CDO derivative business. Prior to assuming a management role, rated numerous credit derivative transactions, modeled indenture requirements, analyzed collateral, negotiated with underwriters and assessed the transaction documents. I also chaired credit committees and developed new rating methodologies.

8. As a Managing Director at Moody's Investors Service, I was responsible for all rated derivatives products which referenced structured finance securities. My portfolio covered cash products, such as CDOs, as well as a variety of synthetic products. The latter included fully synthetic and hybrid CDOs, bespoke CDOs and CLNs so long as the reference entities were structured. I also headed cash and synthetic municipal CDOs.

9. I have made many public presentations on CDOs and related topics. While at Moody's, I was frequently invited to speak on Moody's (or moderate speaker panels) at securitization conferences. I have since also testified before the House Oversight and Government Reform Committee (September 2009), the Senate Permanent Subcommittee on Investigations (April 2010) and the Financial Crisis Inquiry Commission (June 2010) on the topics of credit rating agencies, ratings reform, and the role of the rating agencies in the recent financial downturn. [See Exhibit A]

10. I hold an undergraduate degree in aerospace engineering from the University of Southern California, a law degree from the New York University School of Law and a Master's of Science in Statistics from NYU's Stern School of Business.

11. A copy of my CV is attached to this report as Addendum A.

II. REMARKS

12. In this report, I will refer to the plaintiffs GE Dandong; LOH Tuck Woh Peter; Singapore Government Staff Credit Cooperative Society, Ltd; NI Yan Amy; ANG Soo Chieng; CHOH Gek Hong Johnson; NG Shook Phin Susan; and ZHAO Yuzheng collectively as the "Plaintiff" or the "Plaintiffs," and to the investments in Pinnacle Performance Limited Series 1, 2, 3, 6, 7, 9 and 10 notes purchased by them separately as each specific "Pinnacle Series," and collectively as the "Pinnacle Notes."

13. I will refer to the defendants Pinnacle Performance Limited; Morgan Stanley Asia (Singapore) Pte; Morgan Stanley & Co. International plc; Morgan Stanley Capital Services Inc.; Morgan Stanley & Co. Inc.; and Morgan Stanley collectively as the "Defendants."

14. I will refer to the amended complaint filed October 22, 2012 between the Plaintiffs and the Defendants as the "Complaint."

15. I have reviewed various documents relevant to this matter provided to me by the Plaintiff's counsel and I have also considered several documents that reside in the public domain. I have also taken as true certain of the information provided to me by the Plaintiff's counsel, while other information I have sought to verify, as described within this report. The documents that I reviewed that I found relevant to my analysis are attached as Exhibit B or referenced in the "footnotes" to this text. Numerous documents have been made available to me. I have not read them all, and even those I have read I may not have read in their entirety. My reference to a document herein, therefore, should not be misunderstood to mean that I have considered such document in its entirety.

16. In forming my opinion, I have relied on certain information made available to me. I therefore respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional support for these opinions, to the extent any additional information is made available to me.

17. PF2 Securities Evaluations, Inc. ("PF2") is being compensated at a rate of $750 per hour for my work in producing this report. This compensation is not contingent on my forming any specific opinion.

### III. SCOPE

18. I have been asked by the Plaintiffs' counsel to address the following concerns in my report:
    i.   whether the types of risks inherent in the Pinnacle Notes could be understood or analyzed by retail investors;
    ii.  whether the risks inherent in the Pinnacle Notes were visible to retail investors; and
    iii. if the Plaintiffs' allegations of Pinnacle Notes' over-exposure to the "FIRE Entities" (by way of the ACES underlying assets) are true or substantially true, whether such overexposure led to or caused the losses suffered on the Pinnacle Notes.

### IV. THE PINNACLE NOTES

19. The Pinnacle Notes were offered as credit-linked notes ("CLNs"), which referenced a pool of between five and seven "Reference Entities" or "Reference Obligations" (or the "Pinnacle Notes' Reference Entities" or "Pinnacle Notes' Reference Obligations"). While the Reference Entities typically differed for each Pinnacle Series, Pinnacle Series 6 and 7 were exposed to the same pool of Reference Entities, and the same is true of Series 9 and 10.

20. During my career I have analyzed a broad range of derivative structures. Many of these structures were similar in many respects to the Pinnacle Notes.

