UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GE DANDONG; LOH TUCK WOH PETER; SINGAPORE GOVERNMENT STAFF CREDIT COOPERATIVE SOCIETY, LTD; NI YAN AMY; ANG SOO CHENG; CHOH GEK HONG JOHNSON; NG SHOOK PHIN SUSAN; and ZHAO YUZHENG, <br><br> Plaintiffs, <br><br> -vs.- <br><br> PINNACLE PERFORMANCE LIMITED; MORGAN STANLEY ASIA (SINGAPORE) PTE; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY CAPITAL SERVICES INC.; MORGAN STANLEY & CO. INC.; and MORGAN STANLEY, <br><br> Defendants. | Case No.: 10 Civ. 8086 (JMF)(GWG) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE KOLCHINSKY AND WOLSON DECLARATIONS**

**KIRBY McINERNEY LLP**
Daniel Hume
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: 212-371-6600
Facsimile: 212-751-2540

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Wolson's Background and Expert Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    Kolchinsky's Background and Expert Report. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     Applicable Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Motions in Limine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Expert Testimony and the Modified *Daubert* Analysis at the Class
           Certification Stage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Permissible Scope of Expert Testimony and Industry Custom and Practice. . . . . . 6

II.    The Reports Are Relevant to the Court's Class Certification Determination. . . . . . . . . . 7

III.   The Experts Do Not Offer Impermissible Legal Opinions. . . . . . . . . . . . . . . . . . . . . . 10

IV.   Defendants' Remaining Arguments Under *Daubert* Are Meritless. . . . . . . . . . . . . . . . 14

      A.    The Experts' Reports Are Based on Sufficient Factual Underpinnings. . . . . . . . 15

      B.    The Expert Reports Are Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           1.    Kolchinsky. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           2.    Wolson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Cases**:

*Amakua Dev. LLC v. Warner*,
   No. 05 Civ. 3082, 2007 WL 2028186 (N.D. Ill. July 10, 2007) . . . . . . . . . . . . . . . . . . . . . 6

*Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*,
   265 F. Supp. 2d 240 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   No. 09 Civ. 0696, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) . . . . . . . . . . . . 19, 22, 23

*Borawick v. Shay*,
   68 F.3d 597 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*,
   769 F. Supp. 2d 269 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*,
   No. 12 Civ. 5803, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) . . . . . . . . . . . . . . *passim*

*Daubert v. Merrill Lynch Dow Pharm., Inc.*,
   509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Dura Auto Sys. of Ind., Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*First Nat'l State Bank v. Reliance Elec. Co.*,
   668 F.2d 725 (3d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fogarazzo v. Lehman Bros, Inc.*,
   No. 03 Civ. 5194, 2005 WL 361025 (S.D.N.Y. Feb. 16, 2005) . . . . . . . . . . . . . . . . . . . 10

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
   270 F.R.D. 150 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gen. Elec. Capital Corp. v. Nichols*,
   No. 09 Civ. 0758, 2011 WL 1638048 (D. Conn. Apr. 29, 2011) . . . . . . . . . . . . . . . . 5, 16

*Gordon Partners v. Blumenthal*,
    No. 02 Civ. 7377, 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) . . . . . . . . . . . . . . . . . . . . . 10

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 13

*Hill v. Reederei F. Laeisz G.M.B.H.*,
    435 F.3d 404 (3d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hnot v. Willis Grp. Holdings Ltd.*,
    241 F.R.D. 204 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Holmes Grp., Inc. v. RPS Prods., Inc.*,
    No. 03 Civ. 40146, 2010 WL 7867756 (D. Mass. June 25, 2010) . . . . . . . . . . . . . . . . . 12

*In re Bankatlantic Bancorp, Inc., Sec. Litig.*,
    No. 07 Civ. 61542, 2010 WL 6397500 (S.D. Fla. Aug. 18, 2010) . . . . . . . . . . . . . . . . 14

*In re Initial Pub. Offering Sec. Litig.*,
    174 F. Supp. 2d 61 (S.D.N.Y 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re MTBE Prods. Liab. Litig.*,
    643 F. Supp. 2d 471 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 16

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Israel v. Spring Indus., Inc.*,
    No. 98 Civ. 5106, 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006). . . . . . . . . . . . . 14, 15, 23

*King v. Brandtjen & Kluge, Inc.*,
    No. 94 Civ. 411, 2001 WL 1804345 (W.D.N.Y. June 20, 2011) . . . . . . . . . . . . . 7, 16, 18

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

*Lee Valley Tools, Ltd. v. Indus. Blade Co.,*
    288 F.R.D. 254 (W.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lewis v. New Mexico Dep't of Health,*
    275 F. Supp. 2d 1319 (D.N.M. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lippe v. Bairnco Corp.,*
    288 B.R. 678 (Bankr. S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*MacQuesten Gen. Contracting, Inc. v. HCE, Inc.,*
    No. 99 Civ. 8598, 2002 WL 31388716 (S.D.N.Y. Oct. 22, 2002) . . . . . . . . . . . . . . . . . 24

*Marx & Co. v. Diner's Club, Inc.,*
    550 F.2d 505 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,*
    No. 98 Civ. 6907, 2001 U.S. Dist. LEXIS 10803 (S.D.N.Y. July 27, 2001) . . . . . . . 14-15

*Pereira v. Cogan,*
    281 B.R. 194 (Bankr. S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*S.E.C v. Berlacher,*
    No. 07 Civ. 3800, 2010 WL 3566790 (E.D. Pa. Sept. 13, 2010) . . . . . . . . . . . . . . . . . . 10

*S.E.C v. Todd,*
    No. 03 Civ. 2230, 2006 WL 5201386 (S.D. Cal. Oct. 17, 2006) . . . . . . . . . . . . . . . . . . 13

*Se-Kure Controls, Inc., v. Vanguard Prods. Grp., Inc.,*
    No. 02 Civ. 3767, 2008 WL 169054  (N.D. Ill. Jan. 17, 2008) . . . . . . . . . . . . . . . . . . . . . 12

*Sil-Flo, Inc. v. SFHC, Inc.,*
    917 F.2d 1507 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Specht v. Jensen,*
    853 F.2d 805 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,*
    467 F.3d 107 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

*United States v. Barbee,*
    968 F.2d 1026 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iv

*United States v. Barile*,
  286 F.3d 749 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Jacques Dessange, Inc.*,
  No. 99 Cr. 1182, 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) . . . . . . . . . . . . . . . . . . . 13

*United States v. Leo*,
  941 F.2d 181(3d Cir. 1991) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Mavashev*,
  No. 08 Cr. 902, 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010). . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Offill*,
  666 F.3d 168 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Oles*,
  994 F.2d 1519 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ozsusamlar*,
  428 F. Supp. 2d 161 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Schiff*,
  538 F. Supp. 2d 818 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22

