```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/22/2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

GE DANDONG ET AL.,

                          Plaintiffs,

                  -v-

PINNACLE PERFORMANCE LTD. ET AL.,

                          Defendants.

-----------------------------------------------------------

10 Civ. 8086 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In this putative class action, a group of Singapore investors ("Plaintiffs") assert various

claims against Morgan Stanley & Co. and certain of its affiliates (collectively, "Defendants"),

related to a series of credit-linked notes (the "Pinnacle Notes" or the "Notes") issued by

Defendant Pinnacle Performance Limited ("Pinnacle") and purchased by Plaintiffs.  On October

31, 2011, the Honorable Leonard B. Sand — to whom this case was previously assigned —

granted in part and denied in part Defendants' motion to dismiss Plaintiffs' complaint.  *See*

*Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (LBS), 2011 WL 5170293, at *1

(S.D.N.Y. Oct. 31, 2011).[1]  By separate opinion dated December 12, 2011, Judge Sand granted a

preliminary injunction to Plaintiffs, enjoining Defendants from pursuing an anti-suit injunction

from the High Court of the Republic of Singapore.  *See Dandong v. Pinnacle Performance Ltd.*,

No. 10 Civ. 8086 (LBS), 2011 WL 6156743, at *1 (S.D.N.Y. Dec. 12, 2011).

Defendants sought interlocutory review of both orders.  Although the Second Circuit

affirmed the injunction, it held that Judge Sand had erred in not addressing whether there was

---

[1]      The original Complaint misidentified Defendant Morgan Stanley and Co., Inc. as
"Morgan Stanley" and did not name Morgan Stanley as a defendant.  Morgan Stanley was added
as a defendant in this action in the Amended Complaint.

personal jurisdiction over Pinnacle and remanded for jurisdictional discovery on that issue. *See Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810, 814 (2d Cir. 2012) (summary order). The Court declined to reach the question of whether Judge Sand had properly ruled on Defendants' motion to dismiss. *Id.* at 814. After remand, on October 22, 2012, Plaintiffs filed an Amended Complaint, alleging claims for fraud, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and aiding and abetting fraud. (Docket No. 109).

Pinnacle has now moved, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for dismissal of the Amended Complaint for lack of personal jurisdiction. (Docket No. 127). Defendant Morgan Stanley has separately moved, pursuant to Rules 9(b), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure, as well as the doctrine of *forum non conveniens* and principles of international comity, for dismissal of the Amended Complaint in its entirety. (Docket No. 120). For the reasons stated below, Pinnacle's motion to dismiss is DENIED, and Morgan Stanley's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The factual background of this action is complex and summarized in greater detail in Judge Sand's prior opinions, familiarity with which is assumed.

Plaintiffs are retail investors who purchased the Pinnacle Notes from various distributor banks based in Asia between August 2006 and December 2007. The Pinnacle Notes are a type of credit derivative known as a credit-linked note ("CLN"), which Defendants structured and issued in seven series during 2006 and 2007. (*See* McNeela Decl. (Docket No. 134) Ex. 2 at ii; *id.* Ex. 3 at ii; *id.* Ex. 4 at ii; *id.* Ex. 5 at ii; *id.* Ex. 6 at ii). Credit-linked notes shift the credit risk associated with certain Reference Entities ("REs") from a protection buyer (typically the bank

arranging the CLNs) to a protection seller (the CLN investors).  As explained in Judge Sand's

October 31, 2011 Opinion, CLNs are typically created as follows:

> *First*, the bank arranging the CLNs creates a Special Purpose Vehicle ("SPV") to
> issue the CLNs.  The SPV is generally . . . an orphan company owned by a trustee
> that will not appear on the balance sheet of any party to the transaction.  The bank
> then buys protection from the SPV in the amount of the CLNs that will be issued
> to investors insuring it against the possibility that the REs would experience a
> credit event, such as a default.  The name given to this particular transaction is a
> credit default swap, and this is, in effect, a derivative contract that functions like a
> form of insurance.  *Second*, the SPV sells the CLNs to investors and uses the
> principal it receives therefrom to purchase highly-rated securities, or underlying
> assets, which serve as collateral in the event the REs default. . . .  *Third*, in return
> for assuming the risk, investors receive interest in the form of (i) credit protection
> payments from the sponsoring bank and (ii) any interest generated by the
> underlying assets.  Assuming that no credit event occurs, investors will receive
> the redemption value of the Note.

*Dandong*, 2011 WL 5170293, at *1 (internal quotation marks and citations omitted).

   In 2005, Defendants retained the law firm of Maples and Calder ("Maples") to

incorporate Pinnacle in the Cayman Islands as the SPV that would issue the Pinnacle Notes.

(*See* McNeela Decl. (Docket No. 126) Exs. 18 & 19).  On November 30, 2005, Maples

incorporated Pinnacle through its affiliate, Mapcal Ltd.  (*See* McNeela Decl. (Docket No. 126)

Ex. 1 ("Gordon Dep.") at 36:5-7.  Pinnacle entered into a Proposals and Advice Agreement with

Morgan Stanley Asia (Singapore) Pte. ("MS Singapore"), under which MS Singapore proposed

the terms and conditions of each series of Notes and oversaw the solicitation of investors.

