UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: 10/17/2013               │
└─────────────────────────────────────┘
```

GE DANDONG ET AL.,

               Plaintiffs,

     -v-

PINNACLE PERFORMANCE LTD. ET AL.,

               Defendants.

10 Civ. 8086 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In this action, a group of Singapore investors assert various claims against Morgan Stanley & Co. and certain of its affiliates related to a series of credit-linked notes (the "Pinnacle Notes" or "Notes") issued by Defendant Pinnacle Performance Limited.  Before the Court are two motions.  First, named Plaintiffs — Ge Dandong, Loh Tuck Woh Peter, the Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS"), Ni Yan Amy, Ang Soo Cheng, Choh Gek Hong Johnson, Ng Shook Phin Susan, and Zhao Yuzheng — move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for certification of a proposed class.  Second, Defendants move, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the declarations of Plaintiffs' proffered experts Ilya Eric Kolchinsky and Craig A. Wolson.  For the reasons that follow, Plaintiffs' motion to certify the class is GRANTED, and Defendants' motion to exclude the expert declarations is DENIED in part as moot and in part on the merits.

## BACKGROUND

The background of this action is complex and summarized in greater detail in prior opinions of this Court and the Court of Appeals, familiarity with which is assumed.  *See, e.g.*, *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong I*), No. 10 Civ. 8086 (LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong II*),

No. 10 Civ. 8086 (LBS), 2011 WL 6156743 (S.D.N.Y. Dec. 12, 2011), *aff'd sub nom. Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810, 814 (2d Cir. 2012) (summary order); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong III*), — F. Supp. 2d. —, 2013 WL 4482509, at *13 (S.D.N.Y. Aug. 22, 2013).

Plaintiffs are retail investors who purchased the Notes from various distributor banks based in Asia between August 2006 and December 2007. The Notes are a type of credit derivative known as a credit-linked note ("CLN"), which Defendants structured and issued in seven series during 2006 and 2007. (*See* McNeela Decl. (Docket No. 143) Ex. 3 at ii; *id.* Ex. 4 at ii; *id.* Ex. 5 at ii; *id.* Ex. 6 at SING0003533; *id.* Ex. 7 at SING0000964). Credit-linked notes shift the credit risk associated with certain Reference Entities ("REs") from a "protection buyer" (typically the bank arranging the CLNs) to a "protection seller" (the CLN investors). As Judge Sand — to whom this case was previously assigned — explained in his October 31, 2011 opinion, CLNs are typically created as follows:

> First, the bank arranging the CLNs creates a Special Purpose Vehicle ("SPV") to issue the CLNs. The SPV is generally . . . an orphan company owned by a trustee that will not appear on the balance sheet of any party to the transaction. The bank then buys protection from the SPV in the amount of the CLNs that will be issued to investors insuring it against the possibility that the REs would experience a credit event, such as a default. The name given to this particular transaction is a credit default swap, and this is, in effect, a derivative contract that functions like a form of insurance. Second, the SPV sells the CLNs to investors and uses the principal it receives therefrom to purchase highly-rated securities, or underlying assets, which serve as collateral in the event the REs default. . . . Third, in return for assuming the risk, investors receive interest in the form of (i) credit protection payments from the sponsoring bank and (ii) any interest generated by the underlying assets. Assuming that no credit event occurs, investors will receive the redemption value of the Note.

*Dandong I*, 2011 WL 5170293, at *1 (internal quotation marks and citations omitted).

As Judge Sand also explained, "[g]enerally . . . from the perspective of the investor, the single most important risk exposure in a CLN is the credit risk associated with the reference entities." *Id.* at *2 (internal quotation marks and alterations omitted).  Yet, Plaintiffs contend, "[r]ather than invest [their] principal in low-risk underlying assets, [Defendants] invested in high-risk synthetic collateralized debt obligations," *id.*, that they themselves issued (the "ACES CDOs").  Even worse, Plaintiffs argue, Defendants "shorted" — that is, bet against — the ACES CDOs that were to serve as the underlying assets for the Notes (Compl. ¶ 77 (Docket No. 1)), creating a situation in which Defendant "MS Capital stood to profit in the event that the pool of assets performed poorly, while the investors suffered losses."  *Dandong I*, 2011 WL 5170293, at *2.

 Plaintiffs commenced this action on October 25, 2010.  (Compl. (Docket No. 1)).  At bottom, they allege that each series of Pinnacle Notes was sold pursuant to a set of documents (the "Offering Documents") that failed to reveal the true nature of the financial arrangement. The Offering Documents for each series comprised (1) a Base Prospectus common to all the Pinnacle Notes; (2) a Pricing Statement specific to the series; and (3) a two-page Brochure purporting to provide a "Summary of Terms" with respect to the series.  (Compl. ¶¶ 247-51). According to the Complaint, these documents were materially false and misleading in various ways, including "by portraying the synthetic CDOs as one choice . . . for the Underlying Asset," when "in truth investment in the Synthetic CDOs was certain" (Compl. ¶ 254), and by failing to disclose that Defendant "Morgan Stanley created the synthetic CDOs to be used as Underlying Assets and . . . possessed opposed interests . . . to those of Plaintiffs."  (Compl. ¶ 266).

