UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GE DANDONG; LOH TUCK WOH PETER; SINGAPORE GOVERNMENT  STAFF CREDIT COOPERATIVE SOCIETY, LTD; NI YAN AMY; ANG SOO CHENG; CHOH GEK HONG JOHNSON; NG SHOOK PHIN SUSAN; and ZHAO YUZHENG,<br><br>     Plaintiffs,<br><br>   -vs.-<br><br>PINNACLE PERFORMANCE LIMITED; MORGAN STANLEY ASIA (SINGAPORE) PTE; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY CAPITAL SERVICES INC.; MORGAN STANLEY & CO. INC.; MORGAN STANLEY,<br><br>     Defendants. | Civil Action No. 10 Civ. 8086<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

Page No.

INTRODUCTION AND SUMMARY OF THE ACTION...................................................1

I.      PARTIES ...........................................................................................................9

      A.      Plaintiffs ..............................................................................................9

      B.      Defendants ..........................................................................................10

            1.      Pinnacle Performance Limited ("Pinnacle")..............................10

            2.      Morgan Stanley Asia (Singapore) Pte ("MS Singapore")..................11

            3.      Morgan Stanley & Co. International plc ("MS International").........12

                  a.      MS International's Role in the Pinnacle Notes .........................13

                  b.      Morgan Stanley's Control of MS International.......................13

            4.      Morgan Stanley Capital Services Inc. ("MS Capital")..................21

                  a.      MS Capital's Role in the Pinnacle Notes and Pinnacle Transactions..............................................................22

                  b.      Morgan Stanley's Control of MS Capital................................23

            5.      Morgan Stanley ..........................................................................25

            6.      Morgan Stanley & Co. LLC ("MS&Co.")...................................26

II.      JURISDICTION AND VENUE .....................................................................27

III.      GENERAL OVERVIEW OF CLNs AND SYNTHETIC CDOs................................27

      A.      The Basic Structure and Purpose of CLNs........................................27

      B.      The Basic Structure and Purpose of Synthetic CDOs ......................30

            1.      CDOs Are Based on a Portfolio of Assets ................................30

i

2.      Synthetic CDOs "Reference" an Asset Portfolio "Synthetically" Through Credit Default Swaps ..................................................31

3.      Because Synthetic CDOs Are Based on Credit Default Swaps, They Feature Counterparties Who Take Opposing "Long" and "Short" Positions With Respect to the CDO's Risk Portfolio ............32

4.      CDO Tranches: Layering The Risk Profile ..................................32

5.      CDO Tranche Risk Is Defined By Tranche Attachment Point, Tranche Detachment Point, and Tranche Thickness ........................34

6.      Bespoke Synthetic Single Tranche CDOs Issue a Single Tranche of Securities Representing One Specific Slice of Aggregate Portfolio Risk..................................................................................34

7.      The Bottom Line on Bespoke Synthetic Single Tranche CDOs: A Bet Between Two Parties over a Precisely-Specified, Discrete Slice of Losses Potentially Generated in Portfolio of Reference Entities ........................................................................................35

IV.    THE PINNACLE NOTES, THE SYNTHETIC CDOs AND DEFENDANTS' FRAUDULENT SCHEME ..................................................36

A.     Overview of the Pinnacle Notes ...........................................................36

1.      Pinnacle Notes - Series 1 ..............................................................38

2.      Pinnacle Notes - Series 2 ..............................................................40

3.      Pinnacle Notes - Series 3 ..............................................................42

4.      Pinnacle Notes - Series 6 and Series 7 .........................................44

5.      Pinnacle Notes - Series 9 and Series 10 .......................................46

B.     Morgan Stanley's Pinnacle Notes Scheme ...........................................48

1.      The Pinnacle Notes Appeared to Be Typical CLNs .....................48

2.      The Pinnacle Notes Appeared to Be *Conservative* Credit Linked Notes, With Virtually Non-Existent Principal Risk Given the Safe Nominal Reference Entities to Which They Were Credit-Linked .................................................................................49

3.      The Pinnacle Notes Were the Deceptive "Bait" Employed By
        Morgan Stanley to Secure Control Over Investor Principal For
        Morgan Stanley's Use and Benefit in the Wider Pinnacle
        Transactions Scheme ..................................................................................50

4.      Morgan Stanley Structured the Synthetic CDOs to Transfer
        the Plaintiffs and the Class' Investment in the Pinnacle Notes to
        Morgan Stanley ..........................................................................................51

5.      Morgan Stanley Custom-Built the Synthetic CDOs to Receive
        the Pinnacle Notes Investors' Money, to Intensify the Risk of Loss,
        and to Fail ..................................................................................................53

        a.      Morgan Stanley Created the Synthetic CDOs for the
                Specific Purpose of Receiving the Principal Raised
                Through Morgan Stanley's Creation of the Pinnacle Notes ....54

        b.      Morgan Stanley Had Full Control Over Portfolio
                Construction, and Plaintiffs and the Class Were Excluded
                from Any Input ..........................................................................57

        c.      Defendants Structured the MS ACES CDOs to Intensify the
                Risk of Loss................................................................................58

        d.      Morgan Stanley Structured the Synthetic CDOs to Fail..........62

                i.      Morgan Stanley Seeded the Portfolios With
                        Concentrated Risk ........................................................62

                        I.      Morgan Stanley's Consistent, Concentrated
                                Inclusion of Icelandic Banks at Elevated
                                Risk of Default....................................................64

                        II.     Morgan Stanley's Consistent, Concentrated
                                Inclusion of Companies at Elevated Risk
                                of Default in the Event of a Housing
                                Downturn ............................................................67

                        III.    A Case Study of the Synthetic CDO
                                Underlying Series 9 and Series 10 of the
                                Pinnacle Notes Reveals Morgan Stanley's
                                Intentions ............................................................75

iii

ii.     Morgan Stanley Designed the Synthetic CDOs to
        Have Very "Low" and "Thin" Single Tranches
        That Would Begin to Experience Impairment Quickly
        and Would Experience Total Principal Impairment
        Should Aggregate Portfolio Losses Rise by No More
        Than 1% ...........................................................................80

iii.    Additional Factors Demonstrating that Morgan
        Stanley Intentionally Built the Synthetic CDOs to
        Fail ................................................................................84

        I.      Morgan Stanley's Bespoke Synthetic
                CDO Tranches Featured Lower Attachment
                Points Than Those in Then-Available,
                Standardized, Similarly-Rated Synthetic
                CDOs ....................................................................85

        II.     Morgan Stanley's Synthetic CDOs Got
                Even Riskier Over Time, Even as the Financial
                and Housing Crises Were in Full Bloom............88

        III.    Morgan Stanley Reinvested the Money Raised
                by the Sale of the Synthetic CDO Notes in a
                Far More Conservative Investment ..................89

        IV.     Defendants Abused Their Roles as Market
                Agent to Cover Up the Pinnacle Notes' Risks
                and Perpetuate the Fraud, and as Calculation
                Agent to Ensure that the MS ACES CDOs
                Failed...................................................................93

V.   THE PINNACLE NOTES OFFERING DOCUMENTS WERE
     MATERIALLY FALSE AND MISLEADING ..........................................96

     A.     The Offering Documents ...................................................96

     B.     The Offering Documents' Representations that the Underlying Assets
            for the Pinnacle Notes "*May Include*" Synthetic CDOs Were Materially
            False and Misleading .......................................................97

     C.     The Offering Documents Did Not Disclose that the Underlying Assets
            Were Synthetic CDOs That Morgan Stanley Had Created and in which
            Morgan Stanley Possessed an Adverse/Opposite Interest.............................100

iv

    **D.**    **The Offering Documents Failed to Disclose that Morgan Stanley Custom-Designed for Use as Underlying Assets Bespoke Synthetic CDOs That Were Structured to Increase the Risk of Loss and to Ultimately Fail** ..........**102**

    **E.**    **The Offering Documents' Representation that the Underlying Assets Were "Acceptable" to MS Capital Was Materially False and/or Misleading**...........................................................................................**105**

**VI.**    **CLASS ALLEGATIONS** ...........................................................**108**

**VII.**    **COUNTS** ......................................................................................**110**

    **First Claim for Relief Fraud (Against All Defendants)** .............................................................**110**

    **Second Claim for Relief Aiding and Abetting Fraud (Against All Defendants)** .............................................................**112**

    **Third Claim for Relief Fraudulent Inducement (Against All Defendants)** .............................................................**113**

    **Fourth Claim for Relief Aiding and Abetting Fraudulent Inducement (Against All Defendants)** .............................................................**114**

    **Fifth Claim for Breach of Implied Covenant of Good Faith and Fair Dealing (Against All Defendants Except for MS&Co.)** ...........................**115**

**VIII.**    **PRAYER FOR RELIEF** ........................................................**117**

**IX.**    **JURY TRIAL DEMANDED**...................................................**118**

## INTRODUCTION AND SUMMARY OF THE ACTION

1.     Plaintiffs GE Dandong, LOH Tuck Woh Peter, Singapore Government Staff Credit Cooperative Society, Ltd, NI Yan Amy, ANG Soo Cheng, CHOH Gek Hong Johnson, NG Shook Phin Susan, and ZHAO Yuzheng ("Plaintiffs"), bring this class action on their behalf and on behalf of all other purchasers of Pinnacle Performance Limited Series 1, 2, 3, 6, 7, 9 and 10 notes (the "Pinnacle Notes") between August 1, 2006 and December 31, 2007, inclusive (the "Class Period"), and who have been damaged thereby (the "Class").

2.     Allegations concerning Plaintiffs' own acts are based on personal knowledge. All other allegations are based on the investigation of Plaintiffs' counsel. That investigation included, but was not limited to, a review and analysis of:  (a) the offering documents for the Pinnacle Notes; (b) the offering documents for the Synthetic CDOs that served as Underlying Assets for each Series of Pinnacle Notes; (c) a report issued by the Monetary Authority of Singapore with respect to the marketing and sale of  structured notes,  including the Pinnacle Notes; (d) the Pinnacle Notes "notifications" concerning matters relating, *inter alia,* to the performance, value, and price of the Pinnacle Notes and their Synthetic CDO Underlying Assets; (e) newspaper, magazine, and other periodical articles relating to the Pinnacle Notes; and (f) other matters of public record. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

3.     This action alleges that several Morgan Stanley entities conspired and engaged in a coordinated and concerted scheme conceived, masterminded, and executed (in part) in New York – to create a deceptive, rigged investment: the Pinnacle Notes.  The Pinnacle Notes were

marketed as conservative investments, but were, in fact, specifically designed to: (i) surreptitiously increase the risk of loss to investors in order to create greater spreads and therefore greater front end profits to Morgan Stanley; and (ii) ultimately fail, thereby wiping out Plaintiffs and the Class' $138.7 million and redirecting those funds, on a dollar-for-dollar basis, into Morgan Stanley's coffers.

4.      The scheme turned on a complex series of financial transactions *in which Morgan Stanley entities stood on both sides*.  Yet the essence of the scheme was simple: (i) the funds Plaintiffs and the Class invested in the Pinnacle Notes were reinvested, purportedly for preservation of that principal until the Pinnacle Notes' maturity, by a Morgan Stanley entity into Synthetic CDOs of Morgan Stanley's own making; (ii) Morgan Stanley made its baseline profit off the spread generated by these CDOs; (iii) a Morgan Stanley entity stood as the counterparty to the credit default swap agreements underlying the Synthetic CDOs; (iv) pursuant to those credit default swap agreements, each dollar Plaintiffs and the Class lost in the Synthetic CDOs was a dollar gained by Morgan Stanley; and  (v) Morgan Stanley designed the Synthetic CDOs to secretly increase the risk of loss in order to generate a greater initial profit, and to fail at the back end so that it, as counterparty, would obtain Plaintiffs and the Class' funds.  In both circumstances, Morgan Stanley enriched itself at the investors' expense through its self-dealing. No part of this prearranged fraudulent scheme had been disclosed to Plaintiffs and the Class at the time of their investment in the Pinnacle Notes.

5.      Thus, through extensive self-dealing, Morgan Stanley, in concert with the other Defendants, funneled Plaintiffs and the Class' investment in the Pinnacle Notes into a rigged financial instrument of Morgan Stanley's own design, in which it had simultaneously positioned itself as the party to benefit when that instrument failed.

6.      The following introductory paragraphs provide a general overview of the fraudulent scheme through a description of the Pinnacle Notes and the Synthetic CDOs, which are explained in greater detail at ¶¶ 133-278, *infra*.

7.      The Pinnacle Notes appeared to be a type of conservative, run-of-the-mill investment known as Credit-Linked Notes ("CLNs").  CLNs have at their heart an agreement known as a credit default swap ("CDS"), pursuant to which the purchaser of the CLNs, in substance, bears a defined credit risk in exchange for periodic payments for assuming such risk.

8.      Investment banks create CLNs via a three-step process.

(a)      **The Credit Default Swap**.  In the first of the three steps, the investment bank (also known as the "sponsoring bank") establishes an issuing trust, generally a "brain dead" entity known as a Special Purpose Vehicle ("SPV"), which exists only to facilitate the issuance of the CLNs.  The investment bank then enters into a credit default swap with the SPV.  Under the credit default swap, the SPV contracts to protect the bank from the credit risk associated with a "reference entity" (or entities) for a certain "notional amount" (*e.g.,* the credit risk associated with $10 million worth of IBM bonds), in the event the reference entity defaults (*e.g.*, IBM does not fully honor its bond obligations).  In exchange, the SPV receives regular "credit protection payments" from the sponsoring bank, expressed as a percentage of the "notional amount" (*e.g.*, 2% of the $10 million worth of IBM bonds).  The riskier the reference entity or entities, the higher the cost of their credit protection and the more income paid to the SPV.  The end result is that the SPV generates a stream of "money in" (the credit protection payments from the counterparty, *i.e.* the sponsoring bank), while incurring a contingent obligation  in the event the reference entity defaults to pay "money out" to the sponsoring bank as the counterparty to the credit default swap, up to the "notional amount."

3

(b)      **The CLN Issuance**.  In the second step, the SPV, having incurred a credit risk of up to the "notional amount" (*e.g.*, $ 10 million), must raise sufficient funds to satisfy this obligation in the event of the reference entity's default (*e.g.*, the default of IBM's bonds).  The SPV accomplishes this goal by selling newly-issued CLNs, such as the Pinnacle Notes, to investors up to the "notional amount."  The CLN investors' principal is the source of funds to cover the SPV's obligations to the sponsoring bank in the event the reference entity defaults.  The SPV holds such principal during the life of the CLNs, and should no such default occur, generally returns that principal to the CLN investors.

(c)      **The SPV's Investment of the CLN Principal in an Underlying Asset**. During the life of the CLN, the principal raised from the CLN investors is invested by the SPV in an "Underlying Asset."  Income generated by the Underlying Asset is packaged with the income from the sponsoring bank's credit protection payments to the SPV, and passed on to the CLN investors as the yield on their CLN notes.  In the event of a reference entity default, the SPV would liquidate the underlying asset to satisfy its obligation to the counterparty to the credit default swap.

9.      Accordingly, in the normal case, it is not only in the CLN investors' interest to have their principal reinvested in a safe, liquid Underlying Asset (so as to ensure full return of principal in the absence of a reference entity default), *but it is also in the interest of the SPV counterparty, i.e., the sponsoring bank* (so as to ensure full payment should a reference entity default).  Were the principal reinvested in a risky asset or one that could not be readily sold, the SPV counterparty's right to full payment in case of reference entity default would be threatened. For these reasons, the Underlying Asset in CLN transactions is customarily one that is both safe and liquid.

10.     The attractiveness of CLNs to investors is that they can offer yields higher than those traditionally offered by direct investment in traditional fixed-income securities.  This is because the SPV passes through to the investors: (1) the income generated by reinvestment of investor principal in an Underlying Asset (*e.g.*, 3% per year on $10 million of U.S. Treasury securities); *and* (2) the income it receives for assuming the contingent risk of referenced entity default (*i.e.*, the credit protection payments, *e.g.*, 2% of the notional amount).

11.     The primary "risk" in CLN transactions is the reference entities' potential default, which would require the SPV to use the CLN investors' principal investment to pay the sponsoring bank while the primary "safety" inherently lies in the Underlying Assets.

12.     With respect to the Pinnacle Notes, however, Morgan Stanley, acting in concert with and through the other Defendants, secretly turned this fundamental feature of CLNs upside down.  Morgan Stanley put the true risk of the Pinnacle Notes where no one expected it to be: in the Pinnacle Notes' underlying assets (the "Underlying Assets").

13.     Under normal circumstances, Morgan Stanley's structuring of the Pinnacle Notes in this fashion is wholly counterintuitive.  As the sponsoring bank and counterparty to the credit default swap with the Pinnacle SPV, Morgan Stanley paid the Pinnacle SPV regular credit protection payments in return for Pinnacle s promise to pay Morgan Stanley in the event of the reference entities' default: an obligation secured by the Underlying Assets.

14.     The question naturally arises:  why would Morgan Stanley put its own right to repayment at risk by causing the Pinnacle Notes investors' principal to be reinvested in an unsafe and illiquid Underlying Asset?  The answer, as discussed below, is twofold, but boils down to a classic bait and switch scheme secretly designed to benefit Morgan Stanley at Plaintiffs' and the Class' expense.

15.     First, Morgan Stanley, which selected the reference entities, was not worried about their default.  The reference entities presented an infinitesimal risk of default because they were, in all cases, highly-rated sovereign nations or global corporations.  This is not only why Morgan Stanley felt safe imperiling Pinnacle's ability to make good on the contracted credit protection Morgan Stanley had obtained, but also why Plaintiffs and the Class decided to invest in the Pinnacle Notes. *This was the bait*.

16.     Second, in reinvesting the Pinnacle Notes investors' principal into an Underlying Asset, Morgan Stanley selected Synthetic CDOs of Morgan Stanley's own making.  Rather than being a safe, liquid investment, these Synthetic CDOs were secretly designed by Morgan Stanley to increase the risk of loss to investors.  The reason is twofold.  First, Morgan Stanley's initial profit from the Pinnacle Notes transactions came from the credit-spread on the underlying CDOs.  The riskier the CDO the greater the credit spread, and therefore, the greater the amount of profit Morgan Stanley could siphon off.   Second, by increasing the risk of loss, Morgan Stanley increased the opportunity for the CDOs to fail, and upon failing to transfer the Pinnacle Notes investors' principal to Morgan Stanley. *This was the switch*.

17.     Morgan Stanley, *prior* to the issuance of each series of Pinnacle Notes, custom-built a Synthetic CDO to serve as the Underlying Asset for that series of Pinnacle Notes.  As such, each series of Pinnacle Notes was issued *after* Morgan Stanley had created a Synthetic CDO in the *exact amount* to be raised by each corresponding series of Pinnacle Notes   for a total of $138.7 million.

18.     As further detailed herein at ¶¶ 104-26, *infra*, synthetic CDOs are, at bottom, a bet between two counterparties over a specific risk exposure.  Investors who purchase the Synthetic CDO notes are "long" the risk, while the counterparty is "short" the risk.  If that risk materializes,

the principal invested by the long investors in the CDO notes is swapped to the short counterparty, thereby impairing the CDO notes and causing principal loss.

19.     The Synthetic CDOs that Morgan Stanley created were not merely bets, but bets Morgan Stanley *rigged*, in which it (i) unilaterally and secretly structured the CDOs to increase the risk of loss in order to siphon off the increased spread and inflate its initial profit, and (ii) placed *itself* on the side guaranteed to win additional windfall profits (the "short" side), when the increased risk materialized in the failure of the CDOs.

20.     As further detailed herein at ¶¶ 169-278, *infra*, Morgan Stanley, acting in concert with the other Defendants, accomplished this goal by customizing the risk exposure underlying the Synthetic CDOs to result in their default, and to therefore transfer Plaintiffs and the Class' principal to Morgan Stanley.  In short, the risk exposure Morgan Stanley selected for each Synthetic CDO consisted of an incredibly narrow tranche of high-risk debt.  In other words, the tranche associated with the Synthetic CDOs would experience total impairment upon even low-levels of default.

21.     This scheme not only caused Plaintiffs and the Class to lose 100% of the principal they had invested in the Pinnacle Notes (because the Underlying Assets "safeguarding" that principal became worthless), but also caused a dollar-for-dollar transfer of that lost principal to Morgan Stanley as the predetermined winner.

22.     Thus, the Pinnacle Notes were a facade that Morgan Stanley employed to gain control over Plaintiffs and the Class' principal, which it then used to fund rigged bets.  Specifically, Morgan Stanley siphoned off the profit generated by the increased spread it baked into the CDOs, and it was the predetermined winner when the CDOs failed.  Using safe reference entities as bait, Morgan Stanley crafted the Pinnacle Notes to appear to be near-riskless

investments and raised $138.7 million from Plaintiffs and the Class through the Pinnacle Notes. Having secured that principal, Morgan Stanley caused and directed that Plaintiffs and the Class' principal be used to purchase $138.7 million of notes issued by Morgan Stanley's custom-built Synthetic CDOs.

23.     It was not disclosed to Plaintiffs and the Class that by investing in the Pinnacle Notes what they really were doing was buying CDOs that Morgan Stanley structured to be as risky as possible in order to increase Morgan Stanley's baseline profit at investors' expense, and also taking the opposite side from Morgan Stanley on a bet Morgan Stanley had rigged. Plaintiffs and the Class did not know, and had no way of knowing, that Morgan Stanley built the Synthetic CDOs to fail, and in failing to transfer their $138.7 million investment to Morgan Stanley.  Plaintiffs and the Class believed in and relied upon Morgan Stanley's good faith as the creator of the Pinnacle Notes and the selector of the Underlying Assets into which the principal raised by the Pinnacle Notes would be reinvested.

24.     Morgan Stanley's scheme with respect to the issuance of the Pinnacle Notes, the underlying credit default swap agreements, and the reinvestment of the Plaintiffs and the Class' principal in the Synthetic CDOs (the "Pinnacle Transactions") worked exactly as Morgan Stanley intended.  None of the reference entities to which the Pinnacle Notes were credit-linked defaulted.  Normally, this would mean CLN investors would receive 100% principal return.  But Pinnacle investors suffered 100% principal losses.  This is because, even as the Pinnacle Notes' reference entities proved safe, the Synthetic CDOs failed just as Morgan Stanley had intended. Because Morgan Stanley was the "short" counterparty to the Synthetic CDOs, when the CDOs failed, Plaintiffs and the Class' investment in the Pinnacle Notes, which was reinvested into the Synthetic CDOs, was transferred to Morgan Stanley.

8

25.     This action seeks to hold Defendants responsible for their fraudulent and deceitful scheme.

# I.
# PARTIES

A.     **Plaintiffs**

26.     Plaintiff GE Dandong, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 1 securities and has been damaged thereby.

27.     Plaintiff LOH Tuck Woh Peter, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 2 securities and has been damaged thereby.

28.     Plaintiff Singapore Government Staff Credit Cooperative Society, Ltd, a cooperative membership organization located in Singapore, purchased Pinnacle Performance Limited Series 3 securities and has been damaged thereby.

29.     Plaintiff NI Yan Amy, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 3 securities and has been damaged thereby.

30.     Plaintiff ANG Soo Cheng, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 6 securities and has been damaged thereby.

31.     Plaintiff CHOH Gek Hong Johnson, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 7 securities and has been damaged thereby.

32.     Plaintiff NG Shook Phin Susan, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 9 securities and has been damaged thereby.

33.     Plaintiff ZHAO Yuzheng, an individual residing in Singapore, purchased Pinnacle Performance Limited Series 10 securities and has been damaged thereby.

B.      **Defendants**

34.     The Defendants are all related entities that conspired and acted in furtherance of a common corrupt agreement to defraud Plaintiffs.  A description of each Defendant as well as an overview of its involvement in the conspiracy is discussed below.

1.      **Pinnacle Performance Limited ("Pinnacle")**

35.     Defendant Pinnacle Performance Limited ("Pinnacle") is a limited liability corporation duly organized and existing under the laws of Cayman Islands (registration number MC-158263), with registered offices located at PO Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

36.     Pinnacle is identified in the Pinnacle Notes Offering Documents as the "Issuer" with respect to the Pinnacle Notes.  In fact, Pinnacle Performance is a "special purpose vehicle" ("SPV") existing for the sole purpose of raising money by issuing the Pinnacle Notes. Pinnacle had neither employees nor subsidiaries, nor even day-to-day management.  *See* August 7, 2006, Pinnacle Performance Limited Base Prospectus, at 7, 42-43 ("Base Prospectus").

37.     As described on pages 9, 40 and 42-43 of the Base Prospectus, at all times relevant to the Complaint, Pinnacle did not have any offices, assets, employees or day-to-day management, and received all of its operational funding and share capital from MS Singapore pursuant to an "Expenses Agreement."

38.     Pinnacle's only "personnel" consisted of two directors appointed by Maples Finance Jersey Ltd., a business affiliate of the Cayman Islands law firm Maples & Calder, which was retained by Morgan Stanley and/or the other defendants to register Pinnacle.  Pursuant to the Expense Agreement, MS Singapore paid Maples Finance Jersey Ltd. any and all fees and expenses related to the appointment of Pinnacle's directors.

39.     Pinnacle's directors were not independent, but rubber-stamped any and all business transactions proposed by the other defendants pursuant to a "Proposals and Advice Agreement."  Under that agreement, MS Singapore, together "with any other Morgan Stanley entity" that ratified the agreement, was empowered to propose business transactions involving Morgan Stanley to Pinnacle's directors and then advise them to enter into those same transactions.

40.     In this fashion, MS Singapore and/or the other Defendants proposed and advised Pinnacle to issue each Series of Pinnacle Notes, to enter into the CDS agreements with MS Capital, and to approve of the Underlying Assets selected by MS International.  And for each Series of Notes, Pinnacle's directors blindly followed the instruction they received from the other Defendants without seeking advice from a disinterested third-party or performing any other due-diligence.

41.     At all times, Pinnacle was created, devised, constructed, operated and controlled by Defendant Morgan Stanley as part of Defendants' fraudulent scheme.  Morgan Stanley used its control over Pinnacle in order to gain access to over $130 million from Plaintiffs, which was then reinvested in rigged financial products – the Synthetic CDOs – which were specifically designed by Morgan Stanley to redirect those funds on a dollar-for-dollar basis into Morgan Stanley's coffers.

### 2.     Morgan Stanley Asia (Singapore) Pte ("MS Singapore")

42.     Defendant Morgan Stanley Asia (Singapore) Pte ("MS Singapore") is an indirect wholly-owned subsidiary of Morgan Stanley, incorporated under the laws of the Republic of Singapore, with registered offices located at One Marina Boulevard #28-00, Singapore 018989, and with a principal place of business located at 23 Church Street, #16-01 Capital Square,

Singapore 049481.   MS Singapore's principal activities include the provision of investment banking and support services, issuing and trading notes, and entering into swap transactions and investing in bonds as part of its normal trading operations.  *See* Base Prospectus, at 44.  Prior to approximately August 2007, MS Singapore was known by and operated under the name "Morgan Stanley Dean Witter Asia (Singapore) Pte," and was referred to in certain pre-August 2007 Pinnacle Notes Offering Documents by that name.

43.    MS Singapore is identified in the Pinnacle Notes' Offering Documents as the "Arranger" with respect to the Pinnacle Notes.  The Offering Documents make clear that MS Singapore's role as "Arranger" was merely nominal or clerical rather than substantive, explaining that the Arranger "will not be involved" in managing the collateral underlying the Pinnacle Notes or "mak[ing] any determinations in respect of the [Pinnacle] Notes."  Base Prospectus, at 44.  At all times relevant hereto, MS Singapore – with respect to its activities relating to the Pinnacle Notes – was operated and controlled by Morgan Stanley.

**3.  Morgan Stanley & Co. International plc ("MS International")**

44.    Defendant Morgan Stanley & Co. International plc ("MS International"), a wholly-owned subsidiary of Morgan Stanley, is a corporation duly organized and existing under the laws of England and Wales, with registered offices located at 25 Cabot Square, Canary Wharf, London, E14 Q4A.  MS International's principal activity is the provision of financial services to corporations, governments, financial institutions and individual investors.  Prior to April 13, 2007, MS International was known by and operated under the name "Morgan Stanley & Co. International Limited," and was referred to in all pre-April 13, 2007 Pinnacle Notes Offering Documents by that name.

12

### a.     MS International's Role in the Pinnacle Notes

45.     MS International is identified in the Pinnacle Notes' Offering Documents as, *inter alia*, the "Determination Agent," "Dealer," "Market Agent" and "Forward Counterparty" with respect to the Pinnacle Notes.

46.     As Determination Agent, MS International was provided with "sole and absolute discretion," Base Prospectus at 12, in selecting the investment to serve as the Underlying Assets for the Pinnacle Notes, and was further charged with the role of monitoring such assets and taking further action (such as declaring early redemption) should such assets threaten to suffer impairment or loss.

### b.     Morgan Stanley's Control of MS International

47.      At all times relevant hereto, MS International – generally and with respect to its specific activities relating to the Pinnacle Notes – was operated and controlled by and acted in concert with Morgan Stanley.  Morgan Stanley utilized its control over MS International to further the Defendants' fraudulent scheme: specifically, by having MS International reinvest Plaintiffs' investment in the Pinnacle Notes into the rigged Synthetic CDOs Morgan Stanley created.

48.     At all relevant times, Defendant MS International functioned as a mere department or alter-ego of Morgan Stanley.  Morgan Stanley exercised complete domination over MS International generally and specifically with respect to the Pinnacle Notes and Pinnacle Transactions, and used such domination to commit the fraud or wrong complained of herein.

49.     Morgan Stanley  "is a global financial services firm that, *through its subsidiaries and affiliates*, provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals . . .

13

Morgan Stanley conducts its business from its headquarters in and around New York City, its regional offices and branches throughout the U.S. and its *principal offices in London*, Tokyo, Hong Kong and other world financial centers."  Morgan Stanley 2009 Form 10-K, at 1 (emphasis added); *see also* June 15, 2010 Registration Document of Morgan Stanley and Morgan Stanley & Co. International plc, filed with the Financial Services Authority ("FSA"), at 23-24 (the "June 15, 2010 Registration Document") (emphasis added).

50.     Morgan Stanley's operations are conducted through multiple wholly-owned subsidiaries. As Morgan Stanley's 2009 Form 10-K states: "Morgan Stanley provides financial advisory and capital-raising services to a diverse group of corporate and other institutional clients globally, *primarily through wholly owned subsidiaries* that include Morgan Stanley & Co. Incorporated ("MS&Co."), *Morgan Stanley & Co. International plc*, Morgan Stanley Japan Securities Co., Ltd. and Morgan Stanley Asia Limited.  These and other subsidiaries also conduct sales and trading activities worldwide, as principal and agent, and provide related financing services on behalf of institutional investors." Morgan Stanley 2009 Form 10-K, at 2.

51.     MS International is one of the primary Morgan Stanley wholly-owned subsidiaries through which Morgan Stanley conducts its operations, *see* Morgan Stanley 2009 Form 10-K, at 2, 122; June 15, 2010 Registration Document, at 13-14 ("Morgan Stanley is the holding company of a global financial services group. *MSI plc is one of the principal operating companies* in the Morgan Stanley Group . . .") (emphasis added), and is the organizational name given to Morgan Stanley's "principal office[] in London," 2009 Form 10-K, at 1; June 15, 2010 Registration Document at 23-24.

52.     MS International serves as Morgan Stanley's primary operating subsidiary with respect to European investment banking operations.  *See* May 29, 2007 Registration Document

of Morgan Stanley and Morgan Stanley & Co. International plc, filed with the Luxembourg Commission de Surveillance du Secteur Financier, at 17 ("May 29, 2007 Registration Document").