21. Typically, the primary risk in investing in a CLN is the Reference Entities themselves.

22. Each series of Pinnacle Notes references a separate set of Reference Entities, although Series 6 and Series 7 reference the same entities, as do Series 9 and Series 10. All of the entities are large and well known corporate or government issuers.

| Pinnacle Reference Entities | | | | |
|---|---|---|---|---|
| Series 1 | Series 2 | Series 3 | Series 6&7 | Series 9&10 |
| People's Republic of China | People's Republic of China | Standard Chartered Bank | Bank of America Corporation | Commonwealth of Australia |
| Republic of Korea | Republic of Korea | HSBC Bank plc | Citigroup Inc. | Hong Kong Special Administrative Region of the People's Republic of China |
| Kingdom of Thailand | Malaysia | Bank of China Limited | DBS Bank Ltd. | Republic of Singapore |
| Malaysia | Bank of China Limited | The Korea Development Bank | Singapore Telecommunications Limited | Singapore Telecommunications Limited |
| Bank of China Limited | The Korea Development Bank | Malayan Banking Berhad | Oversea-Chinese Banking Corporation Limited | Temasek Holdings (Private) Limited |
| The Korea Development Bank | Malayan Banking Berhad | DBS Bank Limited | United Overseas Bank Ltd | |
| Petroliam NasionalBerhad (Petronas) | DBS Bank Limited | United Overseas Bank Ltd | | |

23. For the Pinnacle CLNs the investors invested in the deals at initiation, as opposed to "pay-as-you-go" investments. The upfront payment made by Pinnacle investors was used, as is typical, to purchase collateral that funds the trade. This purchased collateral is often referred to interchangeably, as "funding," "eligible investments," "underlying assets," or "charged assets" but I will generally refer to the choice of collateral as the Underlying Assets (or Underlying Asset, if there is only one).

24. Each Pinnacle Series invested its principal in a single Pinnacle Underlying Asset, each an "ACES Note," "ACES Series" or "Pinnacle Underlying Asset."

25. Underlying assets are often held in a separate account, to cover any losses suffered by the buyer of protection should the reference entities suffer any losses, or to make whole the principal investment of the seller of protection, at maturity, should the reference entities avoid any writedowns.

26. While it was a typical feature of a CLN that the principal investments made would be invested in some form of underlying assets, the choice of using a single ACES Note as the Underlying Asset, for each Pinnacle Series, brought additional layers of obfuscation and risk to the Pinnacle investors. This is especially the case given our understanding that the Defendants did not disclose to the investors until after they had invested in the Pinnacle Notes that Defendants created, and MS Capital was the counterparty to, the Underlying Assets Defendants selected.

V.   LEGAL RISK AND OVEREXPOSURE TO MORGAN STANLEY

27. As can be seen from the following diagram, Morgan Stanley and its various subsidiaries played a host of different roles in the Pinnacle transaction. Among other things Morgan Stanley Capital Services Inc. was responsible for, and Morgan Stanley insured, the interest payments payable to the issuer of the Pinnacle Notes, which would be passed on to the Pinnacle Note investors. If Morgan Stanley defaulted, Pinnacle

4

Note holders might not be able to realize these payments. It is therefore clear that in addition to their exposure to the five to seven Pinnacle Reference Entities, and the single ACES Underlying Asset, Pinnacle Note investors were taking substantial counterparty risk to Morgan Stanley.

## Pinnacle Structure

[Diagram: Pinnacle Structure

Top section:
- Swap Counterparty (Morgan Stanley Capital Services Inc.) ↔ CDS on Reference Entities ↔ Issuer (Pinnacle Performance Ltd.) — labeled "Insurance"
- Arranger: Morgan Stanley Dean Witter Asia (Singapore) Pte.
- Issuer ↔ Pinnacle Note Series 1 — labeled "Insurance" and "Interest"
- Determination/Settlement/Market Agent: Morgan Stanley & Co. Int'l. Ltd.
- Interest payments guaranteed by Morgan Stanley
- Interest flows from Issuer to Swap Counterparty

Bottom section (shaded):
- Swap Counterparty (Morgan Stanley Capital Services Inc.) ↔ ACES's Reference Entities ↔ CDO Issuer: Morgan Stanley ACES SPC — labeled "Insurance"
- CDO Issuer ↔ Pinnacle Underlying Asset: Morgan Stanley ACES Series 2006-28 — labeled "Insurance" and "Interest"
- ACES's Underlying Asset(s)
- ACES Calculation Agent: Morgan Stanley Capital Services Inc.
- Interest flows from CDO Issuer to Swap Counterparty]

28. Due to the omnipresence of Morgan Stanley entities throughout the structure, different Morgan Stanley entities were often interacting with one another. However, given the private nature of the trade and their limited access to information, the investors would not have been able to verify whether their best interests were always being taken into account. For example, it would have been very difficult, if not impossible, for each Pinnacle Series' investors to ascertain whether the appropriate price was paid for the ACES Note in which Pinnacle invested.