*United States v. Wilson*,
  484 F.3d 267 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Universe Antiques, Inc. v. Vareika*,
  No. 10 Civ. 3629, 2011 WL 5117057 (S.D.N.Y. Oct. 21, 2011) . . . . . . . . . . . . . . . . . . . 14

*Weitz Co., LLC v. Lloyd's of London*,
  No. 04 Civ. 90353, 2007 WL 7131908 (S.D. Iowa 2007). . . . . . . . . . . . . . . . . . . . . . . . 20

**Federal Rules**:

Fed R. Civ. P. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

Fed R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed R. Evid. 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 15

Fed. R. Evid. 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Preliminary Statement**

The vast majority, if all, of Defendants' arguments in support of their motion to exclude the expert reports ("Reports") of Craig A. Wolson ("Wolson") and Ilya Eric Kolchinsky ("Kolchinsky") (collectively the "Experts") challenge the weight, not the admissibility, of that evidence, and therefore are improper on a *Daubert* motion.

The Experts' conclusions that: (i) the Pinnacle Notes deviated from credit-linked note ("CLN") custom and practice by concentrating risk in Underlying Assets that Defendants created, selected, and bet against; (ii) such information was not disclosed in the uniform Offering Materials; (iii) a reasonable CLN investor would have found such information significant/important; and (iv) Defendants' concentration of risk in the Underlying Assets – namely, their over-exposure to entities falling within the Finance Insurance and Real Estate market segments ("FIRE entities") – resulted in the Pinnacle Notes losses, are relevant to Fed. R. Civ. P. 23's commonality and preponderance requirements, and are of the type courts routinely admit.

Accordingly, Defendants' motion to exclude should be denied.

**Statement of Facts**

In addition to the statements of facts set forth in Plaintiffs' Memorandum of Law and Reply Memorandum of Law in Support of their Motion for Class Certification ("P. Cert. Br." and "P. Rep. Br.," respectively) – which Plaintiffs adopt by reference herein – Plaintiffs set forth the following additional facts:

**A.     Wolson's Background and Expert Report**

Wolson first started working as an attorney in the securities field in 1974, and has specialized in derivatives since 1988, and structured finance since 1994. *See* Wolson Tr. at 61:25-62:5 (annexed as Exhibit 2 to the April 25, 2013 Declaration of Andrew D.W. Cattell ("Cattell Decl.")).  During

his career, Mr. Wolson has worked on CLN, as well as dozens of collateralized debt obligation ("CDO") transactions, *see id.* at 79:4-16, 80:17-25, 129:11-17, 130:14-24; *see also* Expert Declaration of Craig A. Wolson ("Wolson Decl.") (Dkt. No. 146) ¶ 1.04. As Chemical Bank's legal representative to the International Swap Dealers Association ("ISDA"), Wolson was involved in promulgating ISDA's 1992 Master Agreement Forms. *See* Wolson Decl. ¶ 1.04. Notably, ISDA is the main trade association for derivatives dealers, and its form credit-default swap agreement ("CDS") is used in both CLN and Synthetic CDO transactions.

Among other experience, Wolson has been a member of the New York City Bar Association's Structured Finance Committee since 2004 – which consists of 35 of the leading structured finance lawyers in the United States – and served as its Chairman from 2004 to 2008. *See* Wolson Tr. at 62:6-10, 132: 10-13; Wolson Decl.¶ 1.05. Since 2009, Wolson has also been a member of the American Bar Association's Structured Finance and Securitization Committee and the New York State Bar Association's Derivatives and Structured Products Committee. *See* Wolson Tr. at 62:14-19; Wolson Decl. ¶ 1.05. Finally, Wolson has co-authored numerous articles on securitization financing, and has spoken at and/or moderated panels at several structured finance seminars. *See* Wolson Decl. ¶ 1.05.

In his report, Wolson first discusses customary CLN and Synthetic CDO structure, *see id.* at ¶¶ 2.01-3.08, noting in particular that the creditworthiness of the CLN Reference Entities ("REs") is the primary risk, while the Underlying Assets are only a secondary risk consideration, *see id.* at ¶¶ 2.07, 2.08. Wolson then explains how the Pinnacle Notes' structure deviated from those standards by, *inter alia*, creating an express conflict of interest whereby the Defendants stood to gain and Plaintiffs stood to lose if the Underlying Assets that Defendants created and selected lost their

value. *See id.* at ¶ 4.04.  Wolson also opines that this information was not disclosed in the Pinnacle

Notes' Offering Materials, and concerned fundamental deviations from customary CLN and CDO

practice, such that the omitted information would have been important/significant to a reasonable

investor. *See id*. at ¶¶ 5.01-02.

### B.    Kolchinsky's Background and Expert Report

Kolchinksy has over 15 years of structured finance experience.  *See* Expert Report of Ilya

Eric Kolchinsky ("Kolchinksy Decl.") (Dkt. No.147) at ¶ 2.  He has worked at, *inter alia*, Goldman

Sachs, Merrill Lynch, MBIA Insurance Corporation, and Lehman Brothers.  *See id.* ¶ 6.  From 2006

to 2007, Kolchinsky was a Managing Director at Moody's Investor Service on the ratings side, and

then Head of Methodology for Structured Finance Valuations at Moody's Analytics from 2007 to

2009.  *See id.* ¶¶ 6-8 & Addendum.[1]  He has also given numerous presentations on CDOs and other

related topics, and frequently spoke, or moderated panels, at securitization conferences. *See id.* ¶ 9.

Additionally, he served as an expert witness and has given testimony before Congress, *see id.* ¶ 9 &

Addendum; Kolchinsky Tr. at 42:25-43:7, 44:23-46:9 (annexed as Exhibit 1 to the Cattell Decl.).

In his report, Kolchinsky discusses the Pinnacle Notes' structure, and explains that although

the Pinnacle Notes' advertised primary risk was the five to seven well-known CLN REs, *see*

Kolchinsky Tr. at 107:4-10, the Underlying Assets, which were far riskier than the CLN REs, were

the true primary risk and were heavily exposed to FIRE entities, *see* Kolchinsky Decl. ¶¶ 19-27, 42.

---

[1] While at Moody's, Kolchinsky rated numerous credit derivative transactions, analyzed collateral, negotiated with underwriters, oversaw Moody's U.S. ABS CDO derivative business, and was responsible for all rated derivatives products that referenced structured finance securities*.  See id.* at ¶ 8, Addendum.  Those products included, *inter alia*, synthetic CDOs, bespoke CDOs, and certain CLNs.  *See id.*  In sum, Kolchinsky was either the analyst or manager on hundreds of synthetic CDOs transactions like the MS ACES CDOs. *See* Kolchinsky Tr. at 220:3-6.