(Youngwood Decl. (Docket No. 128) Ex. 3 at 1-3; Gordon Dep. 64:5-10, 94:14-95:18, 98:21-

99:25).  After Pinnacle's directors approved MS Singapore's proposals, it issued the Notes,

which were then sold to Plaintiffs by independent distributors.  (Youngwood Decl. Ex. 3 at 2).

Pinnacle's "sole business [was] the raising of money by issuing Series of Notes . . . for the

purposes of purchasing assets and entering into related derivatives and other contracts."

(McNeela Decl. (Docket No. 126) Ex. 3 at SING 618).  Pinnacle used the principal raised from

3

the sale of the Notes to purchase the Underlying Assets, namely, single tranche Synthetic

Collateralized Debt Obligations ("CDOs") that were selected by Defendant Morgan Stanley &

Co. International plc ("MS International") and issued by Morgan Stanley ACES SPC ("MS

ACES").  (*See* Gordon Dep. 118:21-120:2, 122:6-14; Am. Answer ¶¶ 4, 104; McNeela Decl.

Docket No. 126) Ex. 3 at SING 621; *id.* Ex. 30 § 2.3).

These CDOs (the "MS ACES CDOs") were linked to the performance of a portfolio of

approximately 100 CDO reference entities ("CDO REs"), *see Dandong*, 2011 WL 5170293, at

*2, which Defendant Morgan Stanley Capital Services Inc. ("MS Capital") had selected.  (*See*

McNeela Decl. (Docket No. 126) Ex. 13 at 1; *id.* Ex. 14 at 1; *id.* Ex. 15 at 1; *id.* Ex. 16 at 1; *id.*

Ex. 17 at 1).  According to Plaintiffs, Defendants marketed the Notes as safe, conservative

investments (McNeela Decl. (Docket No. 134) Ex. 1 at SING 162963; *id.* Ex. 2 at ii; *id.* Ex. 3 at

ii; *id.* Ex. 4 at ii; *id.* Ex. 5 at ii; *id.* Ex. 6 at ii), when in reality MS Capital had selected a highly

disproportionate number of CDO REs that were at an elevated risk of default, and it had

manipulated the characteristics of the MS ACES CDOs to suffer sudden, swift, and total

impairment upon even modest CDO RE defaults (Am. Compl. ¶¶ 154, 167-244).

Plaintiffs further allege that, when promoting the Notes, Defendants did not inform

investors that they had an inherent conflict of interest because they had "shorted" the MS ACES

CDOs.  Specifically, the MS ACES CDOs were based on a credit default swap under which

Pinnacle — using the investors' principal — assumed the CDO's credit risk, taking the "long"

position on the risk by selling protection to MS Capital.  (Am. Compl. ¶¶ 72, 146-48; Gordon

Dep. 115:20-116:20, 119:17-120:2; Am. Answer ¶¶ 4, 18).  Plaintiffs allege that under this

arrangement there was an express conflict of interest because MS Capital was the "short"

counter-party to — that is, bet against — every MS ACES CDO that MS International had

selected to serve as an Underlying Asset for the Notes.  (Am. Compl. ¶ 72).  Under this arrangement, "MS Capital stood to profit in the event that the pool of assets performed poorly, while the investors in the Notes suffered losses."  *Dandong*, 2011 WL 5170293, at *2.

Plaintiffs commenced this action on October 25, 2010.  (Docket No. 1).  By Order dated October 31, 2011, the Court granted in part and denied in part Defendants' motion to dismiss, dismissing Plaintiffs' claims of negligent misrepresentation, breach of fiduciary duty, unjust enrichment, aiding and abetting negligent misrepresentation, and aiding and abetting breach of fiduciary duty.  *See Dandong*, 2011 WL 5170293, at *16.  The Court declined to dismiss Plaintiffs' remaining claims for, *inter alia*, fraud, fraudulent inducement, and breach of the implied covenant of good faith and fair dealing.  *Id.*  The Court also denied Defendants' motion to dismiss on the basis of forum selection clauses contained in the Notes' various pricing statements, *forum non conveniens*, and principles of international comity.  *See id.*  Less than a month later, Defendants "took the extraordinary measure of seeking an 'expedited' anti-suit injunction from the High Court" of Singapore to bar Plaintiffs from litigating before this Court, based on arguments "substantially similar" to those Judge Sand had rejected in the October 25, 2010 Order.  *See Dandong*, 2011 WL 6156743, at *1, *4.  By Order dated December 12, 2011, the Court granted Plaintiffs' motion for a counter-injunction, and enjoined Defendants from further prosecuting their injunction application in Singapore.  *See id.* at *1, *8.