Defendants filed a motion to dismiss the Complaint and, in October 2011, Judge Sand granted in part and denied in part their motion.  The Court allowed the Plaintiffs' claims for,

*inter alia*, fraud, fraudulent inducement, and breach of the implied covenant of good faith and fair dealing to proceed. *See Dandong I*, 2011 WL 5170293, at *16. Defendants subsequently sought an anti-suit injunction from the High Court of the Republic of Singapore; in response, Judge Sand issued an anti-anti-suit injunction, preventing Defendants from further prosecuting their injunction application in Singapore, *see Dandong II*, 2011 WL 6156743, at *1. Judge Sand's injunction was affirmed by the Second Circuit on interlocutory review, but the Court of Appeals nonetheless remanded the case because it found that Judge Sand had erred in not addressing whether there was personal jurisdiction over Defendant Pinnacle Performance Limited. *See Lam Yeen Leng*, 474 F. App'x 810. The Circuit did not address whether Judge Sand had properly ruled on Defendants' motion to dismiss. *See id.*

On remand, Plaintiffs filed an Amended Complaint (Docket No. 109), which Defendants again moved to dismiss. This time, Defendant Morgan Stanley moved to dismiss on the grounds, among others, that "subsequent developments render[ed] the Amended Complaint's core fraud allegation implausible as a matter of law" and that the "Plaintiff[s] . . . testified that they did not read or could not remember reading the Pinnacle Notes offering documents that the Amended Complaint alleges Plaintiffs relied on." (Morgan Stanley Mem. in Supp. Mot. To Dismiss 1 (Docket No. 122)). The Court granted Morgan Stanley's motion to dismiss with respect to Plaintiffs' claim of aiding and abetting breach of the implied covenant of good faith and fair dealing, but otherwise denied the motion. *See Dandong III*, 2013 WL 4482509, at *13. That is, Plaintiffs' claims for fraud, aiding and abetting fraud, fraudulent inducement, aiding and abetting fraudulent inducement, and breach of the covenant of good faith and fair dealing all survived. (Am. Compl. ¶¶ 289-330).

As noted, there are now two motions pending before this Court.  First, Plaintiffs move

pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify the following class:

> All persons who purchased Pinnacle Notes Series 1, 2, 3, 6, 7, 9, and 10 or their
> successors in interest and thereby suffered damages, excluding: the Defendants
> named herein; any of Defendants' Officers or Directors or their immediate family
> members; or any firm trust, partnership, corporation, or entity in which a
> Defendant or its Officers or Directors or their immediate family members, has a
> controlling interest.

(Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification ("Pls.' Cert.

Mem.") 1 (Docket No. 142)).  Plaintiffs also seek the appointment of the named Plaintiffs as

class representatives, as well as the appointment of Kirby McInerney LLP as lead class counsel.

(*Id.*)  Second, Defendants move pursuant to Rule 702 of the Federal Rules of Evidence to

exclude two expert declarations filed by Plaintiffs in support of their motion for class

certification, namely the declarations of Craig A. Wolson (Docket No. 146), and Ilya Eric

Kolchinsky (Docket No. 147).  (*See* Memorandum of Law in Support of Defendants' Motion to

Exclude the Declarations of Plaintiffs' Experts Ilya Eric Kolchinsky and Craig A. Wolson

("Defs.' Exclusion Mem.") (Docket No. 155)).  The Court will address the two motions in turn.

## DISCUSSION

### A.  Class Certification

Rule 23 governs class certification.  A party seeking class certification must first meet the

requirements of Rule 23(a), namely: numerosity, commonality, typicality, and adequacy of

representation.  *See* Fed. R. Civ. P. 23(a).  If those threshold requirements are met, the proposed

class must also fit within one of the subdivisions of Rule 23(b).  *See* Fed. R. Civ. P. 23(b); *see

also, e.g.*, *Brown v. Kelly*, 609 F.3d 467, 475-76 (2d Cir. 2010).  Here, Plaintiffs propose a Rule

23(b)(3) damages class (Pls.' Cert. Mem. 16), which means that it must meet Rule 23(b)(3)'s

requirements that (1) "questions of law or fact common to class members predominate over any

questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In evaluating a motion for class certification, a district court is required to evaluate compliance with each of Rule 23's requirements, even if that requires considerations of merits issues. *See, e.g.*, *Levitt v. J.P. Morgan Sec.*, 710 F.3d 454, 465 (2d Cir. 2013). In making such determinations, however, a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir.2006); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). "The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification. *Levitt*, 710 F.3d at 465, and Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks omitted). Instead, the party seeking certification must "satisfy through evidentiary proof" compliance with the Rule. *Id.* In evaluating whether the moving party has done so, the Court must engage in a "rigorous analysis" in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Id.* (internal quotation marks omitted). The party seeking certification meets its burden by establishing that the requirements have been met by a preponderance of the evidence. *See Levitt*, 710 F.3d at 465.

## 1. The Rule 23(a) Prerequisites

### i. Numerosity

The first requirement for class certification is that the class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Second Circuit has held that "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs' counsel has been retained by more than 200 Notes investors (McNeela Decl. ¶ 2), and Defendants do not contest the numerosity requirement. (Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Defs.' Cert. Mem.") (Docket No. 152) 27 n.22). The Court thus concludes that the class meets the numerosity requirement of Rule 23(a)(1).

### ii. Commonality

The second requirement for class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Members of the class must have claims that "depend upon a common contention" that is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The test for commonality, however, "is not demanding and is met so long as there is at least one issue common to the class." *Linsley v. FMS Inv. Corp.*, 288 F.R.D. 11, 15 (D. Conn. 2013) (internal quotation marks omitted).

Plaintiffs have met this burden. They have put forth numerous issues that are common to the class including, *inter alia*, "[w]hether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets . . . from the investors" (Pls.' Cert. Mem. 19); "whether Defendants acted with scienter when they omitted material facts" (*id.*); and whether Defendants

engaged in behavior that they argue constitutes bad faith.  (Pls.' Mem. 20).  *See also Dandong I*,
2011 WL 5170293 at *10-16.  These issues, which can be resolved on a class-wide basis, are
indeed central to the validity of the claims in this litigation.  Defendants do not contest the
commonality requirement except "to the extent it affects whether Plaintiffs satisfy Rule
23(b)(3)'s predominance requirement" (Defs.' Cert. Mem. 27 n.22), an issue addressed
separately below.  The commonality requirement has thus been met.