53.   The "Organisational Structure" subsection of Registration Documents filed by Morgan Stanley and MS International with various securities regulators identifies Morgan Stanley as MS International's "controlling entity" and "ultimate parent undertaking":   "*MSI plc's ultimate parent undertaking and controlling entity is Morgan Stanley. . . .*" June 15, 2010 Registration Document, at 44; May 29, 2007 Registration Document, at 19 (emphasis added).

54.   MS International's own financial statements state exactly the same relationship: "*The Company's ultimate parent undertaking and controlling entity is Morgan Stanley . . . .*" May 29, 2007 Registration Document at 27.

55.   Registration Documents filed by Morgan Stanley and MS International with various securities regulators further disclose "substantial inter-relationships" between MS International and Morgan Stanley:

> There are substantial inter-relationships between MSI plc and other Morgan Stanley group companies
>
> *Morgan Stanley is the holding company of a global financial services group. MSI plc is one of the principal operating companies in the   Morgan Stanley Group* (as defined below). MSI plc itself provides a    wide range of financial and securities services. *There are substantial inter-relationships between MSI plc and Morgan Stanley as well as other companies in the Morgan Stanley Group, including the provision of funding, capital, services and logistical support to or by MSI plc, as well as common or shared business or operational platforms or systems, including employees.* As a consequence of such inter-relationships, and of the participation of both MSI plc and other Morgan Stanley Group companies in the global financial services sector, factors which could affect the business and condition of Morgan Stanley or other companies in the Morgan Stanley Group may also affect the

business and condition of MSI plc. Any such effect could be direct, for example, where economic or market factors directly affect the markets in which MSI plc and other companies in the Morgan Stanley Group operate, or indirect, for example where any factor *affects the ability of other companies in the Morgan Stanley Group to provide services or funding or capital to MSI plc or, directly or indirectly, to place business with MSI plc.* Similarly, any development affecting the reputation or standing of Morgan Stanley or other companies in the Morgan Stanley Group may have an indirect effect on MSI plc. Such inter-relationships should therefore be taken into account in any assessment of MSI plc.

June 15, 2010 Registration Document, at 13-14 (emphasis added, bold in the original).[1]

56.     Among the self-described inter-relationships between Morgan Stanley and MS International were: (1) Morgan Stanley's "provision of funding, capital, services and logistical support to []MSI plc"; and (2) "common or shared business or operational platforms or systems, including employees" and (3) common employees. *Id.*

57.     In fact, these substantial "inter-relationships" between Morgan Stanley and MS International existed because MS International was simply an appendage of Morgan Stanley through which Morgan Stanley conducted many of its European operations.

58.     MS International and Morgan Stanley share a common office space, address and telephone number.   The Registration Documents for MS International state that MS International's headquarters location is 25 Cabot Square, Canary Wharf, London E14 4QA, and the telephone number of its registered office is +44 20 7425 8000.  These are the exact same address and telephone number provided on Morgan Stanley's website upon inquiry as to Morgan Stanley's presence in the United Kingdom.

*See* http://www.morganstanley.com/about/offices/uk.html.

---

[1] *See also* June 15, 2010 Registration Document, at 44; May 29, 2007 Registration Document at 4, 17-19.

59.     Indeed, Morgan Stanley's website makes no distinction between Morgan Stanley and MS International: MS International simply appears as "Morgan Stanley in the United Kingdom." *Id.* This lack of differentiation is underscored by MS International's statement that "an understanding" of MS International's success would not be gained through disclosure of company-specific performance indicators, but only through consideration of the Morgan Stanley Group's overall performance:

> The Group manages its key performance indicators on a global basis. For this reason, **the Company's Directors believe that providing performance indicators for the Company itself would not enhance an understanding of the development, performance or position of the business of the Company**.

May 29, 2007 Registration Document, at 27 (emphasis added).

60.     Morgan Stanley also provided financial support to MS International through both capital injection and debt financing. *See* June 15, 2010 Registration Document at 14 ("Morgan Stanley has in the past provided financial support to MSI plc through capital injection and debt financing"); May 29, 2007 Registration Document at 15 (same).

61.     MS International's Financial Statements detail multiple occasions where MS International secured between hundreds of millions and billions of dollars worth of funding from other entities controlled by Morgan Stanley. *See* May 29, 2007 Registration Document at 47 and 75.

62.     Indeed, the Pinnacle Transactions and Pinnacle Notes serve as a prime example of how Morgan Stanley guaranteed MS International's debts and/or obligations. In the Pinnacle Notes, MS International was required, as the designated "Forward Counterparty" pursuant to a contract with Pinnacle, to perform certain operations and obligations, and to transfer certain funds, in case of specific contingent events. Morgan Stanley *guaranteed* MS International's

contingent obligations and funds transfers by designating itself as the "Forward Guarantor" and providing a "Forward Guaranty." The Pinnacle Notes Offering Documents nowhere reveal any payment Morgan Stanley received for agreeing to take on the contingent obligations of its subsidiary, MS International.

63.     Morgan Stanley's "free," non-arm's-length assumption of such contingent obligations further evidences that Morgan Stanley and MS International were not truly separate or independent entities.

64.     In a subsection of the MS International Financial Statements titled "Directors Report" and subtitled "Principal and Business Review," MS International and its directors represented that MS International and its directors did not control MS International's management of credit risk, market risk, credit risk, liquidity and cash flow risk, and that, instead, such risk management centrally controlled, operated and applied throughout Morgan Stanley:

> **Risk management**
> <u>Risk is an inherent part of the Company's business activity and is managed within the context of the broader Group's business activities</u>.   The Group seeks to identify, assess, monitor and manage each of the various types of risk involved in its activities, in accordance with defined policies and procedures.
>
> *Market risk*
> Market risk refers to the risk that a change in the level of one or more market prices, rates, indices, implied volatilities (the price volatility of the underlying instrument imputed from option prices), correlations or other market factors such as liquidity, will result in losses for a position or portfolio.
>
> <u>The Group manages the market risk associated with its trading activities in consideration of each individual legal entity, but on a global basis, at both a trading division and an individual product level</u>.

*Credit risk*

Credit risk refers to the risk of loss arising from borrower or counterparty default when a borrower, counterparty or obligor is unable to meet its financial obligations.

The Group manages credit risk exposure in consideration of each individual legal entity, but on a global basis, by ensuring transparency of material credit risks, ensuring compliance with established limits, approving material extensions of credit, and escalating risk concentrations to appropriate senior management.

*Liquidity and cash flow risk*
The Group's senior management establishes the overall liquidity and capital policies of the Group. The Group's liquidity and funding risk management policies are designed to mitigate the potential risk that the Group and the Company may be unable to access adequate financing to service its financial obligations when they come due without material, adverse franchise or business impact. The key objectives of the liquidity and funding risk management framework are to support the successful execution of the Group's and the Company's business strategies while ensuring ongoing and sufficient liquidity through the business cycle and during periods of financial distress.

May 29, 2007 Registration Document at 27-28 (underlining added).

65.    The MS International Financial Statements also disclosed that MS International and its directors had dispensed with the need to hold annual meetings for and/or provide reports to shareholders:

*The Company has in place an elective regime to dispense with the need to hold annual general meetings, lay reports and accounts before the shareholders at a general meeting,* and the requirement to re-appoint the auditors, Deloitte & Touche LLP, annually.

May 29, 2007 Registration Document at 28 (emphasis added).

66.    Moreover, despite the fact that MS International issued "Financial Statements," it did not publicly disclose its financial results separately from Morgan Stanley.  Instead, MS

19

International's results of operations were rolled up into and combined in Morgan Stanley's consolidated financial results for operations.

67.     Lastly, at times relevant to the action, there was significant overlap in officers, directors and personnel between MS International and Morgan Stanley.  MS International's May 29, 2007 Registration Document listed as MS International's directors Colin Bryce, May Chien Busch, Jonathan Chenevix-Trench, Keith Clark, Roberto Hoornweg, Mats Jerker Johansson, Dagmar Kollman, David Nicol, Franck Petitgas, Domenico Siniscalco, and Chris Van Aeken.  *See id.*  18-19.  All of the MS International directors were "employed within the Morgan Stanley group of companies."  *See id*. at 19.

68.     Many of these MS International directors, even as certain of them retained titles in MS International, were high-level Morgan Stanley executives and members of senior Morgan Stanley management and operating committees.   Overseeing Morgan Stanley's Institutional Securities business – one of Morgan Stanley's three primary business segments (2009 Form 10-K at 2) – was an operating committee with approximately seven members, two of whom were Jonathan Chenevix-Trench and Mats Jerker Johansson (who served as Morgan Stanley's co-head of institutional securities sales and trading).  Additionally, four further MS International directors – Colin Bryce (Morgan Stanley's European Head of Institutional Sales and Trading), Jonathan Chenevix-Trench (heading Morgan Stanley's business in Europe, the Middle East and Africa), Roberto Hoornweg (Global Head of Interest Rate and Currency), and Franck Petitgas (Head of International Investment Banking) – sat on Morgan Stanley's management committee.  With respect to other MS International directors: (1) Chris Van Aeken served as chief operating officer for Morgan Stanley's private wealth management operations in Europe and the Middle East; (2) Domenico Siniscalco, a former Finance Minister for Italy appointed to a position in MS

20

International reporting to Jonathan Chenevix-Trench on April 19, 2006, was tasked by Morgan Stanley (per a press release) "with responsibility for further developing Morgan Stanley's relationships with key clients across Europe and the emerging markets"; and (3) Dagmar Kollman was CEO of Morgan Stanley's German operations.

69.     In sum, at all times relevant to this action, MS International was an alter-ego/mere department of Morgan Stanley, as evidenced by, *inter alia*: (1) MS International's status as a wholly-owned subsidiary of Morgan Stanley; (2) MS International's financial dependency on Morgan Stanley; (3)   MS International's failure to observe corporate formalities and paraphernalia that are part and parcel of the corporate existence; (4) the lack of treatment of MS International as an independent profit center; (5) the limited business discretion MS International displayed; (6) the significant control Morgan Stanley exerted over MS International's operational policies; (7) the non-arm's-length dealings between MS International and Morgan Stanley; (8) the overlap in officers, directors and personnel; and (9) common offices space, addresses and telephone numbers.

### 4.     Morgan Stanley Capital Services Inc. ("MS Capital")

70.     Defendant Morgan Stanley Capital Services Inc. ("MS Capital"), is a wholly-owned subsidiary of Morgan Stanley,  incorporated in the State of Delaware, with registered offices at Corporate Trust Center, 1209 Orange Street, Wilmington DE 19801, and with its principal executive offices located at 1585 Broadway, New York, NY 10036 (identical to those of Morgan Stanley).  According to Morgan Stanley's own representations in the Pinnacle Notes Base Prospectus, MS Capital's "primary business [] is entering into over-the-counter derivative contracts with institutional clients." Base Prospectus, at 45.

21

### a.    MS Capital's Role in the Pinnacle Notes and Pinnacle Transactions

71.    MS Capital is identified in the Pinnacle Notes' Offering Documents as the "Swap Counterparty" with respect to the "Swap Agreement" underlying the Pinnacle Notes.  The "Swap Agreement" consisted of two separate swap agreements between Pinnacle and MS Capital: (1) a credit default swap; and (2) an asset swap.

(a)    Pursuant to the credit default swap between Pinnacle and MS Capital (Pinnacle's Swap Counterparty), Pinnacle – as also discussed more fully at ¶¶ 133-39 *infra* – provided credit protection to MS Capital with respect to credit risk of the Nominal Reference Entities to which the Pinnacle Notes were credit-linked, in exchange for MS Capital's regular payments to Pinnacle for such credit protection.  This credit default swap was integral and necessary for the creation and issuance of the Pinnacle Notes as credit-linked notes bearing the promised yield; absent this credit default swap, the Pinnacle Notes could not exist as credit-linked notes and could not offer the yield they did.

(b)    Pursuant to the asset swap between Pinnacle and MS Capital (Pinnacle's Swap Counterparty), (1) Pinnacle swapped to MS Capital (a) the interest payments generated by the Underlying Assets, and (b) an amount equal to credit protection payments that Pinnacle received from MS Capital; in exchange for which (2) MS Capital swapped to Pinnacle an amount equal to the funds it needed to provide requisite interest payments on the Pinnacle Notes due to Pinnacle Notes investors.  In this manner, MS Capital was the direct source for the periodic payments of interest to the Pinnacle Notes investors: it forwarded the needed funds to Pinnacle through which they were distributed to Pinnacle Notes investors.

72.    MS Capital occupied a key role with respect to the Synthetic CDOs that Morgan Stanley caused Pinnacle to purchase (through its Determination Agent, MS International) as the

22

Underlying Assets for each Series of Pinnacle Notes.  MS Capital was the short swap counter-party to these CDOs and was thus involved in the underlying transactions that gave rise to and were necessary for the creation of those CDOs.  When those built to fail Synthetic CDOs did fail, the Pinnacle investors' principal was transferred to MS Capital as the "short" party to the Synthetic CDOs.

<b>b.     Morgan Stanley's Control of MS Capital</b>

73.     At all times relevant hereto, MS Capital – with respect to its activities relating to the Pinnacle Notes – was operated and controlled by Morgan Stanley.

74.     In addition to being a wholly-owned subsidiary of Morgan Stanley, Defendant MS Capital has its purported headquarters and offices at an identical address to Morgan Stanley's headquarters (1585 Broadway, New York, NY 10036) with an identical listed telephone number ((212) 761-4000).  Additionally, MS Capital does not publicly report its own financial results of operations.  Rather, such results are consolidated into Morgan Stanley's consolidated financial results reported by Morgan Stanley.

75.     MS Capital does not have a true separate corporate existence from Morgan Stanley, and instead merely serves as Morgan Stanley's face/alter-ego for its U.S. derivatives and swaps transactions.  In essence, in the United States, Morgan Stanley conducted its derivative and swap transactions through MS Capital (outside the United States, Morgan Stanley used another alter-ego for derivative transactions – MS International).  *See* Moody's Investors Service, *Swaps Push-Out to Have Major Impact on U.S. Dealers*, June 21, 2010, at 4, 5, 6.

76.     In order to make MS Capital a credible counterparty to derivatives transactions and swaps contracts entailing substantial obligations (contingent or otherwise), Morgan Stanley routinely *guaranteed* MS Capital's performance in such transactions.  *See Id*. at 5.  For example,

23

in a prospectus regarding the issuance of mortgage-backed securities, Morgan Stanley itself described that:

> Morgan Stanley Capital Services Inc. is a Delaware corporation that is a wholly-owned, unregulated, special purpose subsidiary of Morgan Stanley. Morgan Stanley Capital Services Inc. conducts business in the over-the-counter derivatives market, engaging in a variety of derivatives products, including interest rate swaps, currency swaps, credit default swaps and interest rate options with institutional clients. **The obligations of Morgan Stanley Capital Services Inc. are 100% guaranteed by Morgan Stanley**.[2]

77.     In keeping with its general practice, Morgan Stanley guaranteed MS Capital's contractual obligations for both the Pinnacle Notes and the Synthetic CDOs.

78.     Both the Pinnacle Notes and the Synthetic CDOs were built around an underlying credit default swap contract, pursuant to which MS Capital – in exchange for regular payments it made to its counterparty – obtained credit protection  with respect to certain referenced risks in the event they defaulted.  Both the Pinnacle Notes and the Synthetic CDOs were thus based on the requirement that MS Capital provide regular payments in exchange for this credit risk protection.  For both the Pinnacle Notes and the Synthetic CDOs, Morgan Stanley stood behind and guaranteed the payments and obligations required of MS Capital.[3]

79.     Notably, although Morgan Stanley's provision of such guarantees with respect to the Pinnacle transactions, and others, entailed the assumption of substantial potential liabilities,

---

[2] *See* Morgan Stanley Capital I Inc. "free writing prospectus" filed with the SEC on July 13, 2006, at 31 (emphasis added).

[3] *See, e.g.,* Pinnacle Notes Series 9/10 Pricing Supplement at 9 ("To enable the Issuer to meet its payment obligations under the Notes, the Issuer will enter into a Swap Agreement with Morgan Stanley Capital Services Inc. a Swap Counterparty in respect of the Notes. The obligations of the Swap Counterparty will be guaranteed by Morgan Stanley as Swap Guarantor pursuant to the Swap Guarantee..."); *see also id.,* at B-7. C-8-9; Base Prospectus, at 2, 10, 14-15, 18-19, 44-45; and the December 13, 2007 prospectus prepared by Morgan Stanley for the Morgan Stanley ACES SPC Series 2007-41 Synthetic CDO, at 2, 4, 12.

these guarantees were provided by Morgan Stanley to MS Capital free of charge, and therefore were not arm's length.

80.     Morgan Stanley's non-arm's-length guarantee of MS Capital's obligations – together with Morgan Stanley's ownership of MS Capital and their common office and headquarters – is *prima facie* evidence of Morgan Stanley's domination of MS Capital.

81.     As described herein, Morgan Stanley utilized its domination of MS Capital to perpetrate its fraud against the Plaintiffs.

### 5.     Morgan Stanley

82.     Morgan Stanley is a Delaware corporation with its principal executive offices located at 1585 Broadway, New York, NY 10036.  Morgan Stanley is a global financial services firm that, "through its subsidiaries and affiliates,"  "provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals."  Base Prospectus, at 45.

83.     At all times relevant to this action, Defendants – all Morgan Stanley entities – acted in concert and at Morgan Stanley's direction in furtherance of a common and shared scheme to defraud the Plaintiffs, through the Pinnacle Transactions, of their investment in the Pinnacle Notes.

84.     Morgan Stanley maintains on its website all of the Offering Documents for the Pinnacle Notes.  See http://www.morganstanley.com/pinnaclenotes/index.html.

85.     Morgan Stanley is identified in the Pinnacle Notes' Offering Documents as the "Swap Guarantor" and "Forward Guarantor" with respect to the Pinnacle Notes.  As "Swap Guarantor," Morgan Stanley undertook to "unconditionally guarantee" MS Capital's periodic credit protection payments to Pinnacle.  *See* Base Prospectus, at 18.

25

86.     Morgan Stanley also created each of the Synthetic CDOs into which MS International reinvested the Plaintiffs' investment in the Pinnacle Notes, and in which Morgan Stanley designated its derivatives alter ego MS Capital as the party "short" the referenced risk.

### 6.     Morgan Stanley & Co. LLC ("MS&Co.")

87.     Morgan Stanley & Co. LLC, ("MS&Co."), formerly known as Morgan Stanley & Co. Inc., is a wholly-owned subsidiary of parent company Morgan Stanley.  MS&Co., is a broker-dealer and investment adviser firm registered with the U.S. Securities and Exchange Commission (SEC# 8-15869) under the Securities Exchange Act.

88.     Upon information and belief, MS&Co., had significant involvement in the creation and operation of the Synthetic CDOs that were Underlying Assets of the Pinnacle Notes. The Private Placement Memorandum governing the Synthetic CDOs names MS&Co., as the "Distributor" of the Synthetic CDOs.  MS&Co., also acted as "Calculation Agent" under the "Master Contingent Forward Confirmation" incorporated into the Private Placement Memorandum Supplement for each Synthetic CDO underlying the Pinnacle Notes.

89.     Two employees of MS&Co., have been identified by Defendants as having knowledge relevant to Plaintiffs' allegations.  In Young Chase was a vice-president and registered representative of MS&Co., during the relevant period.  Brian Neer was a registered representative of MS&Co.  Both employees were involved in structuring the Pinnacle Notes.

90.     Upon information and belief, MS&Co., employed the registered representatives described above and provided them and others with the facilities, equipment and support to design, create and structure the Pinnacle Notes and their Underlying Assets.

## II.
## JURISDICTION AND VENUE

91.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(B).

92.     Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in New York.

## III.
## GENERAL OVERVIEW OF CLNs AND SYNTHETIC CDOs

### A.     The Basic Structure and Purpose of CLNs

93.     The Pinnacle Notes appeared to be a type of security known as CLNs, and described themselves as such in the Offering Documents.

94.     CLNs gain their name because their performance and value are linked, through use of derivatives such as credit default swaps, to the performance of various "credits" – shorthand for the credit performance of various institutions such as corporations or sovereign nations that issue debt instruments.

95.     The credit default swap underlying the CLN serves to transfer the risk of default of any credit "referenced" by the CLN to the purchasers of the CLN.

96.     In return for agreeing to assume such risk, CLN purchasers receive a higher yield than they might otherwise obtain ("juiced" by the credit protection payments from the counterparty to the credit default swap, who pays for being protected from the risk transferred via the credit default swap).

97.     The principal invested by CLN purchasers is customarily invested by the CLN issuer in a safe, liquid asset to safeguard such principal for one of two uses: (1) to pay the credit

27

default swap counterparty in case the linked credit(s) default; or (2) to return investor principal upon CLN maturity.

98.     Investment banks such as Morgan Stanley create CLNs through issuing trusts such as the Pinnacle SPV, in a series of four steps detailed below.

99.     First, the sponsoring bank establishes an issuing trust.  These issuing trusts are customarily SPVs – brain-dead entities that are controlled by the sponsoring bank and whose sole purpose is the issuance of CLNs to investors.

100.     Once established, the issuing trust and sponsoring bank enter into a credit default swap referencing a notional amount (*e.g.*, $10 million) of one or several credits (*e.g.*, Bank of America, or IBM, or General Electric) (the "Nominal Reference Entities").  Pursuant to the credit default swap the bank transfers credit risk in a given notional amount of credits (*e.g.*, $10 million of IBM bonds) to the issuing trust, in exchange for which the issuing trust receives regular credit protection payments from the bank.  The amount of such protection payments is expressed as a fraction of the notional amount of the credit protection obtained (*e.g.*, quarterly payments of 0.3% of the notional amount), and the size of such protection payments depends on the creditworthiness of the credit referenced (a riskier credit costs more to insure).  The bank thus pays the issuing trust regular protection payments, in exchange for which the trust stands ready to compensate the bank on any credit losses suffered by the notional amount of the credit referenced (*e.g.*, any losses suffered by $10 million of IBM bonds).

101.     Second, as the issuing trust is a mere empty shell established by the sponsoring bank, the issuing trust "funds" its potential obligation (*i.e.*, its promise to make good on up to $10 million in credit losses should $10 million of IBM bonds default) by issuing and selling CLNs to investors.  If the linked credit defaults and suffers losses, the issuing trust uses the

principal raised from CLN investors to make requisite counterparty payments.  In this manner, the credit risk is transferred from the issuing trust to the CLN investors.  If none of the linked credits default and suffer losses, the issuing trust then returns investors' principal upon CLN maturity.

102.    Third, the issuing trust, upon receipt of the CLN investors' principal, customarily re-invests that principal in an income-generating asset (referred to in the Pinnacle Offering Documents as the "Underlying Asset").  Since the principal collateralizes or secures the issuing trust's obligations (1) under the credit default swap, to make good on any linked credit losses; and (2) under the terms of the CLN issuance, to return investor principal upon CLN maturity, that principal is typically invested in an asset that is both safe and liquid (*e.g.*, Treasury bills).

103.    Fourth, as a result of the prior three steps, the sponsoring bank – through the issuing trust – creates CLN securities with enhanced yields compared to many other fixed-income instruments.  This enhanced yield is generated from: (1) the income generated by re-investment of principal in an income-generating asset, which the issuing trust passes on to the CLN investors; and (2) the credit protection payments that the issuing trust receives from its credit default swap counterparty, which the issuing trust also passes on to the CLN investors.  By adding this latter income stream to the income stream the underlying asset generates, the sponsoring bank – through the issuing trust – creates a security that offers yields superior to those normally available (*e.g.*, superior to direct investment in a Treasury bill).  This enhanced yield is the byproduct of, and balances, the enhanced risk transferred to CLN investors, *i.e.*, the risk of default of the linked credit(s).

**B.       The Basic Structure and Purpose of Synthetic CDOs**

104.    The Underlying Assets in which Morgan Stanley, through its subsidiaries, reinvested the capital raised by the Pinnacle Notes were bespoke, single-tranche Synthetic CDOs that were the product of concerted actions undertaken by the defendants (each in discrete, assigned and complementary roles).

105.    Synthetic CDOs share many basic features with Credit Linked Notes.  Synthetic CDOs feature:  (1) an issuing trust (the CDO), set up by a sponsoring bank, such as Morgan Stanley; (2) credit default swap contracts between the CDO issuing trust and the sponsoring bank; (3) the issuance of CDO notes to investors to fund the CDO's swap obligations; (4) the reinvestment of the funds raised by that issuance into a safe, liquid asset; and (5) the opportunity for enhanced yields to the CDO notes investors.

106.    Thus, like CLNs, Synthetic CDOs transfer the credit risk associated with certain reference entities from the sponsoring bank to investors.  The principal difference, as detailed below, is that CDOs are structured with a series of senior/subordinate "tranches" representing discrete slices of the aggregate credit risk of a portfolio of reference entities.

**1.       CDOs Are Based on a Portfolio of Assets**

107.    A CDO is based on a portfolio of assets.  This portfolio may consist of actual assets that the CDO purchases and holds (a "cash CDO"), or consist of a collection of credit default swaps that merely "reference" such assets synthetically (a "Synthetic CDO" further discussed below).

108.    For example, a $100 million cash CDO could be based on 10 bonds of $10 million each issued by 10 different investment grade corporations (*e.g*., IBM, Coca-Cola, General Electric, *etc*.).   To purchase these assets, the CDO issues notes *backed by those assets* to

investors.  The end result is that the purchasers of the CDO notes gain "exposure" to the CDO's asset portfolio.  In this manner, while the income generated by those assets is passed through the CDO structure to CDO noteholders, any impairment of those assets will create corresponding impairment to the CDO notes, and result in losses to the noteholders.

109.    A principle benefit of such CDO structure is diversification of risk.  In this sense, a CDO is much like a mutual fund, albeit one that invests in bonds rather than in stocks.

2.    **Synthetic CDOs "Reference" an Asset Portfolio "Synthetically" Through Credit Default Swaps**

110.    In a Synthetic CDO, exposure to a portfolio of corporate debt is achieved "synthetically" via credit default swaps, rather than by cash purchase of the actual assets. For example, where a $100 million cash CDO can raise $100 million from investors to purchase 10 bonds of $10 million each, a $100 million Synthetic CDO can achieve exposure to the same portfolio by entering into credit default swaps referencing a $10 million notional amount of the ten same bonds.

111.    Synthetic CDOs thus offer almost unlimited flexibility in the portfolio of credit risk on which they are based.  The Synthetic CDO can easily enter into credit default swaps referencing any notional amount (*e.g*., $10 million, $200 million) of any credits (one IBM bond, another IBM bond, the bonds issued by all Eastern European states, the bonds issued by every company whose name starts with the letter "C", *etc.*) at the stroke of a pen, whether or not any such bonds are available for purchase.  The reference entity portfolios that Morgan Stanley constructed for each of the Synthetic CDOs at issue here are displayed in Appendix B hereto.

3.  **Because Synthetic CDOs Are Based on Credit Default Swaps, They Feature Counterparties Who Take Opposing "Long" and "Short" Positions With Respect to the CDO's Risk Portfolio**

112.  Because Synthetic CDOs are based on credit default swaps, they feature counterparties who take opposing "long" and "short" positions on the CDO's risks.  In each case, the Synthetic CDO-issuing trust is "long" the risk:  it contracts with a counterparty through a credit default swap to provide credit protection with respect to the CDO's referenced portfolio. In exchange for credit protection payments provided to the CDO issuing trust by its counterparty, the trust agrees to "assume" the credit risks referenced by the credit default swaps and compensate the counterparty to the extent such risk materializes.

113.  The CDO issuing trust "funds" its potential counterparty obligations by raising principal through the sale of notes to investors.  By this means, the Synthetic CDO essentially transfers its "long" risk position to the investors who purchase the notes issued by the synthetic CDO issuing trust.  The principal paid by investors to purchase the CDO notes is at risk of impairment should the reference entities included in the CDO's portfolio default, triggering the CDO's obligations to pay its credit default swap counterparty with the investors' principal.

114.  This highlights a crucial feature of Synthetic CDOs: namely, that while the CDO investors, by definition, take the "long" position, there is a counterparty to the credit default swap underlying the CDO that has taken an opposite "short" position with respect to the risk presented in the CDO's reference portfolio.

4.  **CDO Tranches: Layering The Risk Profile**

115.  The single most important determinant of a CDO's risk is its tranching.

116.  CDOs issue multiple sets (or "tranches") of unequal notes representing senior/subordinate interests in the collateral portfolio.  The most junior of the tranches (often

called an "equity" or "first loss" tranche) stands first in line for any and all collateral portfolio losses.  Senior tranches are in turn protected from collateral portfolio losses by the sum total of the more junior tranches below them.  To compensate more junior tranche investors for the increased risk they bear, the CDO structure also functions as a prism redirecting the income generated by the CDO collateral portfolio so that more junior tranches are provisioned with higher yields and more senior tranches with lower yields.

117.    Collateral losses rise up the tranche structure from bottom to top.  For example, in a $100 million CDO, the most junior or equity tranche could be $5 million.  If collateral losses rise to $1 million, the $5 million equity tranche suffers $1 million, or 20%, principal impairment, even as more senior tranches remain untouched.  If collateral losses rise to $5 million, the $5 million equity tranche suffers 100% principal impairment, even as more senior tranches remain untouched.  If collateral losses rise above $5 million, the next most junior tranche begins to suffer principal impairment, *etc*.

118.    Each CDO tranche represents a concrete, discrete "slice" of the aggregate risk residing in the collateral portfolio.  In the above example, the $5 million equity tranche of the $100 million CDO represents the 0%-5% slice of aggregate collateral risk.  If the next most junior tranche is $2 million, that tranche would thus represent the 5%-7% risk slice: it would start experiencing principal impairment if collateral losses rose above $5 million (or 5% of the CDO's total portfolio) and would experience full principal impairment when aggregate collateral losses reached $7 million (or 7%).

5.      **CDO Tranche Risk Is Defined By Tranche Attachment Point, Tranche Detachment Point, and Tranche Thickness**

119.    The risk embodied in each CDO tranche is defined by three structural factors: (1) the tranche's "Attachment Point," which is the level of aggregate portfolio losses at which the tranche in question begins to suffer principal impairment (*e.g.*, 5%); (2) the tranche's "Detachment Point," which is the level of aggregate portfolio losses at which the tranche in question suffers total principal impairment (*e.g.*, 7%); and (3) the tranche's "Thickness," which is merely the difference between the tranche's Detachment Point and the Attachment Point (*e.g.*, 7%-5%, or 2%).

120.    Tranche thickness is a crucial element of CDO risk.  All other things being equal, a thinner tranche can suffer severe or total principal impairment quickly, upon even a small rise in aggregate portfolio losses, while a thicker tranche will suffer less severe principal impairment.

121.    Composition of the CDO's collateral portfolio and the structure of the CDO's tranching are of paramount importance in assessing CDO risk.  Riskier collateral will mean that aggregate portfolio losses will be greater.  The placement of any given tranche, closer to the bottom or farther from it, indicates the proximity of that tranche to collateral risk.  And the relative thickness or thinness of a given tranche indicates the speed/severity of potential principal impairment.

6.      **Bespoke Synthetic Single Tranche CDOs Issue a Single Tranche of Securities Representing One Specific Slice of Aggregate Portfolio Risk**

122.    Normally, a CDO creates and issues an array of tranches whose sum total equals the amount of the CDO's portfolio (*e.g.*, a $100 million CDO collateralized by $100 million of assets issues $100 million of tranched securities), so that the issued tranches cover the full spectrum of portfolio risk from 0% to 100%.  A bespoke single tranche CDO, however, issues

34

just one contrived tranche, representing one discrete slice of portfolio risk (*e.g.*, the 7%-10% tranche).