29. Lastly, complex bespoke structures like the ACES Notes are typically negotiated on an arms-length basis between sophisticated institutional investors. Given the number of risks (as described above) each party acts to limit its risks and exposure. In the case of the Pinnacle Notes, Morgan Stanley was negotiating with Morgan Stanley, leading to a number of conflicts of interest.

## VI.   LOSS CAUSATION CONSIDERATIONS

30. I have been asked to consider whether the Underlying Assets' overexposure, alleged in the Complaint, to the "FIRE Entities" indeed caused the high level of losses suffered by investors in the Pinnacle Notes.

5

31. FIRE is an acronym for (F)inance, (I)nsurance and (R)eal (E)state. The Complaint describes the "FIRE Entities" as follows:

> "Such companies included: (1) home builders; (2) other companies dependent on home construction (such as manufacturers of materials used in home construction, including lumber, cement, etc., manufacturers of home appliances, and home improvement retailers); (3) real estate investment trusts (REITs); (4) financial institutions with significant exposures to real estate, mortgages, and mortgage-backed securities (banks, and non-bank lenders); and (5) insurance companies with significant exposures to real estate, mortgages, and mortgage-backed securities (particularly, monoline insurers and mortgage insurers). Such companies fall within the rubric described by the acronym "FIRE" – standing for those sectors of the economy involved in Finance, Insurance and Real Estate."

32. First, I would like to offer some historical context. The ACES CDOs' reference entities, supporting the ACES Notes, suffered losses significant enough to imperil the ACES Notes, as early as 2008 in the cases of Pinnacle Series 9 and 10. But this high default rate was not the norm for the corporate backed CDO market. Certainly, several mortgage-related CDOs ("SF CDOs") had suffered significant downgrades or writedowns by that stage, but the ACES Notes were referencing corporate debt, and corporate debt performed relatively well throughout the financial downturn. By means of comparison, the ACES CDOs could have acted somewhat similarly to what some call "synthetic arbitrage" CDOs. As a Moody's publication shows,[3] the vast majority (over 90%) of CDO tranches that were impaired during 2008 were SF CDO tranches:

> "Of the new impairments in CDOs, 91% involved SF CDOs (Exhibit 21). Synthetic arbitrage CDOs accounted for the second-largest percentage (3.7%), followed by TRUP CDOs (1.4%) and market value CDOs (1.2%). Less than 1% of 2008 impairments involved high-yield CLOs."



33. While corporate loan and bond default rates went up from 2007 to 2008, they still remained on a moderate level historically.[4] The following chart from Moody's Syndicated Bank Loans Special Comment

---

[3] Moody's Default Rates (2009), with emphasis added. "Impairments" include both principal and interest impairments, as defined by Moody's in the report. ("Principal impairments include securities that had outstanding principal write-downs or losses and securities that were downgraded to Ca or C, even if they have not yet experienced an interest shortfall or principal write-down. Interest impairments, or interest impaired securities, include securities that are not principal impaired, but have outstanding interest shortfalls.")

[4] For example, Moody's reported that "Moody's U.S. leveraged loan default rate ended 2008 at 3.5%, up from the 0.3% recorded in 2007" and that "the issuer-weighted default rate for Moody's-rated speculative-grade bond and loan issuers rose sharply to 4.1% at the end of 2008, up from the closing level of 0.9% in 2007." See respectively Moody's Announcement (2009) and Moody's Syndicated Bank Loans Special Comment (2009).

6

(2009) demonstrates the growing, but still moderate, default rate on speculative (i.e., junk-rated) loans and bonds rated by Moody's.



34. In fact, corporate backed CDOs, like CLOs, performed so well overall throughout the financial downturn that new issuance in this sector has already returned.

35. I have performed two analyses to ascertain whether the allegedly high portion of FIRE Entities contributed to, or caused, the losses suffered on the Pinnacle Notes.