Kolchinsky then notes that because relevant information regarding the Underlying Assets was not included in the Pinnacle Offering Materials, certain risks were not visible to the Pinnacle investors. *See id.* at ¶¶ 27, 28, 43. Finally, Kolchinsky analyzes whether the Underlying Assets were over-exposed to FIRE Entities *vis-à-vis* a standard contemporaneous index, and concludes that they were, in fact, over-exposed and suffered massive losses as a result. *See id.* at ¶¶ 30-39.

## ARGUMENT

I.     **Applicable Legal Standards**

   A.     **Motions in Limine**

The Federal Rules of Evidence favor the admission of all relevant evidence. *See* Fed. R. Evid. 402. Evidence is relevant if it has any "tendency to make [the] existence of any fact [that is] of consequence to [the] determination of [the] action more probable or less probable than it would be without [the] evidence." Fed. R. Evid. 401. A district court considering a motion in limine "'will exclude evidence . . . only when the evidence is clearly inadmissible on all potential grounds.'" *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006)); *Lewis v. New Mexico Dep't of Health*, 275 F. Supp. 2d 1319, 1331 (D.N.M. 2003) ( "[D]oubts about the usefulness of expert testimony should generally be resolved in favor of admissibility.") (citing *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1517 (10th Cir. 1990)).

   B.     **Expert Testimony and the Modified *Daubert* Analysis at the Class Certification Stage**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See* Fed. R. Evid. 702. According to the Supreme Court, expert testimony must be "not only relevant, but reliable." *Daubert v. Merrill Lynch Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

4

Importantly, "[w]hile *Daubert* lists factors for assessing the reliability of scientific methods, they 'may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject matter of his testimony.'" *In re MTBE*, 643 F. Supp. 2d at 477 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *see also Gen. Elec. Capital Corp. v. Nichols*, No. 09 Civ. 0758, 2011 WL 1638048, at *4 n.5 (D. Conn. Apr. 29, 2011) ("[T]he *Daubert* factors *are inappropriate when testimony relates to customs and practices of an industry*, as opposed to engineering or science.") (emphasis added) (citing *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006)).   Accordingly, "an expert may be qualified based solely 'on his experience'" provided he shows how his "'experience . . . led to his conclusion or provided a basis for his opinion.'" *Gen. Elec.*, 2011 WL 1638048, at *5 (quoting *SR Int'l Bus. Ins. Co.*, 467 F.3d at 132).

Moreover, "[i]n assessing reliability . . . the Federal Rules of Evidence favor admissibility of expert testimony.  'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence.'" *In re MTBE*, 643 F. Supp. 2d at 477 (quoting *Daubert*, 509 U.S. at 596); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that solidly . . . proven to be unreliable").

Finally, where, as here, expert testimony is challenged at the class certification stage, a district court does not engage in a full-blown *Daubert* analysis.  Rather, its inquiry is limited to whether the proffered evidence is admissible to establish the requirements of Fed. R. Civ. P. 23.  *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009) (citing *Hnot v. Willis Grp. Holdings Ltd.*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007)).

**C.      Permissible Scope of Expert Testimony and Industry Custom and Practice**

"[T]he permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 423 (3d Cir. 2006); *see also United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991) ("The trial court has wide discretion in determining whether [to admit] expert testimony.").

Pursuant to Rules 702 and 704 of the Federal Rules of Evidence, expert witnesses are generally precluded from opining on ultimate issues of law.  *See In re Initial Pub. Offering Sec. Litig.,* 174 F. Supp. 2d 61, 65-67 (S.D.N.Y 2001); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion . . . on an ultimate issue of law.") (internal marks omitted).  However, "[t]here is a distinction between testimony on ultimate issues of fact and ultimate issues of law." *United States v. Barbee*, 968 F.2d 1026, 1031 (10th Cir. 1992) (citing Fed. R. Evid. 704).  This distinction recognizes that while testimony regarding "the ultimate factual questions aids the jury in reaching a verdict," opinions on ultimate legal issues – *i.e.,* telling the jury how to decide the case – does not.  *Id.* (quoting *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988)); *see also Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008) (Rule 704 "provides that 'testimony in the form of an opinion or an inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'") (quoting Fed. R. Evid. 704).

Thus, "'a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.'" *United States v. Oles*, 994 F.2d 1519, 1523 (10th Cir. 1993) (quoting *Specht*, 853 F.2d at 809).  Moreover, an expert may discuss relevant facts "couched in legal terms."  *Amakua Dev. LLC v. Warner*, No. 05 Civ. 3082, 2007 WL 2028186, at *10 (N.D. Ill. July

10, 2007) (quoting *Specht*, 853 F.2d at 809); *see also Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 252 (S.D.N.Y. 2003) ("An expert may, however, include factual conclusions and opinions . . . that encroach upon the court's duty to instruct upon the law.").

Finally, an expert may permissibly testify as to industry custom and practice. *See Leo*, 941 F.2d at 196-97; *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981); *Highland Capital Mgmt.*, 551 F. Supp. 2d at 180 (holding that securities expert "may testify as to the customs and practices of the industry").[2]

## II.   The Reports Are Relevant to the Court's Class Certification Determination

Defendants first argue that the Reports should be excluded as irrelevant because the Experts were not asked to opine on whether the Court should grant class certification. *See* Memorandum of Law in Support of Defendants' Motion to Exclude the Declarations of Plaintiffs' Experts Ilya Eric Kolchinsky and Craig A. Wolson ("Def. Br.") at 3-4. That the Experts did not arrogate to instruct the Court on how to rule on Plaintiffs' class certification motion – or any of Rule 23's requirements – is consistent with the prohibition on legal opinions.

Rather, in determining the Reports' relevance at this stage, the Court need only assess whether the Reports have the tendency to make the existence of any fact consequential to Rule 23's requirements more or less probable. *See generally Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*, No. 12 Civ. 5803, 2013 WL 978980, at *4 (S.D.N.Y. Mar. 12, 2013). Here, both Reports are relevant to the commonality and preponderance requirements, because

---

[2] *Pereira v. Cogan*, 281 B.R. 194, 200 (Bankr. S.D.N.Y. 2002) ("There is no disagreement that experts may testify as to the customary practices in a profession or industry."); *King v. Brandtjen & Kluge, Inc.*, No. 94 Civ. 411, 2001 WL 1804345, at *8 (W.D.N.Y. June 20, 2001) (finding admissible "opinions regarding industry custom and practice" that "are based in objective facts and have traceable analytical bases in those facts").

they show that:  (i) Plaintiffs' claims can be established through common proof; and (ii) reliance can be inferred based on circumstantial evidence common to the class.[3]

*The Wolson Report*:    Wolson explains that, based on his experience and knowledge of structured finance custom and practice (as confirmed by several treatises):  (i) the primary risk consideration for a CLN investor is the specified REs' creditworthiness, while the Underlying Assets are just a secondary risk factor, *see* Wolson Decl. ¶¶ 2.07-08; (ii) a CLN that reversed this customary risk allocation, such that the Underlying Assets were the primary risk, would deviate significantly from industry custom and practice; and (iii) information regarding such deviations would have been important/significant to CLN investors, *see* Wolson Decl. ¶¶ 2.08-09, 5.02.