The Second Circuit affirmed the injunction in a summary order dated April 10, 2012.  *See Lam Yeen Leng*, 474 F. App'x at 813.  With respect to Pinnacle, however, the Second Circuit found that the "district court [had] erred in enjoining Pinnacle without first making any findings as to its jurisdiction over that party," and remanded the case with instructions to "make factual

findings adequate enough to permit intelligent appellate review" of any judicial determination regarding Pinnacle's personal jurisdiction challenge. *Id.*

On April 23, 2012, Judge Sand ordered that the parties conduct discovery regarding the Court's jurisdiction over Pinnacle and submit simultaneous briefing on the issue. (Docket No. 72). On October 22, 2012, Plaintiffs filed an Amended Class Action Complaint "on their behalf and on behalf of all other purchasers of Pinnacle Performance Limited Series 1, 2, 3, 6, 7, 9 and 10 notes . . . between August 1, 2006 and December 31, 2007, inclusive (the 'Class Period'), and who have been damaged thereby," asserting claims for fraud, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and aiding and abetting fraud. (Am. Compl. ¶ 1). As noted, Pinnacle now moves to dismiss the Amended Complaint as to it for lack of personal jurisdiction; Morgan Stanley moves to dismiss the Amended Complaint in its entirety pursuant to Rules 9(b), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Nos. 120, 125-27, 167-69).[2]

## DISCUSSION

### A. Pinnacle's Motion to Dismiss

The Court turns first to Pinnacle's motion. A plaintiff bears the burden of establishing a court's personal jurisdiction over a particular defendant. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Secs, Inc. v. Banco BRJ, S.A.*, — F.3d —, No. 12-770-cv, 2013 WL 3335784, at *3 (2d Cir. July 3, 2013) (per curiam) (quoting *Ball v. Metallurgie*

---

[2]     Plaintiffs' motion to certify the class pursuant to Rule 23 of the Federal Rules of Civil Procedure is currently pending before the Court. (Docket No. 141).

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). "'Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.'" *Id.* (quoting *Ball*, 902 F.3d at 197). After discovery, however, the plaintiff's *prima facie* showing "'must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. At that point, the *prima facie* showing must be factually supported.'" *Id.* (quoting *Ball*, 902 F.3d at 197).

Here, the parties have engaged in jurisdictional discovery. Moreover, Pinnacle's motion comes on remand from the Second Circuit's decision affirming the anti-anti-suit injunction as to all defendants other than Pinnacle and remanding for further proceedings as to Pinnacle. Before entering a preliminary injunction, such as the anti-anti-suit injunction, jurisdiction over a defendant must be "clearly established," *Weitzman v. Stein*, 897 F.2d 653, 658-59 (2d Cir. 1990), and a "prima facie showing of jurisdiction will not suffice," *Visual Scis., Inc. v. Integrated Commc'ns, Inc.*, 660 F.2d 56, 59 (2d Cir. 1981). Instead, a plaintiff responding to a jurisdictional challenge in that context must "adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *Id.* (citation and internal quotation marks omitted); *accord Lam Yeen Leng*, 474 F. App'x at 813-14 (remanding for application of that standard).

Personal jurisdiction over a non-resident defendant in a federal diversity action is determined by the law of the forum state. *See, e.g.*, *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006). Even if the exercise of jurisdiction is appropriate under state law, however, a court must determine whether the exercise of such jurisdiction satisfies the federal due process requirements of "'fair play and substantial justice.'" *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 477 (1985) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 320 (1945)); *see also Aquiline Capital Partners LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 391 (S.D.N.Y. 2012).

    **1.  N.Y. C.P.L.R. § 302(a)(1)**

    Plaintiffs argue that the Court can exercise personal jurisdiction over Pinnacle pursuant to Section 302(a)(1) of New York's long-arm statute, which permits a court to exercise jurisdiction over a person or entity that "in person or through an agent . . . transacts business within the state or contracts anywhere to supply goods and services in the state." N.Y. C.P.L.R. § 302(a).  To determine the existence of jurisdiction under Section 302(a)(1), a court must decide "(1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks omitted).  "[T]he overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) (internal quotation marks omitted).  As to Section 302(a)(1)'s second requirement, "a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Id.* at 66 (brackets and internal quotation marks omitted).  Section 302(a)(1)'s requirements may be satisfied by a single act within New York, *see id.* at 62, but "jurisdiction will not extend to cover defendants with nothing more than petty contacts to the state," *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726 (S.D.N.Y. 2010) (internal quotation marks omitted).

Pinnacle is a Cayman Island corporation and does not solicit business in New York.  It does not have an office, a phone listing, or mailing address in New York; it is not registered to do business in New York; and it does not have any securities listed on any United States exchange.  (Youngwood Decl. (Docket No. 128) Ex. 1 ¶¶ 3-10; *id.* Ex. 2 at 143:8-146:16).  Nevertheless, Plaintiffs argue that Pinnacle is subject to this Court's jurisdiction because it opened bank accounts in New York to deposit the money it raised from investors and to facilitate its purchase of subsidiary investments that were used to "defraud the Pinnacle investors."  (Pls.' Supplemental Mem. Law Regarding Personal Jurisdiction 1).  Specifically, Plaintiffs allege that for each series of Notes that Pinnacle issued, it (1) established bank accounts in New York with MS Capital to deposit investors' funds; (2) submitted IRS tax documentation related to those accounts to other Defendants in New York to file on its behalf; and (3) used the funds in those accounts to purchase the Underlying Assets that Defendants created (namely, the MS ACES CDOs).  (*Id.* at 2).