### iii.  Typicality

The third Rule 23(a) requirement is that "the claims or defenses of the representative
parties are typical of [those] of the class."  Fed. R. Civ. P. 23(a)(3).  The Supreme Court has
observed that "the commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen.
Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  More specifically, typicality "is
satisfied when each class member's claim arises from the same course of events and each class
member makes similar legal arguments to prove the defendant's liability."  *Sykes v. Mel Harris
& Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012) (quoting *Robinson v. Metro-North
Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

Here, Plaintiffs argue that typicality is satisfied because the named Plaintiffs, "like all
Class members, purchased the Notes pursuant to a uniform application procedure and allege that
they were defrauded and suffered damages due to Defendants' undisclosed self-dealing."  (Pls.'
Cert. Mem. 20-21).  Defendants counter that the named Plaintiffs are not typical because they are
exposed to "unique defenses."  (Defs.' Cert. Mem. 27).  In particular, Defendants claim that the
named Plaintiffs are exposed to unique defenses because (1) they "did not read (or could not
recall reading) the Pinnacle Notes Offering Documents" (Defs.' Cert. Mem. 28); and (2) of the
named Plaintiffs' "individual experiences when investing in" the Notes.  (*Id.*).  These arguments

do not survive scrutiny.

Reformulated, Defendants' first challenge to the typicality requirement is that because the named Plaintiffs did not read the Offering Documents, their claims are subject to the unique defense that they cannot establish the reliance element required for a common law fraud claim. *See, e.g.*, *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (noting that a common law fraud claim requires, *inter alia*, "a misrepresentation or omission of material fact . . . upon which the plaintiff reasonably relied"). Defendants point out that none of the named Plaintiffs could recall reading the Base Prospectus or the Pricing Statements (Defs.' Cert. Mem 5-6) and argue that "if putative class members had — unlike the [named Plaintiffs] — actually *read* the Pinnacle Notes Offering Documents," the named Plaintiffs would be subject to unique defenses. (*Id.* 28).

Ultimately, this argument fails. First, although it is true that each of the named Plaintiffs appears to have admitted failing to review both the Base Prospectus and the Pricing Statements,[1] Defendants have not established that this failure is unique to the named Plaintiffs. That is, it may well be that *none* of the class members — be they class representatives or not — reviewed the Base Prospectus and the Pricing Statements. Second, it appears that Plaintiffs can establish reliance on another document: the Brochures. Each named Plaintiff appears to have reviewed the Brochures,[2] and the Brochures all contained one of the allegedly misleading statements, namely that "[t]he Notes will be secured by, *amongst other assets*, (i) *Underlying Assets which*

---

[1]      See Cattell Decl. (Docket No. 153) Ex. 11 [Ge Dandong] 39:5-7, 78:14-16; Ex. 7 [Loh Tuck Woh Peter] 40:14-17, 39:19-22; Ex. 12 [Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS")] 87:21-24, 88:9-12; Ex. 13 [Ni Yan Amy] 92:8-12, 145:11-14; Ex. 8 [Ang Soon Cheng] 46:7-11; 77:18-20; Ex. 9 [Choh Gek Hong Johnson] 185:21-23, 185:24-186:2; Ex. 14 [Ng Shook Phin Susan] 49:3-5, 49:6-8; Ex. 10 [Zhao Yuzheng] 51:17-20; 52:8-11.

[2]      See Cattell Decl. Ex. 11 [Ge Dandong] 35:14-23; Ex. 7 [Loh Tuck Woh Peter] 44:12-45:50; Ex. 12 [SGSCCS] 59:17-20; Ex. 13 [Ni Yan Amy] 65:19-22, 68:19-69:19-25; Ex. 8 [Ang Soo Cheng] 18:7-9; Ex. 9 [Choh Gek Hong Johnson] 41:18-24; Ex. 14 [Ng Shook Phin Susan] 44:15-22; Ex. 10 [Zhao Yuzheng] 31:9-22.

*may include* AA-rated or higher rated US Dollar denominated  portfolio credit-linked securities

(i.e. Synthetic CDO securities), and (ii) the Swap Arrangements)."  (Am. Compl. ¶ 154)

(emphasis in Am. Compl.); *see also* McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.*

Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965).

Defendants counter that, as a matter of law, Plaintiffs cannot establish reasonable reliance

on sales brochures (Defs.' Cert. Mem. 19), but this argument is unavailing, at least at this stage

of the litigation.  Defendants point to three cases to support their position: *Hunt v. Alliance North*

*American Government Income Trust*, 159 F.3d 723 (2d Cir. 1998), *McCoy v. Goldberg*, 883 F.

Supp. 927 (S.D.N.Y. 1995), and *Independent Order of Foresters v. Donaldson, Lufkin &*

*Jenrette Inc.*, 919 F. Supp. 149 (S.D.N.Y. 1996).  Yet these cases merely stand for the

proposition that when an investor relies on misrepresentations in a sales brochure but could have

discovered the true nature of the product being advertised by looking at other documents,

reliance on the sales brochure is unreasonable.  *See Hunt*, 159 F.3d at 730 ("Minimal diligence in

this case would have included consulting the prospectuses, . . . which contained disclosures

broad enough to cover [the alleged omissions from the sales brochures.]"); *McCoy*, 883 F. Supp.