123.    Such bespoke synthetic single-tranche CDOs are infinitely malleable in portfolio composition and tranche structure: they can be based on a portfolio of whichever reference entities the parties to the transaction agree upon; and they can focus on a bespoke tranche of whatever relative location and size the parties to the transaction agree upon (for example, a 2%-12% tranche, or an 12%-13% tranche, or a 28%-32% tranche, *etc.*).  Graphic representations of the bespoke single tranches that Morgan Stanley constructed for each of the Synthetic CDOs at issue here, displaying their Attachment Points and Detachment Points, are provided in Appendix A hereto.

124.    Normally, sophisticated counterparties bargain over the precise reference entities to be included in the portfolio, as well as the tranche's location and size.

**7.    The Bottom Line on Bespoke Synthetic Single Tranche CDOs: A Bet Between Two Parties over a Precisely-Specified, Discrete Slice of Losses Potentially Generated in Portfolio of Reference Entities**

125.    In short, a bespoke single tranche Synthetic CDO is a bet between two parties over a defined risk: namely, a discrete slice of potential losses linked to an agreed-upon hypothetical portfolio of reference entities.  The CDO is "long" the risk (because it assumes that risk of loss via the credit default swap), and the CDO's credit default swap counterparty is "short" the risk (because it pays credit protection payments to transfer the risk to the CDO).

126.    There are three possible outcomes for any given Synthetic CDO tranche:

(a)    If aggregate portfolio losses remain below the tranche Attachment Point, the CDO owes nothing under the credit default swap to its counterparty.  Upon maturity, the

CDO liquidates its underlying asset, redeems its notes from investors and returns 100% of their principal.

(b)     Should aggregate portfolio losses rise above the tranche Attachment Point (and so long as such losses remain below the tranche Detachment Point), the CDO is required to make payments to its counterparty under the credit default swap.  These payments are made by liquidating part or all of the underlying asset (in which investors' principal had been reinvested), which necessarily impairs investors' principal.

(c)     Should aggregate portfolio losses rise to or exceed the tranche Detachment Point, the CDO's obligations (and assets) are extinguished.  The CDO, having liquidated its underlying asset and used all proceeds to make requisite payments to its credit default swap counterparty, has nothing left to return to its investors in its notes, who therefore suffer 100% principal loss.

## IV.
## THE PINNACLE NOTES, THE SYNTHETIC CDOs AND DEFENDANTS' FRAUDULENT SCHEME

### A.     Overview of the Pinnacle Notes

127.    In sum:

(a)     Between August 2006 and December 2007, Morgan Stanley created, and caused to be issued and sold to Plaintiffs and the Class seven separate Series of Pinnacle Notes (Series 1, 2, 3, 6, 7, 9, 10) totaling $138.7 million.  The Offering Documents for each Series of Pinnacle Notes consisted of a "Pricing Statement" specific to that Series of Pinnacle Notes and a shared Base Prospectus common to all Series of Pinnacle Notes.  Included in each Pricing Statement (at pp. ii-iii of each Pricing Statement) was a two page document purporting to be an

36

"extract from the Pricing Statement" and purporting to provide a "Summary of Terms" with respect to each Series of Pinnacle Notes (the "Brochures").

(b)      Each series of Pinnacle Notes was prominently linked to the creditworthiness of a basket of five to seven specific Nominal Reference Entities (the "FTD" basket) which, in all cases, were highly-rated sovereign nations and/or global corporations.  The Offering Documents prominently displayed these Nominal Reference Entities, and made clear that should any default or experience any other defined "Credit Event" Pinnacle Notes investors' principal would suffer substantial and/or total impairment.  In no case did any Nominal Reference Entities default or experience any other defined "Credit Event."

(c)      With respect to each Series of Pinnacle Notes, after Morgan Stanley determined the total amount to be sold and the total principal raised from Plaintiffs, Morgan Stanley created a bespoke single-tranche Synthetic CDO based on a notional portfolio of corporate credits, whose single tranche was sized to match the amount of Pinnacle Notes sold and the amount of principal raised.  In each case, Morgan Stanley caused Pinnacle to purchase as the Underlying Asset the entire Synthetic CDO tranche it had created.  In each case, Morgan Stanley had taken a short position with respect to the Synthetic CDO tranche, and had caused Pinnacle take the opposing long position by purchasing the notes issued by the CDO.  In each case, the tranche that Morgan Stanley constructed was quite "low," so that relatively few defaults within the portfolio would cause substantial or even total tranche impairment.  In each case, the tranche that Morgan Stanley constructed was extremely "thin," so that a marginal rise in aggregate portfolio defaults and losses would suffice to flip the tranche from 100% return of principal to 100% loss of principal.  In each case, Morgan Stanley seeded the notional portfolio, whose tranched risk the CDO captured, with companies particularly likely to default.  In each

case, should aggregate portfolio losses rise to the low level of the Synthetic CDO tranche, the principal value of the tranche would likely suffer substantial or total principal writedown.  Then, through the credit default swap mechanism on which the Synthetic CDOs were based, investors' principal would be swapped to the counterparty (*i.e*., Morgan Stanley).

(d)     Each of the single-tranche Synthetic CDO Underlying Assets that Morgan Stanley had created and had caused Pinnacle to invest in failed.  In each case, aggregate portfolio losses quickly rose to or exceeded the specific tranche.  Most or all of the principal invested in the notes issued by the CDO tranche was therefore swapped through the Synthetic CDO's underlying credit default swap to Morgan Stanley.  In each case, Morgan Stanley "unwound" the Pinnacle Notes transactions and sold off the Underlying Assets (the now-worthless notes issued by the Synthetic CDO) for at best pennies on the dollar, which were returned to Plaintiffs and the Class for 75%-100% principal losses.

**1.     Pinnacle Notes - Series 1**

128.   Basic, relevant operative details as to Series 1 of the Pinnacle Notes are as follows:

(a)     **Offering Date, Size, and Documents**.  On or about September 26, 2006, Morgan Stanley caused approximately $9.4 million of Pinnacle Series 1 Notes to be created, issued and sold to Plaintiffs, pursuant to the Pinnacle Base Prospectus and a Pinnacle Series 1 Pricing Statement dated August 7, 2006.

(b)     **Nominal Reference Entities**.  The seven Nominal Reference Entities Morgan Stanley assigned to the Pinnacle Series 1 Notes were the People's Republic of China, the Republic of Korea, the Kingdom of Thailand, Malaysia, Bank of China Limited, The Korea

Development Bank, and Petroliam Nasional Berhad (Petronas). None of these Nominal Reference Entities defaulted or experienced a defined Credit Event.

(c)     **Synthetic CDO Underlying Asset**. On or about September 25, 2006, as Plaintiffs and the Class' approximately $9.4 million investment in the Pinnacle Series 1 Notes was finalized, Morgan Stanley created a bespoke single-tranche Synthetic CDO named Morgan Stanley ACES SPC Series 2006-28 Class II, with that single tranche sized at approximately $9.4 million (the "Pinnacle Series 1 Synthetic CDO"). Morgan Stanley thereafter caused Pinnacle to reinvest the like sum of Plaintiffs and the Class' principal into that Synthetic CDO. Morgan Stanley ACES SPC Series 2006-28 was based on a portfolio of 100 reference entities (detailed in Appendix B hereto) chosen by Morgan Stanley, and Morgan Stanley constructed the single tranche in question to have an Attachment Point of 4.15%, a Detachment Point of 4.90%, and thus a tranche thickness of 0.75% (graphically demonstrated in Appendix A hereto). Morgan Stanley took the short side of the transaction, obtaining credit protection from the Synthetic CDO against the event that aggregate portfolio losses rise to 4.15%-4.90%. In the event defaults in the Synthetic CDO's referenced portfolio caused aggregate losses to rise to 4.15%, Plaintiffs and the Class' principal would begin to be transferred to Morgan Stanley, and should such aggregate losses rise to 4.90%, 100% of Plaintiffs and the Class' principal would be transferred to Morgan Stanley.

(d)     **The Failure of the Synthetic CDO Underlying Asset**. Shortly after Morgan Stanley created Morgan Stanley ACES SPC Series 2006-28, selecting the 100 companies to be referenced by the CDO and structuring the low, thin bespoke Class II tranche in question, the companies included in the CDO portfolio began to default. Seven defaults – including the three Icelandic banks Glitnir, Kaupthing, Landsbanki, as well Fannie Mae,

39

Freddie Mac, Idearc, and Syncora – caused aggregate portfolio losses to breach both the Attachment Point and the Detachment Point, resulting in the transfer of the $9.4 million invested in the Synthetic CDO (*i.e.*, the $9.4 million invested in the Pinnacle Series 1 Notes, which Morgan Stanley reinvested in the Pinnacle Series 1 Synthetic CDO) to Morgan Stanley.  Given the failure of the Synthetic CDO, which Morgan Stanley had chosen to serve as the Underlying Asset for the Pinnacle Series 1 Notes, Morgan Stanley declared a Mandatory Early Redemption with respect to the Pinnacle Series 1 Notes, unwinding the Pinnacle Series 1 transaction structure by attempting to sell off the Underlying Asset and return any proceeds (after fees) to Pinnacle Series 1 Notes investors.  As the Synthetic CDO notes were worthless, proceeds from their sale were *de minimis* and yielded no funds to be returned to Pinnacle Series 1 Notes investors. Pinnacle Series 1 Notes investors thus suffered a 100% principal loss.

        **2.**      **Pinnacle Notes - Series 2**

       129.    Basic, relevant operative details as to Series 2 of the Pinnacle Notes are as follows:

        (a)    **Offering Date, Size, and Documents**.  On or about November 21, 2006, Morgan Stanley caused approximately $16.9 million of Pinnacle Series 2 Notes to be created, issued and sold to Plaintiffs, pursuant to the Pinnacle Base Prospectus and a Pinnacle Series 2 Pricing Statement dated October 6, 2006.

        (b)    **Nominal Reference Entities**.  The seven Nominal Reference Entities Morgan Stanley assigned to the Pinnacle Series 2 Notes were the People's Republic of China, the Republic of Korea, Malaysia, Bank of China Limited, The Korea Development Bank, Malayan Banking Berhad, and DBS Bank Limited.  None of these Nominal Reference Entities defaulted or experienced a defined Credit Event.

(c)    **Synthetic CDO Underlying Asset**. On or about November 20, 2006, as Plaintiffs and the Class' approximately $16.9 million investment in the Pinnacle Series 2 Notes was finalized, Morgan Stanley created a bespoke single-tranche Synthetic CDO named Morgan Stanley ACES SPC Series 2006-32, with a single Class II tranche sized at approximately $16.9 million (the "Pinnacle Series 2 Synthetic CDO").  Morgan Stanley thereafter caused Pinnacle to invest the like sum of Plaintiffs and the Class' principal into the Synthetic CDO.  Morgan Stanley ACES SPC Series 2006-32 was based on a portfolio of 100 reference entities (detailed in Appendix B hereto) chosen by Morgan Stanley, and Morgan Stanley constructed the Class II tranche in question to have an Attachment Point of 4.30%, a Detachment Point of 5.05%, and thus a tranche thickness of 0.75% (graphically demonstrated in Appendix A hereto).  Morgan Stanley took the short side of the transaction, obtaining credit protection from the Synthetic CDO against the event that aggregate portfolio losses rise to 4.30%-5.05%.  In the event defaults in the Synthetic CDO's referenced portfolio caused aggregate losses to rise to 4.30%, Plaintiffs and the Class' principal would begin to be transferred to Morgan Stanley, and should such aggregate losses rise to 5.05%, 100% of Plaintiffs and the Class' principal would be transferred to Morgan Stanley.

(d)    **The Failure of the Synthetic CDO Underlying Asset**.  Shortly after Morgan Stanley created Morgan Stanley ACES SPC Series 2006-32, selecting the 100 companies to be referenced by the CDO and structuring the low, thin bespoke tranche in question, the companies included in the CDO portfolio began to default.  Seven defaults – including two of the three Icelandic banks (Kaupthing, Landsbanki), as well as Fannie Mae, Freddie Mac, Syncora Guarantee, Thomson, and Ambac – have caused aggregate portfolio losses to climb to above the 4.30% Attachment Point and have triggered a redemption event.  Consequently,

41

Morgan Stanley notified distributors of the Pinnacle Series 2 Notes that approximately $4.3 million of the original $16.9 million investment would be returned the investors.

### 3.    Pinnacle Notes - Series 3

130.    Basic, relevant operative details as to Series 3 of the Pinnacle Notes are as follows:

(a)    **Offering Date, Size, and Documents**.  On or about February 16, 2007, Morgan Stanley caused approximately $24.6 million of Pinnacle Series 3 Notes to be created, issued and sold to Plaintiffs and the Class, pursuant to the Pinnacle Base Prospectus and a Pinnacle Series 3 Pricing Statement dated January 9, 2007.

(b)    **Nominal Reference Entities**.  The seven Nominal Reference Entities Morgan Stanley assigned to the Pinnacle Series 3 Notes were Standard Chartered Bank, HSBC Bank plc, Bank of China Limited, The Korea Development Bank, Malayan Banking Berhad, DBS Bank Limited, and United Overseas Bank Ltd.  None of these Nominal Reference Entities defaulted or experienced a defined Credit Event.

(c)    **Synthetic CDO Underlying Asset**. On or about February 15, 2007, as Plaintiffs and the Class' approximately $24.6 million investment in the Pinnacle Series 3 Notes was finalized, Morgan Stanley created a bespoke single-tranche Synthetic CDO named Morgan Stanley ACES SPC Series 2007-5, with that single tranche sized at approximately $24.6 million (the "Pinnacle Series 3 Synthetic CDO").  Morgan Stanley thereafter caused Pinnacle to invest the like sum of Plaintiffs and the Class' principal into that Synthetic CDO.  Morgan Stanley ACES SPC Series 2007-5 was based on a portfolio of 121 reference entities (detailed in Appendix B hereto) chosen by Morgan Stanley, and Morgan Stanley constructed the single tranche in question to have an Attachment Point of 6.20%, a Detachment Point of 6.95%, and

thus a tranche thickness of 0.75% (graphically demonstrated in Appendix A hereto).  Morgan Stanley took the short side of the transaction, obtaining credit protection from the Synthetic CDO against the event that aggregate portfolio losses rise to 6.20%-6.95%.  Should defaults in the Synthetic CDO's referenced portfolio cause aggregate losses to rise to 6.20%, Plaintiffs and the Class' principal would begin to be transferred to Morgan Stanley, and should such aggregate losses rise to 6.95%, 100% of Plaintiffs and the Class' principal would be transferred to Morgan Stanley.

(d)     **The Failure of the Synthetic CDO Underlying Asset**.  Shortly after Morgan Stanley created Morgan Stanley ACES SPC Series 2007-5, selecting the 121 companies to be referenced by the CDO and structuring the low, thin bespoke single tranche in question, the companies included in the CDO portfolio began to default.  Eleven defaults – including the three Icelandic banks Glitnir, Kaupthing, Landsbanki, as well as Fannie Mae, Freddie Mac, Syncora Guarantee, CIT Group, Thomson, Bowater, Abitibi, and Chemtura – caused aggregate portfolio losses to breach the Attachment Point and near the Detachment Point, resulting in the transfer of most of the $24.6 million invested in the Synthetic CDO (*i.e.*, Plaintiffs and the Class' $24.6 million invested in the Pinnacle Series 3 Notes, which Morgan Stanley reinvested into the Pinnacle Series 3 Synthetic CDO).  Given the impending total failure of the Synthetic CDO, which Morgan Stanley had chosen to serve as the Underlying Asset for the Pinnacle Series 3 Notes, Morgan Stanley declared a Mandatory Early Redemption with respect to the Pinnacle Series 3 Notes, unwinding the Pinnacle Series 3 transaction structure by attempting to sell off the Underlying Asset and return any proceeds (after fees) to Pinnacle Series 3 Notes investors.  As the Synthetic CDO was all but worthless, proceeds from its sale were *de minimis* and yielded

only a 3% return on principal to Pinnacle Series 3 Notes investors.  Pinnacle Series 3 Notes investors thus suffered a 97% principal loss.

       **4.**       **Pinnacle Notes - Series 6 and Series 7**

     131.    Basic, relevant operative details as to Series 6 and Series 7 of the Pinnacle Notes are as follows:

       (a)     **Offering Date, Size, and Documents**.  On or about July 6, 2007, Morgan Stanley caused approximately $69.9 million of Pinnacle Series 6 Notes and Pinnacle Series 7 Notes to be created, issued and sold to Plaintiffs and the Class, pursuant to the Pinnacle Base Prospectus and a Pinnacle Series 6/7 Pricing Statement dated May 16, 2007.

       (b)     **Nominal Reference Entities**.  The six Nominal Reference Entities Morgan Stanley assigned to the Pinnacle Series 6 Notes and Pinnacle Series 7 Notes were Bank of America Corporation, Citigroup Inc, DBS Bank Ltd., Singapore Telecommunications Limited, Oversea-Chinese Banking Corporation Limited, and United Overseas Bank Limited.  None of these Nominal Reference Entities defaulted or experienced a defined Credit Event.

       (c)     **Synthetic CDO Underlying Asset**. On or about July 5, 2007, as Plaintiffs and the Class' approximately $69.9 million investments in the Pinnacle Series 6 Notes and Pinnacle Series 7 Notes were finalized, Morgan Stanley created a bespoke single-tranche Synthetic CDO named Morgan Stanley ACES SPC Series 2007-26, with that single tranche sized at approximately $69.9 million (the "Pinnacle Series 6/7 Synthetic CDO").  Morgan Stanley thereafter caused Pinnacle to invest the like sum of Plaintiffs and the Class' principal into that Synthetic CDO.  Morgan Stanley ACES SPC Series 2007-26 was based on a portfolio of 125 reference entities (detailed in Appendix B hereto) Morgan Stanley selected, and Morgan Stanley constructed the single tranche in question to have an Attachment Point of 4.60%, a Detachment

44

Point of 5.35%, and thus a tranche thickness of 0.75% (graphically demonstrated in Appendix A hereto).  Morgan Stanley took the short side of the transaction, obtaining credit protection from the Synthetic CDO against the event that aggregate portfolio losses rise to 4.60%-5.35%.  In the event defaults in the Synthetic CDO's referenced portfolio caused aggregate losses to rise to 4.60%, Plaintiffs' and the Class' principal would begin to be transferred to Morgan Stanley, and should such aggregate losses rise to 5.35%, 100% of Plaintiffs' and the Class' principal would be transferred to Morgan Stanley.

(d) **The Failure of the Synthetic CDO Underlying Asset**.  Shortly after Morgan Stanley created Morgan Stanley ACES SPC Series 2007-26, selecting the 125 companies to be referenced by the CDO and structuring the low, thin bespoke single tranche in question, the companies included in the CDO portfolio began to default.  Ten defaults – including two of the three Icelandic banks (Glitnir, Kaupthing), as well as Fannie Mae, Freddie Mac, Syncora Guarantee, Lehman Brothers Holdings, Inc., Washington Mutual, Inc., CIT Group, Ambac Assurance Corp., and AIFUL Corp. – caused aggregate portfolio losses to breach the Attachment Point and near the Detachment Point, resulting in the transfer of most of the $69.9 million invested in the Synthetic CDO (*i.e.*, Plaintiffs and the Class' $69.9 million invested in the Pinnacle Series 6 Notes and the Pinnacle Series Notes, which Morgan Stanley reinvested into the Pinnacle Series 6/7 Synthetic CDO) to Morgan Stanley.  Given the impending total failure of the Synthetic CDO, which Morgan Stanley had chosen to serve as the Underlying Asset for the Pinnacle Series 6 Notes and Pinnacle Series 7 Notes, Morgan Stanley declared a Mandatory Early Redemption with respect to the Pinnacle Series 6 Notes and Pinnacle Series 7 Notes, unwinding the transaction structures by attempting to sell off the Underlying Asset and return any proceeds (after fees) to Pinnacle Series 6 Notes and Pinnacle Series 7 Notes investors.  As

45

the Synthetic CDO was all but worthless, proceeds from its sale were *de minimis* and sufficed to return only 3% of principal to investors in Pinnacle Series 6 Notes and Pinnacle Series 7 Notes. Pinnacle Series 6 Notes investors and Pinnacle Series 7 Notes investors thus suffered a 97% principal loss.

        **5.**        **Pinnacle Notes - Series 9 and Series 10**

     132.    Basic, relevant operative details as to Series 9 and Series 10 of the Pinnacle Notes are as follows:

        (a)     **Offering Date, Size, and Documents**.  On or about December 14, 2007, Morgan Stanley caused approximately $17.9 million of Pinnacle Series 9 Notes and Pinnacle Series 10 Notes to be created, issued and sold to Plaintiffs and the Class, pursuant to the Pinnacle Base Prospectus (and Supplementary Base Prospectuses dated April 24, 2007 and August 13, 2007) and a Pinnacle Series 9/10 Pricing Statement dated October 25, 2007.

        (b)     **Nominal Reference Entities**.  The five Nominal Reference Entities Morgan Stanley assigned to the Pinnacle Series 9 Notes and Pinnacle Series 10 Notes were the Commonwealth of Australia, the Hong Kong Special Administrative Region of the People's Republic of China, the Republic of Singapore, Singapore Telecommunications Limited, and Temasek Holdings (Private) Limited.  None of these Nominal Reference Entities defaulted or experienced a defined Credit Event.

        (c)     **Synthetic CDO Underlying Asset**. On or about December 13, 2007, as Plaintiffs and the Class' approximately $17.9 million investments in the Pinnacle Series 9 Notes and Pinnacle Series 10 Notes were finalized, Morgan Stanley created a bespoke single-tranche Synthetic CDO named Morgan Stanley ACES SPC Series 2007-41, with that single tranche sized at approximately $17.9 million (the "Pinnacle Series 9/10 Synthetic CDO").  Morgan Stanley

thereafter caused Pinnacle to invest Plaintiffs' and the Class' principal into that Synthetic CDO. Morgan Stanley ACES SPC Series 2007-41 was based on a portfolio of 100 reference entities (detailed in Appendix B hereto) chosen by Morgan Stanley, and Morgan Stanley constructed the single tranche in question to have an Attachment Point of 2.67%, a Detachment Point of 3.67%, and thus a tranche thickness of 1.00% (graphically demonstrated in Appendix A hereto). Morgan Stanley took the short side of the transaction, obtaining credit protection from the Synthetic CDO against the event that aggregate portfolio losses rise to 2.67%-3.67%.  In the event defaults in the Synthetic CDO's referenced portfolio caused aggregate losses to rise to 2.67%, Plaintiffs and the Class' principal would begin to be transferred to Morgan Stanley, and should such aggregate losses rise to 3.67%, 100% of Plaintiffs and the Class' principal would be transferred to Morgan Stanley.

(d)   **The Failure of the Synthetic CDO Underlying Asset**.  Shortly after Morgan Stanley created Morgan Stanley ACES SPC Series 2007-41, selecting the 100 companies to be referenced by the CDO and structuring the low, thin bespoke single tranche in question, the companies included in the CDO portfolio began to default.  Five defaults – including two of the three Icelandic banks (Kaupthing, Landsbanki), as well as Fannie Mae, Freddie Mac, and Lehman Brothers Holdings, Inc. – caused aggregate portfolio losses to breach the Attachment Point and near or exceed the Detachment Point, resulting in the transfer of most of the $17.9 million invested in the Synthetic CDO (*i.e.*, Plaintiffs' and the Class' $17.9 million invested in the Pinnacle Series 9 Notes and Pinnacle Series 10 Notes, which Morgan Stanley reinvested into the Pinnacle Series 9/10 Synthetic CDO) to Morgan Stanley.   Given the impending total failure of the Synthetic CDO, which Morgan Stanley had chosen to serve as the Underlying Asset for the Pinnacle Series 9 Notes and Pinnacle Series 10 Notes, Morgan Stanley

47

declared a Mandatory Early Redemption with respect to the Pinnacle Series 9  Notes and Pinnacle Series 10 Notes, unwinding the transaction structures by attempting to sell off the Underlying Asset and return any proceeds (after fees) to Pinnacle Series 9 Notes and Pinnacle Series 10 Notes investors.  As the Synthetic CDO was worthless, proceeds from its sale were *de minimis* and (after fees) did not suffice to return a single dollar of principal to investors in Pinnacle Series 9 Notes and Pinnacle Series 10 Notes.  Pinnacle Series 9 Notes investors and Pinnacle Series 10 Notes investors thus suffered a 100% principal loss.

**B.      Morgan Stanley's Pinnacle Notes Scheme**

**1.      The Pinnacle Notes Appeared to Be Typical CLNs**

133.    The Pinnacle Notes' Offering Documents described each Series of the Pinnacle Notes to be CLNs and the Pinnacle Notes appeared on their face to be typical CLNs of the sort described above.

134.    Morgan Stanley set up an issuing trust, the Pinnacle SPV.  With respect to each Series of Pinnacle Notes, Morgan Stanley caused Pinnacle to enter into a credit default swap transaction with Morgan Stanley's credit-derivative subsidiary MS Capital, referencing a discrete basket of five to seven highly-rated sovereign nations and/or global corporations (i.e., the Nominal Reference Entities).  Pursuant to this credit default swap, Pinnacle received regular credit protection payments from its counterparty MS Capital, in exchange for which it assumed the credit risk presented by the basket of linked Nominal Reference Entities.

135.    To fund Pinnacle's potential credit default swap obligation to its counterparty MS Capital in the event of a Nominal Reference Entity default, Morgan Stanley created and caused Pinnacle to issue CLNs – the Pinnacle Notes – sold to investors.  Plaintiffs and the Class' investment in the Pinnacle Notes was the source of Pinnacle's contingent counterparty payment

to MS Capital should a Nominal Reference Entity default.  In this manner, Morgan Stanley passed the credit risk posed by the basket of Nominal Reference Entities through Pinnacle to the Pinnacle Note investors, *i.e.*, Plaintiffs and the Class.

136.    Thus, the facial risk of the Pinnacle Notes was exactly of the sort typical to CLNs: the risk that the linked credits – here, the Nominal Reference Entities – would default.  Should any of the Nominal Reference Entities default, Pinnacle would use investor principal as the source of funds to make its credit default swap counterparty whole.

**2.      The Pinnacle Notes Appeared to Be *Conservative* Credit Linked Notes, With Virtually Non-Existent Principal Risk Given the Safe Nominal Reference Entities to Which They Were Credit-Linked**

137.    The Pinnacle Notes, on their face, were not risky high-yield investments, but conservative investments offering slightly enhanced yields due to the marginal increase in risk that Pinnacle Notes investors assumed in the form of Nominal Reference Entity default.

138.    In exchange for assuming the facial risk of Nominal Reference Entity default, Pinnacle Note investors received *slightly* enhanced yields.  Because the Nominal Reference Entities were highly-rated sovereign nations and global corporations at quite remote risk of default, the credit protection payments required to transfer their credit risk were relatively small (because the risk on which they were based was small).  These credit protection payments, as passed on to Pinnacle Note investors (together with income generated from re-investment of principal in an Underlying Asset), sufficed to enhance the yields Pinnacle offered only slightly above prevailing rates on then-available, conventional fixed-income investments.

139.    In short, given the remote risks of the Nominal Reference Entities, the Pinnacle Notes appeared to be a relatively conservative investment, offering slightly enhanced yield, where investor principal would only be at risk in the event of Nominal Reference Entity default.

**3.    The Pinnacle Notes Were the Deceptive "Bait" Employed By Morgan Stanley to Secure Control Over Investor Principal For Morgan Stanley's Use and Benefit in the Wider Pinnacle Transactions Scheme**

140.    If the Pinnacle Notes were the conservative CLNs they purported to be, the Plaintiffs and the Class' principal would have been re-invested in a safe and liquid underlying asset during the pendency of the Pinnacle Notes and Pinnacle's credit default swap obligations.

141.    Reinvestment of the investors' principal in a safe and liquid underlying asset is customary to CLNs, because it serves the interests of both parties.  From the perspective of the Pinnacle Note investors, it would safeguard their principal for full return in the case that no Nominal Reference Entities defaulted.  From the perspective of Pinnacle's counterparty MS Capital, it would safeguard Pinnacle's ability to provide the credit protection for the Nominal Reference Entities that MS Capital ostensibly contracted for through the credit default swap.

142.    Nonetheless, as detailed at ¶¶ 153-278, *infra*, Morgan Stanley through its wholly-owned subsidiary, MS International, reinvested Pinnacle Note investors' principal into the Synthetic CDOs – created by Morgan Stanley through its subsidiaries – that were neither conservative nor liquid, but were structured to intensify the risk of loss.

143.    Morgan Stanley was not concerned with imperiling the Pinnacle Notes investors' principal – even though that was the source of funds protecting MS Capital in the event of the Nominal Reference Entities' default – for three reasons.  First, the risk of the Nominal Reference Entities defaulting was remote, because they were all highly-rated corporations or sovereign nations.  Second, because the CDOs were structured to be as risky as possible, they yielded a greater spread, which, unbeknownst to investors, Morgan Stanley siphoned off as profit.  Third, Morgan Stanley stood to gain in the event the CDOs failed because it was the short counterparty to the CDS underlying the CDOs.

50

4.      **Morgan Stanley Structured the Synthetic CDOs to Transfer the Plaintiffs and the Class' Investment in the Pinnacle Notes to Morgan Stanley**

144.     The common goal and result of Morgan Stanley's Pinnacle scheme was to increase the risk of the CDOs to maximize its profit at the front end of the transaction, with such risk ultimately resulting in the dollar-for-dollar transfer of the Plaintiffs and the Class' $138.7 million investment in Pinnacle to Morgan Stanley's coffers.

145.     Pursuant to the Pinnacle Notes Offering Documents, the principal raised from the sale of the Pinnacle Notes was to be reinvested in Underlying Assets by MS International, which was designated as the "Determination Agent."  As Determination Agent, MS International had sole authority to select the Underlying Assets.  At Morgan Stanley's direction and pursuant to their common scheme, MS International reinvested Plaintiffs and the Class' $138.7 million investment in the Pinnacle Notes into the Synthetic CDOs custom built by Morgan Stanley.

146.     In structuring the Synthetic CDOs, Morgan Stanley profited by increasing their risk.  Specifically, as with all fixed income instruments, the riskier the CDO tranche at issue, the greater the spread (or coupon) it generated.  Morgan Stanley secretly structured the Synthetic CDOs to be as risky as possible, within the confines of the required AA rating, in order to boost their spread.  Then, instead of passing that excess spread to investors to compensate them for the increased risk, Morgan Stanley siphoned off the spread as profit.

147.     Additionally, at the heart of the Synthetic CDOs was a credit default swap agreement between the CDO issuing trust and MS Capital.  The CDO issuing trust, and ultimately the purchasers of the notes issued by the Synthetic CDOs, were "long" the tranche of risk embodied in the reference portfolio Morgan Stanley had chosen.  Morgan Stanley, however, through MS Capital, was "short" the risk.

148.    If the tranche of the reference portfolio associated with the Synthetic CDOs became impaired, the money raised by the sale of the CDO notes (*i.e.*, the money the Plaintiffs and the Class invested in the Pinnacle Notes) would be paid to MS Capital pursuant to the credit default swap.

149.    Thus, because MS International reinvested the Pinnacle Notes investors' principal in the notes issued by the Synthetic CDOs, the Pinnacle investors held the long position in those CDOs.  Unknown to the Pinnacle investors at the time of their investment, the counterparty to the Synthetic CDO, and therefore the party holding the corresponding "short" position, was MS Capital.  Accordingly, in the event the Synthetic CDOs Morgan Stanley created, and into which it invested Plaintiffs' money, experienced default-related impairment, every dollar lost by Plaintiffs and the Class was transferred to and gained by MS Capital.