36. I was able to use certain default and recovery information of ACES's Reference Entities available to investors. To the extent I was unable to verify certain information (for example, due to the lack of a redemption notice) I relied on information made available to me Plaintiff's counsel. I have relied on information provided to me by Plaintiff's counsel in categorizing each of the CDX reference entities and each entity among each pool of ACES Reference Entities as either a FIRE Entity or a non-FIRE Entity. I have relied on information provided to me by Plaintiff's counsel in categorizing each of the CDX reference entities and each entity among each pool of ACES Reference Entities as either a FIRE Entity or a non-FIRE Entity.

37. First, I considered what would have occurred had the ACES Series not referenced any FIRE Entities ("Analysis 1"). Next, I considered what would have happened had the ACES Series referenced FIRE Entities but only in the same proportion as the CDX.NA.IG.7 index ("CDX") as referenced in the Complaint ("Analysis 2").

38. According to my calculations, on Pinnacle Series 1, 2, 3, 6, 7, 9 and 10, the Underlying Assets suffered (or would have suffered, if not redeemed) complete writedowns, surpassing each relevant ACES Note's "detachment point." However, in the two analyses, for all five of the ACES Notes, the losses suffered on the ACES Notes would have been lower or non-existent in the two Analyses described above.

| Pinnacle Notes Series | | 1 | 2 | 3 | 6/7 | 9/10 |
|---|---|---|---|---|---|---|
| Underlying Morgan Stanley ACES Series | CDX.NA.IG.7 | 2006-28 | 2006-32 | 2007-5 | 2007-26 | 2007-41 |
| % FIRE Entities | 23.20% | 44.00% | 40.00% | 31.40% | 43.20% | 55.00% |
| % non-FIRE Entities | 76.80% | 56.00% | 60.00% | 68.60% | 56.80% | 45.00% |
| FIRE Loss %* | | 14.86% | 12.73% | 16.56% | 15.96% | 7.36% |
| Non-FIRE Loss % | | 1.27% | 0.53% | 3.61% | 0.00% | 0.00% |
| Actual Cumulative Losses (a) | | 7.25% | 5.41% | 7.68% | 6.90% | 4.03% |
| Losses if no FIRE Entities | | 1.27% | 0.53% | 3.61% | 0.00% | 0.00% |
| Losses if distributed as per CDX | | 4.42% | 3.36% | 6.61% | 3.70% | 1.71% |
| Attachment Point | | 4.15% | 4.30% | 6.20% | 4.60% | 2.67% |
| Detachment Point (b) | | 4.90% | 5.05% | 6.95% | 5.35% | 3.67% |
| Actual Losses to Underlying Asset** (if (a)>(b), this =100%) | | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Losses to Underlying Asset if no FIRE Entities | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Losses to Underlying Asset if distributed as per CDX.NA.IG.7 | | 36.37% | 0.00% | 54.99% | 0.00% | 0.00% |

* At maturity or as projected based on performance and outstanding compositions as of 11/16/12

** For Series 6, 7, 9 and 10, this result includes projected losses beyond the November 16, 2012, date of this analysis (remaining pool was considered per its attributes as of 11/16/12 after having removed defaulted reference entities)

39. Had the Underlying Assets not been exposed to any FIRE Entities (Analysis 1), no losses would have occurred. Had the Underlying Assets been exposed to FIRE Entities, but only in the same proportion as the CDX index (Analysis 2), the average loss taken by the ACES Notes would have been approximately 18.27% or, if weighted according to the Plaintiffs' investment amounts in each series, approximately 25.96%. In other words, approximately 82% of losses on the ACES Notes would have been avoidable simply by moderating the exposure to FIRE Entities to the same proportion as the CDX index.

VII.    CONCLUSION

40. Based on my experience, the Pinnacle Notes were among the most complex assets created by Wall Street. They are difficult to analyze, posing numerous challenges both from a quantitative and qualitative perspective. In my role as Managing Director at Moody's Investors Service, I needed to make numerous staffing decisions, including matching the complexity of a proposed transaction to a potential analyst's skill set. If I needed to staff the Pinnacle Notes, I would have assigned them to one of my most senior and experienced analysts.

41. While these were advertised to retail investors, the risks inherent in the Pinnacle Notes would, in my opinion, have only been understood or could only have been analyzed by the most sophisticated of institutional investors. This, of course, assumes complete disclosure by Defendants regarding the structure of and their interest in the Underlying Assets, before the investors had committed to purchase the Pinnacle Notes

42. As I have detailed throughout this report, while the advertised risk purported to be of an exposure to five to seven well-known and understandable [large corporate or government] entities, the real risks were to highly leveraged, thin-tranche synthetic bespoke Underlying Asset CDOs which were themselves exposed to correlated risks centered on exposures in the real-estate and financial industry.