Relatedly, Wolson also explains that, customarily, both counter-parties to a CLN have an interest in preserving the Underlying Assets' value during the Notes' term. *Id.* at ¶¶ 2.06-07.  Having analyzed the Pinnacle and MS ACES Offering Materials, Wolson concluded that Defendants eliminated this alignment of interests by selecting Underlying Assets Synthetic CDOs that they created and shorted. *Id.* ¶¶ 4.04-.05.  Thus, through undisclosed self-dealing, Defendants created an express conflict of interest where they stood to gain and the investors stood to lose if the Underlying Assets defaulted.  Based on his experience (as supported by several treatises), Wolson concluded that this information, which was omitted from the Offering Materials, constituted such a fundamental deviation from standard CLN structure that a reasonable investor would have deemed it important/significant.  *See id.* ¶¶ 5.01-02.

---

[3] Under Second Circuit law, a fraud claim can be certified where there is evidence of uniform misrepresentations, and circumstantial evidence of reliance common to the class.  *See* P. Cert. Br. at 24-33; P. Rep. Br. at 3-11.  As such, expert evidence bearing on these issues is directly relevant to the Court's determination.

Against this backdrop, Wolson's opinion is directly relevant to: (i) the commonality requirement, because it demonstrates that Defendants' fraudulent conduct and intent can be established through common evidence; and (ii) the preponderance element, because it demonstrates that reliance can be established through circumstantial evidence common to the class. Similarly, Wolson's discussion of the Pinnacle Notes' undisclosed deviations from standard CLN and CDO structure – particularly those aspects of the transaction Defendants unilaterally controlled – is evidence of Defendants' bad faith and therefore demonstrates that Plaintiffs' good faith and fair dealing claims can be proven through common evidence.

*The Kolchinsky Report*: Kolchinsky first opines that, "[b]ased on [his] experience, the Pinnacle Notes were among the most complex assets created by Wall Street," and that a number of significant risks were "not visible" to the investors because Defendants had omitted them from the Offering Materials. Kolchinsky Decl. ¶¶ 26-29, 40. Kolchinsky, like Wolson, noted that in his experience the primary risk to a CLN investor is typically "the Reference Entities themselves," *id.* ¶ 21, and concluded with respect to the Pinnacle Notes that:

> It was very unusual for credit linked notes to have the bulk or the majority of the risk in the second layer, in the underlying assets, as opposed [to in] the reference entities at the credit linked note level. In my general experience, when credit linked notes were offered, the majority of the risk investors can analyze was at the credit linked note level.

Kolchinsky Tr. at 284:16-25; *see also id.* at 107:4-10 (testifying that the MS ACES CDO Underlying Assets were far more risky than the Pinnacle Notes nominal REs). This, like Wolson's testimony, provides circumstantial evidence common to the class of reliance on Defendants' failure to disclose that they had realigned and concealed the Pinnacle Notes' true risks in the Underlying Assets.

9

Kolchinsky also demonstrates that the MS ACES CDOs' heavy bias towards FIRE entities *vis-à-vis* a standard, contemporary Synthetic CDO portfolio resulted in the deterioration of that collateral and the transfer of the Pinnacle investors' money to Defendants. *See* Kolchinsky Decl. ¶¶ 30-39; Kolchinsky Tr. at 131:21-132:5. This testimony is relevant to both the commonality and preponderance elements because it demonstrates that there is class-wide evidence of Defendants' misconduct, and that causation does not require individualized inquiries but can be established pursuant to common proof and methodology.

Accordingly, the Wolson and Kolchinsky Reports are relevant at this stage because they relate directly to "whether plaintiffs' allegations *are capable of being proved on a common basis for all class members*." *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194, 2005 WL 361205, at * 2 (S.D.N.Y. Feb. 16, 2005) (emphasis in original).[4]

## III. The Experts Do Not Offer Impermissible Legal Opinions

Defendants next argue that because the Experts used the word "material" at various times, their Reports must be stricken in their entirety for purporting to offer impermissible legal opinions.[5] Defendants' argument fails for several reasons.

---

[4] Thus, Defendants' reliance on *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 161 n.16 (S.D.N.Y. 2010) – where the court declined to consider an expert declaration that was "entirely irrelevant" to the appropriateness of class certification – is inapt.

[5] Notably, it is commonplace in actions under the federal securities laws for expert witnesses to opine on the materiality of alleged misstatements. *See Gordon Partners v. Blumenthal*, No. 02 Civ. 7377, 2007 WL 431864, at *6-7 (S.D.N.Y. Feb. 9, 2007) (noting that defendants' expert "had been retained . . . in over 200 securities lawsuits, in which she has opined on such issues as loss causation, materiality, and damages" and discussing expert's "event study on the materiality of each announcement"); *see also S.E.C. v. Berlacher*, No. 07 Civ. 3800, 2010 WL 3566790, at *8 (E.D. Pa. Sept. 13, 2010) (the "defense expert . . . conducted an event study and determined that [a particular transaction] was not material information to investors").

As a preliminary matter, assuming *arguendo* that the Experts opined on whether Defendants' omissions were material, Defendants ignore that the vast majority of the Experts' opinions do not concern materiality or any ultimate legal issues.  Wolson primarily (i) opines on industry custom and practice with respect to CLN and CDO structuring, including the customary allocation of risk, (ii) explains where the Pinnacle Notes deviated from standard practice, and (iii) identifies information concerning those deviations that was omitted from the Offering Materials.  *See* Wolson Decl. ¶¶ 2.01-5.02.  Defendants do not, and cannot, contest that testimony concerning industry custom and practice and deviations therefrom is a proper subject of expert testimony.  *See* Point I.C., *supra.*

Similarly, Kolchinsky identifies additional risk factors that, in his experience as a securities analyst at Moody's, impacted the Pinnacle Notes' risk profile, but that were not disclosed in the Pinnacle Notes Offering Materials.  Kolchinsky also analyzes the MS ACES CDO portfolios *vis-à-vis* a contemporaneous, standard index to determine whether the MS ACES CDOs were biased towards FIRE entities, and then analyzes whether the losses suffered by the MS ACES CDOs were due to FIRE entity versus non-FIRE entity credit events.  Neither of those subjects call for legal opinions, and are therefore admissible.