The New York Court of Appeals recently held that a defendant transacts business with New York through its "'use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful.'"  *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 899 (N.Y. 2012) (quoting *Licci*, 673 F .3d at 66).[3]  In *Licci*, the Court found that a foreign bank that "did not operate branches or offices, or maintain employees, in the United States" and whose "sole

---

[3]      A correspondent bank account is "an account with a domestic bank that is held in the name of a foreign financial institution."  *Chase Manhattan Bank v. Banque Generale Du Commerce*, No. 96 Civ. 5184 (KMW), 1997 WL 266968, at *1 n.1 (S.D.N.Y. May 20, 1997).  "Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."  *Id.* (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 650 N.Y.S.2d 726, 727 (App. Div. 1st Dep't 1996)).

point of contact with the United States was a correspondent banking account" transacted business with New York where it made "repeated use" of a correspondent account. *Id.* at 896, 899. That repeated use, the Court explained, "show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial laws of New York and the United States." *Id.* at 900.

Applying that standard here, Pinnacle's use of New York bank accounts to shelter significant and repeated transfers of funds related to the Notes plainly constitutes the "transaction of business" necessary to satisfy the first requirement of Section 302(a)(1). *See, e.g.*, *Jain v. T & C Holding Inc.*, No. 10 Civ. 1006 (RMB), 2011 WL 814659, at *5 (S.D.N.Y. Mar. 3, 2011) (internal quotation marks omitted). In arguing otherwise, Pinnacle asserts that the accounts were "not even bank accounts to begin with," but rather "in house 'accounts' on MS Capital's books" that were opened for "administrative ease." (Pinnacle Mem. in Supp. Mot. to Dismiss 2, 14). That assertion, however, is easily rejected. The evidence in the record indicates that Pinnacle established several accounts with MS Capital in New York to deposit the funds it raised through the issuance of the Notes. (*See, e.g.*, McNeela Decl. (Docket No. 126) Ex. 38 (Series 2), Ex. 39 (Series 3), Ex. 40 (Series 9) Ex. 41 (Series 10)). For example, Richard Gordon, one of Pinnacle's directors, testified that Pinnacle had certain bank accounts in New York "in relation to the swap" (Youngwood Decl. (Docket No. 128) Ex. 2 at 125:2-13), and although he testified that these accounts would have been opened by one of Pinnacle's "counterparties," rather than Pinnacle itself (*see id.* at 125:2-13, 127:2-128:11), the account opening letters are addressed to Pinnacle and direct Pinnacle to file certain forms with the IRS as the beneficial owner of those accounts (McNeela Decl. (Docket No. 126) Ex. 42).

Plaintiffs also satisfy the second prong of the Section 302(a)(1) inquiry, requiring "an articulable nexus or substantial relationship between the business transaction and the claim asserted." *Licci*, 984 N.E.2d at 900 (internal quotation marks and citations omitted).  As Plaintiffs allege, Pinnacle opened accounts specific to Series 9 and 10 on the very same day that the Notes were issued.  (McNeela Decl. (Docket No. 126) Ex. 42 (account opening letters dated December 14, 2007); Am. Answer ¶ 132 (Series 9 and 10 "issued on or about December 14, 2007")).  Additionally, the funds Pinnacle deposited matched the $17.9 million investment raised by the issuance of those Series (*see* Am. Compl. ¶ 132(a); McNeela Decl. (Docket No. 126) Ex. 40 at PINNACLE 1215; *id.* Ex. 41 (Docket No. 126), at PINNACLE 1221), which were then used to purchase $17.9 million of MS ACES CDOs (*see* McNeela Decl. (Docket No. 126) Ex. 31 at SING 49318).  Further, because "Pinnacle did not engage in any business other than the raising of money through the issuance of Notes" (*id.* Ex. 3 at SING 618), Plaintiffs argue that the $17.9 million in Pinnacle's Series 9 and 10 New York accounts must "represent[ ] either: (i) the funds Pinnacle used to purchase the MS ACES CDOs; or (ii) the dollar value of the MS ACES CDOs that Pinnacle purchased."  (Pls.' Supplemental Mem. Law Regarding Personal Jurisdiction 19).  Pinnacle offers no other explanation to rebut this conclusion.

In short, Pinnacle's "repeated use" of the New York account "shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction" and Plaintiffs' claims in this case.  *Licci*, 984 N.E.2d at 901.  Pinnacle "did not route a transfer" relating to the Notes "once or twice by mistake."  *Id.*  Instead, Plaintiffs allege and the record demonstrates that Pinnacle "deliberately used" the New York account "again and again" in connection with the design and issuance of the Notes at issue in this case.  *Id.*  Indeed, it was the very transfers into New York that allowed Pinnacle to purchase the Underlying Assets central to

11

the allegedly fraudulent transactions at issue here.  *See HSH Nordbank AG N.Y. Branch v. Street*,

No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at *5 (S.D.N.Y. July 18, 2012) ("Regardless of

whether the mere maintenance of a New York bank account is not standing alone, a sufficient

basis to subject a foreign defendant to personal jurisdiction under § 302(a)(1), § 302(a)(1) is

satisfied where, as here, the plaintiff's cause of action arises directly from the use of New York

accounts." (internal quotation marks and citation omitted)).  Thus, Section 302(a)(1) provides for

personal jurisdiction over Pinnacle.[4]

### 2.  Due Process

The exercise of personal jurisdiction over Pinnacle also satisfies due process.  The due

process analysis "consists of two separate components: the 'minimum contacts' inquiry and the

'reasonableness' inquiry."  *Licci*, 673 F.3d at 60.  The minimum contacts test asks whether a

defendant has engaged in "purposeful availment" — i.e., whether the contacts indicate the

defendant's intent to invoke the benefits and privileges of New York law.  *See Burger King*, 471

U.S. at 472; *Deutsche Bank Sec. Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 72 (2006).  The

second part of the due process analysis asks "whether the assertion of personal jurisdiction

comports with traditional notions of fair play and substantial justice — that is, whether it is

reasonable under the circumstances of the particular case."  *Bank Brussels Lambert v. Fiddler

Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir 2002) (internal quotation marks omitted).