at 935 ("[A]n investor [can]not justifiably rely on optimistic statements concerning the risk and

profitability of an investment, whether made in a summary brochure or orally, when the total mix

of information adequately disclosed the investment's riskiness." (internal quotation marks

omitted)).[3]  Here, as Judge Sand found, "[d]efendants have proffered nothing to suggest that

---

3       *Foresters* did not explicitly condition its holding on the fact that offering materials
contained the undisclosed information.  See *Foresters*, 919 F. Supp. at 155 ("A sales brochure, in
and of itself, in a highly regulated industry where voluminous contracts detailing the securities at
issue are created and filed with governmental agencies, such as the SEC, is not a document, on
which someone trading securities worth millions of dollars, would reasonably rely.").  But the
Court specifically noted that the plaintiff challenged only the sales brochures, not the actual
contracts or offering circulars, *id.* at 151-52, and none of the cases cited by the *Foresters* court

10

investors . . . were 'practically faced with the facts,' or that they had 'access to truth-revealing information." *Dandong I*, 2011 WL 5170293, at \*14; *see also Dandong III*, 2013 WL 4482509, at \*12.  The named Plaintiffs, in other words, could not have discovered the nature of the alleged fraud by consulting other documents.  At this class certification stage, Defendants have submitted no additional information to call this finding into question.  The named Plaintiffs can, therefore, establish reliance by virtue of their review of the Brochures.

Defendants' second challenge to the typicality requirement also falls short.  Without specifying what, exactly, the defenses are, Defendants claim that "several [named Plaintiffs] are exposed to different unique defenses based on their individual experiences when investing in Pinnacle Notes."  (Defs.' Mem. 28).  For example, Defendants contend that (1) Plaintiff Ang Soo Cheng is subject to unique defenses based on his prior investment experience; (2) Plaintiff Ge Dandong tried, but was ultimately unable, to cancel her investment before the offer period for Series 1 had closed; and (3) Plaintiff Ng Shook Phin Susan was coached by her financial advisor on what to say to receive compensation.  (*Id.*)  But while such experiences may ultimately subject these three named Plaintiffs to defenses not available against other class members, unique defenses defeat the typicality requirement only when they "threaten to become the focus of the litigation."  *In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 224 (S.D.N.Y. 2002) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).  These defenses are far too idiosyncratic to meet that standard. Because "each class member's claim arises from the same course of events and each class

---

supports the proposition that reliance on sales brochures is unjustifiable in all circumstances, *see, e.g.*, *Cong. Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 471 (S.D.N.Y. 1992) ("Where sophisticated businessmen engaged in major transactions *enjoy access to critical information but fail to take advantage of that access*, New York courts are particularly disinclined to entertain claims of justifiable reliance." (emphasis added and internal quotation marks omitted)).

member makes similar legal arguments to prove the defendant's liability," *Sykes*, 285 F.R.D. at

287, the Court finds the typicality requirement satisfied.

### iv.   Adequacy of Representation

Finally, Rule 23(a)(4) requires a certifying court to determine that the class

representatives will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

23(a)(4).  In particular, the Court must inquire as to whether "(1) the plaintiff's interests are

antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are

qualified, experienced, and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G.*

*Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)

Plaintiffs satisfy both conditions.  Although Defendants contend that Plaintiffs fail the

first inquiry because the named Plaintiffs "are not involved in this case" (Defs.' Mem. 29), the

extent of the named Plaintiffs' involvement is sufficient here, particularly given the nature of the

case.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 02 Civ. 4483 (RCC), 2007 WL 1280640, at

*6 (S.D.N.Y. Apr. 30, 2007) ("[I]n 'complex securities litigation, named plaintiffs are not

expected to possess expert knowledge of the details of the case and must be expected to rely on

expert counsel.'" (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d

Cir. 2000))).  The named Plaintiffs have demonstrated a basic understanding of the nature of

their claims (*see, e.g.*, McNeela Decl. Ex. 52 at 188:25-189:6; Ex. 53 at 169:14-24), the case's

procedural posture (*see, e.g.*, *id.* Ex. 52 at 228:10-17; Ex. 56 at 195:3-12), their duties as class

representatives (*see, e.g.*, *id.* Ex. 52 at 210:11-23; Ex. 54 at 185:10-15; Ex. 55 at 161:11-20), and

they have remained at least somewhat active in monitoring the litigation (*see, e.g.*, *id.* Ex. 52 at

206:24-207:8; Ex. 54 at 176:9-19).  The fact that some of them exhibited confusion about the

case (*see, e.g.*, Cattell Decl. Ex. 10 at 205:25-206:7; Ex. 12 at 182:16-24) and admitted to relying

on their lawyers (*see, e.g.*, *id.* Ex. 9 at 168:11-13; Ex. 11 at 121:11-122:8) does not render them

so ignorant as to be "unable or unwilling to protect the interests of the class." *In re Vivendi*

*Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 88 (S.D.N.Y. 2007) (quoting *Baffa*, 222 F.3d at 61).

As to the second inquiry, there is no question that counsel is qualified to conduct the

litigation.  Defendants do not challenge Kirby McInerney's competence, and the firm has a

demonstrated history of success in commercial class litigation.  (*See* McNeela Decl. Ex. 51 at 27-

32).  Accordingly, Plaintiffs have met their burden under Rule 23(a)(4).

### 2.  The Rule 23(b) Requirements

As noted above, a class action must not only meet the four prerequisites of Rule 23(a); it

must also satisfy the requirements of Rule 23(b).  Here, as noted also, Plaintiffs proceed under

Rule 23(b)(3), which requires a showing that (1) "questions of law or fact common to class

members predominate over any questions affecting only individual members," and (2) "a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  The Court will address each requirement in turn.