150.    The Synthetic CDOs did, in fact, experience impairment, resulting in the transfer of Plaintiffs and the Class' investment in the Pinnacle Notes to Morgan Stanley.

151.    Thus, Morgan Stanley *wanted* the Pinnacle Notes investors to lose their capital. And Morgan Stanley achieved this end through blatant, but undisclosed self-dealing, and by investing the  unsuspecting Plaintiffs' and the Class' funds in the Synthetic CDOs, rigged by Morgan Stanley to be so fundamentally unsound that their failure, and the transfer of Plaintiffs' and the Class' fund to Morgan Stanley, was preordained.

152.    Morgan Stanley's methodology in building the Synthetic CDOs (i) to receive the Pinnacle Notes investors' funds, (ii) to intensify the risk in order to profit from the excess spread at Plaintiffs' expense, and (iii) to fail, is explained in the following section.  *See* Section IV.B.5, *infra*.

5.    **Morgan Stanley Custom-Built the Synthetic CDOs to Receive the Pinnacle Notes Investors' Money, to Intensify the Risk of Loss, and to Fail**

153.    As described in Section IV.B.5.a, *infra*, Morgan Stanley created the Synthetic CDOs for only one specific purpose: to receive the principal raised through Morgan Stanley's issuance and sale of the Pinnacle Notes.

154.    As discussed in Section IV.B.5.b, *infra*, Morgan Stanley had complete and sole control over the composition and structure of the Synthetic CDOs.  Plaintiffs and the Class had no input, and were, at the time of their investment in Pinnacle, unaware (because Morgan Stanley did not disclose) that Morgan Stanley had already created the Underlying Asset into which it was going to reinvest their money.

155.    As discussed in Section IV.B.5.c, *infra*, Morgan Stanley structured the CDOs to be as risky as possible within the required AA rating, in order to siphon off their increased spread as profit.  In this connection, Morgan Stanley: (i) engaged in ratings shopping in selecting Fitch as ratings agency; (ii) tinkered with the tranche structure in order to achieve the maximum spread that would pass Fitch's ratings methodology; (iii) manipulated the CDO portfolios to include higher-risk credits, including credits with below-investment grade credit ratings, credits that were on negative ratings watch by S&P and/or Moody's but not Fitch, and credits that were leveraged buy-out candidates; and (iv) repeatedly dispensed with its own internal collateral selection criteria in order to approve riskier (and, for Morgan Stanley, more profitable) CDOs.

156.    As detailed in Sections IV.B.5.d.i-ii, *infra*, in addition to structuring the CDOs to increase their risk and thereby increase Morgan Stanley's front end profit, Morgan Stanley also structured the Synthetic CDOs to ultimately fail in at least three ways.  First, Morgan Stanley constructed CDO collateral portfolios seeded with highly correlated reference entities susceptible

to default in the event of a downturn in the housing or financial markets.  Second, Morgan Stanley structured the Synthetic CDOs bespoke single tranches to be very low (*i.e.*, with a low Attachment Point), thus exposing those tranches to principal impairment upon a relatively small amount of aggregate portfolio losses.  Third, Morgan Stanley structured the Synthetic CDOs' bespoke single tranches to be extremely thin, so that a very small rise in aggregate portfolio losses would suffice to cause 100% impairment of tranche principal.

157.    As further explained in Section IV.B.5.d.iii, *infra*, the peculiar structure of the Synthetic CDOs not only reveals their purpose, but is evidence of the Defendants' fraudulent intent.

     **a.**  **Morgan Stanley Created the Synthetic CDOs for the Specific Purpose of Receiving the Principal Raised Through Morgan Stanley s Creation of the Pinnacle Notes**

158.    The following financial, logistical, and chronological details evidence that Morgan Stanley created and custom-tailored the Synthetic CDOs for the specific purpose of receiving the principal raised from each Series of Pinnacle Notes.  These details further evidence that this had been Morgan Stanley's undisclosed plan since the conception of the Pinnacle Notes.

159.    First, as the table below demonstrates, the dollar size of the single bespoke tranche of each of the Synthetic CDOs matched, *exactly*, the amount of funds raised through the creation, issuance, and sale of each series of Pinnacle Notes.

**Table 1**
**The Matching Issuance Amounts of Pinnacle Notes and Synthetic CDO Notes**

| Pinnacle Notes Series | Dollar Amount of Pinnacle Notes Issued | Synthetic CDO Underlying Asset | Dollar Amount of Single Bespoke Tranche CDO Notes Issued |
|---|---|---|---|
| Series 1 | $9.4 million | Morgan Stanley ACES SPC Series 2006-28, Class II | $9.4 million |
| Series 2 | $16.9 million | Morgan Stanley ACES SPC Series 2006-32, Class II | $16.9 million |
| Series 3 | $24.6 million | Morgan Stanley ACES SPC Series 2007-5 | $24.6 million |
| Series 6 and 7 | $69.9 million | Morgan Stanley ACES SPC Series 2007-26 | $69.9 million |
| Series 9 and 10 | $17.9 million | Morgan Stanley ACES SPC Series 2007-41 | $17.9 million |

160.    Second, chronological and logistical details demonstrate how Morgan Stanley created each Synthetic CDO (1) after the sales and marketing process had allowed Morgan Stanley to determine the precise amount of funds raised from each Series of Pinnacle Notes, (2) in conjunction with the creation and sale of each series of the Pinnacle Notes.

161.    Each Series of Pinnacle Notes was marketed and sold during an "Offer Period" of approximately one month, which allowed Morgan Stanley to determine total investor subscriptions for each Series of Pinnacle Notes. Approximately two weeks after the Offer Period ended, Morgan Stanley caused a sum of Pinnacle Notes matching total investor subscriptions to

55

be created and officially issued on an "Issue Date" that Morgan Stanley designated.  *One day prior to the Issue Date for each Series of Pinnacle Notes, Morgan Stanley issued the matching Synthetic CDOs* (with single tranche sizes exactly matching the amount of funds raised from each Series of Pinnacle Notes).  The financial, chronological, and logistical details provided in the chart below show that the Pinnacle Notes and the Synthetic CDOs were an  integrated and coordinated scheme:

**Table 2**
**Chronological and Logistical Coordination**
**of the Pinnacle Notes and the Synthetic CDOs**

| Pinnacle Notes Series | Pinnacle Notes Offer Period | Pinnacle Notes Issue Date | Underlying Synthetic CDO | Synthetic CDO Issue Date |
|---|---|---|---|---|
| Series 1 | 8/7/2006 - 9/15/2006 | 9/26/2006 | Morgan Stanley ACES SPC Series 2006-28, Class II | 9/25/2006 |
| Series 2 | 10/9/2006 - 11/3/2006 | 11/21/2006 | Morgan Stanley ACES SPC Series 2006-32, Class II | 11/20/2006 |
| Series 3 | 1/10/2007 - 2/8/2007 | 2/16/2007 | Morgan Stanley ACES SPC Series 2007-5 | 2/15/2007 |
| Series 6 and 7 | 5/18/2007 - 6/22/2007 | 7/6/2007 | Morgan Stanley ACES SPC Series 2007-26 | 7/5/2007 |
| Series 9 and 10 | 10/29/2007 - 11/30/2007 | 12/14/2007 | Morgan Stanley ACES SPC Series 2007-41 | 12/13/2007 |

162.    In each case, the Synthetic CDO tranches were sold to one and only one investor (Pinnacle), not only because they had been explicitly created for purchase by that investor, but

56

also because there was no general investor interest for those bespoke Synthetic CDO tranches. In these Synthetic CDOs, Morgan Stanley created and issued only so many Synthetic CDO tranche notes as Morgan Stanley knew it could sell to captive investors, such as Pinnacle, whose investment decisions Morgan Stanley controlled.

<blockquote><b>b.    Morgan Stanley Had Full Control Over Portfolio Construction, and Plaintiffs and the Class Were Excluded from Any Input</b></blockquote>

163.    Full and exact lists of the reference entities in each of the Synthetic CDOs' reference entity portfolios are provided in Appendix B hereto.

164.    Normally, in legitimate synthetic CDO transactions involving truly independent parties, the reference portfolio contents are subject to, and the result of, negotiation between the parties, each of whom has direct interest in the portfolio's risks.

165.    Here, Morgan Stanley alone determined the portfolio of reference entities on which each Synthetic CDO's tranche risk rested.  The initial counterparties to the underlying credit default swap agreement that purportedly agreed to contract over each risk portfolio – namely (1) the Synthetic CDO issuing trust, and (2) MS Capital – as well as MS International, the "Determination Agent" that reinvested the Pinnacle Investor's principal into the Synthetic CDOs, acted in league with and were both controlled by and alter-egos of Morgan Stanley.

166.    The Synthetic CDO issuing trust was a "brain dead" SPV, without employees or management, that Morgan Stanley established solely to enter into derivative transactions with MS Capital and issue related collateralized notes.  MS Capital was merely the face Morgan Stanley presented to the world when dealing in over-the-counter derivatives such as credit default swaps.

167.    Morgan Stanley intended that Plaintiffs and the Class, whose principal Morgan Stanley reinvested in the Synthetic CDOs, would be the sole buyers of these Synthetic CDOs. Each Synthetic CDO was created in conjunction with each Series of Pinnacle Notes, and custom-tailored by Morgan Stanley to produce a single tranche in an amount matching the funds raised from each Series of Pinnacle Notes.  Plaintiffs and the Class had no input into, and were not offered the chance to have any input into, the Synthetic CDOs' reference entity portfolios.

168.    Indeed, at the time of Plaintiffs' investment in the Pinnacle Notes, Morgan Stanley had not disclosed, and Plaintiffs were unaware, that Morgan Stanley had already created the Synthetic CDOs, and that it had already decided that Plaintiffs' funds would be reinvested into those specific Synthetic CDOs.

**c.      Morgan Stanley Structured the MS ACES CDOs to Intensify the Risk of Loss**

169.    The cost of obtaining credit protection on a single name CDS or the tranche of a Synthetic CDO is measured in basis points (each basis point equaling $1/100^{th}$ of 1%, so that 100 basis points equals 1%), and is typically known as the "spread."

170.    In simplest terms, the riskier a Synthetic CDO tranche is, the greater the spread is and therefore, the more costly it is to purchase credit protection on that tranche.  Stated another way, the larger the spread corresponding to a Synthetic CDO tranche the larger the credit protection payments owed to the long counterparty for assuming the increased risk.

171.    The spread on a CLN is traditionally a function of two components: the spread generated from the CLN reference entities, and the spread generated by the Underlying Asset. Typically, the primary component is the spread attributable to the CLN reference entities, *i.e.*, the reference entities to which the CLN is credit-linked.  In the case of the Pinnacle Notes, the

CLN reference entities for each Series comprised what was referred to as the FTD basket. The spread generated by the Underlying Assets is typically substantially smaller and therefore contributes to the CLN spread to a much lesser extent.

172.   With respect to the Pinnacle Notes, Morgan Stanley itself and through its co-Defendants and other affiliates, turned this typical arrangement on its head, and made the least transparent aspect of the Pinnacle Notes transaction – *i.e.*, the MS ACES CDO tranches it structured and selected as the Underlying Assets for the Pinnacle Notes Series – the primary driver of credit risk. Morgan Stanley was able to do this because it: (i) wielded control over the selection, and indeed the creation, of the Underlying Assets; and (ii) did not make available any specific information regarding the structure and origin of the Underlying Assets *until after* the investors had committed to purchase the Pinnacle Notes.

173.   In this manner, for each Series of Pinnacle Notes, the MS ACES CDO that Morgan Stanley structured and selected as the Underlying Asset yielded a spread at least twice as great as the FTD basket for that Series. In fact, for most of the Pinnacle Notes Series, the spread from the MS ACES CDO was many multiples greater than the spread generated by the FTD Basket. For example, in the case of Pinnacle Series 9 and 10, the spread from the MS ACES CDO was over 400 basis points while Morgan Stanley indicated that the spread for the FTD Basket was essentially 0 basis points.

174.   Thus, unbeknownst to investors, the FTD Basket of the Pinnacle Notes Series – which enticed investors with reference entities comprised of sovereign nations and highly-rated corporations – was not the primary risk consideration, as was typical and customary. Instead, the primary risk stemmed from the Underlying Assets, which traditionally were far more secure and constituted only a secondary risk.

175.    Defendants did this to siphon off the excess spread they created by making the MS ACES CDOs riskier as profit.  Indeed, in numerous correspondences, Defendants' personnel noted that they needed to increase the riskiness of the Underlying Asset in order to increase their profit, referred to as "PnL."

176.    As explained by one of Morgan Stanley's senior members of its Structured Credit Products Group ("SCP") in an August 3, 2006 email, at the time Morgan Stanley was creating the MS ACES CDO for the first Series of Pinnacle Notes, Defendants could increase the risk of the CDO, and therefore their profit, by: (i) lowering the Attachment Points; (ii) lowering the coupon to investors; and/or (iii) selecting riskier reference entities with wider spreads for the CDO portfolio.  In fact, Morgan Stanley subsequently employed all three strategies to boost its profits on this and the following Pinnacle Notes Series at the Pinnacle Notes investors' expense.

177.    In addition, and in order to maximize the effectiveness of the methods discussed above, Morgan Stanley engaged in ratings shopping in selecting the particular ratings agency it would use to rate the MS ACES CDOs.

178.    As previously noted, under the Pinnacle Notes Offering Materials, Morgan Stanley was required to select Underlying Assets that were rated at least AA (or the equivalent rating) by "*at least one* of S&P, Moody's and/or Fitch."  Pinnacle Notes Series 1 Pricing Statement, at 12 (emphasis added).

179.    For all of the Series of Pinnacle Notes, Morgan Stanley selected just one rating agency, and for the majority of the Series, selected Fitch Ratings.  Morgan Stanley's internal correspondence details that Defendants selected Fitch for the specific reason that it was far more lenient than the other two ratings agencies, and therefore would assign the requisite AA rating to a CDO that would not come close to passing muster under S&P's and Moody's methodologies.

60

For example, at the time Defendants were structuring the first series of Pinnacle Notes, a member of Morgan Stanley's SCP Group who worked extensively on the Pinnacle Notes transactions, commented in an August 16, 2006 email that Fitch was far more permissive than other ratings agencies, and that the same CDO tranche that Fitch would rate AAA, would only obtain a BBB+ rating from S&P.

180.    Thus, Fitch Ratings presented an arbitrage opportunity *vis-à-vis* the other ratings agencies, and permitted Morgan Stanley, in its own terminology, to "optimize" the riskiness of the MS ACES CDOs.  The only reason Morgan Stanley stopped using Fitch towards the end of the Pinnacle Notes Series was because Fitch changed its methodology, thereby eliminating the arbitrage opportunity to make riskier AA-rated CDOs with Fitch as opposed to Moody's or S&P.

181.    As discussed more fully in the following section, Defendants routinely manipulated the MS ACES CDOs' attachment points and tranche thickness to: (1) "optimize" the CDOs' riskiness; and (ii) greatly increase the likelihood that the CDOs would fail.

182.    Defendants also: (i) selected a number of high-yield credits (as opposed to all investment grade credits) for the MS ACES CDO portfolios in order to increase the risk and therefore the spread; and (ii) selected a number of credits that were on negative ratings watch with S&P and/or Moody's but not Fitch, because they were riskier and therefore generated higher spreads, but would not impact Fitch's ratings methodology.

183.    In fact, Defendants even went so far as to dispense with their own internal credit selection criteria in order to structure risky Underlying Assets for the Pinnacle Notes transactions.

184.    Against this backdrop, Morgan Stanley employed all of the methods identified above to secretly make the MS ACES CDOs as risky as possible within the confines of the AA rating required by the Pinnacle Notes Offering Materials.

185.    None of this information was communicated to investors in the Pinnacle Notes Offering Documents.

### d.        Morgan Stanley Structured the Synthetic CDOs to Fail

186.    Not only did Morgan Stanley's actions detailed above increase the MS ACES CDOs' riskiness from the outset, the manner in which Morgan Stanley structured the CDOs all but assured that this risk would result in their failure at some time during their term and provide Morgan Stanley with windfall profits as the short counterparty to those CDOs.  Among other actions, three of Defendants' structuring methods in particular evidence that the MS ACES CDOs had been built to fail.  First, Morgan Stanley filled its bespoke Synthetic CDO collateral portfolios with reference entities Morgan Stanley deemed to present elevated risks of default, specifically a highly correlated group of reference entities that were exceptionally susceptible to a downturn in the housing or financial markets.  *See* Section IV.B.5.d.i, *infra*.  Second, Morgan Stanley structured the Synthetic CDOs' single tranches to have a very low Attachment Point, thus exposing those tranches to principal impairment upon a relatively small amount of defaults and losses in the reference entity portfolios.  *See* Section IV.B.5.d.ii, *infra*.  Third, Morgan Stanley structured the Synthetic CDOs' bespoke single tranches to be extremely "thin," so that a very small rise in aggregate portfolio defaults and losses would suffice to cause 100% principal impairment.  *See id.*

### i.        Morgan Stanley Seeded the Portfolios With Concentrated Risk

187.    The bespoke Synthetic CDO portfolios created by Morgan Stanley for use in connection with the Pinnacle Notes and the Pinnacle Transactions present a substantial contrast to – and, specifically, were substantially riskier than – *standardized* credit risk portfolios created and traded by a consortium of banks including Morgan Stanley.

188.    This was not by accident, but by design.  Morgan Stanley, negotiating only with itself rather than with any independent counterparty, and possessing an interest in the Synthetic CDOs' failure rather than their success (by taking the "short" side of the transactions), seeded each of its Synthetic CDOs' portfolios with reference entities that Morgan Stanley deemed to present greater likelihood of default.

189.    As detailed below and in Appendix B hereto, Morgan Stanley did so in at least two ways.  First, Morgan Stanley included in each of its bespoke Synthetic CDOs portfolios certain Icelandic banks whose elevated risk of default had been identified in early 2006.  Second, Morgan Stanley included in each of its bespoke Synthetic CDOs portfolios a striking concentration of reference entities susceptible to a housing market downturn; a concentration far higher than that present in the standardized credit risk portfolios that Morgan Stanley created and traded.

190.    Again, as detailed below, such concentration in its bespoke Synthetic CDOs portfolios was not by accident, but by design.  The elevated default risks presented by the Icelandic banks had been identified by financial markets in early 2006.

191.    Additionally, by no later than mid-2006, Morgan Stanley had adopted a "bearish" stance towards the housing market, and was predicting – and positioning itself to profit from – a housing bust.  Morgan Stanley had internally elaborated a theory that already-evident housing price declines during 2006 could devastate not only the real estate front lines – such as home builders and mortgage lenders – but also numerous other companies and industries also exposed to real estate (e.g., home improvement retailers, furniture and appliance makers, construction materials purveyors), including financial companies heavily exposed to real estate (including banks, non-bank lenders, real estate investment trusts, and insurance companies).  Morgan

Stanley therefore seeded its bespoke Synthetic CDOs portfolios with abnormally high concentrations of such companies.

192.    In this manner, Morgan Stanley's bespoke Synthetic CDOs created for use in conjunction with the Pinnacle Transactions were built-to-fail, and in failing to transfer Plaintiffs and the Class' funds to MS Capital (and ultimately Morgan Stanley) as the "short" party to the CDOs.

## I.    Morgan Stanley's Consistent, Concentrated Inclusion of Icelandic Banks at Elevated Risk of Default

193.    Of the five bespoke Synthetic CDOs that Morgan Stanley created for use in the Pinnacle Transactions, two contained as reference entities all three of Iceland's largest banks – Glitnir, Kaupthing and Landsbanski (the "Icelandic Banks") – while the remaining three contained as reference entities two of the three Icelandic Banks.  *See* Appendix B.

194.    This made Morgan Stanley's bespoke Synthetic CDOs highly unusual. Investment banks and credit rating agency research shows that: (a) all three Icelandic Banks were included as reference entities in only 4% of U.S. CDOs; (b) two of the three Icelandic Banks were included in a further 5% of U.S. CDOs; (c) one of the three Icelandic Banks were included in a further 4% of United States CDOs; and thus (d) an overwhelming majority of U.S. CDOs – 87% – did not reference any of the Icelandic Banks.[4]  It is statistically unlikely that the Icelandic Banks were included in the Synthetic CDOs by chance.

195.    Morgan Stanley's inclusion of the Icelandic Banks in the Synthetic CDOs' reference portfolios was thus not random, but intentional.  Specifically, Morgan Stanley included

---

[4] *See* Puneet Sharma, *CDOs Unwind Headwinds,* Barclays Capital European Credit Research, October 16, 2008, at p. 3.

this obscure micro-sector because the Icelandic Banks were known, since at least early 2006, to be at an elevated risk of default.

196.    In February and March 2006, analysts at various credit rating agencies and investment banks (including Fitch Ratings, JPMorgan and Merrill Lynch) issued a series of critical reports identifying substantial credit concerns at the Icelandic Banks.[5]  The reports identified five factors causing these institutions to pose heightened risk.

(a)    First, the Icelandic Banks' loan portfolios were of suspect credit quality even as the Icelandic Banks' allowance for loan losses were substantially lower than at peer institutions.

(b)    Second, the Icelandic Banks' loans were secured, to a uniquely high degree, by shares of stock (and, especially, shares of Icelandic companies, whose share prices had quadrupled between 2004 and 2007).  This transformed the credit risks of the loans into market risks of Icelandic equities, and transformed the Icelandic Banks into *de facto* hedge funds.

(c)    Third, the Icelandic Banks engaged in a high degree of lending to related parties, including to investment companies controlled by the controlling investors of the Icelandic Banks themselves (who, returning to "Second" above, collateralized such loans with their shareholdings of the Icelandic Banks, so that such loans were collateralized by their own shares).

---

[5] *See*, *e.g.*, Fitch, *Bank Systemic Risk Report*, February 6, 2006; Fitch, *Outlook for Issuer Default Ratings for Icelandic Companies*, February 21, 2006; Thomas, Richard, *Icelandic Banks: Not What You Are Thinking*, Merrill Lynch, March 7, 2006; JPMorgan European Credit Research, *Icelandic Banks: Typical Investor Q&A, and Our Response*, March 24, 2006.and Mark J. Flannery, Ph.D., *Iceland's Failed Banks: A Post-Mortem (Prepared for the Icelandic Special Investigation Commission)*, November 9, 2009.

(d)      Fourth, and in part a result of the foregoing, the Icelandic Banks faced a uniquely-difficult funding situation when compared to their peer banks: without much of a deposit base in tiny Iceland, they were dependent on wholesale and short-term funding sources. This left them exposed to severe liquidity risk, imminent given substantial refinancing obligations beginning in 2008.

(e)      Fifth and finally, given their tremendous asset growth during the 2000s, should the Icelandic Banks threaten to fail, they were beyond the ability of Iceland to save: the Icelandic Banks' assets were nine times greater than Iceland's entire gross domestic product by year-end 2007.  This meant that rather than having the luxury of being "too big to fail," they were instead "too big to rescue.

197.   Each of the Icelandic Banks defaulted in 2008.  On April 12, 2010, the Special Investigation Commission to the Althingi (the Icelandic Parliament) published a lengthy report on the failure of the Icelandic Banks.  *See* http://sic.althingi.is/ (partially available in English). The report explained that the five factors identified in 2006 led to the downfall of the Icelandic Banks in October 2008 – precisely the crisis date identified by the 2006 reports, given the Icelandic Banks' refinancing schedule and needs.  As the Icelandic equity boom turned to bust during 2007, the assets and credit quality of the Icelandic Banks became impaired, and the Icelandic Banks were shut off from capital markets just as their refinancing needs skyrocketed in 2008.  In October 2008, Icelandic Banks defaulted.

198.   Morgan Stanley caused the Icelandic Banks to be included in each of the Synthetic CDO portfolios during 2006 and 2007 *precisely because of their then-known risks*. Such risks were known to financial institutions such as Morgan Stanley since February/March 2006, several months prior to the creation of the Pinnacle Notes and the Synthetic CDOs.  Indeed,

investment bank analyst reports from March 2006 concluded that the smartest way to approach the Icelandic Banks from an investment perspective was to "Buy Protection on the Icelandic Banks"[6] – which is *exactly* what Morgan Stanley did by including them as reference entities in the Synthetic CDO portfolios that Morgan Stanley (1) constructed, and (2) bet against, through (3) the underlying credit default swaps through which it purchased protection against the risk of default.

## II.   Morgan Stanley's Consistent, Concentrated Inclusion of Companies at Elevated Risk of Default in the Event of a Housing Downturn

199.   Morgan Stanley's inclusion of the Icelandic Banks, however, is only one of several ways Morgan Stanley stacked the Synthetic CDOs with reference entities bearing significantly elevated risks of default.

200.   Morgan Stanley also filled the Synthetic CDOs' portfolios of reference entities with an unusually-high concentration of companies whose unifying theme was elevated risk of default in the event of a housing bust.  The bespoke portfolios for the Synthetic CDOs differed substantially from standardized credit risk portfolios that Morgan Stanley itself had created and was then making a market in – and differed in this regard.   Rather than seeking broad, representative coverage of the overall economy (as the standardized credit risk portfolios did), Morgan Stanley hand-picked its *bespoke* portfolios in the Synthetic CDOs to include a lopsided concentration of companies exposed to elevated risk of default in a housing bust.

201.   Such companies included:  (1) home builders; (2) other companies dependent on home construction (such as manufacturers of materials used in home construction, including

---

[6] *See* Richard Thomas, *Icelandic Banks: Not What You Are Thinking*, Merrill Lynch, March 7, 2006, at p. 1.

lumber, cement, *etc.*, manufacturers of home appliances, and home improvement retailers); (3) real estate investment trusts (REITs); (4) financial institutions with significant exposures to real estate, mortgages, and mortgage-backed securities (banks, and non-bank lenders); and (5) insurance companies with significant exposures to real estate, mortgages, and mortgage-backed securities (particularly, monoline insurers and mortgage insurers).   Such companies fall within the rubric described by the acronym "FIRE" – standing for those sectors of the economy involved in Finance, Insurance and Real Estate.

202.     The table below compares the composition of the reference portfolios of Morgan Stanley's bespoke Synthetic CDOs to a standard reference portfolio known as the CDX.NA.IG.[7] The CDX.NA.IG had been created by a consortium of investment banks including Morgan Stanley, and Morgan Stanley made an active market in the CDX.NA.IG during the time the Pinnacle Notes and the Synthetic CDOs were created, issued and sold.   The table demonstrates that, in the bespoke Synthetic CDO portfolios that Morgan Stanley created for use in the Pinnacle Transactions, the concentration of reference entities exposed to a housing market downturn was, on average, *nearly double* the concentration of such reference entities in the standard CDX.NA.IG reference portfolio.

---

[7] "CDX" refers to credit default swap; "NA" refers to North America; "IG" refers to investment grade.   The CDX.NA.IG was based, like Morgan Stanley's bespoke Synthetic CDOs, on a portfolio of reference entities – specifically, 125 investment grade North American corporations (*e.g.*, American Express, AT&T, Caterpillar, *etc.*) chosen by a consortium of major investment banks including Morgan Stanley.   The CDX.NA.IG index was updated twice per year by the same consortium of banks, so that every half year a slightly "new" standard version was created. Each new version of the CDX.NA.IG was identified with a successive number: *e.g.*, CDX.NA.IG 8, CDX.NA.IG 9, *etc.*   The CDX.NA.IG was traded by banks such as Morgan Stanley in and of itself, but also – as discussed *infra* at ¶¶ 246-50, was traded in tranched form as if synthetic CDO tranches had been created from the portfolio of reference entities contained in the CDX.NA.IG.

**Table 3**
**The Lopsided Risk Exposures that Morgan Stanley Built**
**Into its Bespoke Synthetic CDOs**

| Pinnacle Notes Series | | 1 | 2 | 3 | 6/7 | 9/10 |
|---|---|---|---|---|---|---|
| Underlying Synthetic CDOs (Morgan Stanley ACES Series...) | | 2006-28 | 2006-32 | 2007-5 | 2007-26 | 2007-41 |
| | CDX.NA.IG | | | | | |
| Homebuilders | 3.2% | 7.0% | 8.0% | 6.6% | 8.0% | 0.0% |
| Other Home Construction | 1.6% | 3.0% | 7.0% | 4.1% | 4.8% | 1.0% |
| REITS | 0.8% | 0.0% | 2.0% | 0.0% | 5.6% | 6.0% |
| Financial | 8.0% | 18.0% | 14.0% | 13.2% | 16.0% | 27.0% |
| Insurance | 9.6% | 16.0% | 8.0% | 8.3% | 8.8% | 20.0% |
| Total FIRE | 23.2% | 44.0% | 39.0% | 32.2% | 43.2% | 54.0% |

203.   In sum, where the CDX.NA.IG had been developed by a consortium of investment banks, including Morgan Stanley, as a portfolio providing standard, representative, balanced exposure to the wider economy as a whole, Morgan Stanley's bespoke Synthetic CDOs provided an idiosyncratic, unrepresentative, and lopsided exposure.  Specifically: where 23.2% of the CDX.NA.IG portfolio consisted of "FIRE" companies, their representation in the Synthetic CDOs was 42.5% – nearly double the normal.  The chart below presents this distinguishing data concerning the Synthetic CDOs' reference entity portfolios in graphic form:

# Built-to-Fail:
## Morgan Stanley's Overweighting of the Synthetic CDOs
## with Financial, Insurance and Real Estate Reference Entities
## (as compared with the standard CDX.NA.IG.7 portfolio)



204.    Appendix B hereto, which lists and classifies all the reference entities included in the Synthetic CDO portfolios and in the CDX.NA.IG, provides the full details underlying the above analysis.  Appendix B lists the reference entities in each portfolio by order of their business classification: first, in five separate color-coded groups, the five FIRE categories (Financial, Insurance, REITs, Home Builders, and Other Home Construction), followed by non-FIRE categories.  Appendix B also indicates the specific reference entities that defaulted in each portfolio, almost all of which were FIRE-classified reference entities.

205.    The above analysis and its broad sector categories (*e.g.*, "insurance") actually understates the degree to which Morgan Stanley filled its bespoke Synthetic CDO portfolios with reference entities at elevated risk of default.  Within each of the above-summarized broad categories (*e.g*., "Financial," "Insurance") are further subcategories that entailed greater or lesser exposure to a real estate downturn.  Invariably, Morgan Stanley over-weighted in its bespoke Synthetic CDO reference portfolios those particular subcategories or companies with greater exposure to a housing downturn.

206.    Insurance has many different subcategories, including:  Insurance Brokerage; Health Insurance; Life Insurance; Fire, Marine and Casualty Insurance; Property and Casualty Insurance; and Surety & Title Insurance.  The last of these subcategories included insurance providers *particularly* exposed to real estate, including: (a) providers of mortgage insurance (who guarantee mortgage payments and become liable for making them in case the borrower defaults); and (b) providers of insurance on financial obligations (known as "monolines").

207.    Among the financial obligations that the monolines guaranteed were hundreds of billions of dollars of securities backed directly by pools of subprime residential mortgages ("subprime RMBS"), or backed by pools of lower-rated tranches of subprime RMBS

71

(collateralized debt obligations of asset-backed securities, or "ABS CDOs").  A housing market downturn which included increasing levels of residential mortgage defaults therefore had the potential of exposing the monolines to tens of billions and potentially hundreds of billions of dollars of losses.