43. Given the lack of clarity and the complexity of the Pinnacle Notes' Underlying Assets, investors could not have appreciated the role played by Morgan Stanley throughout the deal and could not have appreciated the countless ways that Morgan Stanley could have taken advantage of them. Certainly, investors were not aware of the impact of a bankruptcy or default by a Morgan Stanley entity would have had on their investment because of the Defendants' role as counterparty to both the top-level Pinnacle CLN as well as the Underlying Assets.

44. As detailed above, I have also analyzed the relative performance of the FIRE Entity exposure versus non-Fire Entity exposure within each ACES Series. Based on my analysis of their comparative performance and their impact on the ACES Notes, it is my opinion that the alleged overexposure to the FIRE Entities was responsible for the high level of losses suffered by the ACES Notes that supported the Pinnacle Notes.

_____
Ilya E. Kolchinsky

**Exhibit A**
**Kolchinsky Presentations and Publications**

<u>Moody's Approach to Implementing Par Haircuts in Structured Finance CDOs</u>, Moody's CDO RatingFactors Vol. 2, No. 5, January 25, 2006 (co-author)
http://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBS_SF68732

<u>Hedged Trades: Lessons from the Crisis</u>, September 25, 2008, NYSSCPA

<u>The Rating Agencies in the Financial Crisis: Incentives and Failures</u>, April 12, 2011, University of Houston

<u>The Rating Agencies: Regulatory Perspectives</u>, November 2, 2011, Georgetown University Law

<u>The Rating Agencies in the Financial Crisis: Incentives and Failures</u>, December 2, 2011, Harvard Business School

**Exhibit B**
**Referenced Materials**

Moody's Announcement (2009): Announcement: Moody's: Corporate Loan Defaults Rose and Recoveries Fell in 2008, Trend to Continue, Moody's Global Credit Research, March 23, 2009
http://www.moodys.com/research/Moodys-Corporate-Loan-Defaults-Rose-and-Recoveries-Fell-in-2008--PR_175623

Moody's Default Rates (2009): Default & Loss Rates of Structured Finance Securities: 1993-2008, Moody's Special Comment, August 2009.
http://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_119617

Moody's Syndicated Bank Loans Special Comment (2009): Syndicated Bank Loans: 2008 Default Review and 2009 Outlook, Moody's Special Comment, March 2009
http://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_115212

Pinnacle Note and ACES Series documents, including but not limited to prospectuses, pricing supplements and notices including answers to frequently asked questions.
http://www.morganstanley.com/pinnaclenotes/notes.html

Case 1:10-cv-08086-JMF-GWG   Document 145   Filed 03/22/13   Page 12 of 15

**Addendum**
**Kolchinsky Curriculum Vitae**



# ERIC KOLCHINSKY
212.797.0215  |  eric.kolchinsky@pf2se.com

**SUMMARY**

- Consulting and expert-witness engagements related to structured product litigation.
- Assist legal teams in gaining an improved understanding of the financial market dynamics as well as inside understanding of the securitization process.
- Clients include defense and plaintiff-side institutional investors with cases based on securities fraud, valuation procedures and the meaning of ratings.

**RELATED EXPERIENCE**

**State of Wisconsin/Office of the Commissioner of Insurance**                        New York, NY

<u>Consultant</u>                                                                         5/10 to present

- Advise the Office of the Commissioner of Insurance regarding the rehabilitation of Ambac Assurance Corp.
- Develop and implement de-risking strategies for the Residential Mortgage Backed Securities (RMBS) portfolio, including large-scale commutations and open-market synthetic commutations.  Create and implement portfolio risk measures.
- Manage the selection of a valuation vendor for Ambac's RMBS portfolio.  Ensure that the vendor is qualified to perform sophisticated analysis of the liabilities stemming from Ambac's financial guaranties.  Review valuation methodologies and results.

**National Association of Insurance Commissioners**                                    New York, NY

<u>Consultant</u>                                                                        11/09 to present

- Advise the NAIC on the RMBS and Commercial Mortgage Backed Securities (CMBS) valuation projects.  Projects use alternatives to rating agencies in setting risk-based capital for insurance companies.
- Participate in the selection of the RMBS and CMBS valuation vendors.  Ensure that the vendors have the required expertise, data, tools and staffing to accomplish the task in an expedited manner.  Develop, along with the vendors and consultants, appropriate valuation methodologies.
- Monitor the implementation of the valuations process.  Develop and direct an independent quality control function.
- Outreach to regulators, insurance industry professionals and consumer groups.