In any event, both Experts made clear that when they used the word "material" in their Reports or testimony, they were *not* discussing legal requirements or concepts, but were simply using the term as a synonym for "important" or "significant," *i.e.,* information that, in their experience, was typically considered by the parties to CLN and CDO transactions.

Specifically, Wolson confirmed that he was not asked to opine on (i) disclosure standards under U.S. or Singapore law, or (ii) whether the omissions were "material" as that term is understood under U.S. or Singapore law.  *See* Wolson Tr. at 203:19-25, 204:8-17.  Rather, Wolson explained

that he was asked to opine on the importance of the omitted information based on his involvement in numerous structured finance transactions, *see id.* at 204:3-7, and that when he said "material" he meant "important" or "significant," *id.* at 204:18-22.

Similarly, Kolchinsky explained that he was asked to assess whether the Pinnacle Notes Offering Materials omitted information that, in his experience in rating similar securities, was "vital" to understanding the Pinnacle Notes' risks. Kolchinsky Tr. at 186:13-23, 98:21-25, 201:17-24. He, like Wolson, made clear that when he said "material," he was referring to "important" information, *id.* at 220:19-221:8, that "you would want to know as an investor," *id.* at 189:21-24.

Such testimony is entirely permissible, especially in the context of complex securities transactions.[6]  *See, e.g., Holmes Grp., Inc. v. RPS Prods., Inc.*, No. 03 Civ. 40146, 2010 WL 7867756, at *5 (D. Mass. June 25, 2010) (whether information in the patent context was "material," turns on whether "there is a substantial likelihood that an objectively reasonable examiner would have considered the information important," and "'[i]f [the expert] can *shed light on what a reasonable examiner would have considered important*, [the expert's] testimony is admissible.") (emphasis added) (quoting *Se-Kure Controls, Inc.*, *v. Vanguard Prods. Grp., Inc.*, No. 02 Civ. 3767, 2008 WL 169054, at *3 (N.D. Ill. Jan. 17, 2008)); *United States v. Schiff*, 538 F. Supp. 2d 818, 845 (D.N.J. 2008) ("The Court finds that [the expert's] opinions regarding what information is important to investors is at the heart of the dispute . . . and are thus relevant."), *aff'd* 602 F.3d 152 (3d Cir. 2010); *United States v. Barile*, 286 F.3d 749, 761-62 (4th Cir. 2002) (permitting testimony relating

---

[6] "Indeed, courts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (concerning securities transactions)).

to whether submissions contained "materially misleading statements," phrased in the form of whether "the submissions were reasonable") (internal quotation mark omitted); *Crown Cork*, 2013 WL 978980, at *10 (permitting expert to discuss "what [certain] information would have told a reasonable placement agent, and evaluat[e] *how a reasonable actor should have responded* in light of industry practice") (emphasis added).[7]

Defendants' cases do not counsel otherwise. For example, Defendants rely on *United States v. Mavashev*, No. 08 Cr. 902, 2010 WL 234773, at *4 (E.D.N.Y. Jan. 14, 2010), *see* Def. Br. at 8, which precluded an expert from testifying as to the "materiality of non-disclosure." Defendants omit, however, that the Court permitted the same testimony when characterized as "*an explanation of the significance of the misrepresentations* in mortgage loan applications," because "such testimony from a witness with specialized knowledge of mortgage procedures would clearly assist the finder of fact in this case." *Mavashev*, 2010 WL 234773, at *4 (emphasis added); *see also United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 WL 294849, at *2 (S.D.N.Y. Mar. 21, 2000) (cited by Defendants and explaining that "[a]n expert may opine on an issue of fact within the jury's province") (internal quotation marks omitted).

Ultimately, Defendants' concern that the term "material" may confuse the fact-finder as to the proper scope of the Experts' testimony is of little concern here, as the Court is the fact-finder

---

[7] *See also Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("The expert, for example, may tell the jury whether he thinks the method of [securities] trading was normal . . . ."); *S.E.C. v. Todd*, No. 03 Civ. 2230, 2006 WL 5201386, at *2-3 (S.D. Cal. Oct. 17, 2006) (holding that materiality in the securities context is a complex issue, that jury would benefit from expert testimony on the subject, and that expert's opinions "do not constitute imadmissible legal conclusions"); *Highland Capital Mgmt.*, 551 F. Supp. 2d at 181 (although securities expert could not opine on whether one party had authority to bind the other in securities transaction, he could, "based upon his experience, point to factors indicating" that one party "had authority to bind . . . or that there was an agreement").

with respect to Plaintiffs' class certification motion. *Cf. Universe Antiques, Inc. v. Vareika*, No. 10 Civ. 3629, 2011 WL 5117057, at *6 (S.D.N.Y. Oct. 21, 2011) ("Moreover, the *Daubert* dynamic is slightly altered in a bench trial because there is no risk that the jury will be bamboozled.") (internal marks and alterations omitted). Under such circumstances, the Court can simply disregard the use of the word "material," in favor of verbiage – such as "important" or "significant" – that does not unintentionally invoke legal standards. *See, e.g., Crown Cork*, 2013 WL 978980, at *6 (in securities action, holding that expert testimony regarding "the role, standard of care, and due diligence . . . of a placement agent" was admissible and that – to the extent the expert used terms such as "material" or "reckless" – the expert was simply required to "recast his testimony by using terminology that does not express legal conclusions").[8]

## IV.     Defendants' Remaining Arguments Under *Daubert* Are Meritless

Defendants also argue that the Experts' Reports should be excluded as unreliable, because they purportedly are based on insufficient data, or are the product of flawed methodology. But those concerns, which primarily arise in the context of scientific knowledge, are generally inapt where, as here, the Experts' opinions are based on "personal knowledge or experience." *Israel v. Spring Indus., Inc.*, No. 98 Civ. 5106, 2006 WL 3196956, at *2 (E.D.N.Y. Nov. 3, 2006); *Page Mill Asset*

---

[8] *See also Mavashev*, 2010 WL 234773, at *4 (permitting expert testimony that was substantively the same but rephrased to avoid legal conclusion); *In re BankAtlantic Bancorp, Inc., Sec. Litig.*, No. 07 Civ. 61542, 2010 WL 6397500, at *12-13 (S.D. Fla. Aug. 18, 2010) (expert could not opine in manner that tracks the "language of the legal standard for materiality," but could opine "as to the importance of loan credit quality and performance to the valuation of a bank as evidence of the materiality of the information").

*Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907, 2001 U.S. Dist. LEXIS 10803, at *7 n.1 (S.D.N.Y. July 27, 2001) ("[E]xperience alone may provide a sufficient foundation.").[9]

While Defendants spend considerable energy trying to pound a square peg into a round hole, they do not raise any serious challenge to the fact that the Experts sufficiently explained:  (i) how their experience led to their conclusions; (ii) why that experience was a sufficient basis for their opinion; and (iii) how that experience was applied to the facts of this case, which is all that is required for experiential expert testimony.  *Israel*, 2006 WL 3196956, at *2; *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (Bankr. S.D.N.Y. 2003) (citing Fed. R. Evid. 702 advisory comm. note (2000 Amendments)).  In any event, as discussed below, Defendants' arguments either misstate the record, or raise issues that address the weight, and not the admissibility, of the Experts' Reports.

## A.   The Experts' Reports Are Based on Sufficient Factual Underpinnings

Defendants argue that the Reports should be excluded because neither Expert:  (i) spoke to the named Plaintiffs or any other Singapore retail investors, *but see Crown Cork*, 2013 WL 978980, at *6 (expert testifying regarding "role, standard of care, due diligence and disclosure responsibilities of a placement agent," was not required to "conduct a survey of banking professionals"); or (ii) considered the Monetary Authority of Singapore ("MAS") report, which addressed a handful of CLN offerings in addition to the Pinnacle Notes, *see* Def. Br. at 5-6.[10]

---

[9] Fed. R. Evid. 702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) ("Experiential expert testimony . . . does not rely on anything like a scientific method.") (internal quotation marks omitted).

[10] Defendants base their argument entirely on the fact that the MAS Report indicates that, in addition to the Pinnacle Notes, between 2006 and 2008 three other investment banks offered CLNs to the retail public in Singapore:  (i) the Minibonds offered by Lehman Brothers; (ii) the High Notes offered by DBS Bank Ltd; (iii) and the Jubilee Notes offered by Merrill Lynch.

15

The unstated (and utterly unfounded) assumption underlying Defendants' criticisms is that the Experts' broad structured finance experience – particularly, their knowledge of customary CLN and CDO structure, risk allocation, and investor considerations – is irrelevant because the Singapore investor is unlike all other investors, and industry custom and practice somehow changes when one enters Singapore.

As a preliminary matter, even if Defendants' criticisms had any merit – which they do not – they concern the weight accorded to the Experts' testimony, not its admissibility. *See Gen. Elec.*, 2011 WL 1638048, at *6 ("To the extent [the movant's] arguments identify gaps or inconsistencies in [the expert's] Report, they are appropriately addressed at cross examination.") (citing *SR Int'l Bus. Ins.*, 467 F.3d at 134). Thus, in *In re MTBE*, the court rejected a similar *Daubert* challenge based on an expert's purported unfamiliarity with "*local* gasoline distribution" and noted that defendant was free to "impeach [the expert's] credibility on cross-examination" on that ground. 643 F. Supp. 2d at 478 (emphasis added).

Moreover, that the Experts do not buy into Defendants' theory of the case, and did not review materials related thereto, does not warrant exclusion:

> [I]t is the *defendant's* contention that the removal of parts from the press had something to do with the plaintiff's injury . . . . The plaintiff's expert should not be disqualified because his inspection of the press was not tailored to the defendant's theory of the case.

*King*, 2001 WL 1804345, at *8 (internal marks omitted, ellipses and emphasis in original).

In any event, Defendants wholly fail to explain why this information has any bearing on the Experts' opinions. Defendants do not explain how, for example, the handful of other CLN offerings discussed in the MAS Report has anything to do with the Experts' conclusions that: (i) a CLN that

concentrated risk primarily in the Underlying Assets as opposed to the CLN REs deviated significantly from industry custom and practice;[11] and (ii) that the Defendants did not disclose those risks.  Indeed, the notion that Singapore investors, unlike any other investor, would have been indifferent had Defendants disclosed that they were larding the Underlying Assets with risk in order to benefit at the investors' expense, assumes a level of provincialism that defies common sense.

Furthermore, despite Defendants' bid to manufacture this false dichotomy, both Experts testified that they fundamentally disagree with the proposition that the structured finance industry in Singapore is exotic.  Kolchinsky testified that "[t]he CDO and the CLN market was *a global market*."  Kolchinsky Tr. at 91:3-6 (emphasis added).  Similarly, Wolson testified that he was not aware of "any instance" where customary structured finance practice "change[d] depending on geographic location," Wolson Tr. at 210:18-211:2, and the fact that there were a limited number of retail CLN offerings in Singapore over a brief interval did not impact his opinion, *see id.* at 64:4-14.  Indeed, the Pinnacle Notes themselves demonstrate that the CLN and CDO market is global:  the primary Morgan Stanley entities involved in the transactions hail from the United States, England, the Cayman Islands, and Singapore, and Defendants identified several relevant employees located in Hong Kong.  *See* Declaration of Christopher Jackson in Support of Defendants' Motion to Dismiss the Complaint (Dkt. No. 38) at 2-3.

Defendants also misrepresent the record in claiming that Kolchinsky relied on counsels' "flatly untrue" description of Plaintiffs' deposition testimony in forming his opinion "on what retail

---

[11] For example, other than observing that certain of the CLNs offered in Singapore at the same time as the Pinnacle Notes utilized CDOs as the Underlying collateral, *see* Cattell Decl. Ex. 5 at 2, ¶ 2(d), the MAS Report says nothing about the allocation of risk between those CLNs REs and the underlying CDOs.

17

investors in Singapore could understand, analyze, know or see." Def. Br. at 5-6 (citing Kolchinsky Tr. at 173:18-24). As the record demonstrates, neither the question to Kolchinsky nor his testimony had anything to do with the information he relied upon in forming his opinion. *See* Kolchinsky Tr. at 173:18-24; *see also* Kolchinsky Decl. at ¶¶ 15, 32 n.3, 33 n.4, Ex. B (Plaintiffs' testimony not relied upon in generating report). Moreover, Defendants' contention that counsel inaccurately described Plaintiffs' testimony, *see* Def. Br. at 5-6, is nothing more than a repackaged version of their erroneous argument that the Brochures – which were part of the Pricing Statements, which set forth the Pinnacle Notes' key terms, and which all Plaintiffs reviewed prior to investing – somehow are not part of the Offering Materials.