Here, Pinnacle has sufficient contacts with New York for this Court to exercise

jurisdiction.  By using New York bank accounts to deposit funds it raised through the issuance of

the Notes, which were then used to purchase the MS ACES CDOs, Pinnacle has "purposefully

---

[4]     In light of this finding, the Court need not, and does not, reach Plaintiffs' alternative
arguments as to personal jurisdiction based on acts by Pinnacle's agents and alleged co-
conspirators.  *See, e.g.*, *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410,
438 n.29 (S.D.N.Y. 2012) (declining to reach alternative basis for personal jurisdiction over
defendant, once jurisdiction was established under one basis).

avail[ed] [it]self of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475 (internal quotation marks omitted); *see also Peterson v. Islamic Rep. of Iran*, No. 10 Civ. 4518 (KBF), 2013 WL 1155576, at *15 (S.D.N.Y. Mar. 13, 2013) ("The minimum contacts necessary to comport with the New York jurisdictional statutes, C.P.L.R. §§ 301 and 302, necessarily comport with the Due Process Clause since New York law requires a greater showing of minimum contacts than would be required by the Due Process Clause alone." (citing *Licci*, 673 F.3d at 60-61)).

Further, the Court's exercise of jurisdiction over Pinnacle is "reasonable."  *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 165 (2d Cir. 2010) (explaining that "the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts," and the defendant must "present[] 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable'" (quoting *Burger King*, 471 U.S. at 477)).  The reasonableness inquiry focuses on five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Id.* at 164.  None of these factors weighs against the exercise of personal jurisdiction over Pinnacle.

First, the burden on Pinnacle of defending this suit is minimal in comparison to New York's interests in providing a forum to adjudicate disputes over financial instruments created with money funneled through New York bank accounts.  *See Bank Brussels*, 305 F.3d at 129-30. Second, Plaintiffs have brought their claims in New York and exercising jurisdiction over Pinnacle will enable the "efficient resolution of plaintiffs' claims . . . in a single proceeding."

13

*Peterson*, 2013 WL 1155576, at *18; *see also Lawson v. Full Tilt Poker Ltd.*, — F. Supp. 2d —,
2013 WL 950871, at *8 (S.D.N.Y. Mar. 7, 2013) (holding that the exercise of jurisdiction was
reasonable in part because of the interstate judicial system's interest in favor of resolving related
disputes in a single forum).  Accordingly, the Court finds that the exercise of personal
jurisdiction over Pinnacle comports with due process.

## B.  Morgan Stanley's Motion to Dismiss

Having established the Court's jurisdiction over Pinnacle, the Court now turns to
Defendant Morgan Stanley's motion to dismiss pursuant to Rules 9(b), 12(b)(3), and 12(b)(6).

Morgan Stanley moves to dismiss the Amended Complaint on three grounds, which it
contends were not reached by Judge Sand in his October 31, 2011 Opinion dismissing the
original complaint.  First, arguing that the law of the case does not apply, Morgan Stanley asserts
that the Amended Complaint should be dismissed based on the forum selection clause in the
Pinnacle Notes offering documents (i.e., the Base Prospectus and Pricing Statements), as well as
*forum non conveniens* and principles of international comity.  (Morgan Stanley Mem. in Supp.
Mot. to Dismiss 1).  Second, Morgan Stanley argues that "subsequent developments render the
Amended Complaint's core fraud allegation implausible as a matter of law," as Plaintiffs'
allegation that the Pinnacle Notes were "built to fail . . . is contradicted by the subsequent fact
that one Series of Pinnacle Notes did not fail."  (*Id.*).  Third, Morgan Stanley argues that because
certain named Plaintiffs testified that they did not read or could not remember reading the
Pinnacle Notes Base Prospectus and Pricing Statements, Plaintiffs cannot plead reasonable
reliance, which is an essential element of their common law fraud claims.  (*Id.*).  These
arguments are easily rejected.

14

1.   **Forum Selection, *Forum Non Conveniens*, and International Comity**

Morgan Stanley's first argument is barred by the law of the case.  "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)).  Even when cases are reassigned to a different judge, the law of the case "dictates a general practice of refusing to reopen what has been decided."  *Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987).