#### i.  Predominance

The requirement that common questions predominate over individual ones is similar to,

but more demanding than, the commonality prerequisite of Rule 23(a).  *See, e.g.*, *Moore v.*

*PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  The predominance inquiry asks

"whether proposed classes are sufficiently cohesive to warrant adjudication by representation,"

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and it is satisfied if "resolution of

some of the legal or factual questions that qualify each class member's case as a genuine

controversy can be achieved through generalized proof, and if these particular issues are more

substantial than the issues," *In re U.S. Foodservice Inc. Pricing Litig.*, — F.3d —, 2013 WL

4609219, at *7 (2d Cir. Aug. 30, 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).  For common questions to predominate over individual ones, it is not necessary for "each element of plaintiff[s'] claims [to be] susceptible to classwide proof," but only for "common questions [to] predominate over any questions affecting only individual class members." *Amgen*, 133 S. Ct. at 1210 (internal quotation marks and alterations omitted).

As discussed in the context of the commonality requirement, Plaintiffs posit a number of common questions that could be resolved if these case proceeded on a class-wide basis.  Some of these questions relate to Plaintiffs' fraud and fraudulent inducement claims, while others relate to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  Accordingly, the Court evaluates the predominance requirement in two parts: first, with respect to the fraud-based claims, and second, with respect to the implied covenant claims.

### a. Fraud and Fraudulent Inducement

To state a claim for common law fraud or fraudulent inducement under New York law, a plaintiff must demonstrate: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn*, 273 F.3d at 156 (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996)); *see State v. Indus. Site Servs., Inc.*, 862 N.Y.S.2d 118, 121-22 (3d Dep't 2008) (reciting these same elements for a fraudulent inducement claim); *Petrello v. White*, 412 F. Supp. 2d 215, 226-27 (E.D.N.Y. 2006) (same); *see also Twin Holdings of Del. LLC v. CW Capital, LLC*, No. 005193/09, 2010 WL 309022, at *9 (N.Y. Sup. Ct. Jan. 19, 2010) (stating that the elements for fraudulent inducement are the same as those required for fraud).  Plaintiffs put forth three common questions relevant to their fraud-based claims: (1) "[w]hether Defendants

14

withheld information regarding the Pinnacle Notes' Underlying Assets, including conflicts of interest, from the investors" (Pls.' Cert. Mem. 19); (2) "[w]hether the omitted information was material and whether Defendants acted with scienter when they omitted material facts" (*id*); and (3) "[w]hether Defendants' misconduct injured Plaintiffs." (*Id.*). Noting that reliance cannot be presumed in this case, however, Defendants contend that these questions are overwhelmed by individual questions of reliance — in other words, that these questions do not predominate with respect to Plaintiffs' fraud-based claims. (Defs.' Cert. Mem. 13-14).

Defendants are certainly correct that reliance cannot be presumed here. The fraud-on-the-market presumption of reliance that applies in federal securities claims under Rule 10b-5 does not apply to a common law fraud action. *See, e.g.*, *Secs. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 72 (2d Cir. 2000). Likewise, courts in this district have refused to import the so-called *Affiliated Ute* presumption — a presumption of reliance for misleading omissions — into common law fraud claims. *Int'l Fund Mgmt. S.A. v. Citigroup, Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (collecting cases discussing *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972)). Instead, "the requisite reliance is actual reliance." *Id.* And in order to prove such reliance, each individual Plaintiff must demonstrate that the misrepresentation or omission was a "substantial factor in inducing [him or her] to act the way that [he or she] did." *Curiale v. Peat, Matwick, Mitchell & Co.*, 214 A.D.2d 16, 27 (1st Dep't 1995); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 261 (S.D.N.Y. 2010).

It does not follow, however, that individual issues "predominate as a matter of law," as Defendants argue. (Defs.' Mem. 15). To be sure, "[c]ertification is inappropriate where 'reliance is too individualized to admit of common proof.'" *In re U.S. Foodservice Pricing*

*Litig.*, 2013 WL 4609219, at *8 (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F. 3d 215, 224-25 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).  But the obverse of that statement is also true.  That is, the Second Circuit has made clear that "fraud-based claims" are not "entirely beyond the reach of Rule 23," and that where each plaintiff can prove reliance "'through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue),'" certification may well be appropriate.  *Id.* (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated on other grounds by Bridge*, 553 U.S. 639).  As that Court put it in *McLaughlin*, "proof of reliance by circumstantial evidence may be sufficient under certain conditions."  522 F.3d at 225.  For example, in the context of a financial transaction — which "does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase" — payment alone "may constitute circumstantial proof of reliance upon a financial representation."  *Id.* at 225 n.7.

     In light of this case law, many courts in this Circuit and beyond have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product.  *See, e.g.*, *Seekamp v. It's Huge*, 09 Civ. 00018 (LEK/DRH), 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (reliance could be proved through purchase of product where "every plaintiff would have relied on the [allegedly misleading] . . . representation of the [product's] legality and beneficialness in deciding whether to purchase it"); *Spencer v. Hartford*, 256 F.R.D. 284, 301-303 (D. Conn. 2009) (reliance could be proved through plaintiffs' acceptance of structured settlements where quotation documents were alleged to be misleading); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (5th Cir. 2004) (reliance could be proved through doctors' entrance into

HMO contracts when defendant HMOs allegedly misrepresented that they would reimburse doctors for medically necessary services provided to insureds).

Defendants argue that these cases are "no longer good law" in light of the Supreme Court's decision last February in *Amgen*. (Defs.' Cert. Mem. 20). The *Amgen* Court did observe that, in a suit not subject to the fraud-on-the-market presumption, "[i]ndividualized reliance issues would predominate" and "[t]he litigation, therefore, could not be certified under Rule 23(b)(3) as a class action." 133 S. Ct. at 1199. But that observation was *dictum* and, read in context, is little more than an acknowledgement of the uncontroversial proposition that, absent a fraud-on-the-market presumption, individual reliance issues often preclude class certification in fraud cases. *See also id.* at 1193 ("Absent the fraud-on-the-market theory, the requirement that [securities fraud] plaintiffs establish reliance would *ordinarily* preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." (emphasis added)). There is thus no basis to read the passing remark as abrogating widespread circuit court precedent. And were there any doubt on that score, it would be resolved by the Second Circuit's more recent decision in *In re U.S. Foodservice Pricing Litigation*, which expressly reaffirmed that the mere fact that class members have to show causation "by establishing reliance on a defendant's misrepresentations . . . does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." 2013 WL 4609219, at *8 (citing *McLaughlin*, 522 F.3d at 224-25).