208.   Morgan Stanley included in its bespoke Synthetic CDOs – as the table below shows, and as the chart on the next page illustrates –  a sharply disproportionate concentration of monolines and surety and title insurers (*i.e.*, the insurance companies *most directly* exposed to a real-estate downturn) that nearly *quadrupled* the concentration of such reference entities in the CDX.NA.IG:

**Table 4**
**Morgan Stanley's Bias**
**Towards Insurance Companies Most Directly Exposed to a Housing Downturn**

| Pinnacle Notes Series | | 1 | 2 | 3 | 6/7 | 9/10 |
|---|---|---|---|---|---|---|
| Underlying Synthetic CDOs (Morgan Stanley ACES Series...) | | 2006-28 | 2006-32 | 2007-5 | 2007-26 | 2007-41 |
| Insurance Subcategories | | | | | | |
| Monolines / Surety & Title | 16.7% | 50.0% | 62.5% | 80.0% | 72.7% | 30.0% |
| Property/Casualty | 50.0% | 6.2% | 0.0% | 0.0% | 0.0% | 10.0% |
| Fire / Marine / Casualty | 0.0% | 6.2% | 12.5% | 20.0% | 18.2% | 15.0% |
| Health | 16.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Life | 8.3% | 18.8% | 0.0% | 0.0% | 0.0% | 25.0% |
| Brokerage | 8.3% | 0.0% | 12.5% | 0.0% | 9.1% | 0.0% |
| Other | 0.0% | 18.8% | 12.5% | 0.0% | 0.0% | 20.0% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

**Built to Fail:**
**Morgan Stanley Overweighted the Synthetic CDO Reference Portfolios**
**with Insurance Companies Most Exposed to Real Estate --**
**Surety/Title and Monoline Insurers**
**(as compared with the standard CDX.NA.IG.7 portfolio)**



209.    Because there were relatively few monolines available for Morgan Stanley to name in its Synthetic CDOs, Morgan Stanley took the extraordinary step of naming many of the monolines *twice* within an individual Synthetic CDO portfolio (by naming both the corporate parent entity and an operating insurance subsidiary).  For example, the monoline MBIA was named twice in the Synthetic CDOs underlying Series 1 and 3 of the Pinnacle Notes (by including both MBIA Inc. and MBIA Insurance Corp. as reference entities), and in like manner the monolines Ambac and XL were *both* named twice in the Synthetic CDOs underlying Series 6 and 7 of the Pinnacle Notes.

210.    As the above tables and analysis and Appendix B demonstrate, the bespoke Synthetic CDO portfolios that Morgan Stanley created were overweighted with reference entities whose businesses and fortunes were connected to housing and real estate, because they best served Morgan Stanley's built-to-fail design.

211.    Notably, even before Morgan Stanley had created the Synthetic CDOs and seeded them with reference entities in these high risk sectors, Morgan Stanley had concluded that the housing boom was turning to a housing bust.  By mid-2006, Morgan Stanley's leading economists, including Morgan Stanley's chief economist Stephen Roach, were publicly predicting that an imminent housing bust (already evident in declining home prices) would deepen, inflict losses on companies with substantial real estate exposures, and cause the entire economy to experience recession.  Concurrently (and not publicly disclosed at the time), Morgan Stanley's proprietary trading operations had taken a "bearish" stance towards housing and real estate, and were predicting – and positioning themselves to profit from – a housing bust.  *See* Michael Lewis, *The Big Short* at 202-03 ("*Big Short*").

> III.    **A Case Study of the Synthetic CDO Underlying Series 9 and Series 10 of the Pinnacle Notes Reveals Morgan Stanley's Intentions**

212.    Morgan Stanley's intentional seeding of the Synthetic CDO portfolios with entities it believed most likely to fail is perhaps most evident in the case of Series 9 and Series 10 of the Pinnacle Notes: marketed to Plaintiffs and the Class during November 2007; officially issued on December 14, 2007; and having as their Underlying Asset a Morgan Stanley bespoke single tranche Synthetic CDO, Morgan Stanley ACES SPC Series 2007-41, whose notes had been issued one day earlier, on December 13, 2007.

213.    As detailed below, by the time of the Offer Period for Series 9 and Series 10 of the Pinnacle Notes (November 2007) and the ensuing first two weeks of December 2007 (during which time Morgan Stanley constructed Morgan Stanley ACES SPC Series 2007-41 to serve as the Underlying Asset for Series 9 and Series 10 of the Pinnacle Notes), the *severity* of the housing bust had become vividly apparent to the market as a whole, including Morgan Stanley.

214.    During the early months of 2007, subprime mortgage origination had collapsed, most subprime mortgage originators went bankrupt or were acquired for pennies on the dollar, larger financial institutions announced tens of billions of dollars in subprime mortgage losses, and home builders suffered an industry-wide collapse.   During October, November and December of 2007, banks and investment banks revealed further billions of dollars of losses from direct subprime mortgage exposures and, often worse, revealed billions in exposures to and losses from ABS CDOs.

215.    Morgan Stanley, at the time, was both: (1) aware from its own first-hand experience of the severe losses lurking in ABS CDOs; and (2) cognizant of which financial institutions were exposed to large stores of such instruments and their associated losses.

75

216.     As revealed in *The Big Short*, by mid-2006 Morgan Stanley's proprietary traders made a $2 billion "bearish" bet on housing through $2 billion of credit default swap protection on the lower-rated tranches of securities backed by pools of subprime residential mortgages (subprime "RMBS"), and were certain that this bet would result in a $2 billion gain.  *See Big Short* at 202-03.   These subprime RMBS tranches that Morgan Stanley had bet against were structural duplicates of the bespoke single tranche Synthetic CDOs that Morgan Stanley created and bet against in the Pinnacle Transactions: the tranches were very low and very thin slices of aggregate portfolio risk.

217.     The credit protection that Morgan Stanley had purchased on the $2 billion of lower-rated RMBS tranches – its initial bearish bet on the housing market – was relatively expensive because it referenced *lower-rated* securities (*i.e.*, securities perceived to be at greater risk of default).  *See Big Short* at 205-06.   To fund the credit protection payments Morgan Stanley had to make on that $2 billion of referenced lower-rated subprime RMBS, Morgan Stanley in late 2006 and early 2007 *sold* credit protection on the highest-rated tranches (the "super senior tranches") of ABS CDO securities.  *See id.*   Because these latter securities were highly-rated, Morgan Stanley received lower credit protection payments (the securities were perceived to be at more remote risk of default, so insuring them cost less).  *See id.*

218.     Due to this disparity, Morgan Stanley had to sell credit protection on *$16 billion* of super senior ABS CDO tranches in order to generate sufficient funds to pay credit protection on $2 billion of lower-rated RMBS tranches.  *See id.*  In short, in late 2006 and early 2007, to fund its $2 billion short bet on lower-rated mortgage-backed securities, Morgan Stanley went long on $16 billion of super senior tranches of ABS CDOs.  *See id.*

219.    During 2007, Morgan Stanley grew to understand the true severity of the housing

bust, in part through painful first-hand experience from the above-detailed, imbalanced $16

billion long-$2 billion short trade.  *See id*. at 211-19.  Although successful on the short end (the

$2 billion of lower-rated RMBS tranches, whose value was obliterated by the housing bust), the

severity of the same housing bust was such that it also erased the value of th $16 billion of

higher-rated ABS CDO tranches that Morgan Stanley had agreed to protect against loss. *See id*.

220.    By February 2007, indices tracking the value of subprime RMBS tranches and

ABS CDO tranches (known as the ABX and TABX indices, respectively) showed that junior

RMBS tranches had lost substantial value, that junior ABS CDO tranches had lost even more –

but also that even super senior ABS CDO tranches had already lost approximately 15% of their

value.  Although Morgan Stanley managed shortly thereafter to offload approximately $3 billion

of its $16 billion of super senior ABS CDO liabilities, *see id*. at 215-16, it was stuck with the

remaining $13 billion.  No later than June 2007, risk management alarm bells rang all the way to

the top of Morgan Stanley with respect to this exposure, and Morgan Stanley understood it had

already lost billions, *see id*. at 211-12.

221.    By July 2007, Deutsche Bank, Morgan Stanley's credit default swap counterparty

with respect to $4.0 billion of the super senior ABS CDOs, informed Morgan Stanley that losses

on those securities already amounted to $1.2 billion (indicating 30% impairment) – which sum

Deutsche Bank demanded be swapped to it from Morgan Stanley.  *See id*. at 212.  In the weeks

and months that followed, the super senior impairment deepened and counterparty payment

demands increased.  *See id*. at 212-14.  On November 7, 2007, Morgan Stanley issued a press

release announcing CDO-related losses of $3.7 billion from a net ABS CDO exposure of $10.4

billion.   By November 2007, Morgan Stanley had handed over to Deutsche Bank, its

77

counterparty on $4.0 billion of super senior credit default swaps, an amount of $3.7 billion (indicating a 93% loss on the $4.0 billion).  *See id*. at 214.  In mid-December 2007, Morgan Stanley disclosed publicly a $9.6 billion trading loss from its ABS CDO proprietary trading:  an $11.6 billion loss on its $13 billion of super senior ABS CDO exposures, offset by a $2 billion gain from its $2 billion short of lower-rated mortgage-backed securities.

222.    Morgan Stanley was not alone in large-scale exposure to and losses from ABS CDOs.  Concern about subprime RMBS and ABS CDO losses was widespread in the media since at least February 2007, and existed even earlier within sophisticated financial institutions (such as Morgan Stanley, which had established its short position more than a year earlier).  Although by early 2007 ABS CDOs were publicly understood to constitute the most concentrated repository of subprime losses, what was *not* known was *where* the ABS CDOs had gone: which institutions had purchased them and would consequently be stuck with their losses?

223.    By mid-2007, mounting concerns led the monolines to publicly reveal their ABS CDO exposures: Ambac and MBIA's ABS CDO exposures more than doubled Morgan Stanley's $13 billion, and XL's approximately equaled it.  Morgan Stanley had not merely included Ambac, MBIA and XL as reference entities in almost all of the Synthetic CDOs, but had gone so far as to double count them in most of the Synthetic CDOs.  Ambac and XL both defaulted due to their CDO exposures; MBIA would have as well but for a controversial reorganization through which it isolated its CDO exposures in one separately-capitalized segment of the company.

224.    In June and July of 2007, Bear Stearns hedge funds filled with billions of dollars of ABS CDOs revealed 100% investor losses.

225.    In October and November 2007, banks and investment banks all over the world began disclosing billions of dollars of holdings in and losses from ABS CDOs, and in some cases – notably Merrill Lynch, Citigroup, and UBS – tens of billions of dollars of ABS CDO holdings and losses.

226.    In sum, by mid-2007 and certainly no later than October/November 2007, Morgan Stanley was aware – by virtue of its own first-hand experience with ABS CDO exposures and their near-total losses, and by virtue of daily front-page news as to similar and even larger exposures and losses at other financial institutions – that the housing bust had created immense multi-billion dollar losses at financial and insurance institutions the world over.

227.    Thus, by November/December of 2007, at the time it was creating Series 9 and Series 10 of the Pinnacle Notes, Morgan Stanley was well aware of the market downturn, and had it wished to create a safe Synthetic CDO to serve as the Underlying Asset for Series 9 and Series 10 of the Pinnacle Notes, it could simply have excluded, or decreased the percentage of, entities falling within such at-risk sectors as finance and insurance.

228.    Instead, Morgan Stanley created a Synthetic CDO – Morgan Stanley ACES SPC Series 2007-41 – that did *not* avoid exposure to such reference entities, *and actually went far out of its way to expose itself to exactly such known-to-be-at-risk reference entities*. *See* ¶¶ 201-204 *supra* and Appendix B.  The 100 reference entities Morgan Stanley selected to constitute the reference portfolio for Morgan Stanley ACES SPC Series 2007-41 included amongst them, to an even *greater* degree than Morgan Stanley's prior Synthetic CDO portfolios, *concentrated* exposure to such reference entities.  *Id*.  Nearly half of the 100 reference entities that Morgan Stanley included in the underlying portfolio consisted of various financial institutions (banks,

investment banks, insurers, reinsurers, monoline insurers, *etc*.) with large exposures to subprime mortgages, subprime RMBS and/or ABS CDOs.  *Id*.

229.    By seeding the portfolios of its Synthetic CDOs with reference entities selected for their risk rather than their lack of it, Morgan Stanley engineered the Synthetic CDOs to be more likely to generate portfolio losses and, ultimately, fail.  Indeed, the first of the Synthetic CDOs to fail was the last of the Synthetic CDOs Morgan Stanley created: the above-discussed Morgan Stanley ACES SPC Series 2007-41, which failed on or about November 14, 2008, less than a year after Morgan Stanley had created it to yield that very result.

ii.    **Morgan Stanley Designed the Synthetic CDOs to Have Very "Low" and "Thin" Single Tranches That Would Begin to Experience Impairment Quickly and Would Experience Total Principal Impairment Should Aggregate Portfolio Losses Rise by No More Than 1%**

230.    Because, as discussed below, Morgan Stanley structured the Synthetic CDOs' bespoke single tranches to be both very low and very thin, failure of the Synthetic CDOs required only a handful of defaults among the portfolio reference entities – enough to generate losses sufficient to breach the tranches' Attachment Points.

231.    The features of these synthetic CDOs – which were lopsided heavily in favor of default – were not the result of arm's-length negotiations.  The Synthetic CDOs' reference entity portfolios, and single bespoke tranches of risk with respect to those portfolios, had been created solely by Morgan Stanley itself, "negotiating" with its derivatives alter-ego MS Capital.  MS International, wielding its absolute discretionary investment authority under the Pinnacle Agreements, reinvested the Plaintiffs and the Class' money into the Synthetic CDOs Morgan Stanley created pursuant to their common scheme, without concern for the eventual loss of Plaintiffs and the Class' principal.

232.    For each bespoke single tranche Synthetic CDO that Morgan Stanley constructed

for use in connection with the Pinnacle Notes, the table below displays their Attachment Point,

Detachment Point, and Tranche Thickness (also displayed graphically in Appendix A hereto):

**Table 5**
**Morgan Stanley Created Bespoke Single Tranches in the Synthetic CDOs**
**To Be Very Low and Very Thin**

| Pinnacle Notes Series | Underlying Synthetic CDO | CDO Tranche Attachment Point | CDO Tranche Detachment Point | CDO Tranche Thickness |
|---|---|---|---|---|
| Series 1 | Morgan Stanley ACES SPC Series 2006-28, Class II | **4.15%** | 4.90% | 0.75% |
| Series 2 | Morgan Stanley ACES SPC Series 2006-32, Class II | **4.30%** | 5.05% | 0.75% |
| Series 3 | Morgan Stanley ACES SPC Series 2007-5 | **6.20%** | 6.95% | 0.75% |
| Series 6 and 7 | Morgan Stanley ACES SPC Series 2007-26 | **4.60%** | 5.35% | 0.75% |
| Series 9 and 10 | Morgan Stanley ACES SPC Series 2007-41 | **2.67%** | 3.67% | 1.00% |

233.    As the table and Appendix A demonstrate, the bespoke single tranches of

portfolio risk that Morgan Stanley created had very low Attachment Points (shaded column).

The Attachment Point of a given tranche is the amount of underlying portfolio losses it can

withstand before suffering its first dollar of principal impairment.  The low Attachment Points of

81

the bespoke single tranches that Morgan Stanley structured in the Synthetic CDOs meant that those tranches would become impaired upon relatively low levels of aggregate losses in the portfolios underlying the Synthetic CDOs (which portfolios Morgan Stanley had seeded with risky reference entities).

234.   Morgan Stanley's bespoke single tranche Synthetic CDOs were also structured to have an *extremely* thin single tranche. Four of the five bespoke Synthetic CDOs featured a single tranche structured to represent a precise *and incredibly thin* slice of portfolio risk amounting to 0.75% of the total portfolio (the single tranche in fifth Synthetic CDO was only marginally thicker at 1.00%).

235.   This thinness meant that should portfolio losses rise to breach the Attachment Point, a further and minimal rise in aggregate portfolio losses of no more than 1.00% would suffice to cause 100% principal impairment in each of the bespoke single tranches in Morgan Stanley's Synthetic CDOs.

236.   Therefore, each of Morgan Stanley's bespoke Synthetic CDOs featured a single tranche representing a precise, extremely thin "slice" of portfolio risk that could quickly experience 100% principal loss.   For example, should the Synthetic CDO serving as the Underlying Asset for Series 9 and Series 10 of the Pinnacle Notes – Morgan Stanley ACES SPC Series 2007-41 – suffer aggregate portfolio losses of 2.67% (the Attachment Point), the bespoke single tranche in question would start to incur principal loss, and should aggregate portfolio losses rise a mere 1.00% higher to 3.67% (the Detachment Point), the bespoke single tranche in question would incur a 100% principal loss.

237.   The difference between a tranche's first dollar of principal loss (Attachment Point) and the last dollar of principal loss (Detachment Point) is tranche thickness.  The extreme

thinness of the bespoke single tranches Morgan Stanley structured in the Synthetic CDOs meant essentially that there was almost no difference between the first and the last dollar of principal loss. The latter would almost immediately follow the former.

238.    The extremely thin tranches that Morgan Stanley constructed in the Synthetic CDOs for use in the Pinnacle Transactions stand in contrast to far thicker tranches in standardized synthetic CDOs.

239.    The closest equivalent to the purported AA-rated tranches of Morgan Stanley's single tranche Synthetic CDOs is the equivalently-rated AA Senior Mezzanine tranche of the standardized synthetic CDOs based on the CDX.NA.IG. In the standardized synthetic CDOs, the equivalent AA-tranche has a tranche thickness of 3.00% (the difference between its Attachment Point of 7.00% and its Detachment Point of 10.00%). Thus, the equivalent tranches of standardized synthetic CDOs were four times thicker than the bespoke single tranches Morgan Stanley constructed in four of the five Synthetic CDOs (3.00% versus 0.75%), and three times thicker than the bespoke single tranche featured in the fifth Synthetic CDO (3.00% versus 1.00%).

240.    By structuring its bespoke Synthetic CDOs' tranches to be far thinner than normal, Morgan Stanley constructed them to be far riskier than normal. A 1.00% rise in aggregate portfolio losses above the Attachment Point would cause a 100% impairment in Morgan Stanley's bespoke Synthetic CDO tranches, but a substantially smaller impairment of 33.33% in the equivalent tranche of standardized synthetic CDOs – assuming, of course, that the Attachment Points in the CDOs were the same. They were not the same, however; the Attachment Points in Morgan Stanley's bespoke Synthetic CDO tranches were set to be far lower

than the Attachment Point for the equivalent tranche in standardized Synthetic CDOs – as demonstrated immediately below.

241.    In fact, because Morgan Stanley set the Attachment Point so low and the tranche thickness so thin, the Detachment Point of every bespoke single tranche Synthetic CDO was lower than the Attachment Point for the equivalent tranche in standardized synthetic CDOs. Thus, Morgan Stanley's low, thin bespoke tranches in its Synthetic CDOs would suffer 100% principal impairment before equivalent tranches in standardized synthetic CDOs would suffer a single dollar of principal loss.

> ### iii.    Additional Factors Demonstrating that Morgan Stanley Intentionally Built the Synthetic CDOs to Fail

242.    Morgan Stanley's intentions in these bespoke single tranche Synthetic CDOs are further evidenced *inter alia*: (1)  by comparing the structure of these bespoke single tranches that Morgan Stanley created with the structure of standardized similarly-rated Synthetic CDO tranches based on similar underlying portfolios; (2) by comparing these Synthetic CDOs with each other; and (3) by comparing the Synthetic CDOs, which served as the Underlying Assets for the money raised by the Pinnacle Notes, with the underlying asset into which Morgan Stanley reinvested the money raised by the sale of the Synthetic CDOs (which Morgan Stanley sought to preserve until its scheme came to fruition and those funds passed from the Pinnacle investors to Morgan Stanley).

        I.      **Morgan Stanley's Bespoke Synthetic CDO Tranches Featured Lower Attachment Points Than Those in Then-Available, Standardized, Similarly-Rated Synthetic CDOs**

243.   A comparison of (1) the bespoke single tranche Synthetic CDOs created by Morgan Stanley for the Pinnacle Transactions with (2) standardized synthetic CDO tranches then available, demonstrates that Morgan Stanley's Synthetic CDO tranches were far riskier and far more likely to suffer principal impairment.  *Morgan Stanley's bespoke single tranches would begin to suffer principal impairment far before equivalent standardized synthetic CDO tranches, and would suffer 100% principal impairment before standardized synthetic CDO tranches would experience even a single dollar of principal impairment.*

244.   As detailed below, the bespoke single tranche Synthetic CDOs that Morgan Stanley created for the Pinnacle Notes were structured with Attachment Points lower than the Attachment Points of similarly-rated tranches in standardized synthetic CDOs based on like portfolios of corporate reference entities.  Morgan Stanley's bespoke single tranche Synthetic CDOs started taking principal losses at Attachment Points of between 2.67% and 6.20%, while "equivalent" tranches in standardized synthetic CDOs based on like portfolios of corporate reference entities featured a substantially higher Attachment Point of 7.00%.

245.   Indeed, given that Morgan Stanley's bespoke single tranche Synthetic CDOs were also extremely thin, the *Detachment* Points of all of Morgan Stanley's bespoke Synthetic CDOs (ranging from 3.67% to 6.95%) are all lower than the 7.00% *Attachment* Point of equivalent standardized synthetic CDO tranches.  *So all of Morgan Stanley's bespoke single tranche Synthetic CDOs would suffer 100% principal impairment at portfolio loss levels (3.67% to 6.95%) that would leave standardized synthetic CDO tranches without any impairment at all.*

246.     Throughout the times the Pinnacle Notes and Morgan Stanley's bespoke Synthetic CDOs were created and sold, standardized synthetic CDO tranches based on like reference portfolios of investment-grade corporations were available, namely the aforementioned "CDX.NA.IG."

247.     The CDX.NA.IG was traded by banks such as Morgan Stanley in and of itself, but also was traded in tranched form "as if" synthetic CDO tranches had been created from the portfolio of reference entities contained in the CDX.NA.IG.  These standardized synthetic CDO tranches featured standard Attachment Points and Detachment Points, detailed in the table below and created by the same consortium of major investment banks including Morgan Stanley. Essentially, each tranche references a different segment of the loss distribution of the underlying CDX.NA.IG, as if a synthetic collateralized debt obligation had been structured from a portfolio consisting of the CDX.NA.IG.

**Table 6**
**Standard Synthetic CDO Tranche Structure (CDX.NA.IG tranches)**

| Tranche Name | Tranche Rating | Standard Attachment Point | Standard Detachment Point |
|---|---|---|---|
| 30-100 Tranche Super Senior | unrated super senior | 30% | 100% |
| 15-30 Tranche Junior Super Senior | unrated super senior | 15% | 30% |
| 10-15 Tranche Senior | AAA | 10% | 15% |
| **7-10 Tranche Senior Mezzanine** | **AA** | **7%** | **10%** |
| 3-7 Tranche Junior Mezzanine | BBB | 3% | 7% |
| 0-3 Tranche Equity | unrated equity | 0% | 3% |

86

248.    Pursuant to the Pinnacle Note Offering Documents, the Underlying Assets for the Pinnacle Notes would have a credit rating of at least AA.  The Synthetic CDOs that Morgan Stanley created to serve as Underlying Assets had purported credit ratings of AA.  In standardized synthetic CDO tranches, the closest equivalent to such AA-rated tranches is, as shown in the table above, the AA-rated 7%-10% Senior Mezzanine tranche.

249.    While both the standardized synthetic CDOs and Morgan Stanley's bespoke Synthetic CDOs were based on similar portfolios of 100-125 corporate reference entities, the AA-rated bespoke Synthetic CDO tranches that Morgan Stanley constructed for use in the Pinnacle Transactions were far riskier than equivalently-rated AA tranches of standardized synthetic CDOs.  The Attachment Points of the former were far lower than the Attachment Points of the latter.  Morgan Stanley's bespoke AA tranches started incurring principal impairment at lower, and often far lower, levels of aggregate underlying portfolio losses (respectively, 2.67%, 4.15%, 4.30%, 4.60%, 6.2%) than the equivalently-rated AA tranche in standardized synthetic obligations (7.00%).

250.    Due to Morgan Stanley's bespoke tranche structuring of its single tranche Synthetic CDOs, the bespoke  single tranche Synthetic CDOs  not only started incurring principal impairment sooner than did equivalent Synthetic CDOs tranches, *but in fact were structured to experience 100% principal impairment before equivalent standard synthetic CDO tranches suffered any principal impairment at all*.  Because the Morgan Stanley bespoke tranches were not only very "low" but very "thin," the Detachment Points of all of Morgan Stanley's bespoke tranches (*i.e.*, the level of portfolio losses  at which 100% impairment of tranche principal occurred) were lower than the Attachment Point of equivalently-rated AA standard synthetic CDO tranches (7.00%).  Thus, all of Morgan Stanley's bespoke single

tranches would suffer 100% principal impairment before equivalent tranches from standardized synthetic CDOs would suffer a single dollar of principal impairment.

## II. Morgan Stanley's Synthetic CDOs Got Even Riskier Over Time, Even as the Financial and Housing Crises Were in Full Bloom

251.    The last of the bespoke single tranche Synthetic CDOs that Morgan Stanley created for use in the Pinnacle transactions – the December 2007 Morgan Stanley ACES SPC Series 2007-41, for Pinnacle Notes Series 9 and Series 10 – should, had Morgan Stanley truly intended to create a security meant to preserve principal, have featured a higher Attachment Point than Morgan Stanley's prior Synthetic CDOs.

252.    As detailed in Section IV.B.5.c.i.III, *supra*, by December 2007, the subprime and real estate crash had materialized and the risks were widely known: institutions (such as Morgan Stanley itself) had disclosed nonprime exposures in the tens of billions of dollars and had recognized equivalent losses.

253.    Despite this well publicized downturn in the sectors from which Morgan Stanley selected the Synthetic CDOs' reference entities, the last of the Synthetic CDOs had the least structural protections.   Specifically, the December 2007 Morgan Stanley ACES SPC Series 2007-41, featured a bespoke single tranche Morgan Stanley structured with an Attachment Point (2.67%) *far lower than any of the prior Synthetic CDOs* (with Attachment Points ranging from 4.15% to 6.20%).  *See* Table 5 at ¶ 232, *supra*.

254.    Indeed, the 3.67% *Detachment Point* for this CDO – the amount of aggregate portfolio losses sufficient to cause 100% principal impairment – was itself lower than the Attachment Points of all prior Synthetic CDOs.  This last Synthetic CDO tranche would suffer

100% principal losses before all the prior Synthetic CDO tranches suffered any principal losses at all.

### III. Morgan Stanley Reinvested the Money Raised by the Sale of the Synthetic CDO Notes in a Far More Conservative Investment

255.   Until the tranched reference portfolio underlying the Synthetic CDOs defaulted, thus triggering the transfer of Plaintiffs' investment in the CDO notes to MS Capital pursuant to the Synthetic CDOs' credit default swap, Morgan Stanley needed to preserve those funds by reinvesting them in a second set of underlying assets (*i.e.*, the underlying assets purchased with the money raised from the sale of the Synthetic CDO notes).

256.   Morgan Stanley's interests and actions with respect to the two sets of underlying assets – those underlying the Pinnacle Notes, and those underlying the Synthetic CDOs' notes – were diametrically opposite.  Morgan Stanley wanted the Pinnacle Notes' underlying assets to fail, and created bespoke Synthetic CDOs built to fail and, in failing, to effect a swap of funds to Morgan Stanley.

257.   But Morgan Stanley wanted the second set of underlying assets – those securing the Synthetic CDOs' obligations – to succeed, so that the money raised by the sale of the Synthetic CDOs' notes would not diminish in any way until the time it was transferred to Morgan Stanley.

258.   The table below presents, for each Series of Pinnacle Notes (a) the Synthetic CDOs serving as the Underlying Assets for each Series of Pinnacle Notes, and (b) in turn, the security serving as the underlying asset for each Synthetic CDO's notes:

**Table 7**

**The Underlying Assets for (1) the Pinnacle Notes, and (2) the Notes Issued by the Synthetic CDOs**

| Pinnacle Notes Series | Underlying Asset for Pinnacle Notes – the Synthetic CDOs | Underlying Asset held by the Synthetic CDO Issuing Trusts |
|---|---|---|
| Pinnacle Series 1 | Morgan Stanley ACES Series 2006-28 | Aareal Bank AG Mortgage Pfandbriefe (Covered Bond – ISIN XS0269258272) |
| Pinnacle Series 2 | Morgan Stanley ACES Series 2006-32 | MBIA Global Funding LLC Medium Term Notes due May 3, 2012 (ISIN XS0275386497) |
| Pinnacle Series 3 | Morgan Stanley ACES Series 2007-5 | Morgan Stanley Funds plc U.S. Dollar Liquidity Fund (Money Market fund, Institutional Class) |
| Pinnacle Series 6 and 7 | Morgan Stanley ACES Series 2007-26 | Chase Issuance Trust CHASEseries Class A (2007-10) Notes (asset-backed securitization of credit card receivables) (CUSIP – US161571CA05) |
| Pinnacle Series 9 and 10 | Morgan Stanley ACES Series 2007-41 | Capital One Multi-Asset Execution Trust Class A (2006-8) Series Notes (asset-backed securitization of credit card receivables) (CUSIP – I4041NCX7) |

259.    In each case, the underlying asset for the Synthetic CDOs' notes was safer and more liquid than the Synthetic CDO notes themselves – *i.e.*, the Underlying Assets Morgan Stanley created and employed for the Pinnacle Notes.

260.    While the Synthetic CDO tranches underlying the Pinnacle Notes were rated AA, each of the underlying assets for the Synthetic CDO notes was rated *AAA* – the highest possible credit rating.

261.    Covered bonds – the sort of security underlying the CDO notes issued by Morgan Stanley ACES Series 2006-28 (which CDO notes themselves were the Underlying Asset for Series 1 of the Pinnacle Notes) are an extremely safe form of asset-backed security in which the covered bonds are not merely secured by a dedicated pool of collateral assets (as in a regular asset-backed security) but also by the sponsoring bank.  Consequently, covered bonds almost always receive an AAA rating.  Such "double" recourse for capital preservation – to the asset pool, and the sponsoring bank – stands in sharp contrast to the Synthetic CDOs used as the Underlying Assets for the Pinnacle Notes.

262.    Money market funds – the sort of security underlying the CDO notes Morgan Stanley issued in ACES Series 2007-5 (which CDO notes themselves were the Underlying Assets for Series 3) – invest in short-maturity highly-rated obligations, and likewise receive AAA ratings.  The number of times that money market funds have lost even 1% of capital (called "breaking the buck") may be counted on one hand.  As Morgan Stanley itself described the Morgan Stanley Funds plc U.S. Dollar Liquidity Fund – a fund that Morgan Stanley itself created – the "investment objective" was "to provide liquidity and an attractive rate of return, *to the extent consistent with the preservation of capital*" (emphasis added).  *See* http://www.morganstanley.com/liquidity/usd.html.    The substantial liquidity and capital preservation available through this Morgan Stanley product stand in sharp contrast to the illiquidity and risk Morgan Stanley created in the Synthetic CDOs.

263.    Likewise, credit card securitizations – the sort of security underlying the CDO notes issued by Morgan Stanley ACES Series 2007-26 and 2007-41 (which CDO notes themselves were the Underlying Asset for Series 6, 7, 9 and 10 of the Pinnacle Notes) – are asset-backed securities backed by pools of credit card receivables.  The Class A notes were the

senior-most tranche of securities backed by such asset pools, and were protected from collateral losses by multiple more junior tranches – with such protection sufficient to provide an AAA rating.  Besides being safe, senior securities, such credit card securitizations were also extremely *liquid* securities, for two reasons: first, because specific securities were issued in very large amounts, thus creating a large market of purchasers and sellers; and second, because issuers regularly issued many series of near-identical securities each year, thereby creating substantial market familiarity with the securities.  For example, the Capital One Multi-Asset Execution Trust Class A (2006-8) Series Notes securing Morgan Stanley ACES Series 2007-41 (whose notes in turn were securing Pinnacle Series 9 and Series 10) was issued in May 2006 in an amount of $300 million – and the seven prior series issuances during 2006 were all larger (mostly $500 million each, and occasionally $1 billion).  Likewise, the Chase Issuance Trust CHASE series Class A (2007-10) Notes were part of a $1.05 billion issuance in June 2007 – and three of the nine prior securitizations that year were for $2.0 billion each.  The substantial liquidity and capital preservation available through such credit card securitizations stand in sharp contrast to the illiquidity and risk Morgan Stanley created in the Synthetic CDOs.