**Moody's Corporation**                                                                New York, NY

<u>Managing Director</u>, *Moody's Analytics*                                             12/07 to 9/09

- Head of Methodology for Structured Finance valuations.  Analyzed approaches for structured finance valuations and directed quality control of their production.  Coordinated various internal data and analytics units to ensure that the valuations produced were of the highest quality.
- Supervised a newly acquired evaluated pricing service, Moody's Evaluations Inc (MEI) as its Chief Operating Officer.  Managed product strategy, including strategic alliances for MEI.  Oversaw the creation of product specific IT infrastructure.
- Conducted company-wide seminars on lessons learned from the credit crisis.

<u>Managing Director</u>, *Moody's Investors Service*                                    12/06 to 12/07

- One of four Managing Directors responsible for the US Derivatives group with primary focus on ABS CDOs.  Administrative responsibility for over 20 analysts; operational management of up to 40 people, based on deal flow.
- Initiated a re-organization of the rating work flow intended to improve the quality of the rating process, enhanced new analyst training and facilitated communications between analysts.
- Extensive client outreach, public speaking and press contact.



Case 1:10-cv-08288-JMF-GWG Document 155-4 Filed 03/22/13 Page 15 of 16

**Moody's Corporation (cont.)**

<u>Senior Vice President</u>, *Moody's Investors Service*     5/05 to 12/06

- Served as ABS CDO ratings Team Leader. Duties included chairing credit committees and developing new rating methodologies.
- Lead outreach efforts to increase awareness of Moody's methodologies and practices.
- Managed the Moody's derivative analytics technology platform. Responsible for the development of the CDOEdge analytical software package and managing a team of junior analysts.
- Participated in all aspects of the acquisition of Wall Street Analytics, a financial software firm.

**Lehman Brothers**     New York, NY

<u>Vice President</u>, *CDO Origination*     5/04 to 5/05

- Directed the transaction process from client solicitation to closing. Supervised the preparation of client presentations, sales material and legal documents. Participated in the sales and syndication process.
- Advised client in structuring and closing a complex, private market-value transaction.

**Moody's Corporation**     New York, NY

<u>Vice President</u>, *Moody's Investors Service*     5/00 to 5/04

- Rated numerous credit derivative transactions. Modeled indenture requirements, analyzed collateral, negotiated with underwriters and assessed the transaction documents.

**MBIA Insurance Corporation**     New York, NY

<u>Assistant Vice President</u>, *CBO Group*     1/99 to 5/00

- Supported the new business efforts for the CDO group. Reviewed underlying deal documentation and ran deal analytics. Developed criteria and models for purchasing CDO equity.

**Merrill Lynch**     New York, NY

<u>Assistant Vice President</u>, *Global Credit Derivatives*     4/98 to 10/98

- Modeled, structured and executed credit derivative transactions.

**Goldman Sachs**     New York, NY

<u>Associate</u>, *Investment Banking Division – Commercial Real Estate*     1/97 to 4/98

- Executed structured transactions backed by real estate assets, including public CMBS offerings.

---

**EDUCATION**

**New York University Stern School of Business**     New York, NY
    Master of Science (Statistics) 1997

**New York University School of Law**     New York, NY
    Juris Doctor (admitted in New York) 1996

**University of Southern California**     Los Angeles, CA
    Bachelor of Science in Aerospace Engineering 1993


PF2 SECURITIES EVALUATIONS, LLC                    www.pf2se.com

**RELEVANT TESTIMONY**

*Testimony before the Financial Crisis Inquiry Commission*, "Credibility of Credit Ratings, the Investment Decisions Made Based on those Ratings, and the Financial Crisis", (June 2, 2010)

*Testimony before the Senate Permanent Subcommittee on Investigations,* "Wall Street and the Financial Crisis: The Role of Credit Rating Agencies", (April 23, 2010)

*Testimony before the House Oversight and Government Reform Committee,* "Credit Rating Agencies and the Next Financial Crisis", (September 30, 2009)

**EXPERT TESTIMONY**

Dexia SA/NV, et al. v. Bear Stearns & Co. Inc., et al., 12-cv-4761 (S.D.N.Y.) (JSR)