Finally, Defendants attack Wolson on the ground that, despite his vast experience, his Report should be disregarded because he only worked directly on two CLN transactions. Def. Br. at 7. Even crediting Defendants' criticism, courts routinely reject challenges to an Expert's qualifications where the witness has expertise in the general field – here, structured finance – relevant to the action.[12] In any event, Defendants simply ignore that Wolson, in connection with his Committee affiliations, has attended numerous meetings and seminars where CLNs were discussed, *see* Wolson Decl. at ¶ 1.05; Wolson Tr. 132:10-22, and that he was "quite aware" of how CLNs operate, because he had substantial familiarity with Synthetic CDOs, which "are basically a complex form of CLNs,"

---

[12] *See, e.g., King*, 2001 WL 1804345, at *2 ("Assuming that the proffered expert has the requisite minimal education or experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training *narrowly matching the point of dispute in the lawsuit*.") (internal citations omitted, emphasis added); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (same); *see also Crown Cork*, 2013 WL 978980, at * 2 ("Arguments that a proffered expert lacks particular educational or other experiential background, go to the weight, not the admissibility, of the testimony.") (internal marks and alterations omitted).

Wolson Tr. at 129:11-17.  Here, Wolson's expertise is especially apt because this case turns on Defendants' concentration of risk in the Underlying Assets, which are Synthetic CDOs.

**B.     The Expert Reports Are Reliable**

**1.     Kolchinsky**

Defendants again resort to distorting the record in arguing that Kolchinsky served as the "conduit for the opinions of another person."  Def. Br. at 10.  To the contrary, Kolchinsky testified that he was the primary draftsman of his Report:

> Q.     When for the first time did you see a draft of what eventually became your report which has been marked as Kolchinsky Exhibit 1?
>
> A.     I don't recall *when I first drafted* the report.
>
> Q.     The question was a different one.  When was the first time you saw any draft?
>
> A.     *When I produced it.*

Kolchinsky Tr. at 41:12-22 (emphasis added).

That a member of Kolchinsky's team assisted him with portions of the report regarding "the numbers," *id.* at  27:5-11, is entirely permissible.[13]  *See, e.g., Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 0696, 2011 WL 6288415, at *10-11 (S.D.N.Y. Dec. 15, 2011) (rejecting challenge to expert report where third-parties provided  data collection and research assistance); *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (report admissible despite the use of staff to "conduct some verification of the underlying data and to draft

---

[13] Contrary to Defendants' contention, Kolchinsky did not testify that his assistant, Gene Phillips, drafted his report. When Kolchinsky became aware during his deposition that Defendants were misconstruing his testimony regarding the level of Mr. Phillip's assistance, Defendants' counsel impermissibly stopped Kolchinsky from answering a related question in a manner that would have clarified the issue. *See id.* at 29:8-30:15. Despite counsel's bid to manufacture an inaccurate record, Kolchinsky made clear that he wrote his report and that it contains his opinions.

the initial report" where the expert "edited and finalized the report"); *see also Dura Auto Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) ("An expert witness is permitted to use assistants in formulating his expert opinion.").[14]

Defendants also contend that Kolchinsky's failure "to examine how the Pinnacle Notes were actually sold" – *i.e.*, through Distributors – "completely eviscerates his utterly speculative and wholly unreliable conclusion[]" that certain risks were not visible to the Pinnacle investors.  *See* Def. Br. at 12.  Bombast aside, the notion that the Distributors could have educated the investors to risks that Defendants did not disclose in the Offering Materials, and that could not have been ascertained until *after* the investors had already purchased the Pinnacle Notes and Defendants made the MS ACES CDO documents available, is nonsensical.

Defendants next dismiss Kolchinsky's analysis of the FIRE entities' impact on the MS ACES CDOs' performance as unreliable, because Kolchinsky purportedly "does not define" what he means by "over-exposure."  Def. Br. at 12.  At the risk of being pedantic, Defendants fail to grasp that "over-exposure" is a relative concept, like "big" or "small":  its meaning is derived by comparison. The Kolchinsky Report makes clear that the MS ACES CDO portfolios were over-exposed to FIRE entities *vis-à-vis* a contemporaneous, standard Credit Default Swap portfolio:  the CDX.NA.IG.[15]

---

[14] Indeed, *Weitz Co., LLC v. Lloyd's of London*, No. 04 Civ. 90353, 2007 WL 7131908 (S.D. Iowa 2007), which Defendants cite, makes clear that the challenged expert's report would have been admissible if the expert "had been involved, *even to some limited extent*, in the underlying research, analysis or drafting of the report."  *Id.* at *3 (emphasis added).

[15] The CDX.NA.IG is a standard reference portfolio created by a consortium of banks, including Morgan Stanley, and published by Markit Co.  (Cmplt. ¶ 183 & n.7); *see* Declaration of Andrew M. McNeela in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Kolchinsky and Wolson Declarations ("McNeela Decl.") Ex. 1.  "CDX" refers to credit default swap; "NA" refers to North America and "IG" refers to investment grade. (Cmplt.¶ 183 & n.7).  The CDX.NA.IG is updated twice per year by the same consortium of banks,

Adding insult to injury, Defendants know this. Indeed, just one page after lamenting that Kolchinsky's methodology was "impossible to verify," they set upon criticizing his use of the CDX.NA.IG index as a comparitor. Def. Br. at 12-13.

Those criticisms are likewise meritless. Kolchinsky explained at length why the CDX.NA.IG. index was the most appropriate baseline for examining the MS ACES CDO portfolios. Kolchinsky Tr. at 93:24-94:10, 130:22-131:20, 134:16-22, 144:23-145:8. The CDX.NA.IG. is a standardized synthetic credit security that is broadly traded. *See* Kolchinsky Tr. at 144:23-145:8. It is based on a portfolio of approximately 120 REs, and is therefore a close approximation to the MS ACES CDO portfolios, which, depending on the Series at issue, consisted of either 100 or 120 REs. The CDX.NA.IG is comprised of North American investment grade companies, and therefore was the best proxy for the MS ACES CDO portfolios, which primarily consisted of investment grade companies, the majority of which were North American entities. *See id.* at 144:23-145:8, 149:9-14, 164:22-165:65. Kolchinsky further explained that the CDX index was also a fair baseline because it represented a portfolio selected by sophisticated short and long counter-parties, which ensured that the representative credits (*i.e.*, the REs) were carefully picked and not skewed in favor of either position. *See id.* at 134:3-22.

Defendants' criticisms amount to nothing more than nipping at the heels. It is true, as Defendants assert, that the MS ACES CDO portfolios, although comprised primarily of North American entities, included some non-North-American entities and sovereign entities. *See* Def. Br.