Here, Judge Sand previously considered and rejected Morgan Stanley's arguments that the Singapore forum selection clauses preclude suit in New York and that the case should be dismissed on the grounds of *forum non conveniens* or international comity.  *See Dandong*, 2011 WL 5170293, at *4-9.  Specifically, Judge Sand found that "[t]he inevitable conclusion is that the Base Prospectus and Pricing Statements — which contain the omissions and misstatements that underlie Plaintiffs' claims — are governed by no forum selection clause."  *Id.* at *4.  Next, applying the three-part test outlined in *Norex Petroleum Ltd. v. Access Industry Inc.*, 416 F.3d 146, 154 (2d Cir. 2005), Judge Sand found that Plaintiffs' original complaint "asserts causes of action that appear to be connected more strongly to New York than to Singapore," and that Defendants had not put forth any other compelling reasons to dismiss the complaint on ground of *forum non conveniens*.  *See Dandong*, 2011 WL 5170293, at *5-6 (explaining that *forum non conveniens* is a "'discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim'" (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000)).  Finally, Judge Sand rejected

Defendants' arguments that "(i) that international comity is warranted because of the existence of parallel actions in Singapore and (ii) that this court should defer to the specially-created Singapore Monetary Authority's dispute resolution system," finding that "Defendants' appeal to international comity is without merit." *Id.* at *8-9.

Morgan Stanley has not offered a reason — let alone a "cogent or compelling" reason — to reconsider these holdings.  Instead, Morgan Stanley's argument boils down to a contention that Judge Sand got it wrong.  (*See* Morgan Stanley Mem. in Supp. Mot. to Dismiss 16 ("The Court's previous decision failed to recognize that the exclusive Singapore forum selection clause is the *only* forum selection clause that applies to investors like Plaintiffs . . . ."); *id.* at 16-17 ("The Court's decision on the original Defendants' motion held incorrectly that this language restricted the Singapore forum selection clause to the Notes Application Form only."); *id.* at 17 ("[T]he Court erred when it concluded earlier that Plaintiffs' claims were 'governed by no forum selection clause' . . . .")).  These are not grounds to revisit the Court's prior determination.  *See Boyd v. J.E. Robert Co.*, No. 05 Civ. 2455 (KAM) (RER), 2010 WL 5772892, at *16 (E.D.N.Y. Mar. 31, 2010) (holding that because defendants "appear merely to reprise arguments offered in support of prior motions to dismiss that were ultimately rejected by this Court, the doctrine of the law of the case mandates that these arguments be rejected").

At most, Morgan Stanley asserts that "[n]umerous new facts justify reevaluating both the forum selection clause and *forum non conveniens*" rulings.  (Morgan Stanley Mem. in Supp. Mot. to Dismiss 15).  These facts include that (1) Plaintiffs disclaimed reliance on the Pinnacle Notes' offering documents; (2) Plaintiffs testified that they had relied on non-party Distributors' oral representations in Singapore; and (3) Plaintiffs "fail[ed] to supplement the Complaint with any concrete evidence of fraud despite having access to over 100,000 pages of Defendants'

documents to date." (*Id.*).  Yet these new allegations have little bearing on Judge Sand's previous holding, and certainly do not present a compelling reason to depart from it.  Morgan Stanley further argues that "Judge Scheindlin's recent decision in *In re Optimal* shows that a court may — and indeed, should — dismiss actions like this one on *forum non conveniens* grounds."  (*Id.* at 2 (citing *In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2012 WL 3264372 (S.D.N.Y. Aug. 10, 2012)).  But *In re Optimal* does not constitute an "intervening change of controlling case law," as it does not bind this Court.  *See Ali*, 529 F.3d at 490 (internal quotation marks omitted).  Further, considering the "highly fact-specific" nature of *forum non conveniens* analyses, *see Online Payment Solutions Inc. v. Svenska*, 638 F. Supp. 2d 375, 380 (S.D.N.Y. 2009), the Court sees no reason to rely on the holding of *In re Optimal*.

Finally, Morgan Stanley argues that the United States Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) "dictates" the dismissal of this action on grounds of international comity.  (Morgan Stanley Mem. in Supp. Mot. to Dismiss 24).  As Morgan Stanley admits (*id.*), however, *Morrison* predated Defendants' earlier motion to dismiss and was even cited by Defendants in support of their motion; plainly, therefore, it is not an "intervening change" in the law.  Moreover, nothing in *Morrison* — which held, as a matter of statutory construction, that Section 10(b) of the Securities Exchange Act of 1934 does not extend to extraterritorial conduct, *see Morrison*, 130 S.Ct. at 2884 — supports Morgan Stanley's argument that "New York state law [cannot] . . . regulat[e] entirely foreign securities transactions like the Pinnacle Notes."  (Morgan Stanley Reply Mem. 10).  Indeed, courts have been careful to limit *Morrison*'s application to the narrow issue before the Court.  *Loginovskaya v. Batratchenko*, — F. Supp. 2d —, 2013 WL 1285421, at *10 (S.D.N.Y. Mar. 29, 2013); *S.E.C. v.*

*Gruss*, 859 F. Supp. 2d 653, 661 (S.D.N.Y. 2012); *United States v. Singhal*, 876 F. Supp. 2d 82, 97 (D.D.C. 2012).

In sum, Defendants have provided no reason for the Court to revisit Judge Sand's previous determination — made in a careful and detailed opinion — that Plaintiffs' claims survive challenges based on the forum selection clause in the Pinnacle offering documents, the doctrine of *forum non conveniens*, and principles of international comity. Accordingly, the Court adheres to the law of the case and denies Morgan Stanley's motion to dismiss on these grounds.