The question, then, is whether Plaintiffs in this case can prove reliance on a class-wide basis through common, circumstantial evidence. For purposes of class certification, the Court concludes that they can. Like the misrepresentations in *Seekamp*, *Spencer*, and *Klay*, the alleged misrepresentations and omissions here were so fundamental to the value of the Notes that it is

hard to imagine a reasonable investor purchasing them if the Offering Documents had revealed their true nature.  If Plaintiffs had known that Morgan Stanley would select the ACES CDOs — a risky asset whose depreciation would *benefit* a Morgan Stanley affiliate — as the source of funds that Plaintiffs would receive in the absence of a Reference Entity credit event, it stands to reason that Plaintiffs would not have purchased the Notes in the first place.  (*See* Wolson Decl. ¶¶ 2.07, 5.01, 5.02).  The Notes were not the type of product that individuals purchase for "any number of reasons," *McLaughlin*, 522 F.3d at 225; they were financial investments that Plaintiffs made in hopes that they would prove profitable.  Further, the Brochures, which failed to disclose Defendants' conflict of interest and included an allegedly misleading description of the Underlying Assets, contained the same allegedly misleading language across all seven series, (McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.* Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965), were provided to all class members, (McNeela Decl. Ex. 13 ¶¶ 1-3), and were reviewed by each of the Plaintiffs making their purchasing decisions (see *supra* n. 2).

This is not, as Defendants contend, "just a version of the fraud created the market presumption."  (Defs.' Cert. Mem. 24).  The Court cannot — and does not — presume, as a matter of *law*, that the element of reliance is satisfied for each putative class member.  Instead, the Court concludes, based on the evidence in the record at this stage of the proceedings, that "a reasonable factfinder [could] conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' [uniform] representations."  *Klay*, 382 F.3d at 1259. That is, "while each plaintiff must prove reliance, he or she may do so" — in *this* case — "through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."  *In re U.S. Foodservice Pricing Litig.*, 2013 WL 4609219, at *8 (quoting *Klay*, 382 F.3d at 1259).

*Abu Dhabi Commercial Bank*, upon which Defendants rely (Defs.' Cert. Mem. 17-18, 22), is therefore distinguishable.  In that case, the Court refused to certify a common law fraud class action on behalf of three institutional investors who had acquired certain notes issued by a structured investment vehicle.  *See* 269 F.R.D. at 253-54.  But there, unlike here, "the record evidence reveal[ed] material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved in selling the Rated Notes."  *Id.* at 261.  Indeed, there was concrete evidence that some investors "chose not to rely — or relied only minimally — on the [alleged misrepresentations in] credit ratings prior to investing in the Rated Notes."  *Id.* at 265; *see also id.* at 262.  In fact, some investors made their investment decisions "*before* the ratings were issued . . . , rendering it unlikely that any rating played a substantial role in those investors' decisions to invest."  *Id.* at 261 (emphasis in original).  Additionally, the "information memoranda and marketing materials" that were the source of the misrepresentations in *Abu Dhabi* varied between the different notes, and they were modified over time.  *See id.* at 263.  Furthermore, Defendants "prepared no less than fifty-six individualized memoranda to potential . . . investors answering questions and due diligence inquiries by these investors."  *Id.*  In short, individualized reliance issues plainly predominated in that case given the facts.  Not so here.

Finally, while Defendants point to some "non-uniform" conversations putative class members had about the Notes with the Distributors (*see* Defs.' Mem. 7-9; 17) and with the putative class members' own personal financial advisors (*see* Defs.' Mem. 9-10; 17), none of these conversations — either alone or taken together — demonstrates that Plaintiffs cannot establish reliance through common, circumstantial evidence.  New York law does not require Defendants' misrepresentations and omissions to have been the only considerations that

Plaintiffs relied upon in deciding to purchase the Notes.  *See, e.g.*, *Phillips v. Better Homes Depot, Inc.*, No. 02-CV-1168 (ERK), 2003 WL 25867736, at *12 (E.D.N.Y. Nov. 12, 2003) ("'In fraud actions, the fraudulent representations complained of need not be the sole consideration or inducement moving a plaintiff . . . .'" (alteration omitted) (quoting 37 Am. Jur. 2d Fraud and Deceit § 245)).  Instead, the misrepresentation or omission need only have been a "substantial factor in inducing [Plaintiffs] to act the way that [they] did." *Curiale v. Peat, Matwick, Mitchell & Co.*, 214 A.D.2d 16, 27 (1st Dep't 1995).  At most, the conversations Defendants point to demonstrate that some putative class members had more than one reason for purchasing the Notes; they do not, however, contradict the notion that putative class members relied on Defendants' alleged misrepresentations and omissions as well.  *See Seekamp*, 2012 WL 860364, at *10 (finding predominance met in fraud action even where "each proposed class member may have opted to purchase the [product in question] for different reasons"); *Spencer*, 256 F.R.D. at 303 (finding predominance met fraud action notwithstanding that "each plaintiff may have accepted his or her [allegedly fraudulent] settlement for somewhat different reasons").  Accordingly, the Court finds that common questions of law and fact with respect to Plaintiffs' fraud and fraudulent inducement claims will predominate over any individual issues of reliance that may exist.