IV.     **Defendants Abused Their Roles as Market Agent to Cover Up the Pinnacle Notes' Risks and Perpetuate the Fraud, and as Calculation Agent to Ensure that the MS ACES CDOs Failed**

264.     Under the Pinnacle Notes Offering Materials, MS International was designated as the "Market Agent."  Because the Pinnacle Notes did not trade on an exchange, and therefore there was no readily available pricing mechanism for the Notes during their term, MS International's function as "Market Agent" was to provide weekly "indicative prices," also known as bids, to the Pinnacle Notes Distributors.

265.     Although Defendants were not obligated to buy back the Pinnacle Notes at the bid price, or any price for that matter, the "indicative bids" purported to represent the price at which Defendants would hypothetically be willing to buy back the Notes, and thus provided investors with an objective basis for measuring the worth of their Notes.

266.     MS International, however, did not provide legitimate bid prices for the first three Series of Pinnacle Notes, because Defendants did not want to harm the marketing and sale of the later Series of Notes.

267.     Specifically, at the time Defendants were planning to market Pinnacle Notes Series 6, 7, 9, & 10, the first three Series of Notes were experiencing significant deterioration in their values due to the riskiness of the Underlying Assets.  However, MS International provided indicative bids that were far higher than the actual value of the first three Series of Notes – as reflected in Defendants' own internal valuation models – in order to perpetuate the fiction that the Pinnacle Notes were a good investment, when, in fact, they were already well on their way to failing.

268.    Indeed, in August 2007, MS International had consistently provided bids for the Pinnacle Notes that were approximately 95 cents on the dollar, when Defendants' internal models showed the real value to be in the low 80s.

269.    At the same time, Morgan Stanley personnel responsible for selling the later Series of Pinnacle Notes commented in private Bloomberg Chats that the Morgan Stanley's published indicative prices or bids were "fake" and inflated.

270.    This inflation persisted through November 2007, when MS International was still providing external bids above 90 cents on the dollar, even as its internal models valued the same instruments in the 60s.

271.    It was only during December 2007 and January 2008, after Morgan Stanley had decided to discontinue the Pinnacle Notes Program after Series 9 & 10, that MS International's bids were brought in line with its internal models.

272.    Thus, Defendants' act of intentionally misleading the public to believe the Pinnacle Notes were more valuable than they actually were in order to avoid harming future Pinnacle Notes launches further evidences Defendants' fraudulent intent and bad faith.

273.    Additionally, MS Capital was the "Calculation Agent" for both the Pinnacle Notes and the MS ACES CDOs.  With respect to the MS ACES CDOs, one of MS Capital's responsibilities was to determine the amount of loss attributable to any credit events suffered by the reference entities (*i.e.*, single name CDS) comprising the MS ACES CDO portfolios.

274.    Notably, when a reference entity suffers a credit event, the associated credit loss is often not total, but rather some percentage of the notional or par value.  Thus, the valuation methodology for calculating the associated loss, and the manner in which it is carried out, can significantly impact the amount of loss that actually results from a given credit event.

275.    The amount of loss attributable to a particular credit event in the MS ACES CDO portfolios was extremely important because it was only when overall aggregate portfolio losses exceeded the tranche's Attachment Point that the CDOs would suffer principal impairment. Thus, the greater the loss attributable to a particular reference entity suffering a credit event, the greater the chance the Attachment Point would be breached.

276.    Depending on the Series of Pinnacle Notes at issue, MS Capital determined the loss resulting from a credit event by soliciting bids from other banks (known as "dealer bids") to determine the residual value of the reference entity's CDS.  Thus, if the bid for a particular single name CDS was 90 cents on the dollar (indicating a loss of 10%), the overall portfolio losses attributable to that credit event would be less than if the bid was 80 cents on the dollar (indicating a loss of 20%).

277.    Morgan Stanley, through MS Capital, abused its authority in order to obtain CDS bids – such as those for Fannie Mae and Freddie Mac, following credit events for those reference entities – that were far less than their market value.  In this manner, Morgan Stanley was able to report low residual CDS values despite the fact that contemporaneous public auctions for the same CDS yielded significantly higher bid prices.

278.    By doing so, Morgan Stanley was able to calculate a far greater loss for certain credit events in the MS ACES portfolios, and thereby further ensure that aggregate portfolio losses exceeded the tranches' Attachment Points, resulting in the transfer of Plaintiffs' and investors' principal to MS Capital as the short counter party to the MS ACES CDOs.

**V.**

**THE PINNACLE NOTES OFFERING DOCUMENTS WERE
MATERIALLY FALSE AND MISLEADING**

**A.      The Offering Documents**

279.    Each Series of Pinnacle Notes was created, issued, and sold pursuant to (1) a shared Base Prospectus common to all Pinnacle Notes, and (2) a specific Pricing Supplement for each specific Series of Pinnacle Notes, which included (3) a two page "extract from the Pricing Statement" that purported, *inter alia*, to provide a "Summary of Terms" for each series of Pinnacle Notes (the "Brochures") (collectively, the "Offering Documents").

280.    The Offering Documents were drafted and issued by Morgan Stanley directly and through its control of the co-defendants.

281.    **The Base Prospectus**.  Each Series of Pinnacle Notes was created, issued, and sold pursuant to a shared Base Prospectus dated August 7, 2006, as amended by Supplementary Base Prospectuses dated April 24, 2007 and August 13, 2007 (collectively, the "Base Prospectus").  The April 24, 2007 and August 13, 2007 Supplementary Base Prospectuses merely noted changes in the names of various parties involved in the Pinnacle Notes transactions, including MS Singapore and MS International.

282.    **The Pricing Statements**.  Each Series of Pinnacle Notes was also created, issued, and sold pursuant to a Pricing Statement specific to that Series, including a Pinnacle Notes Series 1 Pricing Statement dated August 7, 2006, a Pinnacle Notes Series 2 Pricing Statement dated October 6, 2006, a Pinnacle Notes Series 3 Pricing Statement dated January 9, 2007, a Pinnacle Notes Series 6/7 Pricing Statement dated May 16, 2007, and a Pinnacle Notes Series 9/10 Pricing Statement dated October 25, 2007 as amended by a Pinnacle Notes Series 9/10 Supplementary Pricing Statement dated November 7, 2007 (collectively, the "Pricing Statements").

96

283.   **The Brochures**.   Included in each Pricing Statement (at pp. ii-iii of each Pricing Statement) was a two page document purporting to be an "extract from the Pricing Statement" and purporting to provide a "Summary of Terms" with respect to each Series of Pinnacle Notes. These Brochures were adapted to be published, and were published, as newspaper advertisements in major Singaporean newspapers.   They were also disseminated by the independent distributors that Morgan Stanley appointed to sell the Pinnacle Notes.

284.   The Pricing Statements (and the Brochures included therein) were standardized documents that did not materially differ from each other, and were substantively identical in their representations concerning what the Pinnacle Notes were, how the Pinnacle Notes worked, and the risks to which the Pinnacle Notes were exposed.   The only differences related to the specific dates of issuance and maturity of each Series, the specific interest rates promised by each Series, and the specific basket of reference entities to which each Series was credit-linked.

**B.    The Offering Documents' Representations that the Underlying Assets for the Pinnacle Notes "*May Include*" Synthetic CDOs Were Materially False and Misleading**

285.   Use of the Synthetic CDOs as the Underlying Assets was integral to Defendants' scheme to transfer Plaintiffs and the Class' investment in Pinnacle to Morgan Stanley. Defendants intended at all times that the Underlying Assets for the Pinnacle Notes would only be Synthetic CDOs specifically designed by Morgan Stanley: any other asset, lacking the necessary swap provisions, would not provide the necessary features to enact Defendants' scheme with respect to the Pinnacle Notes and the Pinnacle Transactions.

286.   The Offering Documents materially misrepresented these facts by portraying Synthetic CDOs as one choice, among other assets and securities, for the Underlying Asset. Specifically, the Offering Documents described investment in Synthetic CDOs as merely

97

possible, when in truth investment in the Synthetic CDOs was certain.  Conversely, the Offering

Documents described other possible securities and assets as possible Underlying Assets, when in

truth they were never true alternatives.

287.    The Base Prospectus for all Pinnacle Notes represented that Pinnacle Notes

investors' principal would be invested in an Underlying Asset chosen by the Determination

Agent (MS International), and disclosed a list of other assets that could be chosen for use as an

Underlying Asset, including Synthetic CDOs:

### INFORMATION ON THE UNDERLYING ASSETS
*****

On the Issue Date of a Series of Notes, the Issuer (in consultation
with the Determination Agent) will invest the entire proceeds
received from the Issue of the Notes of that Series in the purchase
of assets as described below.  Such assets shall be the "**Original
Underlying Assets**" and will, as at the Issue Date of Notes of that
Series, meet the criteria set out in the applicable Pricing Statement
for Notes of that Series.

*Original Underlying Assets of a Series may include one or more of
Cash Deposit, Medium Term Notes, Liquidity Funds, Commercial
Paper, Certificates of Deposit, Asset-Backed Securities, Synthetic
CDO Securities, CDO Squared Securities, and/or Credit
Commodity Linked Securities, as described below*. . . (Base
Prospectus at 24) (bold in original, italics added)

288.    Each of the Pricing Statements included, immediately after the cover page and its

notices, and immediately prior to the Table of Contents, introductory/summary pages, one of

which was represented to be a "Summary of Terms," *i.e.*, the Brochure, for each Series of

Pinnacle Notes.  *See* all Pricing Statements, at iii.  Each of the Pricing Statements, in the

"Summary of Terms" section, represented that the Underlying Assets "may" include Synthetic

CDOs:

**Pinnacle Notes [] Summary of Terms**
*****

**Collateral/Security**: The Notes will be secured by, *amongst other assets*, (i) *Underlying Assets which may include* AA-rated or higher rated US Dollar denominated portfolio credit-linked securities (i.e., Synthetic CDO securities), and (ii) the Swap Arrangements.  (Pricing Statements at iii) (emphasis added)

289.    These representations in the Base Prospectus, Pricing Statements and Brochures were materially false and/or misleading.  First, the Offering Documents misrepresented a matter that was a certainty (that the Underlying Assets would only and always be Synthetic CDOs) to be a matter that was a mere possibility (the Underlying Assets "may include" Synthetic CDOs).  Second, the Offering Documents misleadingly suggested that even if Synthetic CDOs constituted some *part* of the Underlying Assets, Synthetic CDOs would be but one of multiple assets comprising the Underlying Assets (the Underlying Assets "may include" Synthetic CDOs).

290.    In truth: (1) Defendants had always intended for the Underlying Assets to be Synthetic CDOs, because their scheme in connection with the Pinnacle Notes and Pinnacle Transactions required use of the Synthetic CDOs as the Underlying Assets; and (2) Defendants had always intended for the Underlying Assets in their *entirety* to be Synthetic CDOs – and had in fact custom-built bespoke single-tranche Synthetic CDOs with those single tranches sized in an amount that exactly equaled the total amount of principal raised through each Series of Pinnacle Notes.

291.    The Offering Documents further misrepresented the certainty that the Underlying Assets would be Synthetic CDOs by providing a list of other purportedly possible forms of Underlying Assets, including "Cash Deposits," "Certificates of Deposit," and "Liquidity Funds" (akin to money market funds).  *See* Base Prospectus at 24; Pinnacle Notes Series 1 Pricing

99

Statement at 12-13; Pinnacle Notes Series 2 Pricing Statement at 13-14;  Pinnacle Notes Series 3 Pricing Statement at 13-14; Pinnacle Notes Series 6/7 Pricing Statement at 31-32; and Pinnacle Notes Series 9/10 Pricing Statement at 30-31.

292.    These representations were materially misleading for two reasons.  First, they represented as possible, a matter that was impossible (namely, that the Underlying Assets would be anything other than Synthetic CDOs).  Second, as each of the purported alternative forms of Underlying Assets (cash deposits, certificates of deposit, and liquidity funds) was safe and liquid, they lent by (misleading) association an assumption of *like* safety and liquidity to the Synthetic CDOs with which they had been grouped in the Offering Documents.  In truth, there was a substantial disparity, in terms of both risk and liquidity, between Synthetic CDOs on the one hand and all the other purportedly possible alternative forms of Underlying Assets on the other.

**C.    The Offering Documents Did Not Disclose that the Underlying Assets Were Synthetic CDOs That Morgan Stanley Had Created and in which Morgan Stanley Possessed an Adverse/Opposite Interest**

293.    In order for Defendants to effect their scheme, Morgan Stanley and/or its affiliates (MS Capital or MS International) had to be the "short" counterparty to the credit default swap underlying the Synthetic CDOs.  That in turn meant that the Synthetic CDOs in question would have to be ones created by Morgan Stanley, which could then designate itself (or its alter-ego MS Capital) as the (short) counterparty to the (long) Synthetic CDO issuing trust.

294.    The Offering Documents omitted and intentionally concealed the material facts that:

(a)    Defendants created the Synthetic CDOs into which it directed the reinvestment of Plaintiffs and the Class' investment in the Pinnacle Notes;

(b)     Defendants had always intended for Plaintiffs and the Class' investment in the Pinnacle Notes to be reinvested into the Synthetic CDOs it created;

(c)     Defendants negotiated with themselves to ensure that Plaintiffs and the Class' investment in the Pinnacle Notes was reinvested into the Synthetic CDOs;

(d)     Defendants, through MS Capital, assumed the "short" counterparty position in the Synthetic CDOs they created, which was diametrically opposed to the "long" position in the Synthetic CDOs Defendants unilaterally assigned to Plaintiffs and the Class.

295.    The Pricing Statements, as well as the Brochures, including any newspaper adaptations, provided almost no disclosures concerning, and no explanation of, Synthetic CDOs. The Pricing Statements and the Brochures only represented certain purported conditions that Synthetic CDOs would have to meet in order to serve as Underlying Assets – including denomination in U.S. dollars, a minimum credit rating of at least AA, and their purported acceptability to MS Capital.  *See* Pinnacle Notes Series 1 Pricing Statement at 12-13; Pinnacle Notes Series 2 Pricing Statement at 13-14; Pinnacle Notes Series 3 Pricing Statement at 13-14; Pinnacle Notes Series 6/7 Pricing Statement at 31-32; and Pinnacle Notes Series 9/10 Pricing Statement at 30-31.

296.    Such statements were materially misleading.  First, they failed to disclose that Defendants would create the Synthetic CDO and would occupy the opposite counterparty position and possess opposite interests with respect to the Synthetic CDO Underlying Assets. Second, they made matters seem as if the Underlying Assets would be selected on the basis of their merits (*e.g.*, the Underlying Assets had to meet certain minimum credit ratings), when, in truth, the Synthetic CDO Underlying Assets were selected for their *lack* of merit, *i.e.* their utility in furthering Defendants' fraudulent scheme.

297.    *That Morgan Stanley required investment in Synthetic CDOs in which it itself held opposed interests and counterparty positions was a material fact to Pinnacle Notes investors*.  Had Plaintiffs and the Class been informed that Morgan Stanley was intending to "invest" their principal in a bet Morgan Stanley created and that they were assigned a position *against* Morgan Stanley, Plaintiffs and the Class would not have agreed to invest in the Pinnacle Notes.

298.    The Base Prospectus provided further disclosures concerning Synthetic CDOs and a brief purported explanation of their risks, s*ee* Base Prospectus at 11-12, 25, and A-16, as well as disclosure of "potential and actual conflicts of interest" between Pinnacle investors and Morgan Stanley, *id*. at 16-17.  These disclosures were all materially misleading, for the same reasons.  They failed to disclose that Morgan Stanley had created the Synthetic CDOs to be used as Underlying Assets and that Morgan Stanley possessed opposed interests and counterparty positions to those of Plaintiffs and the Class.

**D.    The Offering Documents Failed to Disclose that Morgan Stanley Custom-Designed for Use as Underlying Assets Bespoke Synthetic CDOs That Were Structured to Increase the Risk of Loss and to Ultimately Fail**

299.    The Offering Documents failed to disclose that: (i) the Underlying Assets had not been selected to preserve Plaintiffs and the Class' investment but had been structured to increase the risk of loss to provide greater front end profits to Defendants and to ultimately to fail and drain investor principal into Morgan Stanley's coffers, and (ii) any other specific facts (such as the details, tranche structure, and reference entity portfolios of the Synthetic CDOs) that could evidence that fact.

300.    A reasonable investor would consider the omitted facts as relevant in assessing the Pinnacle Notes and their risks.  Such omitted facts included concrete details as to the

102

Synthetic CDO Underlying Assets, and specifically the basic facts around which their risks were constructed, namely the Synthetic CDOs': (1) reference entity portfolios; (2) Attachment Points; (3) Detachment Points; and (4) Defendants' methodology of structuring the CDO tranches and selecting the most permissive ratings agency in order to maximize the risk allowable within the required AA rating.

301.    Such material omissions also rendered affirmative statements made in the Offering Documents materially misleading.

302.    Although the Pricing Statements and Brochures were bereft of any explanation of Synthetic CDOs or their risks, they did – as detailed in Sections V.B & C, *supra* – represent that the Synthetic CDOs chosen as the Underlying Assets would be made based on the merits of those assets (*e.g.*, criteria including minimum credit ratings).   Such representations were materially misleading: in truth, Defendants had created and constructed the Synthetic CDO Underlying Assets (i) to be as risky as possible such that only the most permissible ratings agency would bestow AA ratings, in order to increase their profits; and (ii) to fail.

303.    The Pinnacle Base Prospectus contained certain brief representations concerning Synthetic CDOs and their risks.   *See* Base Prospectus, at 11-12.   Specifically, the Base Prospectus stated in passing that akin to the Pinnacle Notes and their Nominal Reference Entities, Synthetic CDOs themselves had reference entities to which they were credit-linked, and the value of the Synthetic CDOs would depend on the performance of those credit entities:

> Prospective investors should note that if the Underlying Assets for any Series of Notes consist of or include Synthetic CDO Securities, CDO Squared Securities, or Credit Commodity Linked Securities, the market value of the Underlying Assets of such Series will, amongst other things, depend on the occurrence of credit events or potential credit events in respect of the reference entities to which such securities are linked.

> Whether the principal amount of any Synthetic CDO Security is reduced or otherwise written down will depend on whether one or more credit events in respect of the underlying reference entities of such Synthetic CDO Security occur (and whether any other applicable conditions are satisfied) as well as whether any loss calculations in connection with such credit event(s) exceed any relevant threshold amount. (Base Prospectus at 11)

304.   These statements were misleading because they did not state (or otherwise provide any facts informing investors) that the specific Synthetic CDOs that Morgan Stanley had created for use in connection with the Pinnacle Notes had been custom-built *to intensify* the normal risk of principal/value loss.  The Synthetic CDOs were not run-of-the-mill Synthetic CDOs with normal, standard risks, but rather custom-built Synthetic CDOs that (1) had been filled with abnormal amounts of reference entity portfolio risk, and (2) had been structured to be particularly sensitive to even minimal materialization of that risk.  These Synthetic CDOs had been designed not to avoid risk, but to embrace it.

305.   Therefore, omitted from these statements, and rendering them materially misleading, were that Defendants:

(a)   structured the bespoke Synthetic CDOs to "optimize" the amount of risk hidden within the CDO while still achieving, barely, an AA rating;

(b)   filled the bespoke Synthetic CDO reference portfolios with reference entities that Morgan Stanley deemed to present elevated risks of default, thereby intensifying the very risk that the Base Prospectus neutrally and abstractly described – that "occurrence of credit events" could cause diminution of principal or market value;

(c)   had created the Synthetic CDOs around abnormally *low* and *thin* bespoke single tranches of risk from such reference entity portfolios, thereby intensifying the risk; and

104

(d)       surreptitiously flipped the normal allocation of risk between a CLN and its Underlying Assets, in order to make the least transparent aspect of the Pinnacle Notes transactions – the MS ACES CDOs – the primary risk component.

**E.     The Offering Documents' Representation that the Underlying Assets Were "Acceptable" to MS Capital Was Materially False and/or Misleading**

306.    The Offering Documents represented that, notwithstanding MS International's purported sole discretion as "Determination Agent" to select Underlying Assets for the Pinnacle Notes, MS Capital had to deem the Underlying Assets to be "acceptable." *See* Pinnacle Notes Series 1 Pricing Statement at 12; Pinnacle Notes Series 2 Pricing Statement at 13; Pinnacle Notes Series 3 Pricing Statement at 13; Pinnacle Notes Series 6/7 Pricing Statement at 31; and Pinnacle Notes Series 9/10 Pricing Statement at 30.

307.    The Offering Documents further explained that MS Capital had to deem the Underlying Assets "acceptable" because of its purported interest in such assets (*i.e*, the Underlying Assets must be ones "acceptable to the Swap Counterparty [MS Capital] as a funding source for the obligations of the Issuer [Pinnacle] under the Swap Agreement"). *Id*.

308.    The "obligations of the Issuer under the Swap Agreement" included the contingent payment to MS Capital, pursuant to the credit default swap between Pinnacle and MS Capital, should a Nominal Reference Entity default.  Were a Nominal Reference Entity to default, Pinnacle would liquidate the Underlying Assets and use the proceeds of the Underlying Assets' sale to fund its counterparty payment to MS Capital.

309.    Thus, the plain meaning of this representation was that MS Capital would deem the Underlying Assets to be acceptable insofar as they safeguarded the Pinnacle Note investors'

105

principal, which was the "funding source" for Pinnacle's obligation to pay MS Capital under the "Swap Agreement" should a Nominal Reference Entity default.

310.    This representation was materially false and/or misleading.

311.    Far from deeming the Underlying Assets as an "acceptable" safe place to preserve principal, MS Capital structured the Synthetic CDO Underlying Assets to maximize risk in order to increase Morgan Stanley's front end profit, bet *against* the Underlying Assets (the Synthetic CDOs), and stood to benefit by over $138 million from their failure.  Indeed, as part of Defendants' concerted scheme in the Pinnacle Transactions, MS Capital had participated in constructing the Synthetic CDOs so that they would fail, and in failing, effect the transfer of Plaintiffs and the Class' principal to MS Capital and Morgan Stanley.  Because the Reference Entities comprising the Pinnacle Notes' FTD baskets were safe and secure – and therefore presented minimal chance of default – Defendants were not concerned about keeping the Underlying Assets safe, since it was highly unlikely that they would be needed to cover any swap payments owing to a credit event in the FTD baskets.  Rather, because the chance of a credit event in the FTD baskets was minimal, Defendants made the CDOs as risky as possible in order to maximize their profit from structuring the CDOs.

312.    In addition, with respect to each of these Synthetic CDO tranches, MS Capital was "short": should defaults in the Synthetic CDOs' reference portfolios rise to breach the low, thin tranches, MS Capital would gain tens of millions of dollars, and up to $138.7 million dollars. This monetary gain to MS Capital would be Plaintiffs and the Class' principal, which MS International as Pinnacle's Determination Agent had caused to be invested in the notes issued by the Synthetic CDOs.

313.   Thus, MS Capital's interests were directly opposed to those of Plaintiffs and the Class.   Plaintiffs and the Class wanted the Synthetic CDOs to succeed and preserve principal (for return to Plaintiffs and the Class upon the Pinnacle Notes' maturity).  MS Capital wanted the Synthetic CDOs to fail, and in failing, to transfer principal (to MS Capital and Morgan Stanley upon breach of the Synthetic CDO tranche Attachment Points).

314.   MS Capital did not view the Synthetic CDOs as an "acceptable" place to preserve principal.   Rather, as part of Defendants' concerted action with respect to the Pinnacle Transactions scheme, MS Capital helped create the Synthetic CDOs so that they would fail and in failing, transfer principal to MS Capital and Morgan Stanley.

315.   Had the Pinnacle Notes been *bona fide* credit-linked notes, MS Capital's interests would have been aligned with those of Plaintiffs and the Class: both would have wanted the Underlying Assets to preserve principal value to secure Pinnacle's respective obligations to each (for counterparty payments in case of Nominal Reference Entity default or for principal return upon Pinnacle Notes maturity).  Because MS Capital was not interested in Nominal Reference Entity credit protection which it had facially contracted for, and instead had an undisclosed interest in the failure of the Underlying Assets, MS Capital's interests were opposed to Plaintiffs and the Class' interests.  Thus, the Underlying Assets were "acceptable" to MS Capital only insofar as they actually imperiled the Pinnacle Notes investors' principal and furthered Morgan Stanley's fraudulent scheme.

**VI.**
**CLASS ALLEGATIONS**

316.    The Pinnacle Notes, as the Offering Documents asserted, were offered to investors "*solely* on the basis of the information contained and the representations made in" the Offering Documents, Pricing Statements for each series of Pinnacle Notes, backside of cover page (emphasis added).

317.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure, on behalf of a class consisting of all persons or entities who purchased Pinnacle Notes between August 1, 2006 and December 31, 2007 pursuant and/or traceable to the false and misleading information provided in (and omitted from) the Offering Documents, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entities in which Defendants have or had a controlling interest.

318.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands of Class members.  Record owners and Class members can be identified from records maintained by Morgan Stanley or by the Pinnacle Notes' Custodian or Trustee, and can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

319.    Plaintiffs' claims are typical of the members of the Class, because Plaintiffs and all of the Class members sustained damages that arose out of the Defendants' unlawful conduct complained of herein.

320.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Plaintiffs have no interests that are contrary to, or in conflict with, the interests of the Class members that they seek to represent.   Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intend to prosecute this action vigorously.

321.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions that may affect only individual Class members.  The questions of law and fact common to the Class include:

(a)      whether the Offering Documents omitted and/or misrepresented material facts concerning the Pinnacle Notes and their Underlying Assets, the Synthetic CDOs;

(b)      whether Defendants breached their fiduciary duties and/or duties of good faith and fair dealing;

(c)      whether Defendants breached their contractual obligations;

(d)      whether Defendants participated in and pursued the concerted conduct complained of herein;

(e)      whether members of the Class have sustained damages and, if so, the proper measure of such damages.

322.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively

109

small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants. There will be no difficulty in the management of this action as a class action.

## VII.
## COUNTS

### First Claim for Relief
### Fraud
### (Against All Defendants)

323.    The foregoing paragraphs are realleged herein.

324.    This Count is asserted against all Defendants.

325.    In the Offering Documents, Morgan Stanley, directly and through its control of the co-defendants, made materially false and misleading representations and omissions concerning the Pinnacle Notes and the Synthetic CDOs serving as Pinnacle's Underlying Assets.

326.    Pinnacle and MS Singapore, as issuer and arranger of the Pinnacle Notes respectively, made and warranted materially false and misleading representations and omissions concerning the Pinnacle Notes and the Synthetic CDOs serving as Pinnacle's Underlying Assets. MS International, MS Capital, and MS&Co. drafted and created the materially false and misleading Offering Documents.

327.    The Defendants intentionally and materially misrepresented to Plaintiffs and the Class, in connection with their investment in the Pinnacle Notes, that the Pinnacle Notes constituted a safe, conservative investment, and that the purpose of the Underlying Assets – into which the principal raised by the Pinnacle Notes would be reinvested – was principal

110

preservation.  The Pinnacle Notes would have been unmarketable and would not have issued but for these misleading statements and omissions.

328.    Among other things, the Defendants failed to disclose the following material information in the Offering Documents, which rendered its representations false and misleading: (i) the fact that Morgan Stanley, pursuant to a non-arm's-length transaction, was going to reinvest the funds raised by Plaintiffs and the Class' purchase of Pinnacle Notes into Synthetic CDOs of Morgan Stanley's own making, in which Morgan Stanley held interests directly opposite to those of Plaintiffs and the Class; (ii) the fact that Morgan Stanley maximized the amount of risk in the Underlying Assets, such that the Synthetic CDOs, and not the FTD baskets, were the primary risk component, and did so in order to siphon off the increased spread as profit; (iii) the structure and mechanics of the Synthetic CDOs, including the fact that the Synthetic CDOs had been structured such that each dollar lost by Plaintiffs and the Class would be a dollar gained by Morgan Stanley; (iv) the fact that the Synthetic CDOs were designed to fail, and thereby redound to Morgan Stanley's benefit; and (v) the fact that this was Defendants' common scheme all along.

329.    The Defendants made these false and misleading representations and omissions in the Offering Documents knowingly, recklessly, without regard for their truth or falsity, and with the intent to induce Plaintiffs and the Class to rely upon them by investing in the Pinnacle Notes.

330.    Plaintiffs and the Class reasonably relied on the Defendants' materially misleading statements and omissions as they went to the core of Plaintiffs and the Class' investment decision regarding the Pinnacle Notes – namely, the attendant amount and nature of risk associated with the Pinnacle Notes and the determination of whether the respective rates of return associated with the Pinnacle Notes adequately compensated investors for such risks.

331.    Plaintiffs and the Class had no knowledge of and no way to know that the Synthetic CDOs serving as Pinnacle's Underlying Assets had been built by Morgan Stanley to increase the risk of loss and ultimately to fail, and once failing, to effect the transfer of $138.7 million of Plaintiffs and the Class' principal to Morgan Stanley.  Plaintiffs and the Class believed in and relied upon Morgan Stanley's good faith because of its roles as creator of the Pinnacle Notes and as selector of the Underlying Assets into which the principal raised by the Pinnacle Notes would be reinvested.

332.    As a direct and proximate result of Plaintiffs and the Class' reliance upon the false representations and omissions of the Defendants, Plaintiffs and the Class have suffered substantial damages.

**Second Claim for Relief**
**Aiding and Abetting Fraud**
**(Against All Defendants)**

333.    The foregoing paragraphs are realleged herein.

334.    This Count is asserted in the alternative to the First Claim against all Defendants.

335.    Each Defendant had actual knowledge of and substantially assisted in the fraudulent scheme and acts perpetrated by its fellow Defendants.

336.    Each Defendant knew that the other Defendants, in the Offering Documents, intentionally and materially misrepresented to Plaintiffs and the Class that the Pinnacle Notes constituted a safe, conservative investment, and that the purpose of the Underlying Assets–into which the principal raised by the Pinnacle Notes would be reinvested–was principal preservation.

337.    Each Defendant substantially assisted the other Defendants in perpetrating the fraud by concealing in the Offering Documents: (i) the fact that Defendants, pursuant to a non-arm's-length transaction, was going to reinvest the funds raised by Plaintiffs and the Class'

purchase of Pinnacle Notes into Synthetic CDOs Defendants created, and in which they held interests directly opposite to those of Plaintiffs and the Class; (ii) the fact that Defendants maximized the amount of risk in the Underlying Assets, such that the Synthetic CDOs, and not the FTD baskets, were the primary risk component, and did so in order to siphon off the increased spread as profit; (iii) the structure and mechanics of the Synthetic CDOs, including the fact that the Synthetic CDOs had been structured such that each dollar lost by Plaintiffs and the Class would be a dollar gained by Defendants; (iv) the fact that the Synthetic CDOs were designed to fail, and thereby redound to Defendants' benefit; and (v) the fact that this was Defendants' common scheme all along.

338.   Each Defendant could not have perpetrated this fraud without substantial assistance from its fellow Defendants.

339.   As a direct and natural result of (a) Defendants' fraudulent scheme, and (b) each Defendant's aiding and abetting its fellow Defendants in that fraudulent scheme, Plaintiffs and the Class have suffered substantial damages.