---

with each new version identified by a successive number. (*Id.*). The index consists of 120 investment grade North American companies, and was traded by banks such as Morgan Stanley. (Am. Cmplt. ¶¶ 183 & n.7, 227-31). Kolchinsky used the CDX.NA.IG.7, which was issued in September 2006, the same month that the first Series of Pinnacle Notes were issued. *See* McNeela Decl. Ex. 2.

at 13.  But Defendants do not, and cannot, posit an alternative standard reference portfolio that is more apt than the CDX.NA.IG.  Rather, Defendants simply conclude that Kolchinsky should have compared the MS ACES CDOs to the CDOs underlying "other contemporaneous credit linked notes issuances" in Singapore.  Defendants do not explain why such a comparison is appropriate let alone superior to the CDX.NA.IG.  To the contrary, it is undisputed that those idiosyncratic CDO portfolios were not standardized or widely-traded, and Defendants provide no explanation for why they would serve as a reasonable baseline.  Ultimately, however, such ill-conceived criticisms go to the weight of Kolchinsky's opinion, not its admissibility.

Finally, Defendants are wrong that Kolchinsky "does not offer the opinion that the Pinnacle Notes were over-exposed to 'FIRE Entities'" but "*assumes* 'over-exposure.'" Def. Br. at 12 (emphasis in original).  Kolchinsky testified that he independently reviewed and agreed with the Amended Complaint's classification of MS ACES CDO REs that fell within the FIRE rubric. Kolchinsky Tr. at 74:18-75:19, 166:17-25, 168:8-9.  Furthermore, by comparing the percentage of FIRE Entities in the MS ACES CDO portfolios with the percentage of FIRE entities in the CDX.NA.IG, Kolchinsky affirmatively concluded that the MS ACES CDO portfolios had a severe over-exposure to FIRE entities.  *See* Kolchinsky Decl. ¶¶ 38, 39; Kolchinsky Tr. at 93:24-94:10, 131:21-132:3.

### 2.    Wolson

Because Wolson is an experiential expert, much of Defendants' *Daubert* based criticism misses the mark.  *See Bd. of Trustees of AFTRA Ret. Fund*, 2011 WL 6288415, at *4 (experiential expert testimony is not generally susceptible to scrutiny under the four reliability criteria listed in *Daubert*); *see also Schiff*, 538 F. Supp. 2d at 845 ("Because [the expert] is testifying . . . from his

specialized knowledge and long experience as an investor, his methodology is not subjected to the same examination as a more scientific or technical expert's would be.").[16]

As previously discussed, Wolson has decades of structured finance experience, including his work on hundreds of derivatives transactions, including dozens of CDOs, *see* Wolson Decl. ¶¶ 1.04, 1.05, has led prestigious structured finance committees, *see id.*, and has co-written and edited numerous articles on securitizations, and participated in numerous structured finance seminars, *see id.* ¶ 1.05.; Wolson Tr. at 62:14-19. In response, Defendants are reduced, once again, to misstating the record. Their assertion that Wolson failed to identify the standard he used to determine that the Pinnacle Notes deviated from industry custom and practice, *see* Def. Br. at 15, is irreconcilable with both his report and testimony, which make clear that his opinion was based on: (i) his experience in the structured finance industry, *see* Wolson Tr. at 136:10-137:9, 150:3-12; Wolson Decl. ¶¶ 1.07, 4.03; (ii) discussions with colleagues in the industry, *see* Wolson Decl. ¶ 4.03; and (iii) numerous treatises, *see* Wolson Tr. at 62:25-63:4, 136:17-18; Wolson Decl. ¶¶ 1.07, 2.07, 3.07. For this reason, Defendants' reliance on *In re Rezulin Prods. Liability Litig.*, is misplaced. *See* 309 F. Supp. 2d 531, 543 n.27 (S.D.N.Y. 2004) (expert's testimony regarding industry standards consisted of his "own subjective views" and "personal belief[s]").

---

[16] The reliability of experiential expert's testimony turns on whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Bd. of Trustees of AFTRA Ret. Fund*, 2011 WL 6288415, at *4. This is standard is generally met so long as the expert explains (1) how his experience led to his conclusions, and (2) how his experience has been applied to the facts at issue. *See Israel*, 2006 WL 3196956, at *2 ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts."). Wolson has met that standard here. *See, e.g.*, Wolson Decl. ¶¶ 1.07, 4.03; Wolson Tr. at 61:21-24, 129:11-17, 132:6-22, 136:10-137:9.

Similarly, Defendants' assertion that Wolson failed to explain the standard he employed in determining that the Offering Materials omitted information that a reasonable investor would consider important ignores the record. Wolson based his opinion on his experience in the industry, as well as numerous financial treatises. *See* Wolson Tr. at 61:21-63:10, 116:18-21; *see also* Wolson Decl. ¶¶ 2.01-.09.[17]

Finally, Defendants simply repeat their argument that Wolson ignored "highly relevant information" regarding a handful of other CLN issuances in Singapore that were offered over a brief period. *Compare* Def. Br. at 14, *with id.* at 5-6. That argument fails for the same reasons discussed at Point IV.A., *supra*. It bears repeating, however, that Defendants' claim that the MAS Report includes relevant information "about Singapore industry custom in the credit linked note market," is sheer *ipse dixit*. Indeed, the MAS Report does not state that the other CLN issuers also surreptitiously structured the Underlying Assets to concentrate risk, and then bet against those assets in order to enrich themselves at the investors' expense, which is exactly what Defendants' own internal documents establish. *See* P. Cert. Br. at 9-15. Admittedly, that would be a truly fascinating

---

[17] Defendants again misrepresent the record in arguing that Wolson's opinion regarding the type of information a reasonable investor would deem important is based on assumptions regarding so-called Singapore securities practice. *See* Def. Br. at 15-16. In fact, Wolson repeatedly testified that he had not made any assumptions regarding disclosure standards in Singapore, as they were not relevant to his opinion. *See* Wolson Tr. at 115:12-116:7. Wolson further noted that while he generally believed similar standards applied in Singapore and the United States, he clarified that his opinion did not turn on the disclosure standards of any country: "I was not asked to speak about what standards may or not be in Singapore, *but was asked in general, based on my experiences, what a reasonable investor would want to know*." *Id.* at 117:19-23 (emphasis); *see also id.* at 203:19-22. However, even if Defendants had accurately stated the record, challenges to an expert's assumptions go to the testimony's weight, not its admissibility. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[C]ontentions that [an expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony.") (internal citation omitted); *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, No. 99 Civ. 8598, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) (same).

24

custom and practice-based defense.  Ultimately, however, even if Defendants' criticisms were not

baseless, they would go to the weight of Wolson's testimony, and not its admissibility.  *See Cedar*

*Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y.

2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may go

to weight, not admissibility.") (internal citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude.

Dated:  May 17, 2013
      New York, New York

                       Respectfully submitted,

                       **KIRBY McINERNEY LLP**

                       By:   /s/ Andrew M. McNeela
                            Daniel Hume
                            Andrew M. McNeela
                            825 Third Avenue, 16th Floor
                            New York, NY 10022
                            Tel:  212-371-6600
                            Fax:  212-751-2540

                            *Counsel for Plaintiffs*

25