### 2. Allegations of Fraud

The law of the case also applies to much of Morgan Stanley's argument that Plaintiffs' allegations of fraud are insufficient as a matter of law. Morgan Stanley argues that Plaintiffs cannot show that there were misstatements or omissions in the Pinnacle offering documents. In doing so, however, it merely restates the exact arguments that were rejected by Judge Sand in his October 31, 2011 Order, including that investors were properly warned that the Underlying Assets would be synthetic CDOs (*compare* Defs.' Feb. 2, 2011 Mem. 34 (Docket No. 19)), *with* Morgan Stanley Mem. in Supp. Mot. to Dismiss 8); that the risks of the underlying transactions were "repeatedly disclosed in the Pinnacle Notes offering documents," (*compare* Defs.' Feb. 2, 2011 Mem. 33, *with* Morgan Stanley Mem. in Supp. Mot. to Dismiss 9); and that MS Capital was clearly identified as the swap counterparty in the Underlying Assets' offering documents (*compare* Defs.' Feb. 2, 2011 Mem. 33-34, *with* Morgan Stanley Mem. in Supp. Mot. to Dismiss 9). Judge Sand held that "while there is little doubt that the cautionary language warned Plaintiffs that the Notes carried some risk, it [was] inadequate to have put the reasonable investor on notice of the alleged fraud." *Dandong*, 2011 WL 5170293, at *13. Morgan Stanley has presented no basis to revisit that ruling.

18

Morgan Stanley also argues that Plaintiffs' fraud allegations are implausible as a matter of law because one series of Notes identified in the original complaint (Series 5) did not default, but instead matured and paid out one hundred percent of principal with interest.  Morgan Stanley contends that this "undisputed fact highlights the legal inadequacy of Plaintiffs' total reliance on the structure of the Notes from which to infer a fraudulent state of mind."  (Morgan Stanley Reply Mem. 1).  It is well-established that when deciding a motion to dismiss, however, a court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material."  *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (alteration in original) (internal quotations marks omitted); *accord Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, 11 Civ. 5608 (CS), 2013 WL 135216, at *3 (S.D.N.Y. Jan. 10, 2013).

Here, as Morgan Stanley correctly notes, the Amended Complaint makes no reference to Series 5 (Morgan Stanley Mem. in Supp. Mot. to Dismiss 1); as such, Morgan Stanley's argument that Series 5 "matured and paid out one hundred percent of principal with interest" (*id.* at 7), is plainly a matter outside the four corners of the Amended Complaint.  Accordingly, and because the Court declines to convert Morgan Stanley's motion into one for summary judgment, the Court will not consider the evidence Morgan Stanley submitted to support its assertion that Series 5 "was a good investment" — namely, excerpts of the June 21, 2012 deposition of the

19

Singapore Government Staff Credit Cooperative Society (McNeela Decl. (Docket No. 134) Ex. 13). It follows that the alleged success of Series 5 does not provide a basis to dismiss.[5]

### 3. Reasonable Reliance

Morgan Stanley next argues that Plaintiffs cannot establish reasonable reliance because every named Plaintiff has been deposed and has testified that he or she did not read or could not remember reading the Pinnacle Notes Base Prospectus and Pricing Statements. (Morgan Stanley Mem. in Supp. Mot. to Dismiss 11-13). Morgan Stanley contends that this testimony contradicts the original Complaint's allegations of reliance on the Base Prospectus and Pricing Statements and that Plaintiffs' new allegation in the Amended Complaint that Plaintiffs relied on sales brochures fails as a matter of law. As discussed above, however, Defendant cannot introduce testimonial evidence from depositions on a motion to dismiss pursuant to Rule 12(b)(6), as the Court is limited to reviewing the allegations in the complaint and documents attached to it or incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-54 (2d Cir. 2002); *Kregler v. City of New York*, 770 F. Supp. 2d 602, 607 (S.D.N.Y. 2011). Thus, the Court excludes the deposition testimony introduced by Morgan Stanley.[6]

---

[5]      Even if this Court were to credit Morgan Stanley's allegations with respect to Series 5, the success of a single series of Notes is insufficient to alter the conclusion, reached by Judge Sand, that Plaintiffs adequately alleged fraud in their original complaint — allegations that are repeated in the Amended Complaint. *See Dandong*, 2011 WL 5170293, at *11-12 ("[Plaintiffs] have pled what amounts to self dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created."); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007) (explaining that in determining whether fraud has been properly plead, a court must consider whether "*all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (emphasis added)).

[6]      Relying on the unpublished summary order in *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) (summary order), Morgan Stanley argues that because the Second Circuit has approved the use of confidential witness testimony to test the good faith of a complaint's allegations on a motion to dismiss, "[t]here is no reason to exclude the parties' own testimony." (Morgan Stanley Reply Mem. of Law 5 n.3). In *Campo*, however, the Court held

Morgan Stanley also argues that "[a]s a matter of law, Plaintiffs cannot plead reasonable reliance on the sales brochures, especially because each directs potential investors to read the Prospectus before investing." (Morgan Stanley Mem. in Supp. Mot. to Dismiss 13). But Judge Sand previously held that neither the Base Prospectus nor the Pricing Statements sufficiently warned Plaintiffs of the risks of the transactions and do not insulate defendants from allegations of fraud. *See Dandong*, 2011 WL 5170293, at *13-14 (holding that the "cautionary language" in the offering documents "[did] not embrace the alleged fraud"). Thus, the brochures' instruction that investors should review the Base Prospectus and the Pricing Statements (Youngwood Decl. (Docket No. 128) Ex. 3 at ii), is irrelevant to the issue of Plaintiffs' reliance. *See Fed. Hous. Fin. Agency v. Deutsche Bank AG*, No. 11 Civ. 6192 (DLC), 2012 WL 5471864, at *2-3 (S.D.N.Y. Nov. 12, 2012) (holding that reliance on offering materials was sufficient to state a claim for fraud despite the materials' instruction to read the final prospectus because the plaintiff's "complaint is not that the information in the Preliminary Materials was inconsistent with that in the final Prospectus . . . but that both sets of materials contained the same, inaccurate, information").