### b.  Implied Covenant of Good Faith and Fair Dealing

New York law implies a covenant of good faith and fair dealing in all contracts, which "embraces a pledge that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (citation omitted). In the Amended Complaint, Plaintiffs alleged that all Defendants other than Morgan Stanley &

20

Co. violated the covenant in various ways (Am. Compl. ¶¶ 105, 325-330), and they now posit at least four common questions relevant to alleged violations of the implied covenant, namely: (1) "[w]hether Defendants utilized their unilateral authority over the Underlying Assets to select CDOs that they created and shorted," (Pls. Cert. Mem. 20); (2) "[w]hether Defendants utilized their unilateral control over the Underlying Assets to select REs highly susceptible to a downturn in the housing and financial markets" (*Id.*); (3) "[w]hether Defendants played ratings arbitrage and selected Fitch in order to create the riskiest possible Underlying Collateral still capable of garnering an AA rating" (*Id.*); and (4) [w]hether Defendants lowered their internal underwriting criteria in order to approve riskier Underlying Assets," (*Id.*)

Defendants object to certification of implied covenant claim on two grounds.  First, they claim that Plaintiffs' attempt to certify an implied covenant class is an impermissible attempt to "re-package a defective common law securities fraud class" as an implied covenant class.  (Defs. Cert. Mem. 26).  But the cases upon which Defendants rely concern the "re-packaging" of *defective* fraud claims.  *See, e.g.*, *Permasteelisa S.p.A. v. Lincolnshire Mgmt. Inc.*, 793 N.Y.S.2d 16, 17 (1st Dep't 2005) ("The claim for breach of the implied covenant of good faith . . . merely duplicated the insufficient contract claim," which itself "was essentially duplicative of the insufficient fraud claim."); *Sutton Assocs. v. Lexis-Nexis*, 761 N.Y.S.2d 800, 804 (N.Y. Sup. Ct. Apr. 29, 2003) (holding that the implied covenant claim "[was] duplicative of and merely recast[ed] [plaintiff's] unavailing fraud theory").  Here, Plaintiffs have stated a *valid* fraud claim, as Judge Sand and this Court previously determined.  *See Dandong I*, 2011 WL 5170293, at *14; *Dandong III*, 2013 WL 4482509, at *11.  Accordingly, Defendants' argument is without merit.

Second, Defendants argue that Plaintiffs cannot satisfy the predominance requirement with respect to the implied covenant claim because they rely on a "common course of conduct"

theory that was rejected by the Second Circuit in *Moore v. PaineWebber*, 306 F.3d 1247 (2d Cir.

2002).  (Defs. Cert. Mem. 26).  But the holding in *Moore* was simply that, in the context of a

fraudulent misrepresentation claim, proving a common course of conduct could not, by itself,

establish predominance because "each plaintiff must prove that he or she personally received a

material misrepresentation, and that his or her reliance on this misrepresentation was the

proximate cause of his or her loss."  *Moore*, 306 F.3d at 1255.  That principle is irrelevant to

Plaintiffs' implied covenant claims, as liability for an implied covenant claim does not require

reliance on any sort of misrepresentation.  *See, e.g.*,  *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17

N.Y.3d 208, 228-29 (2011) (holding that insureds stated a claim against insurer for breach of the

implied covenant when insurer allegedly transferred assets to its parent company for no

consideration); *Forman v. Guardian Life Ins. Co. of Am.*, 908 N.Y.S.2d 27, 30 (1st Dep't 2010)

(holding that insurance auditor adequately stated a claim for breach of the implied covenant

against insurer where insurer allegedly provided auditor with claims to audit but entered into

agreement that prevented auditor from recovering funds on those claims),  Accordingly, common

issues predominate with respect to Plaintiffs' implied covenant claims as well.  *See, e.g.*, *In re

Checking Account Overdraft Litig.*, 281 F.R.D. 667, 681 (S.D. Fla. 2012) ("[B]reach of the duty

[of] good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective

bad faith or objectively unreasonable conduct."); *Nat'l Seating & Mobility, Inc. v. Parry*, No. 10

Civ. 2782 (JSW), 2012 WL 2911923, at *1, *10 (N.D. Cal. July 16, 2012) (certifying implied

covenant class based on employer's allegedly inaccurate calculation of employees'

compensation); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 321 (S.D.N.Y. 2005) (certifying

class and approving settlement predicated on breach of, *inter alia*, duty of good faith and fair

dealing), *aff'd in part, vacated in part*, 443 F.3d 253 (2d Cir. 2006).

### ii.  Superiority

In addition to mandating the predominance of common factual and legal issues, Rule

23(b)(3) also requires the Court to determine whether "a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  Four factors are "pertinent" to this inquiry:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

*Id.*  Courts have held that class actions are particularly appropriate in federal securities actions,

*see, e.g.*, *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir. 1968) ("[A] class action in a federal

securities action may well be the appropriate means for expeditious litigation of issues, because a

large number of individuals may have been injured, although no one person may have been

damaged to a degree which would have induced him to institute litigation solely on his own

behalf."); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. at 91 (collecting cases), and these

considerations apply with equal force here.  Further, Plaintiffs have put forth evidence that a

class action judgment would likely be enforced in a Singapore court (*see* Furmston Decl.

(Docket No. 144) ¶¶ 11-12), and Defendants do not appear to contest the superiority

requirement.  Accordingly, the Court finds that it is satisfied, and Plaintiffs' motion to certify the

class is therefore GRANTED.  Additionally, the Court appoints Kirby McInerney LLP as class

counsel, and approves the named Plaintiffs as class representatives.