**Third Claim for Relief**
**Fraudulent Inducement**
**(Against All Defendants)**

340.   The foregoing paragraphs are realleged herein.

341.   This Count is against all Defendants.

342.   Defendants knew at the time that they made, directly or through their control of co-defendants, materially false and misleading representations and omissions in the Offering Documents concerning the Pinnacle Notes and the Synthetic CDOs serving as Pinnacle's Underlying Assets that such representations were untrue.

113

343.     Pinnacle and MS Singapore, as issuer and arranger of the Pinnacle notes respectively, knew at the time that they made and warranted materially false and misleading representations and omissions in the Offering Documents concerning the Pinnacle Notes and the Synthetic CDOs serving as Pinnacle's Underlying Assets that such representations were untrue. MS International, MS Capital, and MS&Co., as the drafters and creators of the Offering Documents, similarly knew such representations and omissions were untrue.  Morgan Stanley, directly and through its control of the co-defendants also knew that such representations and omissions were untrue.

344.     The Defendants acted with the intent to deceive and mislead the Plaintiffs and the Class to induce them to invest in the Pinnacle Notes, and to obtain and fraudulently misappropriate their principal into Synthetic CDOs that Morgan Stanley designed to intensify the risk of loss and ultimately to fail.

345.     The Defendants structured these Synthetic CDOs such that each dollar lost by Plaintiffs and the Class would be a dollar gained by Morgan Stanley.

346.     Plaintiffs and the Class relied on the information the Defendants provided in the Offering Documents in making the decision to invest in the Pinnacle Notes.

347.     As a direct and proximate result of Plaintiffs' and the Class' reliance upon the false representations and omissions of the Defendants, Plaintiffs and the Class have suffered damages.

**Fourth Claim for Relief**
**Aiding and Abetting Fraudulent Inducement**
**(Against All Defendants)**

348.     The foregoing paragraphs are realleged herein.

349.     This Count is asserted in the alternative to the allegations of the Third Claim against all Defendants.

350.     Each Defendant had actual knowledge of and substantially assisted in the acts of fraudulent inducement committed by its fellow Defendants.

351.     Each Defendant was aware that its fellow Defendants made materially false and misleading representations and omissions in the Offering Documents concerning the Pinnacle Notes and the Synthetic CDOs serving as Pinnacle's Underlying Assets.

352.     Defendants assisted one another to deceive and mislead the Plaintiffs and the Class to induce them to invest in the Pinnacle Notes, and to obtain and fraudulently misappropriate their principal into Synthetic CDOs that Defendants designed to fail.

353.     Defendants structured these Synthetic CDOs such that each dollar lost by Plaintiffs and the Class would be a dollar gained by Defendants.

354.     Each Defendant could not have engaged in fraudulent inducement without substantial assistance from its fellow Defendants.

355.     As a direct and natural result of (a) each Defendants' fraudulent inducement, and (b) each Defendants' aiding and abetting its fellow Defendants' fraudulent inducement, Plaintiffs and the Class have suffered substantial damages.

**Fifth Claim for**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against all Defendants Except MS&Co.)**

356.     The foregoing paragraphs are realleged herein.

357.     This Count is asserted against all Defendants except MS&Co.

358.     The relationship among the Pinnacle Note investors and Pinnacle as the "Issuer," MS International as "Determination Agent," and MS Capital as "Swap Counterparty," included

115

an implied covenant of good faith and fair dealing.  A breach of the covenant of good faith and fair dealing may occur even without violating an express term of a contract.  Implied in the agreement among the parties was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of that agreement.

359.   Pinnacle failed to perform its obligations in good faith by failing to disclose that it was gathering monies from Plaintiffs and the Class in order to ferry that sum to fund Morgan Stanley's rigged bets on products that were designed to (i) intensify the risk of loss, (ii) fail, and (iii) in failing, redound to Defendants' benefit.

360.   MS International failed to perform its obligations in good faith by knowingly and intentionally (i) selecting Synthetic CDOs that were designed to increase the risk of loss and fail, and in failing redound to Defendants' benefit, and (ii) providing false indicative bids in its capacity as Market Agent.

361.   MS Capital failed to perform its obligations in good faith by (i) making itself the adverse Swap Counterparty with respect to the Underlying Assets, (ii) failing to disclose that arrangement to the Pinnacle Notes investors, (iii) abusing that secret arrangement to create and structure the Underlying Asset to increase the risk of loss and to fail in order to unfairly benefit Defendants at Plaintiffs' expense, and (iv) abusing its position as Calculation Agent to manipulate the dealer bids it received when any of the single name CDS in the MS ACES portfolios suffered a credit event, in order to increase the loss amount and thereby increase the chance the Attachment Point for the CDOs would be breached.

362.   MS Capital further failed to perform its obligation in good faith when it abused its ability as Swap Counterparty to the Pinnacle Notes to approve Defendants' investment of Plaintiffs' principal into the rigged Underlying Assets that MS Capital created and for which it

116

assumed an adversarial short position. MS Capital approved the Synthetic CDOs for use as the Underlying Assets, not for the purposes of principal preservation – the fundamental function of Underlying Assets – but because they were designed to fail and to transfer Plaintiffs' principal to Defendants.

363.    Morgan Stanley breached the covenant of good faith and fair dealing by virtue of the acts of, and its control over, its alter-egos MS Capital, MS International, and Pinnacle.

364.    Because of Defendants' knowing, intentional, and bad faith violations of the implied covenant of good faith and fair dealing, Plaintiffs and the Class have suffered substantial damages.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

365.    Determining that the instant action is certifiable as a class action under Rule 23 of the Federal Rules of Civil Procedure;

366.    Determining that Defendants engaged in fraud, and that the adequate relief for such conduct is rescission and/or other compensatory damages (including interest thereon);

367.    Determining that Defendants aided and abetted each other in perpetrating the fraud, and that the adequate relief for such conduct is rescission and/or other compensatory damages (including interest thereon);

368.    Determining that Defendants fraudulently induced Plaintiffs and the Class to invest in the Pinnacle Notes, and that the adequate relief for such conduct is rescission and/or other compensatory damages (including interest thereon);

117

369.    Determining that Defendants aided and abetted each other in perpetrating the fraudulent inducement, and that the adequate relief for such conduct is rescission and/or other compensatory damages (including interest thereon);

370.    Determining that Defendants breached the implied covenant of good faith and fair dealing, and that the adequate relief for such conduct is rescission and/or other compensatory damages (including interest thereon);

371.    Awarding punitive damages for each claim to the maximum extent allowable under the law because of the outrageous nature of Defendants' willful and wanton disregard of Plaintiffs' and the Class' rights;

372.    Awarding Plaintiffs' counsel reasonable attorneys' fees and costs; and

373.    Granting such other relief as the Court may deem just and proper.

## IX.
## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: January 22, 2014

**KIRBY McINERNEY LLP**

By:   *(signature)*
Daniel Hume
Andrew M. McNeela
Christopher Studebaker
Meghan J. Summers
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: dhume@kmllp.com

*Plaintiffs' Counsel*

118

# Appendix A

# Underlying Asset for Pinnacle Notes, Series 1
## Morgan Stanley ACES SPC Series 2006-28, Class II



**CDO Reference Entity Portfolio**

**Bespoke Single Tranche of Risk from that Portfolio**

**Concrete Risk Proposition**

Credit Default Swap Referencing 100 Equally-Weighted Corporate Securities … Including Fannie Mae, Freddie Mac, Idearc, Syncora Guarantee, Glitnir, Landsbanki, Kaupthing

The $9.4 million bespoke single tranche Synthetic CDO tranche that Morgan Stanley (1) constructed, (2) bet against, and (3) sold to Pinnacle using Pinnacle Notes investors' principal.

**Attachment Point:** Begins to take losses when defaults among the 100 underlying reference entities cause aggregate portfolio losses to reach 4.15%

**Detachment Point:** Ends taking losses (because written down to $0) when aggregate losses reach 4.90%

**Explanation:** A default among the 100 reference entities will produce a loss. Assume that loss is 50% (actual losses were substantially higher). If two reference entities default, aggregate portfolio losses reach 1%. By the time eight reference entities default, aggregate portfolio losses reach 4.00% -- the threshold at which the particular tranche at issue here starts incurring writedowns (i.e., 4.15%). *Two further defaults bring aggregate losses down to 5.00% -- resulting in near-100% writedown of the CDO tranche.*

**Conclusion:** The tranche's "low-ness" means that it will start taking losses after a relatively small number of defaults. The tranche's "thin-ness" (0.75%) means that it will quickly flip from 100% principal return to 100% loss.

4.90%

4.15%

# Underlying Asset for Pinnacle Notes, Series 2
## Morgan Stanley ACES SPC Series 2006-32, Class II



**CDO Reference Entity Portfolio**

Credit Default Swap Referencing 100 Equally-Weighted Corporate Securities … Including Fannie Mae, Freddie Mac, Syncora Guarantee, Thomson, Landsbanki, Kaupthing

**Bespoke Single Tranche of Risk from that Portfolio**

5.05%

4.30%

**Concrete Risk Proposition**

The $16.9 million bespoke single tranche Synthetic CDO tranche that Morgan Stanley (1) constructed, (2) bet against, and (3) sold to Pinnacle using Pinnacle Notes investors' principal.

**Attachment Point:** Begins to take losses when defaults among the 100 underlying reference entities cause aggregate portfolio losses to reach 4.30%

**Detachment Point:** Ends taking losses (because written down to $0) when aggregate losses reach 5.05%

**Explanation:** A default among the 100 reference entities will produce a loss. Assume that loss is 50% (actual losses were substantially higher). If two reference entities default, aggregate portfolio losses reach 1%. By the time eight reference entities default, aggregate portfolio losses reach 4.00% -- the threshold at which the particular tranche at issue here starts incurring writedowns (i.e., 4.30%). *Two further defaults bring aggregate losses down to 5.00% -- resulting in near-100% writedown of the CDO tranche.*

**Conclusion:** The tranche's "low-ness" means that it will start taking losses after a relatively small number of defaults. The tranche's "thin-ness" (0.75%) means that it will quickly flip from 100% principal return to 100% loss.

# Underlying Asset for Pinnacle Notes, Series 3
## Morgan Stanley ACES SPC Series 2007-5



**CDO Reference Entity Portfolio**

**Bespoke Single Tranche of Risk from that Portfolio**

**Concrete Risk Proposition**

Credit Default Swap Referencing 121 Equally-Weighted Corporate Securities … Including Fannie Mae, Freddie Mac, Glitnir, Syncora Guarantee, CIT Group, Thomson, Bowater, Abitibi, Chemtura, Landsbanki, Kaupthing

6.95%

6.20%

The $24.6 million bespoke single tranche Synthetic CDO tranche that Morgan Stanley (1) constructed, (2) bet against, and (3) sold to Pinnacle using Pinnacle Notes investors' principal.

**Attachment Point:** Begins to take losses when defaults among the 121 underlying reference entities cause aggregate portfolio losses to reach 6.20%

**Detachment Point:** Ends taking losses (because written down to $0) when aggregate losses reach 6.95%

**Explanation:** A default among the 121 reference entities will produce a loss. Assume that loss is 50% (actual losses were substantially higher). If two reference entities default, aggregate portfolio losses reach 1%. By the time twelve reference entities default, aggregate portfolio losses reach 6.00% -- the threshold at which the particular tranche at issue here starts incurring writedowns (i.e., 6.20%). *Two further defaults bring aggregate losses down to 7.00% -- resulting in near-100% writedown of the CDO tranche.*

**Conclusion:** The tranche's "low-ness" means that it will start taking losses after a relatively small number of defaults. The tranche's "thin-ness" (0.75%) means that it will quickly flip from 100% principal return to 100% loss.

A-3

# Underlying Asset for Pinnacle Notes, Series 6 and 7
## Morgan Stanley ACES SPC Series 2007-26



**CDO Reference Entity Portfolio**

Credit Default Swap Referencing 125 Equally-Weighted Corporate Securities
…
Including Fannie Mae, Freddie Mac, Syncora Guarantee, Washington Mutual, Inc., CIT Group, Ambac Assurance Corp., AIFUL Corp., Lehman Brothers Holdings, Inc., Glitnir, Kaupthing

**Bespoke Single Tranche of Risk from that Portfolio**

5.35%
4.60%

**Concrete Risk Proposition**

The $69.9 million bespoke single tranche Synthetic CDO tranche that Morgan Stanley (1) constructed, (2) bet against, and (3) sold to Pinnacle using Pinnacle Notes investors' principal.

**Attachment Point:** Begins to take losses when defaults among the 125 underlying reference entities cause aggregate portfolio losses to reach 4.60%

**Detachment Point:** Ends taking losses (because written down to $0) when aggregate losses reach 5.35%

**Explanation:** A default among the 125 reference entities will produce a loss. Assume that loss is 50% (actual losses were substantially higher). If two reference entities default, aggregate portfolio losses reach 1%. By the time nine reference entities default, aggregate portfolio losses reach 4.50% -- the threshold at which the particular tranche at issue here starts incurring writedowns (i.e., 4.60%). *Two further defaults bring aggregate losses down to 5.50% -- resulting in near-100% writedown of the CDO tranche.*

**Conclusion:** The tranche's "low-ness" means that it will start taking losses after a relatively small number of defaults. The tranche's "thin-ness" (0.75%) means that it will quickly flip from 100% principal return to 100% loss.

# Underlying Asset for Pinnacle Notes, Series 9 and 10
## Morgan Stanley ACES SPC Series 2007-41



**CDO Reference Entity Portfolio**

Credit Default Swap Referencing 100 Equally-Weighted Corporate Securities … Including Fannie Mae, Freddie Mac, Lehman Brothers Holdings, Inc., Landsbanki, Kaupthing

**Bespoke Single Tranche of Risk from that Portfolio**

3.67%

2.67%

**Concrete Risk Proposition**

The $17.9 million bespoke single tranche Synthetic CDO tranche that Morgan Stanley (1) constructed, (2) bet against, and (3) sold to Pinnacle using Pinnacle Notes investors' principal.

**Attachment Point:** Begins to take losses when defaults among the 100 underlying reference entities cause aggregate portfolio losses to reach 2.67%

**Detachment Point:** Ends taking losses (because written down to $0) when aggregate losses reach 3.67%

**Explanation:** A default among the 100 reference entities will produce a loss. Assume that loss is 50% (actual losses were substantially higher). If two reference entities default, aggregate portfolio losses reach 1%. By the time five reference entities default, aggregate portfolio losses reach 2.55% -- the threshold at which the particular tranche at issue here starts incurring writedowns (i.e., 2.67%). *Two further defaults bring aggregate losses down to 3.5% -- resulting in near-100% writedown of the CDO tranche.*

**Conclusion:** The tranche's "low-ness" means that it will start taking losses after a relatively small number of defaults. The tranche's "thin-ness" (1.00%) means that it will quickly flip from 100% principal return to 100% loss.

A-5

# Appendix B

# Reference Portfolio
# Morgan Stanley ACES 2006-28
# Underlying Asset for Pinnacle Notes, Series 1

**Reference Entity**
**(Lavender Indicates Default)**                    **Classification**

| # | Reference Entity | Classification |
|---|---|---|
| 1 | Banco Santander | Financial - Commercial Banks |
| 2 | Barclays Bank plc | Financial - Commercial Banks |
| 3 | Citigroup | Financial - Commercial Banks |
| 4 | Glitnir banki hf | Financial - Commercial Banks |
| 5 | JSC Vnestorgbank | Financial - Commercial Banks |
| 6 | Kaupthing banki hf | Financial - Commercial Banks |
| 7 | Landsbanki Islands hf | Financial - Commercial Banks |
| 8 | Lloyds TSB Bank plc | Financial - Commercial Banks |
| 9 | Sberbank | Financial - Commercial Banks |
| 10 | The Governor and the Company of the Bank of Scotland | Financial - Commercial Banks |
| 11 | The Royal Bank of Scotland plc | Financial - Commercial Banks |
| 12 | Federal Home Loan Mortgage Corp. | Financial - Federal Credit Agencies |
| 13 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 14 | Aiful Corp. | Financial - Mortgage Bankers & Loan Correspondents |
| 15 | Countrywide Home Loans | Financial - Mortgage Bankers & Loan Correspondents |
| 16 | Block Financial Corp. | Financial - Personal Services |
| 17 | Merrill Lynch & Co. Inc. | Financial - Security Brokers, Dealers & Flotation |
| 18 | The Bear Stearns Companies Inc. | Financial - Security Brokers, Dealers & Flotation |
| 19 | Berkshire Hathaway | Insurance - Fire, Marine & Casualty Insurance |
| 20 | Aegon N.V. | Insurance - Life Insurance |
| 21 | Axa | Insurance - Life Insurance |
| 22 | Prudential plc | Insurance - Life Insurance |
| 23 | Muenchener Rueckversicherungs AG | Insurance - Mass Risk Reinsurance |
| 24 | Ambac Assurance Corp. | Insurance - Monoline |
| 25 | Financial Security Assurance Inc. | Insurance - Monoline |
| 26 | MBIA Inc. | Insurance - Monoline |
| 27 | MBIA Insurance Corp. | Insurance - Monoline |
| 28 | XL Capital Assurance Inc. (Syncora) | Insurance - Monoline |
| 29 | Swiss Reinsurance Corp. | Insurance - Property and Casualty Reinsurance |
| 30 | Zurich Insurance Company | Insurance - Short-Term Insurance |
| 31 | MGIC Investment Corp. | Insurance - Surety & Title Insurance |
| 32 | Radian Group Inc. | Insurance - Surety & Title Insurance |
| 33 | The PMI Group Inc. | Insurance - Surety & Title Insurance |
| 34 | Assicurazioni Generali | Insurance - Agents, Brokers & Services |
| 35 | Centex Corp. | Operative Builders |
| 36 | D.R. Horton Inc. | Operative Builders |
| 37 | Lennar Corp. | Operative Builders |
| 38 | MDC Holdings | Operative Builders |
| 39 | Pulte Homes Inc. | Operative Builders |
| 40 | The Ryland Group Inc. | Operative Builders |
| 41 | Toll Brothers Inc. | Operative Builders |
| 42 | Louisiana Pacific Corp. | Lumber & Wood Production |

**Legend**

- Default
- Finance
- Insurance
- REITs
- Homebuilder
- Home-Other

# Reference Portfolio
## Morgan Stanley ACES 2006-28
## Underlying Asset for Pinnacle Notes, Series 1

| 43 | Rentokil Initial plc | Business Support Services |
|---|---|---|
| 44 | The Sherwin Williams Co. | Retail - Building Materials |
| 45 | Wolters Kluwer NV | Business & Tax Services |
| 46 | PHH Corp. | Business Credit Services |
| 47 | GKN Holdings plc | Business Services |
| 48 | R.R. Donnelly & Sons Co. | Business Services |
| 49 | ITV plc | Cable & Pay Television |
| 50 | Ciba Specialty Chemicals Holding | Chemicals - Major Diversified |
| 51 | Clariant AG | Chemicals - Major Diversified |
| 52 | Eastman Chemical Co. | Chemicals - Major Diversified |
| 53 | Lanxess AG | Chemicals - Major Diversified |
| 54 | Olin Corp. | Chemicals - Major Diversified |
| 55 | Portugal Telecom Int'l Finance BV | Commercial Investment Trust |
| 56 | Johnson & Johnson | Drug Manufacturers - Major |
| 57 | Pfizer Inc. | Drug Manufacturers - Major |
| 58 | TXU Energy Company LLC | Electric Services |
| 59 | Tyco Int'l Ltd. | Electronic Connectors |
| 60 | Nestle SA | Food Products |
| 61 | Republic of South Africa | Foreign Governments |
| 62 | Russian Federation | Foreign Governments |
| 63 | United Mexican States | Foreign Governments |
| 64 | Fortune Brands Inc. | Heating Equipment |
| 65 | Thomson | Household Audio/Video |
| 66 | Computer Sciences Corp. | IT Services |
| 67 | Glencore Int'l AG | Mineral/Agricultural/Energy Commodities Trading |
| 68 | Amcor Ltd. | Misc. Manufacturing Industry |
| 69 | Valeo | Motor Vehicle Parts & Accessories |
| 70 | Aktiebolaget Volvo | Motor Vehicles |
| 71 | Gaz de France | Natural Gas Distribution |
| 72 | Kinder Morgan Energy Partners, L.P. | Natural Gas Distribution |
| 73 | Kinder Morgan Inc. | Natural Gas Distribution |
| 74 | ONEOK Inc. | Natural Gas Distribution |
| 75 | Centrica plc | Oil & Gas Production and Supply |
| 76 | Gannett Co. | Publishing - Newspapers |
| 77 | Clear Channel Communications | Radio Broadcasting |
| 78 | Alltel Corp. | Radio Telephone Communications |
| 79 | Deutsche Telekom AG | Radio Telephone Communications |
| 80 | Darden Restaurants Inc. | Restaurants |
| 81 | Autozone | Retail - Auto & Home Stores |
| 82 | Safeway Inc. | Retail - Grocery Stores |
| 83 | InterActive Corp. | Retail - Retail Stores |
| 84 | Coles Myer Ltd. | Retail - Variety Stores |
| 85 | Limited Brands, Inc. | Retail - Women's Clothing |
| 86 | The Gap Inc. | Retail - Apparel Stores |
| 87 | ThyssenKrupp AG | Steel & Technology Production |
| 88 | CenturyTel | Telephone Communications |
| 89 | Koninklijke KPM NV | Telephone Communications |
| 90 | Telstra Corp. Ltd. | Telephone Communications |

# Reference Portfolio
# Morgan Stanley ACES 2006-28
# Underlying Asset for Pinnacle Notes, Series 1

| | | |
|---|---|---|
| 91 | Verizon Communications Inc. (Idearc) | Telephone Communications |
| 92 | Belo Corp. | Television Broadcasting |
| 93 | CBS Corp. | Television Broadcasting |
| 94 | Liz Claiborne Inc. | Textile - Apparel Clothing |
| 95 | Hasbro Inc. | Toys & Games |
| 96 | Mattel Inc. | Toys & Games |
| 97 | BAA plc | Transportation Development |
| 98 | Sabre Holdings Corp. | Transportation Services |
| 99 | Con-way Inc. | Trucking |
| 100 | Amerisource Bergen | Wholesale Drugs |

# Reference Portfolio
# Morgan Stanley ACES 2006-32
# Underlying Asset for Pinnacle Notes Series 2

| | Reference Entity (Lavender Indicates Default) | Classification |
|---|---|---|
| 1 | Banco Santander | Financial - Commercial Banks |
| 2 | Citigroup, Inc. | Financial - Commercial Banks |
| 3 | Commonwealth Bank of Australia | Financial - Commercial Banks |
| 4 | Kaupthing banki hf | Financial - Commercial Banks |
| 5 | Landsbanki Islands hf | Financial - Commercial Banks |
| 6 | National Australia Bank Ltd. | Financial - Commercial Banks |
| 7 | Sberbank | Financial - Commercial Banks |
| 8 | The Governor and the Company of the Bank of Scotland | Financial - Commercial Banks |
| 9 | Wells Fargo & Company | Financial - Commercial Banks |
| 10 | Federal Home Loan Mortgage Corp. | Financial - Federal Credit Agencies |
| 11 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 12 | Man Group plc | Financial - Investment Management |
| 13 | Countrywide Home Loans, Inc. | Financial - Mortgage Bankers & Loan Correspondents |
| 14 | Block Financial Corp. | Financial - Personal Services |
| 15 | The Goldman Sachs Group Inc. | Financial - Security Brokers, Dealers, & Flotation |
| 16 | Berkshire Hathaway Inc. | Insurance - Fire, Marine & Casualty |
| 17 | Marsh & McLennan Companies Inc. | Insurance - Agents, Brokers & Services |
| 18 | Muenchener Rueckversicherungs AG | Insurance - Mass Risk Reinsurance |
| 19 | Ambac Financial Group Inc. | Insurance - Monoline |
| 20 | Financial Security Assurance Inc. | Insurance - Monoline |
| 21 | XL Capital Assurance Inc. (Syncora) | Insurance - Monoline |
| 22 | MGIC Investment Corp. | Insurance - Surety & Title Insurance |
| 23 | The PMI Group Inc. | Insurance - Surety & Title Insurance |
| 24 | Centex Corp. | Operative Builders |
| 25 | D.R. Horton Inc. | Operative Builders |
| 26 | Lennar Corp. | Operative Builders |
| 27 | MDC Holdings Inc. | Operative Builders |
| 28 | Pulte Homes Inc. | Operative Builders |
| 29 | The Ryland Group Inc. | Operative Builders |
| 30 | Toll Brothers Inc. | Operative Builders |
| 31 | Health Care Property Investors Inc. | Real Estate Investment Trusts |
| 32 | Unibail Holding | Real Estate Investment Trusts |
| 33 | Rentokil Initial plc | Business Support Services |
| 34 | Rinker Group Ltd. | Concrete Products |
| 35 | Louisiana Pacific Corp. | Lumber & Wood Production |
| 36 | Weyerhauser Co. | Lumber & Wood Production |
| 37 | Norbord Inc. | Lumber & Wood Products |
| 38 | The Home Depot Inc. | Retail - Building Materials |
| 39 | The Sherwin Williams Co. | Retail - Building Materials |
| 40 | Masco Corp. | Structural Wood Products |
| 41 | GKN Holdings plc | Business Services |
| 42 | R.R. Donnelly & Sons Co. | Business Services |
| 43 | ITV plc | Cable & Pay Television |

**Legend**

- Default
- Finance
- Insurance
- REITs
- Homebuilder
- Home-Other

# Reference Portfolio
# Morgan Stanley ACES 2006-32
# Underlying Asset for Pinnacle Notes Series 2

| 44 | Viacom Inc. | Cable & Pay Television |
|---|---|---|
| 45 | Lanxess AG | Chemicals - Major Diversified |
| 46 | Olin Corp. | Chemicals - Major Diversified |
| 47 | Portugal Telecom Int'l Finance BV | Commercial Investment Trust |
| 48 | GE Capital Corp. | Commercial Leasing & Finance Services |
| 49 | Telecom Italia SPA | Communication Services |
| 50 | Kimberly Clark Corp. | Converted Paper Products |
| 51 | Nabors Industries Inc. | Drilling Oil & Gas Wells |
| 52 | Electricite de France | Electric Services |
| 53 | TXU Energy Company LLC | Electric Services |
| 54 | Tyco Int'l Ltd. | Electronic Connectors |
| 55 | Sara Lee Corp. | Food Products |
| 56 | Tyson Foods Inc. | Food Products |
| 57 | Republic of South Africa | Foreign Governments |
| 58 | Russian Federation | Foreign Governments |
| 59 | Fortune Brands Inc. | Heating Equipment |
| 60 | Starwood Hotels | Hotels & Motels |
| 61 | Thomson | Household Audio/Video |
| 62 | Computer Sciences Corp. | IT Services |
| 63 | Brunswick Corp. | Leisure Products |
| 64 | Anheuser-Busch Companies Inc. | Malt Beverages |
| 65 | Boston Scientific Corp. | Medical Instruments |
| 66 | Universal Health Services Inc. | Medical/Hospital Services |
| 67 | The Black & Decker Corp. | Metalworking Machinery/Equipment |
| 68 | Glencore Int'l AG | Mineral/Agricultural/Energy Commodities Trading |
| 69 | Valeo | Motor Vehicle Parts |
| 70 | Continental AG | Motor Vehicle Safety Products |
| 71 | DaimlerChrysler AG | Motor Vehicles |
| 72 | Kinder Morgan Inc. | Natural Gas Distribution |
| 73 | ONEOK Inc. | Natural Gas Distribution |
| 74 | JSC Gazprom | Oil & Gas Development & Refining |
| 75 | Johnson Controls Inc. | Public Building and Related Furniture |
| 76 | Gannett Co. Inc. | Publishing - Newspapers |
| 77 | The New York Times Co. | Publishing - Newspapers |
| 78 | Alltel Corp. | Radio Telephone Communications |
| 79 | Deutsche Telekom AG | Radio Telephone Communications |
| 80 | Teliasonera Aktiebolag | Radio Telephone Communications |
| 81 | Next plc | Retail - Clothing & Home Products |
| 82 | The Gap Inc. | Retail - Clothing Stores |
| 83 | Federated Department Stores | Retail - Department Stores |
| 84 | IAC/InterActive Corp. | Retail - Retail Stores |
| 85 | Limited Brands, Inc. | Retail - Women's Clothing |
| 86 | Phelps Dodge Corp. | Smelting/Refining Metals |
| 87 | AT&T Inc. | Telephone Communications |
| 88 | Bellsouth Corp. | Telephone Communications |
| 89 | CenturyTel Inc. | Telephone Communications |
| 90 | France Telecom | Telephone Communications |
| 91 | Koninklijke KPM NV | Telephone Communications |
| 92 | Sprint Nextel Corp. | Telephone Communications |

# Reference Portfolio
## Morgan Stanley ACES 2006-32
## Underlying Asset for Pinnacle Notes Series 2

| 93 | Vivendi | Telephone Communications |
|---|---|---|
| 94 | Belo Corp. | Television Broadcasting |
| 95 | CBS Corp. | Television Broadcasting |
| 96 | Liz Claiborne Inc. | Textile - Apparel Clothing |
| 97 | BAA plc | Transportation Development |
| 98 | Expedia Inc. | Transportation Services |
| 99 | Sabre Holdings Corp. | Transportation Services |
| 100 | Amerisource Bergen Corp. | Wholesale Drugs |

# Reference Portfolio
# Morgan Stanley ACES 2007-5
# Underlying Asset for Pinnacle Notes Series 3

**Reference Entity**
**(Lavender Indicates Default)**          **Classification**

| # | Reference Entity | Classification |
|---|---|---|
| 1 | Barclays Bank plc | Financial - Commercial Banks |
| 2 | Citigroup Inc. | Financial - Commercial Banks |
| 3 | Dexia Credit Local | Financial - Commercial Banks |
| 4 | Glitnir banki hf | Financial - Commercial Banks |
| 5 | Kaupthing banki hf | Financial - Commercial Banks |
| 6 | Landsbanki Islands hf | Financial - Commercial Banks |
| 7 | Sberbank | Financial - Commercial Banks |
| 8 | Federal Home Loan Mortgage Corp. | Financial - Federal Credit Agencies |
| 9 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 10 | CIT Group | Financial - Finance Lessors |
| 11 | Countrywide Home Loans, Inc. | Financial - Mortgage Bankers & Loan Correspondents |
| 12 | Residential Capital LLC | Financial - Mortgage Bankers & Loan Correspondents |
| 13 | Block Financial Corp. | Financial - Personal Services |
| 14 | Merrill Lynch & Co. Inc. | Financial - Security Brokers, Dealers & Flotation |
| 15 | The Goldman Sachs Group Inc. | Financial - Security Brokers, Dealers & Flotation |
| 16 | Berkshire Hathaway | Insurance - Fire, Marine & Casualty |
| 17 | Everest Reinsurance Holdings Inc. | Insurance - Fire, Marine & Casualty |
| 18 | Ambac Assurance Corp. | Insurance - Monoline |
| 19 | Financial Security Assurance Inc. | Insurance - Monoline |
| 20 | MBIA Inc. | Insurance - Monoline |
| 21 | MBIA Insurance Corp. | Insurance - Monoline |
| 22 | XL Capital Assurance Inc. (Syncora) | Insurance - Monoline |
| 23 | MGIC Investment Corp. | Insurance - Surety & Title |
| 24 | Radian Group Inc. | Insurance - Surety & Title |
| 25 | The PMI Group Inc. | Insurance - Surety & Title |
| 26 | Beazer Homes USA Inc. | Operative Builders |
| 27 | Centex Corp. | Operative Builders |
| 28 | K. Hovnanian Enterprises Inc. | Operative Builders |
| 29 | Lennar Corp. | Operative Builders |
| 30 | MDC Holdings Inc. | Operative Builders |
| 31 | Pulte Homes Inc. | Operative Builders |
| 32 | Standard Pacific Corp. | Operative Builders |
| 33 | Toll Brothers Inc. | Operative Builders |
| 34 | Rentokil Initial plc | Business Support Services |
| 35 | Weyerhauser Co. | Lumber & Wood Production |
| 36 | The Home Depot Inc. | Retail - Building Materials |
| 37 | The Sherwin Williams Co. | Retail - Building Materials |
| 38 | Masco Corp. | Structural Wood Products |
| 39 | Qantas Airways Ltd. | Air Transportation |
| 40 | Southwest Airlines Co. | Air Transportation |
| 41 | Ladbrokes plc | Betting & Gambling |
| 42 | R.R. Donnelly & Sons Co. | Business Services |
| 43 | ISS Global A/S | Business Support Services |
| 44 | Viacom Inc. | Cable & Pay Television |
| 45 | Chemtura Corp. | Chemicals - Major Diversified |