### 4.  Morgan Stanley's Remaining Arguments

Morgan Stanley also argues that Plaintiffs' fraudulent inducement claim and claim for breach of the implied covenant of good faith and fair dealing should be dismissed because they are duplicative of their fraud claim. (Morgan Stanley Mem. in Supp. Mot. to Dismiss 13-14). "At the pleadings stage, however, the Plaintiffs are entitled to pursue alternative theories." *Apple v. Atlantic Yards Dev. Co., LLC*, No. 11 Civ. 5550 (JG) (JMA), 2012 WL 2309028, at *6

---

that the testimony could be used "for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint." *Campo*, 371 F. App'x at 216 n.4. Here, Plaintiffs have not relied on confidential witnesses in their Amended Complaint, and accordingly there is no reason for the Court to consider the proffered testimony.

(E.D.N.Y. June 18, 2012) (collecting cases); *see also Willman v. Zelman & Assocs., LLC*, No. 11

Civ. 1216 (KBF), 2012 WL 811512, at *5 (S.D.N.Y. Mar. 12 ,2012) ("Dismissal of plaintiff's

alternative theories at this stage would violate the liberal policy of rule 8(e)(2) which allows

plaintiffs wide latitude in framing their right to recover." (internal quotation marks omitted));

*China Dev. Indus. Bank v. Morgan Stanley & Co., Inc.*, 927 N.Y.S.2d 52 (App. Div. 1st Dep't

2011) (sustaining claims of fraud and fraudulent inducement arising out of the same series of

events); *Citi Mgmt. Grp., Ltd. v. Highbridge House Ogden, LLC*, 847 N.Y.S.2d 33, 34 (App.

Div. 1st Dep't 2007) ("[T]he claims for breach of the implied covenant of good faith and fair

dealing, and for fraud, should not be dismissed as duplicative of the breach-of-contract cause of

action at this juncture."); *cf. Dandong*, 2011 WL 5170293, at *16 (declining to dismiss Plaintiffs'

fraudulent inducement and fraud claims and noting that the elements of the two are the same).

To be sure, Plaintiffs cannot obtain double recovery for the same injury; but that prospect can be

addressed at a later stage of the case, if necessary.

Next, Morgan Stanley contends that Plaintiffs' claims for aiding and abetting fraud and

fraudulent inducement fail because Plaintiffs have not alleged any underlying torts.  (Morgan

Stanley Mem. in Supp. Mot. to Dismiss 14).  A plaintiff asserting a claim of aiding and abetting

fraud must allege (1) existence of the underlying fraud; (2) the defendant's actual knowledge of

the fraud; and (3) the defendant's substantial assistance in perpetrating the fraud.  *See Lerner v.*

*Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).  "Substantial assistance occurs when a

defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby

enabling the [fraud or breach of fiduciary duty] to occur."  *Fraternity Fund Ltd. v. Beacon Hill*

*Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007) (alteration in original) (internal

quotation marks omitted).  Here, Plaintiffs have sufficiently alleged the existence of the

underlying fraud, and the Amended Complaint alleges that Morgan Stanley substantially assisted

the fraud by, *inter alia*, inducing Plaintiffs to invest in the Pinnacle Notes by concealing material

information about the Notes, including that they were "designed to fail."  (Am. Compl. ¶¶ 303-

05, 317-21).  Consequently, Plaintiffs have sufficiently alleged claims for aiding and abetting

fraud and fraudulent inducement.

Finally, as Plaintiffs concede (Pls.' Mem. in Opp'n Morgan Stanley's Mot. to Dismiss 25

n.23), Morgan Stanley is correct in arguing that New York law does not recognize a cause of

action for aiding and abetting breach of the implied covenant of good faith and fair dealing.  *See*

*Fisch v. New Heights Acad. Charter Sch.*, No. 12 Civ. 2033 (DLC), 2012 WL 4049959, at *7

(S.D.N.Y. Sept. 13, 2012).  Accordingly, that claim — and that claim alone — is dismissed.

## CONCLUSION

For the foregoing reasons, Pinnacle's motion to dismiss for lack of personal jurisdiction

is DENIED.  Morgan Stanley's motion to dismiss is GRANTED with respect to Plaintiffs' claim

of aiding and abetting breach of the implied covenant of good faith and fair dealing, but is

DENIED as to Plaintiffs' remaining claims.  The Clerk of Court is directed to terminate Docket

Number 120.

SO ORDERED.

Dated: New York, New York
      August 22, 2013

                                                   JESSE M. FURMAN
                                    United States District Judge