## B.  The Admissibility of Expert Reports

The second motion before the Court is one brought by Defendants to exclude the

declarations of Plaintiffs' experts Craig A. Wolson (the "Wolson Declaration") and Ilya Eric

Kolchinsky (the "Kolchinsky Declaration"), pursuant to Rule 702 of the Federal Rules of

Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Daubert*

requires that an expert's testimony "both rest[] on a reliable foundation and [be] relevant to the

task at hand." *Id.* at 597. When a motion to exclude expert testimony is made at the class

certification stage, the *Daubert* standard applies, but the inquiry is "limited to whether or not the

[expert reports] are admissible to establish the requirements of Rule 23." *In re NYSE Specialists*

*Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009). In other words, "[t]he question is not . . .

whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to

liability, but rather whether [the Court] may utilize it in deciding whether the requisites of Rule

23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (S.D.N.Y.

2000). Defendants challenge the Declarations as both irrelevant and unreliable.

       Defendants' arguments with respect to the Kolchinsky Declaration have some force, but

they are moot because the Court did not consider the Kolchinsky Declaration in reaching its

decision on Plaintiffs' motion to certify. Defendants' arguments with respect to the Wolson

Declaration, on the other hand, fail to persuade. First, as the discussion above makes clear, the

Wolson Declaration is plainly relevant insofar as it has a "valid connection to the pertinent

inquiry." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2009). That is,

the Wolson Declaration is relevant to the predominance inquiry under Rule 23(b)(3) because it

speaks to whether and how investors would have reacted differently if Defendants had provided

the omitted information or had they not made the allegedly misleading statements on the

documents provided to Plaintiffs. (Wolson Decl. ¶¶ 5.01, 5.02).

       The fact that the Wolson Declaration refers to the omitted information as "material" does

not render it an inadmissible legal opinion. The Court does not understand any of Mr. Wolson's

statements — particularly that the "offering materials omitted information that would have been material to any reasonable investor" (Wolson Decl. ¶ 5) — as "encompass[ing] an ultimate legal conclusion." *United States v. Jacques Dessange, Inc.*, No. S2 99 Cr. 1182 (DLC), 2000 WL 294849, at \*2 (S.D.N.Y. Mar. 21, 2000).  Whether the omitted information and misrepresentations were material is an issue for the factfinder at trial, and is not before the Court at this stage of the litigation.  The question presently before the Court is simply whether common questions predominate — or, alternatively, whether individual questions of reliance overwhelm them — and the importance of the omitted information and allegedly misleading statements has some bearing on that question.  Of course, if Wolson were to testify regarding materiality at trial, the Court might well instruct him to "recast his testimony by using terminology that does not express legal conclusions."  *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Bos. Corp.*, Nos. 12 Civ. 5803 (JLG) et al., 2013 WL 978980, at \*8 (S.D.N.Y. Mar. 12, 2013).  The risk of jury confusion inherent in a witness's use of a legal term is not relevant at this stage, however.

Defendants' reliability objections to the Wolson Declaration are also unconvincing.  *See* Fed. R. Evid. 702 (providing that expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and that "the expert reliably applied the principles and methods to the facts of the case"); *see also Daubert*, 509 U.S. at 593-94 (listing factors to use in assessing the reliability of expert testimony).  Defendants' principal objection appears to be that Wolson failed to account for the geographical location of Plaintiffs.  In particular, they assert that Wolson "has no understanding of either the Singapore securities marketplace or Singapore investors" and that he did not conduct any investigation about the Singapore financial markets.  (Defs.' Exclusion Mem. 6-7, 14-15).  But Defendants fail to

identify any reason that information would be relevant to investors in United States markets —
markets with which Wolson is indisputably familiar (*see* Wolson Decl. ¶¶ 1.04, 1.05; Cattell
Decl. (Docket No. 156) Ex. 2 136:24-137:9) — but not to investors in the Singapore
marketplace.  Defendants also contend that the Wolson Declaration represents nothing more than
Wolson's subjective opinion, unmoored from any verifiable methodology.  (Defs.' Exclusion
Mem. 15-16).  But Wolson's opinion regarding the importance of the omitted or allegedly
misleading information is based on his experience in the structured finance industry, and experts
are permitted to provide such experiential testimony so long as they "explain how [their]
experience leads to the conclusion reached and how [their] experience is reliably applied to the
facts."  *Israel v. Spring Indus., Inc.*, 2006 WL 3196956, at *2 (E.D.N.Y. Nov. 3, 2006); *see also*
*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *4
(S.D.N.Y. Dec. 15, 2011).  Wolson has done so here.  (Wolson Decl. ¶ 1.07).

     Ultimately, Defendants' objections to the Wolson Declaration go more to weight than to
admissibility.  *See, e.g.*, *Bacardi & Co. v. N.Y. Lighter Co.*, No. 97-CV-7140 JS VVP, 2000 WL
298915, at *2 (E.D.N.Y. Mar. 15, 2000) ("Although expert testimony should be excluded if it is
speculative or conjectural, or if it is based on assumptions that are so unrealistic and
contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other
contentions that the assumptions are unfounded go to the weight, not the admissibility, of the
testimony." (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see*
*also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (describing the
"liberal admissibility standards of the federal rules" and explaining that "[a] minor flaw in an
expert's reasoning or a slight modification of an otherwise reliable method will not render an
expert's opinion per se inadmissible"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d

Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony.").  Accordingly, Defendants' motion is DENIED.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED. Defendants' motion to exclude the declarations of Plaintiffs' experts is DENIED as moot with respect to the Kolchinsky Declaration and DENIED on the merits with respect to the Wolson Declaration.  The Clerk of the Court is directed to terminate Docket Numbers 141 and 154.

SO ORDERED.

Dated: October 17, 2013
       New York, New York

_____
JESSE M. FURMAN
United States District Judge