**Legend**

- Default
- Finance
- Insurance
- REITs
- Homebuilder
- Home-Other

# Reference Portfolio
## Morgan Stanley ACES 2007-5
## Underlying Asset for Pinnacle Notes Series 3

| | | |
|---|---|---|
| 46 | Lanxess AG | Chemicals - Major Diversified |
| 47 | NOVA Chemical Corp. | Chemicals - Major Diversified |
| 48 | Portugal Telecom Int'l Finance BV | Commercial Investment Trust |
| 49 | GE Capital Corp. | Commercial Leasing & Financial Services |
| 50 | Telecom Italia SPA | Communication Services |
| 51 | Compagnie de Saint Goban | Construction & Packaging Materials |
| 52 | Kimberly Clark Corp. | Converted Paper Products |
| 53 | L'Oreal | Cosmetics |
| 54 | The Stanley Works | Cutlery/Tools/Hardware |
| 55 | Nabors Industries Inc. | Drilling Oil & Gas Wells |
| 56 | Transocean Inc. | Drilling Oil & Gas Wells |
| 57 | Johnson & Johnson | Drug Manufacturers - Major |
| 58 | Novartis AG | Drug Manufacturers - Major |
| 59 | Pfizer Inc. | Drug Manufacturers - Major |
| 60 | Vattenfall Aktiebolag | Electric & Heat Services |
| 61 | TXU Energy Company LLC | Electric Services |
| 62 | RWE AG | Electric, Gas & Water Services |
| 63 | Tyco Int'l Ltd. | Electronic Connectors |
| 64 | Siemens AG | Electronics and Electrical Engineering |
| 65 | Harrah's Operating Co. Inc. | Entertainment - Recreation |
| 66 | Nestle SA | Food Products |
| 67 | Sara Lee Corp. | Food Products |
| 68 | Fortune Brands Inc. | Heating Equipment |
| 69 | Starwood Hotels | Hotels & Motels |
| 70 | Thomson | Household Audio/Video |
| 71 | Ingersoll-Rand Co. | Industrial Machinery/Equipment |
| 72 | First Data Corp. | IT Services |
| 73 | Computer Sciences Corp. | IT Services |
| 74 | Brunswick Corp. | Leisure Products |
| 75 | Boston Scientific Corp. | Medical Instruments |
| 76 | Universal Health Services Inc. | Medical/Hospital Services |
| 77 | The Black & Decker Corp. | Metalworking Machinery/Equipment |
| 78 | ArvinMeritor Inc. | Motor Vehicle Parts & Accessories |
| 79 | Valeo | Motor Vehicle Parts & Accessories |
| 80 | Continental AG | Motor Vehicle Safety Products |
| 81 | DaimlerChrysler AG | Motor Vehicles |
| 82 | Ford Motor Co. | Motor Vehicles |
| 83 | Toyota Motor Corp. | Motor Vehicles |
| 84 | Gaz de France | Natural Gas Distribution |
| 85 | Kinder Morgan Inc. | Natural Gas Distribution |
| 86 | Abitibi Consolidated Inc. | Paper Mills |
| 87 | Bowater Inc. | Paper Mills |
| 88 | Mobil Corp. | Petroleum Refining |
| 89 | E.On AG | Power & Gas Services |
| 90 | Gannett Co. | Publishing - Newspapers |
| 91 | The New York Times Co. | Publishing - Newspapers |
| 92 | Alltel Corp. | Radio Telephone Communications |
| 93 | Deutsche Telekom AG | Radio Telephone Communications |
| 94 | Teliasonera Aktiebolag | Radio Telephone Communications |

# Reference Portfolio
# Morgan Stanley ACES 2007-5
# Underlying Asset for Pinnacle Notes Series 3

| | | |
|---|---|---|
| 95 | Telstra Corp. Ltd. | Radio Telephone Communications |
| 96 | Veolia Environnement | Refuse Systems |
| 97 | Darden Restaurants Inc. | Restaurants |
| 98 | The Gap Inc. | Retail - Clothing Stores |
| 99 | Federated Department Stores | Retail - Department Stores |
| 100 | J.C. Penney Co. Inc. | Retail - Department Stores |
| 101 | Kohl's Corp. | Retail - Department Stores |
| 102 | Radio Shack Corp. | Retail - Electronics |
| 103 | FreeScale Semiconductor | Semiconductors & Related Services |
| 104 | STMicroelectronics NV | Semiconductors & Related Services |
| 105 | Ryder System Inc. | Services - Auto Rental/Leasing |
| 106 | ThyssenKrupp AG | Steel & Technology Production |
| 107 | British Telecom plc | Telephone Communications |
| 108 | CenturyTel | Telephone Communications |
| 109 | France Telecom | Telephone Communications |
| 110 | Koninklijke KPN NV | Telephone Communications |
| 111 | PCCW-HKT Telephone Ltd. | Telephone Communications |
| 112 | Sprint Nextel Corp. | Telephone Communications |
| 113 | Vivendi | Telephone Communications |
| 114 | CBS Corp. | Television Broadcasting |
| 115 | UST Inc. | Tobacco Products |
| 116 | BAA plc | Transportation Development |
| 117 | Expedia Inc. | Transportation Services |
| 118 | Sabre Holdings Corpl | Transportation Services |
| 119 | ProSiebenSat.1 Media AG | TV & Radio Broadcasting |
| 120 | Acom Co. Ltd. | Venture Capital & Loan Correspondents |
| 121 | Amerisource Bergen Corp. | Wholesale Drugs |

# Reference Portfolio
# Morgan Stanley ACES 2007-26
# Underlying Asset for Pinnacle Notes Series 6 and 7

| # | Reference Entity (Lavender Indicates Default) | Classification |
|---|---|---|
| 1 | Glitnir banki hf | Financial - Commercial Banks |
| 2 | JSC "Kazkommertsbank" | Financial - Commercial Banks |
| 3 | JSC VTB Bank | Financial - Commercial Banks |
| 4 | Kaupthing banki hf | Financial - Commercial Banks |
| 5 | Sberbank | Financial - Commercial Banks |
| 6 | Experian Finance plc | Financial - Credit & Investment Research |
| 7 | Federal Home Loan Mortgage Corp. | Financial - Federal Credit Agencies |
| 8 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 9 | Washington Mutual Inc. | Financial - Federal Savings Institution |
| 10 | CIT Group Inc. | Financial - Finance Lessors |
| 11 | GMAC LLC | Financial - Finance Lessors |
| 12 | Aiful Corp. | Financial - Mortgage Bankers & Loan Correspondents |
| 13 | Countrywide Home Loans, Inc. | Financial - Mortgage Bankers & Loan Correspondents |
| 14 | Residential Capital LLC | Financial - Mortgage Bankers & Loan Correspondents |
| 15 | HSBC Finance Corp. | Financial - Personal Credit Institutions |
| 16 | Block Financial Corp. | Financial - Personal Services |
| 17 | Lehman Brothers Holdings Corp. | Financial - Security Brokers, Dealers, & Flotation |
| 18 | Merrill Lynch & Co. Inc. | Financial - Security Brokers, Dealers, & Flotation |
| 19 | The Bear Stearns Companies Inc. | Financial - Security Brokers, Dealers, & Flotation |
| 20 | The Goldman Sachs Group Inc. | Financial - Security Brokers, Dealers, & Flotation |
| 21 | Aon Corp. | Insurance - Agents, Brokers & Services |
| 22 | American Financial Group Inc. | Insurance - Fire, Marine & Casualty |
| 23 | Axis Capital Holdings Ltd. | Insurance - Fire, Marine & Casualty |
| 24 | Ambac Assurance Corp. | Insurance - Monoline |
| 25 | Ambac Financial Group Inc. | Insurance - Monoline |
| 26 | MBIA Insurance Corp. | Insurance - Monoline |
| 27 | XL Capital Assurance Inc. (Syncora) | Insurance - Monoline |
| 28 | XL Capital Ltd. | Insurance - Monoline |
| 29 | MGIC Investment Corp. | Insurance - Surety & Title |
| 30 | Radian Group Inc. | Insurance - Surety & Title |
| 31 | The PMI Group Inc. | Insurance - Surety & Title |
| 32 | Beazer Homes USA Inc. | Operative Builders |
| 33 | Centex Corp. | Operative Builders |
| 34 | D.R. Horton Inc. | Operative Builders |
| 35 | KB Home | Operative Builders |
| 36 | Lennar Corp. | Operative Builders |
| 37 | MDC Holdings Inc. | Operative Builders |
| 38 | Pulte Homes Inc. | Operative Builders |
| 39 | Standard Pacific Corp. | Operative Builders |
| 40 | The Ryland Group Inc. | Operative Builders |
| 41 | Toll Brothers Inc. | Operative Builders |
| 42 | Archstone Smith Operating Trust | Real Estate Investment Trusts |

**Legend**

- Default
- Finance
- Insurance
- REITs
- Homebuilder
- Home-Other

# Reference Portfolio
# Morgan Stanley ACES 2007-26
# Underlying Asset for Pinnacle Notes Series 6 and 7

| | | |
|---|---|---|
| 43 | AvalonBay Communities Inc. | Real Estate Investment Trusts |
| 44 | ERP Operating Limited Partnership | Real Estate Investment Trusts |
| 45 | Health Care Property Investors Inc. | Real Estate Investment Trusts |
| 46 | iStar Financial Inc. | Real Estate Investment Trusts |
| 47 | Kimco Realty Corp. | Real Estate Investment Trusts |
| 48 | Prologis | Real Estate Investment Trusts |
| 49 | Rentokil plc | Business Support Services |
| 50 | CSR Ltd. | Concrete Products |
| 51 | Louisiana Pacific Corp. | Lumber & Wood Production |
| 52 | The Sherwin Williams Co. | Retail - Building Materials |
| 53 | Kingfisher plc | Retail - Home Improvement |
| 54 | Masco Corp. | Structural Wood Products |
| 55 | Qantas Airways Ltd. | Air Transportation |
| 56 | Southwest Airlines Co. | Air Transportation |
| 57 | Ladbrokes plc | Betting & Gambling |
| 58 | The Western Union Co. | Business Services |
| 59 | Tyco Int'l Ltd. | Business Services |
| 60 | R.R. Donnelly & Sons Co. | Business Services |
| 61 | Ciba Specialty Chemicals Holding | Chemicals - Major Diversified |
| 62 | Clariant AG | Chemicals - Major Diversified |
| 63 | Koninklijke DSM NV | Chemicals - Major Diversified |
| 64 | Lanxess AG | Chemicals - Major Diversified |
| 65 | GE Capital Corp. | Commercial Leasing & Financial Services |
| 66 | Telecom Italia SPA | Communication Services |
| 67 | DSG Int'l plc | Converted Paper Products |
| 68 | Alcoa Inc. | Drawing/Extruding Metals |
| 69 | GlobalSantaFe Corp. | Drilling Oil & Gas Wells |
| 70 | Nabors Industries Inc. | Drilling Oil & Gas Wells |
| 71 | Noble Corp. | Drilling Oil & Gas Wells |
| 72 | Exelon Corp. | Electric Services |
| 73 | PPL Energy Supply LLC | Electric Services |
| 74 | Compass Group plc | Food & Entertainment Services |
| 75 | Sara Lee Corp. | Food Products |
| 76 | Kingdom of Thailand | Foreign Governments |
| 77 | Russian Federation | Foreign Governments |
| 78 | Fortune Brands Inc. | Heating Equipment |
| 79 | Starwood Hotels | Hotels & Motels |
| 80 | Wyndham Worldwide Corp. | Hotels & Motels |
| 81 | Ingersoll-Rand Co. | Industrial Machinery/Equipment |
| 82 | First Data Corp. | IT Services |
| 83 | Computer Sciences Corp. | IT Services |
| 84 | Brunswick Corp. | Leisure Products |
| 85 | Universal Health Services Inc. | Medical/Hospital Services |
| 86 | The Black & Decker Corp. | Metalworking Machinery/Equipment |
| 87 | Valeo | Motor Vehicle Parts & Accessories |
| 88 | Continental AG | Motor Vehicle Safety Products |

# Reference Portfolio
# Morgan Stanley ACES 2007-26
# Underlying Asset for Pinnacle Notes Series 6 and 7

| 89  | Reliance Industries Ltd.       | Oil & Gas Production & Refining                      |
|-----|--------------------------------|------------------------------------------------------|
| 90  | GS Caltex Corp.                | Oil Refining & Distribution                          |
| 91  | Pearson plc                    | Publishing - Books                                   |
| 92  | Reed Elsevier plc              | Publishing - Misc.                                   |
| 93  | Gannett Co.                    | Publishing - Newspapers                              |
| 94  | Motorola Inc.                  | Radio & TV Broadcasting & Communications             |
| 95  | Telstra Corp. Ltd.             | Radio Telephone Communications                       |
| 96  | Telus Corp.                    | Radio Telephone Communications                       |
| 97  | Republic Services Inc.         | Refuse Systems                                       |
| 98  | Darden Restaurants Inc.        | Restaurants                                          |
| 99  | The TJX Companies Inc.         | Retail - Clothing Stores                             |
| 100 | Macy's Inc.                    | Retail - Department Stores                           |
| 101 | Medco Health Solutions Inc.    | Retail - Drug Stores                                 |
| 102 | Safeway Ltd.                   | Retail - Grocery Stores                              |
| 103 | J Sainsbury plc                | Retail - Grocery; Investment & Finance Services      |
| 104 | Costco  Wholesale Corp.        | Retail - Variety Stores                              |
| 105 | Alliance Boots plc             | Retail - Wholesale Drugs and Health/Beauty Products  |
| 106 | Limited Brands Inc.            | Retail - Women's Clothing                            |
| 107 | Avis Budget Group Inc.         | Services - Auto Rental/Leasing                       |
| 108 | Ryder System, Inc.             | Services - Auto Rental/Leasing                       |
| 109 | Manor Care Inc.                | Services - Skilled Nursing Care                      |
| 110 | Alcan Inc.                     | Smelting/Refining Metals                             |
| 111 | Commercial Metals Co.          | Steel Works                                          |
| 112 | BCE Inc.                       | Telephone Communications                             |
| 113 | British Telecommunications plc | Telephone Communications                             |
| 114 | CenturyTel Inc.                | Telephone Communications                             |
| 115 | Koninklijke KPN NV             | Telephone Communications                             |
| 116 | PCCW-HKT Telephone Ltd.        | Telephone Communications                             |
| 117 | Sprint Nextel Corp.            | Telephone Communications                             |
| 118 | CBS Corp.                      | Television Broadcasting                              |
| 119 | Jones Apparel Group Inc.       | Textile - Women's Outerwear                          |
| 120 | Altadis SA                     | Tobacco Products                                     |
| 121 | BAA Ltd.                       | Transportation Development                           |
| 122 | Expedia Inc.                   | Transportation Services                              |
| 123 | Con-Way Inc.                   | Trucking                                             |
| 124 | AmerisourceBergen              | Wholesale Drugs                                      |
| 125 | McKesson Corp.                 | Wholesale Drugs                                      |

# Reference Portfolio
# Morgan Stanley ACES 2007-41
# Underlying Asset for Pinnacle Notes Series 9 and 10

| | Reference Entity<br>(Lavender Indicates Default) | Classification |
|---|---|---|
| 1 | Abbey National plc | Financial - Commercial Banks |
| 2 | Banco Santander | Financial - Commercial Banks |
| 3 | Bank of America Corp. | Financial - Commercial Banks |
| 4 | Bank of Scotland plc | Financial - Commercial Banks |
| 5 | Barclays Bank plc | Financial - Commercial Banks |
| 6 | BNP Paribas | Financial - Commercial Banks |
| 7 | China Development Bank | Financial - Commercial Banks |
| 8 | Citigroup Inc. | Financial - Commercial Banks |
| 9 | Deutsche Bank AG | Financial - Commercial Banks |
| 10 | Kaupthing banki hf | Financial - Commercial Banks |
| 11 | Landsbanki Islands hf | Financial - Commercial Banks |
| 12 | The Royal Bank of Scotland plc | Financial - Commercial Banks |
| 13 | UBS AG | Financial - Commercial Banks |
| 14 | Wachovia Corp. | Financial - Commercial Banks |
| 15 | Wells Fargo & Co. Inc. | Financial - Commercial Banks |
| 16 | Federal Home Loan Mortgage Corp. | Financial - Federal Credit Agencies |
| 17 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 18 | Export Import Bank of China | Financial - Federal Development Bank |
| 19 | Korea Development Bank | Financial - Foreign Development Bank |
| 20 | The Export Import Bank of Korea | Financial - Foreign Development Bank |
| 21 | Orix Corp. | Financial - Business Credit Institution |
| 22 | HSBC Finance Corp. | Financial - Personal Credit Institutions |
| 23 | Legal & General Group plc | Financial - Risk, Savings, & Investment Management |
| 24 | Westfield Management Ltd. | Financial - Risk, Savings, & Investment Management |
| 25 | Lehman Brothers Holdings Inc. | Financial - Security Brokers, Dealers & Flotation |
| 26 | Merrill Lynch & Co. | Financial - Security Brokers, Dealers & Flotation |
| 27 | The Bear Stearns Companies, Inc. | Financial - Security Brokers, Dealers & Flotation |
| 28 | The Goldman Sachs Group Inc. | Financial - Security Brokers, Dealers & Flotation |
| 29 | Allianz SE | Insurance - Agents, Brokers & Services |
| 30 | Assicurazioni Generali | Insurance - Agents, Brokers & Services |
| 31 | Berkshire Hathaway | Insurance - Fire, Marine & Casualty |
| 32 | Mitsui Sumitomo Insurance Co. Ltd. | Insurance - Fire, Marine & Casualty |
| 33 | Tokio Marine & Nichido Fire Insurance Co. Ltd. | Insurance - Fire, Marine & Casualty |
| 34 | Aegon NV | Insurance - Life Insurance |
| 35 | AXA | Insurance - Life Insurance |
| 36 | Genworth Financial Inc. | Insurance - Life Insurance |
| 37 | Lincoln National Corp. | Insurance - Life Insurance |
| 38 | Prudential Financial Inc. | Insurance - Life Insurance |
| 39 | Muenchener Rueckversicherungs AG | Insurance - Mass Risk Reinsurance |
| 40 | Financial Security Assurance Inc. | Insurance - Monoline |
| 41 | MBIA Insurance Corp. | Insurance - Monoline |
| 42 | XL Capital Ltd. (Syncora) | Insurance - Monoline |
| 43 | AIG, Inc. | Insurance - Property & Casualty |
| 44 | Swiss Reinsurance Co. | Insurance - Property & Casualty Reinsurance |

**Legend**

| | |
|---|---|
| | **Default** |
| | **Finance** |
| | **Insurance** |
| | **REITs** |
| | **Homebuilder** |
| | **Home-Other** |

# Reference Portfolio
# Morgan Stanley ACES 2007-41
# Underlying Asset for Pinnacle Notes Series 9 and 10

| | | |
|---|---|---|
| 45 | Zurich Insurance Co. | Insurance - Short-Term Insurance |
| 46 | Hannover Rueckversicherungs AG | Insurance - Surety & Title |
| 47 | MGIC Investment Corp. | Insurance - Surety & Title |
| 48 | The PMI Group Inc. | Insurance - Surety & Title |
| | | |
| 49 | Boston Properties Limited Partnership | Real Estate Investment Trusts |
| 50 | ERP Operating Limited Partnership | Real Estate Investment Trusts |
| 51 | Kimco Realty Corp. | Real Estate Investment Trusts |
| 52 | Prologis | Real Estate Investment Trusts |
| 53 | Simon Property Group L.P. | Real Estate Investment Trusts |
| 54 | Vornado Realty L.P. | Real Estate Investment Trusts |
| 55 | Lowe's Companies Inc. | Retail - Building Materials |
| 56 | Cargill Inc. | Agricultural & Risk Management Services |
| 57 | FPL Group Capital Inc. | Agriculture Production - Crops |
| 58 | BASF AG | Chemicals - Major Diversified |
| 59 | GE Capital Corp. | Commercial Leasing & Financial Services |
| 60 | ENI SPA | Crude Petroleum & Natural Gas |
| 61 | Royal Dutch Shell plc | Crude Petroleum & Natural Gas |
| 62 | Total SA | Crude Petroleum & Natural Gas |
| 63 | Abbott Labs | Drug Manufacturers - Major |
| 64 | AstraZeneca plc | Drug Manufacturers - Major |
| 65 | GlaxoSmithKline plc | Drug Manufacturers - Major |
| 66 | Sanofi-Aventis | Drug Manufacturers - Major |
| 67 | Electricite de France | Electric Services |
| 68 | Korea Electric Power Corp. | Electric Services |
| 69 | National Grid plc | Electric Services |
| 70 | SP Power Assets Ltd | Electric Services |
| 71 | Suez | Electric Services |
| 72 | RWE AG | Electric, Gas & Water Services |
| 73 | Medtronic Inc. | Electromedical Supplies |
| 74 | Siemens AG | Electronics & Electrical Engineering |
| 75 | Samsung | Electronics & Machinery |
| 76 | Nestle | Food Products |
| 77 | Republic of Ireland | Foreign Governments |
| 78 | State of Qatar | Foreign Governments |
| 79 | Gas Natural SDG SA | Gas Services |
| 80 | MTR Corp. Ltd. | Local Transit & Highway Passenger Trains |
| 81 | BHP Billiton Ltd | Metal Mining |
| 82 | Anglo American plc | Mining - Major Diversified |
| 83 | BMW AG | Motor Vehicles |
| 84 | Gaz de France | Natural Gas Distribution |
| 85 | Gannett Co. Inc. | Newspapers - Publishing |
| 86 | Centrica plc | Oil & Gas Production & Supply |
| 87 | BP plc | Petroleum Refining |
| 88 | E.On AG | Power & Gas Distribution |
| 89 | SK Telecom Co. Ltd. | Radio Telephone Communications |
| 90 | The TJX Companies Inc. | Retail - Clothing Stores |
| 91 | Colgate-Palmolive Co. | Retail - Perfumes/Cosmetics/Cleaning |
| 92 | Proctor & Gamble | Retail - Perfumes/Cosmetics/Cleaning |

# Reference Portfolio
# Morgan Stanley ACES 2007-41
# Underlying Asset for Pinnacle Notes Series 9 and 10

| | | |
|---|---|---|
| 93 | Target Corp. | Retail - Variety Stores |
| 94 | Wal-Mart Stores Inc. | Retail - Variety Stores |
| 95 | International Lease Finance Corp. | Services - Equipment Rental/Leasing |
| 96 | Temasek Holdings Ltd. | Sovereign Wealth Fund |
| 97 | POSCO | Steel Works |
| 98 | AT&T Inc. | Telephone Communications |
| 99 | UPS Inc. | Trucking & Courier Services |
| 100 | Kelda Group plc | Water & Wastewater Services |

# Reference Portfolio
## CDX.NA.IG.7

| | Reference Entity (Lavender Indicates Default) | Classification |
|---|---|---|
| 1 | Washington Mutual | Financial - Commercial Banks |
| 2 | Wells Fargo | Financial - Commercial Banks |
| 3 | American Express | Financial - Credit Services |
| 4 | Capital One | Financial - Credit Services |
| 5 | Federal Home Loan Mortgage Corp | Financail - Federal Credit Agencies |
| 6 | Federal National Mortgage Association | Financial - Federal Credit Agencies |
| 7 | CIT Group | Financial - Finance Lessors |
| 8 | Countrywide Home Loans | Financial - Mortgage Bankers & Loan Correspondents |
| 9 | Residential Capital Corp | Financial - Mortgage Bankers & Loan Correspondents |
| 10 | EOP Operating Limited P'ship | Financial - Research & Investment Information |
| 11 | Marsh & McLennan | Insurance - Agents, Brokers & Services |
| 12 | Aetna | Insurance - Health |
| 13 | Cigna | Insurance - Health |
| 14 | Metlife | Insurance - Life |
| 15 | Ace Ltd. | Insurance - Property & Casualty |
| 16 | AIG | Insurance - Property & Casualty |
| 17 | Loews | Insurance - Property & Casualty |
| 18 | The Allstate Corp | Insurance - Property & Casualty |
| 19 | The Chubb Corp | Insurance - Property & Casualty |
| 20 | The Hartford Financial Services | Insurance - Property & Casualty |
| 21 | MBIA Insurance Corp | Insurance - Surety & Title |
| 22 | XL Capital | Insurance - Surety & Title |
| 23 | Simon Property Group LP | Real Estate Investment Trust |
| 24 | Centex | Operative Builders |
| 25 | Lennar Corp | Operative Builders |
| 26 | Pulte Homes | Operative Builders |
| 27 | Toll Brothers | Operative Builders |
| 28 | Weyerhauser | Lumber & Wood Production |
| 29 | The Sherwin-Williams Co | Retail - Home Building |
| 30 | News America Inc | Advertising Agencies |
| 31 | Omnicom Group | Advertising Agencies |
| 32 | Goodrich | Aerospace/Defense Products |
| 33 | Honeywell | Aerospace/Defense Products |
| 34 | Lockheed Martin | Aerospace/Defense Products |
| 35 | Northrop Grumman | Aerospace/Defense Products |
| 36 | Raytheon | Aerospace/Defense Products |
| 37 | Southwest Airlines | Air Transportation |
| 38 | Whirlpool | Appliances |
| 39 | Amgen | Biotechnology Products |
| 40 | CBS | Broadcasting - Television |
| 41 | R.R. Donnelly & Sons | Business Services |
| 42 | Clear Channel Comm's | Cable & Pay Television |
| 43 | Comcast | Cable & Pay Television |
| 44 | Cox Comm's | Cable & Pay Television |
| 45 | Embarq | Cable & Pay Television |
| 46 | Time Warner | Cable & Pay Television |
| 47 | E.I du Pont | Chemicals - Major Diversified |

**Legend**

- Default
- Finance
- Insurance
- REITs
- Homebuilder
- Home-Other

# Reference Portfolio
## CDX.NA.IG.7

| | | |
|---|---|---|
| 48 | Eastman Chemical | Chemicals - Major Diversified |
| 49 | Olin Corp | Chemicals - Major Diversified |
| 50 | Rohm and Haas | Chemicals - Major Diversified |
| 51 | The Dow Chemical Co | Chemicals - Major Diversified |
| 52 | General Electric Capital Corp. | Commercial Leasing & Financial Services |
| 53 | International Lease Finance | Commercial Leasing & Financial Services |
| 54 | Boeing Capital | Commercial Leasing & Financial Services |
| 55 | Textron Financial Corp. | Commercial Leasing & Financial Services |
| 56 | Motorola | Communications Equipment |
| 57 | Hewlett-Packard | Diversified Computer Products |
| 58 | IBM | Diversified Computer Products |
| 59 | Ingersoll-Rand | Diversified Machinery |
| 60 | Alcoa | Drawing/Extruding Metals |
| 61 | Transocean | Drilling Oil & Gas |
| 62 | Bristol-Myers Squibb | Drug Manufacturers - Major |
| 63 | Wyeth | Drug Manufacturers - Major |
| 64 | American Electric Power | Electric Services |
| 65 | Constellation Energy | Electric Services |
| 66 | Dominion Resources | Electric Services |
| 67 | Duke Power | Electric Services |
| 68 | FirstEnergy | Electric Services |
| 69 | Progress Energy | Electric Services |
| 70 | Caterpillar | Farm & Construction Machinery |
| 71 | Deere & Co. | Farm & Construction Machinery |
| 72 | Campbell Soup | Food Products |
| 73 | ConAgra Food | Food Products |
| 74 | General Mills | Food Products |
| 75 | Kraft Foods | Food Products |
| 76 | Sara Lee | Food Products |
| 77 | Sempra Energy | Gas Services |
| 78 | Harrah's | General Entertainment (Casinos) |
| 79 | Carnival Corp. | General Entertainment (Cruises) |
| 80 | Marriot | Hotels & Motels |
| 81 | Starwood Hotels | Hotels & Motels |
| 82 | Newell Rubbermaid | Housewares & Accessories |
| 83 | Computer Sciences Corp. | IT Services |
| 84 | National Rural Utilities Coop. Finance Cc | Loan, Credit, & Inv. Services |
| 85 | Baxter Int'l | Medical Instruments |
| 86 | Devon Energy Corp. | Oil & Gas Drilling & Production |
| 87 | Halliburton | Oil & Gas Equipment & Services |
| 88 | Anadarko Petroleum | Oil & Gas Production |
| 89 | Conoco Phillips | Oil & Gas Production & Supply |
| 90 | Valero Energy | Oil & Gas Refining & Distribution |
| 91 | MeadWestvaco | Packaging & Containers |
| 92 | International Paper | Paper & Paper Products |
| 93 | Temple-Inland | Paper & Paper Products |
| 94 | Alltel | Radio Telephone Communications |
| 95 | Cingular Wireless | Radio Telephone Communications |
| 96 | CSX | Railroad Construction/Operation |
| 97 | Norfolk Southern | Railroad Construction/Operation |
| 98 | Union Pacific | Railroad Construction/Operation |

# Reference Portfolio
## CDX.NA.IG.7

| 99 | McDonalds | Restaurants |
|---|---|---|
| 100 | Nordstrom | Retail - Apparel |
| 101 | The Gap | Retail - Apparel |
| 102 | Autozone | Retail - Auto & Home Products |
| 103 | Federated Department Stores | Retail - Department Stores |
| 104 | CVS | Retail - Drug Stores |
| 105 | Radio Shack | Retail - Electronics |
| 106 | Safeway | Retail - Grocery |
| 107 | The Kroger Co. | Retail - Grocery |
| 108 | IAC/Interactive | Retail - Retail Stores |
| 109 | Target | Retail - Variety Store |
| 110 | Walmart Stores | Retail - Variety Store |
| 111 | Arrow Electronics | Retail - Wholesale Electronics |
| 112 | Limited Brands | Retail - Women's Clothing |
| 113 | Alcan | Smelting/Refining Metals |
| 114 | AT&T | Telephone Communications |
| 115 | CenturyTel | Telephone Communications |
| 116 | Sprint Nextel | Telephone Communications |
| 117 | Verizon Communications (Idearc) | Telephone Communications |
| 118 | Jones Apparel Group | Textile - Women's Outerwear |
| 119 | Altria | Tobacco Products |
| 120 | Expedia | Transportation Services |
| 121 | Sabre Holdings | Transportation Services |
| 122 | Burlington Northern | Transportation/Shipping Services |
| 123 | The Walt Disney Co. | TV & Radio Broadcasting & Entertainment |
| 124 | Cardinal Health | Wholesale Drugs |
| 125 | McKesson | Wholesale Drugs |